UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HANNA BOUVENG,

               Plaintiff,

     v.

NYG CAPITAL LLC d/b/a NEW YORK GLOBAL
GROUP, FNL MEDIA LLC, and BENJAMIN
WEY,

               Defendants.

Case No. 14-CV-5474 (PGG)

## **DEFENDANTS' TRIAL MEMORANDUM OF LAW**

DENTONS US LLP
Glenn Colton
Gary Meyerhoff
1221 Avenue of the Americas
New York, New York 10020
Tel.  (212) 768-6700

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

**I.    PLAINTIFF'S RETALIATION CLAIM** ................................................. 4

   **A.    Plaintiff's Salacious Complaints, Extortionate Pre-Suit Demand  Letters, And Press Activities Are Not Protected Activity That Can  Give Rise to a Retaliation Claim Under the NYSHRL and NYCHRL**.................................................................. 4

   **B.    Section 8-107 (7) Retaliation Under The NYCHRL May Need To Be  Restricted As Applied To This Case To Comply With The First Amendment**........................................... 6

**II.   PLAINTIFF'S DEFAMATION CLAIM** ............................................... 8

   **A.    Plaintiff Must Identify The Specific Defamatory Words At Issue To Allow The Court To Determine Which Words Are Legally Actionable** ................................... 8

   **B.    Plaintiff Improperly Sues All Three Defendants For Defamatory Conduct** ............ 11

   **C.    Defendants Have A Defense To Defamation Based On Plaintiff's Use Of Threats And The Tabloid Press To Instigate A Response**.................................................... 15

**III.    PLAINTIFF'S BREACH OF CONTRACT CLAIM** .................................. 18

   **A.    Factual Background**........................................................................ 18

   **B.    The Legal Issues** .......................................................................... 23

**IV.    The Stipulation On The Sexual Harrassment/Discrimination Counts** ...................... 31

**V.   The Need For A Jury Of Ten** ........................................................... 32

**VI.    THE PENDING MOTION TO DISMISS, DEFENSES AND COUNTERCLAIMS** 33

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alesayi Beverage Corp. v. Canada Dry Corp.*,
  797 F. Supp. 320 (S.D.N.Y. 1992)......................................................................29

*Ascentive, LLC v. Opinion Corp.*,
  842 F. Supp. 2d 450 (E.D.N.Y. 2011) ..............................................................13

*Ballew v. Georgia*,
  435 U.S. 223 (1978)..........................................................................................32

*Barton Grp., Inc. v. NCR Corp.*,
  796 F. Supp. 2d 473 (S.D.N.Y. 2011) *aff'd*, 476 F. App'x 275 (2d Cir. 2012)......................25

*Bonanni v. Hearst Communications, Inc.*,
  58 A.D.3d 1091, 872 N.Y.S.2d 221 (3d Dep't 2009)............................................14

*Born v. Monmouth Cnty. Corr. Inst.*,
  458 F. App'x 193, 200 (3d Cir. 2012) ................................................................32

*Chaplinsky v. State of New Hampshire*,
  315 U.S. 568 (1942)............................................................................................7

*Conocophillips v. 261 E. Merrick Rd. Corp.*,
  428 F. Supp. 2d 111 (E.D.N.Y. 2006) ...............................................................23

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975)............................................................................................7

*Croslan v. Hous. Auth. for City of New Britain*,
  974 F. Supp. 161 (D. Conn. 1997).......................................................................9

*Delaware Credit Corp. (U.S.A.) v. Aronoff*,
  No. 92-CV-135S, 1992 WL 170896 (W.D.N.Y. July 10, 1992) ...........................30

*Dickson v. Polly Slezak*,
  73 A.D.3d 1249, 902 N.Y.S.2d 206 (3d Dep't 2010)............................................16

*DiFolco v. MSNBC Cable L.L.C.*,
  831 F. Supp. 2d 634 (S.D.N.Y. 2011)...................................................................7

ii

*Edelstein v. Farber*,
    27 A.D.3d 202,811 N.Y.S.2d 358 (1st Dep't. 2006) ............................................................10

*Erickson v. Pardus*,
    551 U.S. 89, 93 (2007) ..................................................................................................5

*ESPN, Inc. v. Office of Com'r of Baseball*,
    76 F. Supp. 2d 383 (S.D.N.Y. 1999) ..........................................................................25

*Ford v. Cardiovascular Specialists, P.C.*,
    103 A.D.3d 1222, 959 N.Y.S.2d 352 (4th Dep't 2013) ..............................................28

*Gaeta v. New York News Inc.*,
    95 A.D.2d 315, 466 N.Y.S.2d 321 (1st Dep't 1983) *rev'd on other grounds*, 62
    N.Y.2d 340 (N.Y. 1984) ........................................................................................11, 12

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ......................................................................................................7

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562, 780 N.E.2d 166 (2002) ....................................................................27

*GTE Automatic Elec. Inc. v. Martin's Inc.*,
    127 A.D.2d 54, 512 N.Y.S.2d 107 (1st Dep't 1987) .................................................23

*Inter–Power of N.Y. Inc. v. Niagara Mohawk Power Corp.*,
    259 A.D.2d 932, 686 N.Y.S.2d 911 (3d Dep't 1999) ................................................25

*JMD Holding Corp. v. Cong. Fin. Corp.*,
    4 N.Y.3d 37, 828 N.E.2d 60 (N.Y. 2005) ................................................................28

*Karaduman v. Newsday, Inc.*,
    51 N.Y.2d 531, 416 N.E.2d 557 (N.Y. 1980) ..........................................................12

*Kjar v. Jordan*,
    271 A.D.2d 981,981, 630 N.Y.S.2d 825 (4th Dep't 1995) ......................................12

*Konig v. WordPress.com*,
    112 A.D.3d 936, 978 N.Y.S.2d 92 (2d Dep't 2013) ..................................................14

*Kraus v. Brandstetter*,
    202 A.D.2d 396, 610 N.Y.S.2d 527 (2nd Dep't 1994) ............................................12

*Kristensons-Petroleum, Inc. v. Sealock Tanker Co.*,
    304 F. Supp. 2d 584 (S.D.N.Y. 2004)..................................................................................29

*Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., Inc.*,
    176 F. Supp. 2d 199 (S.D.N.Y. 2001)..................................................................................21

*Liberman v. Gelstein*,
    80 N.Y.2d 429,434-35, 605 N.E.2d 344 (1992) ..................................................................10

*Matter of Liquidation of Union Indem. Ins. Co. of New York*,
    89 N.Y.2d 94, 674 N.E.2d 313 (N.Y. 1996) ........................................................................23

*Mandelblatt v. Perelman*,
    683 F. Supp. 379 (S.D.N.Y. 1988)......................................................................................17

*Manufacturers Hanover Trust Co. v. Yanakas*,
    7 F.3d 310 (2d Cir. 1993).................................................................................................23

*Marchuk v. Faruqi & Faruqi, LLP*,
    No. 13 CIV.1669 AKH, 2015 WL 363625 (S.D.N.Y. Jan. 18, 2015) ...............................5, 6

*McManus v. Doubleday & Co.*,
    513 F. Supp. 1383 (S.D.N.Y. 1981)....................................................................................11

*Murawski v. Pataki*,
    514 F. Supp. 2d 577 (S.D.N.Y. 2007)..................................................................................13

*National Equipment Rental, Limited v. Fowler*,
    287 F.2d 43 (2d Cir. 1961)................................................................................................29

*Oviedo v. Rudin Management Co., Inc.*,
    140 A.D.2d 680, 529 N.Y.S.2d 105 (2d Dep't 1988)............................................................17

*Park v. Lewis*,
    139 A.D.2d 961, 528 N.Y.S.2d 250 (4th Dep't 1988)............................................................16

*Parrino v. SunGard Availability Servs. LP*,
    No. CV 11-3315 JFB GRB, 2012 WL 826946 (E.D.N.Y. Feb. 16, 2012) ..............................9

*R/S Associates v. New York Job Dev. Auth.*,
    98 N.Y.2d 29, 771 N.E.2d 240 (2002)..................................................................................27

*Ricci v. Teamsters Union Local 456*,
    781 F.3d 25 (2d Cir. 2015)..................................................................................................13

iv

*S. Rd. Associates, LLC v. Int'l Bus. Machines Corp.*,
　　4 N.Y.3d 272, 826 N.E.2d 806 (2005).................................................................27

*Seldon v. Magedson*,
　　No. 11 CIV. 6218 PAC MHD, 2012 WL 4475274 (S.D.N.Y. July 10, 2012) .......13

*Shiamili v. Real Estate Grp. of New York, Inc.*,
　　17 N.Y.3d 281, 952 N.E.2d 1011 (2011).............................................................14

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
　　779 F.3d 191 (2d Cir. 2015).................................................................................16

*Sofi Classic S.A. de C.V. v. Hurowitz*,
　　444 F. Supp. 2d 231 (S.D.N.Y. 2006)...................................................................25

*Spagnuolo v. Suffolk County*,
　　2013 WL 3863926 (E.D.N.Y. July 24, 2013) ......................................................17

*Strasbourger v. Leerburger*,
　　233 N.Y. 55, 134 N.E. 834 (1922).......................................................................25

*Tenavision, Inc. v. Neuman*,
　　45 N.Y.2d 145, 379 N.E.2d 1166 (N.Y. 1978).....................................................24

*Treppel v. Biovail Corp.*,
　　No. 03 CIV. 3002 (PKL), 2005 WL 2086339 (S.D.N.Y. Aug. 3, 2005) ..........11, 12

*United Mine Workers of Am. v. Gibbs*,
　　383 U.S. 715 (1966).............................................................................................30

*Weiner v. Doubleday & Co.*,
　　74 N.Y.2d 586, 549 N.E.2d 453 (1989)...............................................................14

*Will of Bobst*, 651 N.Y.S.2d 26, 27 (1st Dep't 1996) ..................................................25

**Statutes**

47 U.S.C. § 230(f)(2)....................................................................................................13

NYC Code § 8-107 ..........................................................................................................6

**Other Authorities**

Fed. R.Civ.P. 8(a)(2).......................................................................................................5

v

Fed. R. Civ. P. 12(a)(4)................................................................................32

Fed. R. Civ. P. 13(a) .................................................................................29

Fed. R. Civ. P. 42......................................................................................30

Restatement (Second) of Torts), § 583  (1977)............................................16

Size of the Jury, 9B Fed. Prac. & Proc. Civ. § 2491 (3d ed.) ......................31

First Amendment of the United States Constitution ...........................4, 6, 7, 8

**INTRODUCTION**

Plaintiff's thirteen-count, blunderbuss complaint in this action is designed to shock, threaten and embarrass.  It does not come close to being a legitimate presentation of legal claims for judicial resolution, and that presents a number of legal issues for the Court to consider. Plaintiff and her counsel have used the tabloid press to turn what is at best a questionable story of purported sexual harassment into what Plaintiff shockingly and troublingly labels an $850 million case.  With the hyperbole stripped away, close analysis of the elements of the legal claims asserted reveals that the retaliation, defamation, and breach of contract claims are just not supportable.  To understand why, one must first be familiar with the background to the parts of this case that have received the most attention to date:  the response to Plaintiff's attempt to extort an exorbitant, undeserved settlement through false, public humiliation of Benjamin Wey and his family, which appeared in The Blot, an internet magazine.

Plaintiff's first litigation salvo left little doubt as to the tenor and vitriol an eventual litigation was to take.  Just a week after Plaintiff's termination on April 22, 2014, Plaintiff's attorneys threatened Benjamin Wey in writing with "embarrassing litigation" and, remarkably, potential "law enforcement intervention" for "criminal misconduct" if Mr. Wey did not meet plaintiff's exorbitant monetary demands.  (4/29/14 David Ratner Letter, Ex. 1.)[1]  The next shot over the bow was a week later, when Plaintiff's attorneys upped the ante by making an outright threat to Mr. Wey:  "embarrassing litigation for [him], [his] company and [his] *family*." (5/7/14 David Ratner Letter, Ex. 2) (emphasis added.)

---

[1] References to "Ex. __" are to exhibits attached to the accompanying Declaration of Gary Meyerhoff.

Mr. Wey did not capitulate, and Plaintiff carried through with her threats.  On July 21, 2014, she filed a complaint replete with sordid details and sensationalized allegations, patently designed to attract public attention.  (Initial Complaint, Ex.3.)  This first of three pleadings labeled Mr. Wey a "virulent sexual harasser and stalker" (*Id.*, ¶8).  It included lurid details of alleged events Mr. Wey unequivocally denies, including allegations that:  "Defendant begged [plaintiff] to have sex with him without a condom, insisting he was 'clean'" (*Id.,* ¶50); "Defendant . . . got into the bed naked, hugged plaintiff from behind, and pressed his erection against her" (*Id*, ¶59); "[Defendant] then ***forced*** Plaintiff to have sexual intercourse with him" (*Id*, ¶62) (emphasis added); and "[Defendant] plied plaintiff with alcohol and, once she was intoxicated, ***forced*** her to have sexual intercourse with him" (*Id*, ¶65) (emphasis added).  These allegations undoubtedly were designed specifically to evoke images of rape.  Included in this same complaint, Plaintiff gratuitously elected to reference the family she had threatened: ""Wey…is married to lawyer Michaela Wey and…the father of three children."  (*Id.,* ¶8).

These are not the tactics of a plaintiff seeking to redress a legitimate legal grievance. This is not a complaint designed to meet a Federal Court's notice pleading standards.  And in what could hardly be deemed a coincidence, this complaint, designed for the tabloid press, landed exactly there.  The *New York Post* published a story within hours of the complaint's filing, adopting Plaintiff's sensational "virulent sexual harasser and stalker" language.  (July 22, 2014 *New York Post* Article, Ex. 4.)  A second well-placed story in the *New York Post* a week later  included Plaintiff's allegation that Mr. Wey's sexual harassment "'culminated in his forcing' her 'to have sexual relations with him.'"  July 29, 2014 *New York Post* Article, Ex. 5.)  Plaintiff had painted an image in the minds of millions of readers of a rape that never occurred.

2

After the damage was done in the tabloid press, when Plaintiff was questioned at her deposition months later, ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████.

These facts inform on the legitimacy of two of the major legal claims presented in this case -- retaliation and defamation, for which Plaintiff claims a startling $175 million in damages. A legal claim of retaliation requires that the conduct complained of be prompted by *protected* activity.  Calling the filing of the complaint in this action, under these circumstances, a "protected activity" is insulting to the plaintiffs and counsel who use the courts to seek redress of grievances legitimately.  This Court recently rejected, as a matter of law, the contention that a less egregious complaint than Plaintiff's could constitute protected activity.

As for defamation, the overwhelming focus of the articles in The Blot (and any other allegedly defamatory communications) is on the attempt by Plaintiff and her counsel to extort money through their improper conduct.  Plaintiff -- certainly not shy about demanding money -- does not even seek economic damages for this purported defamation.  She can show no harm to her reputation or her finances.  While Plaintiff still seeks to recover for purported emotional

3

injury, she will offer no medical/psychiatric evidence.  Apparently, Plaintiff intends to take the stand, testify that these articles have caused her emotional injury, and ask the jury for $75 million in compensatory and punitive damages on that claim alone.

Whether or not one believes it was appropriate for The Blot to "fight back" publicly against Plaintiff's allegations, close analysis of the legal principles governing Plaintiff's claims reveals that these events do not support actionable legal claims of retaliation and defamation. Also discussed below are the significant legal issues imperiling Plaintiff's breach of contract claim, which rests on Defendants' purported violations of a stipulation on the mutual removal of internet postings.  On this one, Plaintiff and her counsel are "at it again" -- they recently reversed course on how liquidated damages should be calculated, ratcheting up the already overstated claim of $120,000 in her pleadings to over $2 million on a frivolous interpretation of the contract that is wholly belied by their own letters to Defendants and the Court, and by their own pleading. Defendants also address below a legal stipulation the parties have reached on reducing the number of counts to be tried that are based on discrimination, sexual harassment and retaliation, the likely need to seat ten jurors for the trial, and issues relating to pending motion to dismiss.

I.      **PLAINTIFF'S RETALIATION CLAIM**

There are two legal issues for the Court to consider with respect to Plaintiff's retaliation claims (the seventh and eighth causes of action).  First, as the facts discussed above support, these claims cannot be viable if they do not involve retaliation for protected activity.  Second, Plaintiff's retaliation claims have the potential to conflict with the First Amendment.

      A.      **Plaintiff's Salacious Complaints, Extortionate Pre-Suit Demand Letters, And Press Activities Are Not Protected Activity That Can Give Rise to a Retaliation Claim Under the NYSHRL and NYCHRL**

4

Lawsuits are typically considered protected activity under the NYSHRL and the NYCHRL.  However, given the nature of Plaintiff's complaint, as well as her pre-suit activity and courting of sensational publicity, the filing of this lawsuit is not "protected activity" capable of supporting a retaliation claim under either the NYSHRL or NYCHRL.  In another case in this Court just a couple of months ago, Judge Hellerstein carefully analyzed the issue of protected activity and held exactly that. *See Marchuk v. Faruqi & Faruqi, LLP*, No. 13 CIV.1669 AKH, 2015 WL 363625 (S.D.N.Y. Jan. 18, 2015).  Specifically, in rejecting plaintiff's retaliation claim under both the NYSHRL and NYCHRL, Judge Hellerstein wrote:

> [A]lthough it is true that . . . .a lawsuit ordinarily qualifies as protected activity if the plaintiff has a good faith reasonable belief that defendants' actions violated the law [citation omitted], Ms. Marchuk's complaint was anything but ordinary.  Fed. R.Civ.P. 8(a)(2) requires a "short and plain statement of the claim showing the pleader is entitled to relief."  Under rule 8(a)'s notice pleading standard, "[s]pecific facts are not necessary." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). . . . Plaintiff filed a 22-page complaint containing every salacious detail elicited during the trial and many more that weren't.  It was replete with incendiary language and vituperative attacks as any complaint I have seen. . . .  Plaintiff is represented by experienced counsel who knows well what a pleading should contain, and the decision to file this unprofessional document thus reflects an intent to extend the litigation from the courts to the press.

*Id.* at *4.

As discussed above, a sample of plaintiff's complaint demonstrates it is precisely the type of "salacious" "vituperative" document that violates Rule 8(a), is designed for the press rather than the Courts and is thus unworthy of protected activity status.  Plaintiff's complaint labels Mr. Wey a "virulent sexual harasser and stalker (Initial Complaint, Ex. 3, ¶8) and describes the lurid details of purported sexual encounters that describe forced sexual activity -- rape.  (*Id.*, ¶¶50, 59, 65.).

5

When combined with plaintiff's other pre-suit and press-directed activities, the case at bar presents an even stronger case for denying protected activity status than that presented in *Marchuk*.  Plaintiff's attorneys were not shy about threatening Mr. Wey with the attack they later made -- threatening to embarrass him and his family, and to refer him to law enforcement due to his alleged "criminal misconduct."  (Exs. 1 and 2.)  Plaintiff then made good on her threats, making a specific and gratuitous reference to the identity and profession of Mr. Wey's wife and to his three children in the Initial Complaint. (Ex., 3, ¶8.)

To make matters worse, that Plaintiff's complaint, in Judge Hellerstein's words, "reflect[ed] an intent to extend the litigation from the courts to the press" was borne out quickly when the *New York Post* published a story within hours of the complaint's filing that included Plaintiff's sensational "virulent sexual harasser and stalker" language and a week later published a second story that specifically quoted plaintiff's allegation of "forced" sexual intercourse, painting an image in the minds of millions of readers of a rape that never occurred ███████

████████████

Simply put, plaintiff's extortionate threats, deliberate attempts to embarrass and filing of a complaint designed for the newspaper not the courthouse does not qualify as protected activity capable of supporting a retaliation claim.  This Court should follow Judge Hellerstein's lead in *Marchuk* and deny protected activity status to plaintiff's complaint and related activities.

**B.    Section 8-107 (7) Retaliation Under The NYCHRL May Need To Be <u>Restricted As Applied To This Case To Comply With The First Amendment</u>**

Section (v) of the NYCHRL states

> The retaliation or discrimination complained of under this subdivision
> need not result in an ultimate action with respect to employment…or in a
> materially adverse change in the terms and conditions of

6

employment…the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.

NYC Code § 8-107.

Plaintiff appears to allege that Defendants' alleged speech subsequent to Plaintiff's threatening demand letters and salacious complaint were retaliatory acts that would "reasonably be likely to deter a person from engaging in protected activity".  If so, the Court will need to assess what items of alleged speech are capable of supporting a retaliation claim without running afoul of the First Amendment and thus can be presented to the jury and if presented to the jury, instruct on the limitations that must be imposed upon the broad language of the NYCHRL.

Speech is protected by the First Amendment of the United States Constitution and Article I Section 8 of the New York State Constitution. However, there are certain types of "well-defined" and "narrowly limited classes of speech" the prevention and punishment of which the Constitution does allow. *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571-72 (1942). These limitations include the prohibition of libelous speech. Libel, in contrast to the NYCHRL, has a body of case law specifically addressing First Amendment concerns and injecting First Amendment protections, such as specifying truth as a complete defense. *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 489-90 (1975); *DiFolco v. MSNBC Cable L.L.C.*, 831 F. Supp. 2d 634, 644 (S.D.N.Y. 2011).

The NYCHRL retaliation statute, on its face, provides no First Amendment limitations thus, taken to the lengths plaintiff seems to want to go, prohibits constitutionally protected conduct.  *See Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972) ("A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected

7

conduct."). Stated another way, although the NYCHRL does not prohibit speech on its face, its broad sweep impinges on speech because the statute is easily susceptible to punishing protected free speech in finding that a defendant's speech, whether it be true or not, that could reasonably deter a person from engaging in protected activity.

At this point, we are not asking the Court to invalidate the NYCHRL retaliation provision on First Amendment grounds but rather attempting to comply with the Court's Individual Rules that require parties to raise in a trial memorandum of law legal issues that parties believe may arise before or at trial.  When plaintiff specifies precisely which acts of alleged retaliation she will rely upon to attempt to prove her retaliation claim, we will know what speech is involved and will be better able to directly address the First Amendment protections that should be accorded that speech at issue and what limitations should be placed upon the broad prohibitions of the NYCHRL that could, depending on the issue presented, run afoul of the First Amendment.

## II.    PLAINTIFF'S DEFAMATION CLAIM

Plaintiff's twelfth cause of action is for "Defamation/Slander."  The legal issues fall into three areas:  (a) do the words Plaintiff contends to be disparaging constitute actionable defamation, (b) can certain Defendants be liable for statements allegedly made by others, and (c) can Plaintiff recover for defamation that she instigated by using her complaint and the tabloid press to threaten and humiliate Mr. Wey.

### A.    Plaintiff Must Identify The Specific Defamatory Words At Issue To Allow The Court To Determine Which Words Are Legally Actionable

Plaintiff does not identify with particularity the specific statements she alleges to constitute defamation; she seeks relief based upon "the aforementioned, patently false

8

statements" (Compl., Ex. 7, ¶214)[2] -- a generalized reference to statements located somewhere in the preceding fifty-nine pages of allegations.  While the Complaint mentions that the defamatory statements *include* "written statements made via emails, text message, Facebook posts and blog messages on Defendants' internet magazine 'The Blot'" (*id.,* ¶216), it does not set forth the purportedly harmful words upon which the defamation claim is based.[3]  And Plaintiff does not identify specific words in the Joint Pre-Trial Order.

Plaintiff bears the burden of identifying the "particular statements" that she claims are defamatory.  *See Croslan v. Hous. Auth. for City of New Britain*, 974 F. Supp. 161, 170- 171 (D. Conn. 1997) (without the specific words constituting the purported defamation, plaintiff failed to provide the detail necessary for defendants to properly defend themselves, despite her identification of 55 news articles and 22 board meetings in which purported defamatory comments were made).  *See also Parrino v. SunGard Availability Servs. LP*, No. CV 11-3315 JFB GRB, 2012 WL 826946, at *3 (E.D.N.Y. Feb. 16, 2012) (Plaintiff must specify the "specific words about which [she] complains.").

Contending that defamatory words can be found somewhere in a stack of documents is not sufficient.  That approach, rejected in *Croslan,* gives the Court no ability to address the legal issues likely to dispose of most, if not all, of the purportedly defamatory words as potentially

---

[2] The Second Amended Complaint, filed on October 24, 2014, is the operative pleading in the action at this time.  For ease of reference, "Compl." refers to the Second Amended Complaint.

actionable.  And there are multiple legal grounds upon which the Court can narrow (if not eliminate) this potentially vast defamation claim.

Principally among these grounds is a determination of whether the purportedly actionable words constitute defamation *per se*.  Plaintiff has stipulated in the Joint Pre-Trial Order (Section VIII) that she will not be seeking "special damages" for defamation, consistent with Plaintiff's prior representations (to Defendants and to the Court) that she would not be seeking economic damages of any kind.[4]  Plaintiff, thus, expressly concedes that she "will need to establish that the statements she claims to be defamatory constitute defamation *per se* under New York law.  (Joint PTO, Section VIII.)[5]

The Court not only will need to determine whether particular words constitute defamation *per se*, but whether they are statements of fact (as opposed to non-actionable opinions), are directed at the Plaintiff (as opposed to others), or are otherwise protected.  The only way to avoid the presentation at trial of defamation claims based on dozens of non-actionable words is to vet

---

[3] Plaintiff quotes, repetitively, from certain emails, texts, and Facebook messages Mr. Wey purportedly had sent to Plaintiff's "family and friends." (*Id.,* ¶¶96-98; 102-03; 105-06; 109-12; 114; 117, 120-128; 140-141.)  Those paragraphs do not identify which of the words in those communications constitute statements that purport to defame Plaintiff specifically.  The Complaint also states that  "defamatory articles" and comments on such articles were published by The Blot Magazine"  (*id.,* ¶ 129), and goes on to describe and quote from certain articles (*id.,* ¶¶ 131-134; 137-139); those paragraphs also fail to identify which of the words purport to defame Plaintiff specifically.

[4] At an April 29, 2015 discovery conference with Magistrate Judge Freeman, when certain of Plaintiff's deficiencies in producing requested financial records were raised, Mr. Ratner stated: "And I told them my word is good.  We're not claiming economic damages.  I put it in a letter.  I put it in an e-mail.  We're not claiming economic damages.  And now it's on the record in court." (Transcript, Ex. 18, 54:13-17.)

[5] Defamation is not actionable unless the plaintiff has suffered "special damages-the "loss of something having economic or pecuniary value." *Liberman v. Gelstein*, 80 N.Y.2d 429,434-35, 605 N.E.2d 344 (1992). An exception is if the statements constitute "defamation *per se*." *Id.* If a cause of action is not based on defamation *per se,* it cannot be maintained absent a showing of

those words in advance.  Without a list specifically identifying the words in dispute, it will be impossible to manage the briefing and ruling on the implicated legal issues efficiently.  For that reason, Defendants will be filing a pre-motion letter seeking an order requiring Plaintiff to present such a list; once provided, Defendants will be able to present a supplemental trial brief on whether such statements can constitute actionable defamation.

### B.   Plaintiff Improperly Sues All Three Defendants For Defamatory Conduct

Plaintiff alleges defamation generally against all three Defendants.  As Defendants argued in the pending motion to dismiss, Plaintiff's defamation claims are based upon the alleged acts of FNL Media and Mr. Wey; they cannot be attributed to NYG Capital LLC, warranting dismissal as a matter of law.  (See Brief in Support of MTD, Docket #49, at 10-12.)  In addition, Plaintiff (1) has legal challenges with holding Mr. Wey liable for articles on The Blot for which he is not identified as the author, and (2) cannot hold any of the Defendants liable for "comments" posted on The Blot.

### 1.    Mr. Wey Is Unlikely To Be Liable Personally For Articles He Did Not Author

FNL Media LLC is the publisher of the online magazine "The Blot."  (Wey Dep., Ex. 8, 83:25.)  The articles in The Blot that discuss Plaintiff do not identify Mr. Wey as the author.  Mr. Wey does not own FNL Media LLC.  While he is the "publisher" of The Blot, and writes pieces for The Blot, he does not review all articles before they are published.  (*Id.,* 88:2-18.)

---

special damages. *Edelstein v. Farber,* 27 A.D.3d 202,811 N.Y.S.2d 358 (1st Dep't. 2006).

It is unlikely that Plaintiff will be able to satisfy her burden of proving that Mr. Wey is personally liable for articles about her that were posted on The Blot.  Plaintiff must prove each element of her defamation claim as to each defendant.  *See McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1390 (S.D.N.Y. 1981) (requiring plaintiff to establish *mens rea* of co-author and publisher of defamatory statements).  If Plaintiff cannot prove that Mr. Wey made a defamatory statement, "it is axiomatic that [she] can cannot establish a cause of action for defamation." *Treppel v. Biovail Corp.*, No. 03 CIV. 3002 (PKL), 2005 WL 2086339, at *3 (S.D.N.Y. Aug. 3, 2005).  The Blot articles are publications; with respect to defamatory statements contained in such a publication, Plaintiff must prove that Mr. Wey "participated in the creation or publication of the statements at issue."  *Id*.

Sole reliance on Mr. Wey's position or responsibilities as "publisher" will not be sufficient to hold him liable for the publication of defamatory statements.  "The relationship of the individual publisher and editor, standing alone, is insufficient to impose liability."  *Gaeta v. New York News Inc.*, 95 A.D.2d 315, 466 N.Y.S.2d 321, 329 (1st Dep't 1983) *rev'd on other grounds*, 62 N.Y.2d 340 (N.Y. 1984); *see also Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 540 (N.Y. 1980) ("Inasmuch as the record is barren of any concrete evidence of the reporters' involvement in the republication of the newspaper series, we conclude that the causes of action against them must be dismissed.").

In *Gaeta*, the publisher and editor of a newspaper that published a defamatory article were not individually liable for defamation because they did not have "any affirmative role in the preparation or editing of the article."  95 A.D.2d at 325, 466 N.Y.S.2d at 328.  Similarly, in *Treppel*, a plaintiff tried to hold the general counsel and media contacts of a company responsible

12

for the company's defamatory statements.  2005 WL 2086339, at *3.  The court dismissed the

claims against these individual defendants because there were no allegations that they "were

involved in the creation or the publication of the statements."  *Id*. at *4.[6]  Thus, Plaintiff cannot

rely on Mr. Wey's position at the Blot; she must prove that he participated in the creation or

publication of the article.

2.    None of the Defendants Can Be Liable For
                Comments Posted By Others On The Blot Website's Articles

Plaintiff cannot demonstrate that any of the three Defendants "participated in the creation

or the publication" of the statements made in the comment section of The Blot website's articles.

*Treppel,* 2005 WL 2086339, at *3.  Since the comments reflect that they were authored by third

parties and posted on a web provider, Defendants are immunized from liability under the

Communications Decency Act of 1996, 47 U.S.C. § 230, et seq (the "CDA").  Section 230(c)(1)

of the CDA provides that "[n]o provider or user of an interactive computer service shall be

treated as the publisher or speaker of any information provided by another information content

provider."[7] Section 230(e)(3) preempts any state law that is inconsistent with the protections that

Section 230 offers.

Courts in this circuit have interpreted the CDA as shielding web hosts and internet

---

[6] *See also Kjar v. Jordan*, 271 A.D.2d 981,981, 630 N.Y.S.2d 825, 825 (4th Dep't 1995) ("[T]o
the extent that that cause of action asserts a claim for defamation, the record reveals that Jordan
neither made the alleged defamatory statements nor participated in their publication."); *Kraus v.
Brandstetter*, 202 A.D.2d 396, 397, 610 N.Y.S.2d 527, 528 (2nd Dep't 1994)(refusing to
reinstate a complaint against defendants that did not participate in the publication of the
defamatory statements).
[7] The CDA defines "interactive computer service" as "any information service, system, or access
software provider that provides or enables computer access by multiple users to a computer
server, including specifically a service or system that provides access to the Internet." 47 U.S.C.
§ 230(f)(2).

providers from liability "arising from defamation and other state-law claims that are premised on posts of, or links to, third-party content." *Seldon v. Magedson*, No. 11 CIV. 6218 PAC MHD, 2012 WL 4475274, at *16 (S.D.N.Y. July 10, 2012); *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 26 (2d Cir. 2015) (website GoDaddy.com, LLC immunized for liability for purported false statements about Plaintiff in a union newsletter republished on a website hosted on GoDaddy's servers).

Such immunization applies even when the web provider republishes, edits or actively encourages negative comments. *Seldon,* 2012 WL 4475274, at *16 (owner of website containing free message board related to companies' business practices was not liable for comments posted by third-parties even though he edited their titles as this was merely editorial); *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450 (E.D.N.Y. 2011) (owner of consumer review website afforded protection under CDA despite encouraging the publication of negative comments); *Murawski v. Pataki,* 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007) (search engine was not liable for links to third party content).

*Shiamili v. Real Estate Grp. of New York, Inc.,* 17 N.Y.3d 281, 952 N.E.2d 1011 (2011) is instructive.  In *Shiamili,* plaintiff, founder and CEO of a realty company brought an action for defamation against Defendants, a competing real estate company and its CEO and assistant, who allegedly administered a blog dedicated to the New York City real estate industry.  A purportedly defamatory comment was published about Shiamili on the Web site by an anonymous user, accusing him of being a racist and anti-Semitic. Defendants re-posted the comment, creating a stand alone post with separate headings.  Despite the republishing of the comment, the New York Court of Appeals held that Defendants were shielded from liability under the CDA, since the

14

purported defamatory statements were "information provided by another information content provider." *Id.,* at 285, 1014 ("creating an open forum for third parties to post content—including negative commentary—is at the core of what section 230 protects.").

Similar to *Shimali,* unless Plaintiff can prove that the comments responding to articles posted on The Blot were authored by one of the Defendants, they have no claim; as an interactive computer service immunized from liability under the CDA, FNL Media LLC cannot be liable.[8]

**C.   Defendants Have A Defense To Defamation Based On Plaintiff's Use Of Threats And The Tabloid Press To Instigate A Response**

Plaintiff alleges that she was subject to sexual harassment in one form or another, repeatedly, over a period several months. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

---

[8] Such claims also are likely to fail because no reasonable reader would believe that any statement in the comments conveyed facts about the Plaintiff. *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 592, 549 N.E.2d 453 (1989) (constitutionally protected expression of "opinion" may not be the subject of an action for defamation). The purpose of the comments were to express thoughts and opinion on the news article. *See Konig v. WordPress.com*, 112 A.D.3d 936, 937, 978 N.Y.S.2d 92 (2d Dep't 2013) (anonymous poster's generalized references to criminal activity on an internet blog were protected opinion); *Bonanni v. Hearst Communications, Inc.*, 58 A.D.3d 1091, 872 N.Y.S.2d 221 (3d Dep't 2009) (newspaper articles appearing in the "commentary" section of a paper's website describing police officer as intoxicated at work unfit for service, and that he did not deserve police union's support constituted opinion).



As discussed above, Plaintiff nonetheless elected to retain a law firm that threatened Mr. Wey with criminal prosecution and public embarrassment, and threatened his family.  Plaintiff then made good on the threat by essentially accusing him of rape in her Initial Complaint, a false story delivered to the tabloid press with grave and unfair consequences for Mr. Wey.  ██████

████████████████████████████████████████████████████████

████████████████████████   And she now complains that articles she alleges *he* has written about *her* constitute defamation.  Even more troubling, Plaintiff does not seek any economic damages for this defamation, nor will she have a psychiatrist testify that she has been emotionally injured.  She will get on the stand, claim she feels terrible, and ask the jury for $50 million on this claim alone.

Under New York law, when a plaintiff intentionally instigates or elicits the publication of defamatory statements, a defamation claim resulting from such instigation can be barred.  In *Sleepy's LLC v. Select Comfort Wholesale Corp.,* 779 F.3d 191 (2d Cir. 2015), the Second Circuit reviewed and considered the application of this defense to defamation, often referred to as "consent."  As the Second Circuit observed:

> Decisions of New York's intermediate appellate courts have established .
> . . . that, in some circumstances, a person's intentional eliciting of a

> statement she expects will be defamatory can constitute her consent to
> the making of the statement.

*Id.* at 199.

This concept has long been recognized in the common law as a defense to defamation. *See* Restatement (Second) of Torts), § 583  (1977).  We recognize that this defense does not ordinarily arise in a context like the instant case.  It is most often applied in cases like *Sleepy's,* where a plaintiff suspects that someone has defamed them, hires a private investigator to approach the person and provoke them into making defamatory statements, and then sues based on statements made to the investigator.

For example, in *Dickson v. Polly Slezak,* 73 A.D.3d 1249, 902 N.Y.S.2d 206 (3d Dep't 2010) , a real estate broker hired an investigator to pose as potential seller of real estate interested in listing property with plaintiff.  A defamation claim based on statements instigated through the investigation was "subject to the complete defense that, because plaintiff hired [an investigator] to garner what he had every reason to anticipate would be defamatory comments from defendants, he implicitly consented to the publication of such comments." *Id.,* 73 A.D.3d at 1250-51, 902 N.Y.S.2d at 207.  *See also, Park v. Lewis,* 139 A.D.2d 961, 528 N.Y.S.2d 250 (4th Dep't 1988) (defamation claim of ophthalmologist who hired investigators to pose as patients and visit with local ophthalmologists barred because he "authorized his agents to obtain further comment when he had reason to anticipate that defendant's responses to inquiries might be defamatory"); *Spagnuolo v. Suffolk County,* 2013 WL 3863926 (E.D.N.Y. July 24, 2013) (when plaintiff's agent provokes defamatory statements, he is considered to have consented.).[9]

---

[9] The defense has been applied in other contexts where a plaintiff, with good reason to expect that a defendant will defame them, provokes or entraps the defendant into doing so.  *See  Oviedo*

Defendants recognize that it may sound counter-intuitive to suggest that Plaintiff

"consented" to being subject to the negative statements published in The Blot.  In fairness, the

term "consent" is a misnomer for the doctrine at issue.  The consent is *implied* against those who

instigate or provoke the conduct they then seek a financial reward for procuring.  And while there

may be statements in The Blot that come close to constituting defamation *per se,* there is

something unseemly about permitting Plaintiff to collect money by broadcasting to the world,

falsely, that Mr. Wey is a rapist, and then to sue him for the response.  The consent defense

targets and rejects recovery for such unseemly defamation claims.  Like the plaintiffs in all of the

cases set forth above, ███████████████████████████████████████

████████████████████████████████████████.  She should not be

permitted to seek exorbitant damages for a reaction to that accusation, one she surely expected

and may even have decided (with counsel) to provoke to strengthen her case.

## III.    PLAINTIFF'S BREACH OF CONTRACT CLAIM

### A.    Factual Background

Plaintiff's breach of contract claim (thirteenth cause of action) is based upon Defendants'

purported violation of the terms of a stipulation the parties reached on August 28, 2014 (the

"Agreement") concerning internet postings Defendants and Plaintiff's legal counsel (the law firm

Morelli Alters Ratner LLP ("MAR")) had made regarding this lawsuit.  (Agreement, Ex. 9.)

In return for a "mutual removal of internet postings and cessation of certain

---

*v. Rudin Management Co., Inc.,* 140 A.D.2d 680, 529 N.Y.S.2d 105 (2d Dep't 1988) (doorman's
libel suit dismissed where he had filed a grievance forcing defendant to describe the bad acts he
was accused of); *Mandelblatt v. Perelman,* 683 F. Supp. 379 (S.D.N.Y. 1988) (where former
corporate employees enforced their right to have their terminations subject to an investigation,
defamation claims based on statements made in investigation were subject to consent defense).

communications," Plaintiff agreed (among other things) to withdraw her then-pending motion for injunctive relief relating to Defendants' internet postings and covenanted not to seek such relief. (*Id.,* p.3-4.)  Not only would Defendants remove postings, but MAR would remove its own postings about the lawsuit as well.  *Id.*  And with respect to violations of this mutual removal of internet postings obligation, the Agreement contains a liquidated damages clause which, in pertinent part, requires the "the payment of liquidated damages by the offending party to the offended party in the amount of $10,000 (Ten Thousand Dollars) within ten (10) days after notice is made to counsel of said violation."  (*Id.,* p.4.)

According to Plaintiff's Complaint, Plaintiff notified Defendants on September 17, 2014 of four violations, obligating Defendants to pay $40,000 which was not paid.  (Compl., Ex. 7, ¶222-23.)  Plaintiff alleges further violations after September 17, 2014, although she does not indicate the dates of any further notices, and her discussion of these additional violations is contradictory.  She first alleges that since September 17, 2014, Defendants published "*at least* eight more*" articles (*id*, ¶156), and later alleges the number to be "*at least* four more."  (*Id.,* ¶225.)  Plaintiff then alleges that she has incurred economic damages in an amount not less than $120,000.  (*Id.,* ¶227.)  Each of these allegations, however, multiplies $10,000 by the number of incidents of purported violation.

Defendants contend that they were fraudulently induced to enter into the Agreement, rendering it void.  Prior to executing the Agreement, on August 24, 2014, Plaintiff's preliminary injunction motion was still pending, and it was approximately five days before Plaintiff's supplemental brief on the motion was due.  In a conversation between the parties' counsel, Martha McBrayer of MAR stated that a Swedish court had issued a "restraining order" against

Mr. Wey as a result of his visit to Cafe Linne in Stockholm in August 2014.  Plaintiff, through

Ms. McBrayer, threatened to disclose the purported Swedish restraining order to the public by

including it in the upcoming supplemental submission in support of the pending motion.

    Defendants' lead counsel at the time, Justin Sher witnessed this representation and threat;

these events were later memorialized in correspondence from Mr. Sher to Ms. McBrayer, and she

did not dispute Mr. Sher's account.  Mr. Wey will testify that the public disclosure of these

purported events -- which could very well impact the pending motion and Mr. Wey's reputation --

was a material factor in Defendants' decision to enter into the Agreement.

    On September 2, 2014, Mr. Sher emailed Ms. McBrayer:  "You mentioned that your

client had obtained a Swedish restraining order against Mr. Wey.  Could you please provide a

copy?"  (Ex. 10.)  With no response, Mr. Sher sent another email on September 3, 2014

requesting "a copy of the TRO you indicated your client obtained in Sweden."  Mr. Sher

explained, "[w]e need to review it and assess its scope so that we can make sure our client

complies."  (Ex. 11.)

    Ms. McBrayer finally responded, stating, "They haven't issued an order yet; we will

provide a copy of the order if/when they do so. . . ."  (Ex. 11.)  Mr. Sher responded, on

September 4, 2014:

> My client was induced to enter into the stipulation, in large part, because
> he believed -- based on your representation, which I relayed -- that Ms.
> Bouveng had obtained a restraining order from a Swedish court and the
> you intended to show the order to Judge Gardephe as part of your
> supplemental submission.  We now understand from you that that was
> false and that, in fact, Ms. Bouveng has only applied for such an order
> and is under some form of police protection.  Please provide
> documentation relating to the Swedish TRO application and the police
> protection.  In addition, please indicate the basis of your belief that Mr.

> Wey is still in Sweden.  Was ask that you and your client preserve all
> records regarding these statements.

(*Id.*)

In response the same day, Mr. Ratner wrote:

> Justin, with all due respect, ***I don't give a shit why your client entered
> into the stipulation or whether you or your client misunderstood
> Martha.***  We are not going to comply with your request.  However, if
> you want to annul the stipulation and reschedule the hearing, let me
> know so we can work out a new briefing schedule.

(*Id.*) (emphasis added).[10]

On September 17, 2014, MAR provided two notices to Defendants' counsel of purported

breach of the Agreement:  an 11:39 a.m. email citing and attaching two articles (Ex. 12),

demanding payment of $20,000 in liquidated damages, and an 11:58 a.m. email attaching one

additional article (with no reference to liquidated damages).  (Ex. 13.)  And on September 30,

2014, Ms. McBrayer sent another email notice of another article, seeking an additional $10,000

in liquidated damages.  (Ex. 14.)

In response, on September 30, 2014, Mr. Sher sent a letter to Ms. McBrayer indicating

that "the stipulation dated August 28, 2014 . . . is disaffirmed and that, even if it remained valid

in any respect, Plaintiff is in breach."  (Ex. 15.)  Defendants pointed out that:

> [A]s we previously advised you, Benjamin Wey was induced to enter
> into the Stipulation by your false representation that Hanna Bouveng had
> obtained a restraining against Mr. Wey in Sweden.  Although your
> colleague, David Ratner, responded by email that he "did not give a shit,"
> the Stipulation is voidable and disaffirmed.  *See Ladenburg Thalmann &*

---

[10] In correspondence to the Court dated May 15, 2015, Plaintiff's counsel contends that these
issues will make the lawyers witnesses.  Untrue.  Even in that letter, Plaintiff's counsel still have
not stated that there is any fact dispute over what Ms. McBrayer represented to Defendants'
counsel about the purported restraining order which, again, is set forth in this subsequent written
correspondence.

*Co. v. Imaging Diagnostic Sys., Inc.,* 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2001).

*Id.*

Mr. Sher also provided notice to Plaintiff of eleven separate breaches of the Stipulation based upon Plaintiff's failure "to refrain from adding and, to the extent within their control, remove Internet postings . . . ."  Mr. Sher sought $110,000 for the eleven violations.  *Id.*

On September 30, 2014, Plaintiff sent a letter to the Court describing the circumstances surrounding the Agreement, Plaintiff's view that Defendants had breached the Agreement, but failed to pay $30,000 in liquidated damages, Plaintiff's discovery that day of another alleged violation (making the damages amount $40,000), and -- notably -- requesting a hearing on the preliminary injunction.  (Ex. 16.) Neither Mr. Ratner nor Ms. McBrayer denied that Ms. McBrayer had (a) represented to Defendants that there was a restraining order in place and that she would use it in the then-upcoming filing, or (b) that such representations were factually untrue at the time they were made.  On October 2, 2014, Mr. Wey filed an action in Supreme Court of the State of New York, County of New York against Hanna Bouveng for breach of contract and fraud ("the Wey Action").  (Ex. 17.)[11]

Plaintiff now asserts that the liquidated damages provision of the Agreement calls for the payment "of $10,000 for each daily violation since Defendants' initial violation of October 4, 2014, in an amount as of April 16, 2015 totaling $1,940,000."  (Joint Pre-Trial Order, Section V.)  This position contradicts Plaintiff's Complaint; it was not advanced until after Defendants' new counsel (Dentons) appeared in the case.  Plaintiff has not explained, in the Pre-Trial Order or

---

[11] Plaintiff's counsel filed papers in this Court to remove the Wey Action, but it appears that they failed to provide a notification of removal to the State Court, leaving some doubt as to whether

22

elsewhere, how this more recent position can be reconciled with the contemporaneous position Plaintiff took in its notices and correspondence with the Court -- $10,000 per incident.

**B.     The Legal Issues**

Plaintiff's breach of contract claim (thirteenth cause of action) presents at least four issues of law that will arise at or before trial:  (1) Defendants' right to present fraud as a defense; (2) Plaintiff's improper effort to both repudiate the Agreement and seek continuing performance of it; (3) Plaintiff's recent attempt to characterize the liquidated damages clause as entitling Plaintiff to $10,000 per day, instead of $10,000 per violation, and (4) Defendants' right to have its claims against Plaintiff for fraud and breach of the Agreement heard together with Plaintiff's claim.

1.      Defendants Are Entitled To Establish Fraud As A Defense

As discussed above, there is documentary evidence -- correspondence between the parties -- confirming that Defendants were induced to enter into the Agreement by Plaintiff's agent's representation that Ms. Bouveng had obtained a restraining order in Sweden against Mr. Wey, and that Plaintiff intended to make that fact public through its upcoming filing in connection with its then-pending preliminary injunction motion.  (Exs. 12-15.)  In the same correspondence, Ms. McBrayer confirmed the falsity of her representation, that no such restraining order had been entered.  (Ex. 11.)  Defendants intend to introduce evidence at trial to establish the elements of fraud as a defense to the breach of contract claim.[12]

Fraud, and the request for rescission *ab initio,* is an appropriate defense to a breach of

_____

removal was proper.

[12] As the Court is aware, Defendants await a ruling on the pending the motion to dismiss and have not yet  served an answer to Plaintiff's Complaint.  One of the defenses to the breach of contract claim will be that the contract cannot be enforced -- and there can be no breach -- because the Agreement was fraudulently induced.

23

contact claim under New York law. *Matter of Liquidation of Union Indem. Ins. Co. of New York*, 89 N.Y.2d 94, 110, 674 N.E.2d 313 (N.Y. 1996) (upholding defense of fraud in the inducement). Even a counterclaim of fraud in the inducement is relevant to, and sufficient to create a fact dispute over, a primary claim for breach of contract. *See GTE Automatic Elec. Inc. v. Martin's Inc.*, 127 A.D.2d 54, 512 N.Y.S.2d 107, 108 (1st Dep't 1987) (denying plaintiff's summary judgment motion on its claim to recover on promissory notes, there was nothing "preclud[ing] defendant from reliance upon fraud as a defense").

While general merger clauses can eliminate the availability of parol evidence, such clauses do not apply to fraud in the inducement claims. In *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993), the Second Circuit vacated an order dismissing the affirmative defense of fraudulent inducement to a case involving the breach of a guaranty that stated it was "absolute and unconditional." The Agreement does not contain a merger clause; even if it did, a fraud defense would still be proper. *See also, Conocophillips v. 261 E. Merrick Rd. Corp.*, 428 F. Supp. 2d 111, 122 (E.D.N.Y. 2006) ("Defendants claim fraud in the inducement, and have presented this Court with evidence to substantiate this affirmative defense.")

Defendants should be allowed to present evidence of fraud as an affirmative defense to the jury. Defendants also will be seeking jury instructions on the legal effect of the fraud on Plaintiff's right to recover for breach of contract.

> 2.    Plaintiff Elected To Treat The Agreement As Terminated In September;
>        She Cannot Seek Damages For Alleged Failure To Perform Thereafter

If Plaintiff survives Defendants' "procured by fraud" defense, the majority of the damages

24

she seeks for breach of contract are not collectable.  One of the Agreement's material terms was Plaintiff's covenant not to seek injunctive relief relating to Defendants' internet postings.  On September 30, 2014, Plaintiff filed a letter with the Court requesting that very relief.

Accordingly, no later than September 30, 2014, Plaintiff elected to stop performing the Agreement -- treating the contract as if it had terminated.  Whether Plaintiff pursues the damages theory set forth in the Complaint (more than $120,000 for twelve or more individual instances of breach), or the overreaching theory her counsel recently has advanced (over $2 million, based on $10,000 per day purportedly in breach), Plaintiff seeks to recover for Defendants' alleged failure to perform *after* Plaintiff had stopped performing.  Under the well-settled election-of-remedies doctrine, either the contract remained in force or it did not; by electing to treat it as terminated, Plaintiff cannot claim damages for Defendants' failure to perform thereafter.

"Referred to as an anticipatory repudiation, a disavowal of the contract can be determined to have occurred whenever there is an 'overt communication of intention' not to perform. However, for these principles to operate, it should be shown that the announcement of an intention not to perform was positive and unequivocal." *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 150, 379 N.E.2d 1166 (N.Y. 1978).  By letter dated September 30, 2014, Defendants' counsel notified Plaintiff's counsel that Defendants considered the Agreement "disaffirmed," that "even if it remained valid in any respect, Plaintiff is in breach," and that the Agreement is "voidable and disaffirmed."  (Ex.15.)

With a positive and unequivocal announcement of the intention not to perform:

> The nonrepudiating party. . . then "has two mutually exclusive
> options[:]" it may "(a) elect to treat the repudiation as an anticipatory
> breach and seek damages for breach of contract, thereby terminating the
> contractual relation between the parties, or (b) ... continue to treat the

> contract as valid and await the designated time for performance before
> bringing suit." *Id.* (citing *Inter–Power of N.Y. Inc. v. Niagara Mohawk
> Power Corp.,* 259 A.D.2d 932, 686 N.Y.S.2d 911, 913 (3d Dep't 1999)).
> What the nonrepudiating party cannot do is "at the same time treat the
> contract as broken and as subsisting. One course of action excludes the
> other." *Strasbourger v. Leerburger,* 233 N.Y. 55, 59, 134 N.E. 834
> (1922). Moreover, once an election has been made, it cannot be changed.
> *Lucente,* 310 F.3d at 258–59. In determining which remedy the
> nonrepudiating party has elected, "the operative factor is whether [it]
> has taken an action (or failed to take an action) that indicated to the
> breaching party that [it] had made an election." *Id.* at 259 (ellipsis and
> internal quotation marks omitted).

*Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 501 (S.D.N.Y. 2011) *aff'd*, 476 F. App'x

275, 276 (2d Cir. 2012).[13]

Here, Plaintiff's decision, on September 30, 2014, to send a letter to the Court requesting

a hearing on the injunction -- indisputably not permitted under the Agreement -- was an action

indicating Plaintiff's election to treat the Agreement as terminated.  Plaintiff acted in conformity

with that election thereafter, continuing to pursue and obtain the very hearing Defendants sought

to avoid by entering into the Agreement.  Plaintiff cannot expect to be freed from its obligation to

perform under the Agreement -- as if its constraints did not exist -- and simultaneously expect

Defendants to continue to perform.  As this Court held in *Barton,* upon electing to act in a

manner that demonstrated non-performance, a plaintiff cannot then seek to recover amounts that

would become due under an in-force contract thereafter.  *Id.* at 501.

Here, Plaintiff acted as if the Agreement was no longer in force no later than September

30, 2014.  By that date, Plaintiff had provided Defendants with notice of only four purported

---

[13] *See also, ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp. 2d 383, 389 (S.D.N.Y. 1999)(rejecting effort to treat contract as in-force and later terminate); *Soft Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 238 (S.D.N.Y. 2006) (same); *Will of Bobst*, 234 A.D.2d 7, 8, 651 N.Y.S.2d 26, 27 (1st Dep't 1996) (same).

violations of the Agreement and, with a liquidated damages provision calling for $10,000 per

violation, Plaintiff had requested payment of $40,000.  Those facts, and that amount as the proper

damages amount, were confirmed in the very letter Plaintiff sent to the Court on September 30,

2014 seeking the hearing.  (Ex. 16.)  That is the most Plaintiff can collect on its breach of

contract claim.

> 3.      Plaintiff's Contention That She Is Entitled To Liquidated
> <u>Damages For Each Day Since Notice Of Breach Is Unsupportable</u>

Plaintiff recently reversed course on how the liquidated damages for her breach of

contract claim should be calculated.  After consistently asserting, in multiple notices to

Defendants and the Court -- and in her own Complaint -- that she is entitled to $10,000 for each

instance in which Defendants posted an article (at most, $120,000 for 12 such instances),

Plaintiff now boldly contends that the number of instances do not matter.  According to Plaintiff,

she is entitled to $10,000 per day since the first notice in September -- now more than $2 million.

There is no support for such a claim under the plain meaning of the Agreement, which

provides (in pertinent part):

> 3(a).  Wey, NYG and Sher Tremonte LLP will refrain from adding and ,
> to the extent within their control, remove Internet postings concerning
> Bouveng, MAR, [and other listed items and persons]. . . .
>
> 3(b).  Bouveng and MAR will refrain from adding and, to the extent
> within their control, remove Internet postings concerning Wey, NYG
> [and other listed items].
>
> * * *
>
> 7. Liquidated Damages.  Each violation of paragraph 3(a) and/or
> paragraph 3(b) by Wey or Bouveng shall result in payment of liquidated
> damages by the offending party to the offended party in the amount of
> $10,000 (Ten Thousand Dollars) within ten (10) days after notice is
> made to counsel of said violation.

(Agreement, Ex. 9, pp. 2-4.)

Liquidated damages are available for "each violation" of the restrictions in Paragraphs 3(a) and 3(b).  No contract language sets forth, or even implies, a right to collect $10,000 per day following notice of a violation.  There is no reference to any time period at all; a per-day amount is no more supportable than a per-week or per-month amount.  The language is clear and unambiguous -- $10,000 for each violation, not $10,000 for each day.

Clear and unambiguous contract language must be enforced "according to the plain meaning of its terms."  *Greenfield v. Philles Records, Inc*., 98 N.Y.2d 562, 780 N.E.2d 166 (2002).  One cannot use parol evidence -- matters extraneous to the four corners of the contract -- to create an ambiguity. *R/S Associates v. New York Job Dev. Auth.,* 98 N.Y.2d 29, 33, 771 N.E.2d 240, 242 (2002) ("[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.")  *See also S. Rd. Associates, LLC v. Int'l Bus. Machines Corp*., 4 N.Y.3d 272, 278, 826 N.E.2d 806, 809-10 (2005) (rejecting Defendant's attempts to create ambiguity in a lease provision when the terms of the lease provision were clear and unambiguous).  That is exactly what Plaintiff attempts here.

Further, the Agreement is clear and unambiguous in entitling a party to liquidated damages only after notice is made of "said violation." (Agreement, Ex. 9, at p. 3.)  The notices Plaintiff provided carefully set forth the number of violations and the amount owed, interpreting the Agreement in a manner contrary to its current position:  two articles, $20,000 owed; another article, now $30,000 owed.  Plaintiff never provided notice of additional violations based on the passage of time.  Even if a violation could be interpreted as recurring on each day (and it cannot), the failure to provide notice would doom a claim to any non-noticed liquidated damages.  If

28

Plaintiff truly believed that the bargain struck in the Agreement would entitle her to liquidated damages for each day, surely Plaintiff would have made that clear in one of her notices, or in the Complaint.

Moreover, if the Court were inclined to entertain the possibility that a per-day liquidated damages amount was called for by this contract (and respectfully it should not), such a clause would be unenforceable as a matter of law.  For a liquidated damages provision to be enforceable, the amount of liquidated damages must bear a reasonable proportion to the probable loss.  *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 379-385, 828 N.E.2d 60 (N.Y. 2005) .  Determination of whether liquidated damages is an unenforceable penalty is a question of law for the Court to decide.  *Id.*  Where liquidated damages are grossly disproportionate to anticipated damages, the clause will not be enforced.  *See Ford v. Cardiovascular Specialists, P.C.*, 103 A.D.3d 1222, 1223, 959 N.Y.S.2d 352, 353 (4th Dep't 2013) (liquidated damages of 150% of employee's salary was grossly disproportionate to the anticipated damages resulting from employee's breach of a non-compete clause).  Here, more than $2 million in purported compensatory damages for what would arguably be the "harm" to Plaintiff from the posting would be grossly disproportionate to any claimable loss.  Such an amount could only be characterized as an improper penalty.

> 4.   Defendants' Breach of Contract Claims Against
>      Plaintiff Should Be Tried At The Same Time

While Plaintiff seeks to pursue a claim for breach of contract in the trial of this action, Mr. Wey has claims for breach of the same contract -- the Agreement -- and for fraud in the inducement as well.  While there may be a lack of procedural clarity as to whether the Wey Action was properly removed, there is no doubt that it is pending and has been assigned to Judge

Gardephe.  In addition, while Defendants have not yet answered the pending Complaint, when it does answer Defendants have the right to serve counterclaims.  To avoid the procedural wrangling that may be necessary with respect to the status of the Wey Action, Defendants intend to assert counterclaims for breach of contract and fraud based on the Agreement.  As long as such counterclaims are permitted (and Mr. Wey's rights are protected), Mr. Wey could then dismiss the Wey Action.

Defendants are entitled to have their counterclaims on breach of the Agreement and fraud tried at the same time as Plaintiff's breach of contract claim.  Defendants' claims undoubtedly meet the standard for compulsory counterclaims, in that they  "[arise] out of the transaction or occurrence that is the subject matter of the opposing party's claim," and "[do] not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a).  As such, they squarely fall within the category of claims that should be tried together.  *National Equipment Rental, Limited v. Fowler*, 287 F.2d 43 (2d Cir. 1961) (in an action by a lessor for the breach of a lease, a claim that the lease was fraudulently induced was a compulsory counterclaim); *Kristensons-Petroleum, Inc. v. Sealock Tanker Co.*, 304 F. Supp. 2d 584, 588 (S.D.N.Y. 2004) (declaratory judgment claim regarding contract interpretation was a compulsory counterclaim in breach of contract action); *Alesayi Beverage Corp. v. Canada Dry Corp.,* 797 F. Supp. 320 (S.D.N.Y. 1992) (breach of contract counterclaims were compulsory in suit for breach of the same agreement.)

Defendants' claims on the breach of the Agreement involve the same facts, the same witnesses, and the same contract.  Whether as a defense to Plaintiff's claims or in support of its own, the fraud issues will have to be litigated for both.  In the interests of judicial economy, to

30

avoid undue prejudice to Defendants from having to litigate the same issues twice, to avoid the

risk of inconsistent verdicts, and fairness to both parties, Defendants' claims should be litigated at

the same time, in the trial of this action.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715

(1966) ("Under the federal rules, the impulse is toward entertaining the broadest possible scope

of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly

encouraged ").

 If for some reason Defendants are not permitted to bring such claims as counterclaims,

Defendants would then move to have the Wey Action joined with this one so both could be

litigated together.  Fed. R. Civ. P. 42 ("if actions before the court involve a common question of

law or fact, the court may join for hearing or trial any or all maters at issue in the actions,

consolidate the actions or issue any other orders to avoid unnecessary cost or delay."); *Delaware*

*Credit Corp. (U.S.A.) v. Aronoff*, No. 92-CV-135S, 1992 WL 170896, at *7 (W.D.N.Y. July 10,

1992) (consolidating cases where they arose from the same underlying contract, related to the

same negotiations and had common witnesses).

**IV.** **The Stipulation On The Sexual Harrassment/Discrimination Counts**

 In the Joint Pretrial Order, the parties have stipulated as follows:

> With respect to Plaintiff's claims under the New York State Human
> Rights Law and the New York City Human Rights Law, the currently
> existing eight causes of action in the complaint will be reduced to four
> with the parties attempting in good faith to agree on jury instructions for
> those claims.  Specifically, the jury will be presented with two claims
> under the New York State Human Rights Law (sexual harrassment and
> retaliation) and two claims under the New York City Human Rights Law
> (sexual harassment and retaliation).

 While there is no reason to expect this agreement not be followed or enforced,

Defendants reserve their right to supplement this brief on these issues should the need arise or

31

should the Court so require.

## V.      **The Need For A Jury Of Ten**

We understand the Court's practice to be to empanel 8 jurors for a civil trial.  Given that this case already has received significant press attention (in the New York Post, among other publications) we also expect the trial to garner press attention.  The press reports to date already contain significant information about the complaint's allegations that the jury will not hear:  for example, that Mr. Wey was allegedly a "virulent sexual harasser and stalker" (the stalking claim has been withdrawn) that Mr. Wey "'trapped her' into a bedroom merger" (Plaintiff did *not* testify that Mr. Wey forced her to have sex).  The reports in the *New York Post*, in articles about the lawsuit, also boastfully and carelessly references its own prior trumped up reporting of events related to Mr. Wey's business.

Given the possibility that jurors, despite warnings and instructions from the Court, may nonetheless expose themselves to media coverage, the risk of losing jurors is significant enough to warrant empaneling ten to ensure against the risk of ending up with less than six to deliberate. "In order to decrease the risk of being confronted with a jury of fewer than six members, particularly in light of the abolition of the alternate juror provision of Rule 4744 and the fact that the constitutionality of a civil jury of fewer than six members has not been sanctioned by the Supreme Court, more than six jurors should be impanelled as a matter of standard practice. Since the rule does not distinguish between jurors and alternates, the parties' interests thus will be protected if any jurors must be discharged before a verdict is rendered."  The Size of the Jury, 9B Fed. Prac. & Proc. Civ. § 2491 (3d ed.).

"[T]he risk of losing a juror or two during trial cautions that the jury as seated should

have at least eight members, because a verdict may not be received from a jury of fewer than six unless the parties agree to a smaller jury." 9-48 Moore's Federal Practice - Civil § 48.03.  Here, the risk of losing three or four is significant enough to warrant seating ten.  No prejudice would result; as the Supreme Court has observed, increased jury size increases reliability.  *See Ballew v. Georgia*, 435 U.S. 223, 233 (1978); *see also, Born v. Monmouth Cnty. Corr. Inst.,* 458 F. App'x 193, 200 (3d Cir. 2012) ("Born appears to complain that there were twelve jurors, and not fewer, but she has no right to a civil jury of fewer than twelve people.  As the committee note to the 1991 Amendment to Rule 48 notes, '[t]he use of jurors in excess of six increases the representativeness of the jury and harms no interest of a party.'").

## VI.   THE PENDING MOTION TO DISMISS, DEFENSES AND COUNTERCLAIMS

Defendants' pending motion to dismiss presents argument on several legal issues which, depending on how the motion is resolved, may continue to be relevant during or before trial. Defendants stand on those arguments and incorporate them herein.

Defendants' time to serve an answer, asserting defenses and counterclaims, has not yet arrived; with the filing of the pending motion to dismiss, the time to answer will be 14 days after the ruling on the motion.  Fed. R. Civ. P. 12(a)(4).  Defendants anticipate filing at least one counterclaim (discussed above) and perhaps more; such filing, and the defenses Defendants may assert, could give rise to legal issues not addressed herein, and Defendants reserve the right to supplement this memorandum of law to address such issues.

Dated:  May 15, 2015
          New York, New York

Respectfully submitted,

s/Glenn Colton

Glenn Colton
Gary Meyerhoff
1221 Avenue of the Americas
New York, New York 10020
Tel.  (212) 768-6700

*Attorneys for Defendants*

34