# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW YORK

CASE NO. 14-cv-5474 (PGG)

- - -

| | |
|---|---|
| HANNA BOUVENG, | : |
| Plaintiff, | : |
| vs. | : |
| NYG CAPITAL LLC d/b/a/ | : |
| NEW YORK GLOBAL GROUP | : |
| GROUP, FNL MEDIA LLC, | : |
| and BENJAMIN WEY, | : |
| Defendants. | : |

VIDEOTAPED DEPOSITION OF

BENJAMIN WEY

March 10, 2015

New York, New York

- - -

REPORTED BY:  DANA N. SREBRENICK, CRR CLR

- - -

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph/917.591.5672 fax

deps@golkow.com

Page 38

1    A.  Yes.
2    Q.  What was the master's thesis
3  in?
4    A.  It was in leadership.
5    Q.  Just regular old leadership,
6  not any kind of special leadership?
7    A.  Leadership about
8  entrepreneurship strategies.
9    Q.  Was that a daytime program, a
10  nighttime program, both day and night?  You
11  tell me.
12    A.  Both day and night.
13    Q.  Did you ever work in Oklahoma?
14    A.  Yes.
15    Q.  What kind of work did you do in
16  Oklahoma?
17    A.  International trade and
18  investments.
19    Q.  Okay.  And did -- who did you
20  work for in Oklahoma?
21    A.  I worked for myself.
22    Q.  Did -- did you have a company
23  name that you worked for?  Did you set up a
24  firm or a company?
25    A.  Yes.

Page 39

1    Q.  What was the name?
2    A.  It's called New York Global
3  Group.  It's Benchmark Global Group.
4    Q.  And at some point, did you get
5  in trouble with the Oklahoma Department of
6  Securities?
7    A.  Could you repeat the question?
8    Q.  Sure.  At some point, did you
9  get in trouble with the State of Oklahoma
10  Department of Securities?
11    A.  What does "trouble" mean here
12  in this context?
13    Q.  Well, did they ban you from
14  ever selling stock in the State of Oklahoma?
15    A.  The answer is no.
16    Q.  Really?  Okay.
17        Were you ever censured by the
18  Department of Securities in the State of
19  Oklahoma?
20    A.  Yes.
21        (Exhibit 10, State of Oklahoma
22  Department of Securities' letter, marked for
23  identification.)
24  BY MR. RATNER:
25    Q.  And I'd like to show you the

Page 40

1  document that's been marked Exhibit 10, which
2  consists of five pages.
3        Have you ever seen that before?
4    A.  May I see this?
5    Q.  So the pending question,
6  Mr. Wey, in case you forgot, is did you ever
7  see this document before.
8    A.  Yes, I have.
9    Q.  And if you look at the last
10  page or the second to last page -- or, the
11  third to last page -- sorry -- page number 3
12  of this exhibit, which is Bates numbered 109,
13  that's your signature, true?
14    A.  Yes.
15    Q.  Okay.  And if you look at page
16  2 of exhibit -- of the exhibit, it says,
17  "Censure.  Respondent" -- that's you,
18  correct?
19    A.  Yes.
20    Q.  -- "consents to the issuance of
21  a censure," right?
22    A.  Yes.
23    Q.  And prohibition to conduct
24  business, it says, "Respondent" -- again,
25  that's you, true?

Page 41

1    A.  Yes.
2    Q.  -- "agrees that subsequent to
3  the execution of the agreement, he shall not
4  request to register as a broker dealer,
5  broker dealer agent, investment advisor,
6  investment advisor representative and/or
7  issuer agent under the act," right?
8    A.  Yes.
9    Q.  So you agreed that you would
10  not conduct any of those businesses in the
11  State of Oklahoma, true?
12        MR. SHER:  Objection.
13  BY MR. RATNER:
14    Q.  You may answer.
15        MR. SHER:  You can answer.
16    A.  "I shall not request to conduct
17  business in Oklahoma," that's the exact
18  language.
19  BY MR. RATNER:
20    Q.  Okay.  Well, let's read the
21  next sentence then.  "Respondent further
22  agrees that he shall not transact security
23  business on behalf of an issuer of securities
24  or as a broker dealer, broker dealer agent,
25  investment advisor, investment advisor

Benjamin Wey

Page 62

1  February 2014, that what Ms. Bouveng wanted
2  to do was become a United States citizen,
3  true?
4      A.   Yes.
5      Q.   Not that she abandoned applying
6  for the H-1B visa because she was negligent
7  or because she was careless or anything like
8  that, true?
9      A.   Not true.
10     Q.   Okay.  Is there anything in --
11 on Exhibit 13, page 1548, that says, Oh, by
12 the way, Hanna negligently didn't fill out
13 the application?
14     A.   No.
15     Q.   Then, next page, Mr. Johnson
16 writes back to you on February 27th at 11:18
17 a.m., right?
18     A.   Appears to be.
19     Q.   Okay.  And -- and he sent a
20 copy of this to both you and Ms. Bouveng,
21 right?
22     A.   Yes.
23     Q.   And it says, "I'm in receipt of
24 Mr. Wey's e-mail early this morning stating
25 that Ms. Bouveng no longer wishes to go

Page 63

1  forward with the H-1B petition," right?
2      A.   Yes.
3      Q.   And did you respond to that, or
4  did Ms. Bouveng respond to that, to your
5  knowledge, and say, No, no, no.  I want to go
6  through with the H-1B petition?
7      A.   Yes, we did.
8      Q.   Okay.  And where's that?
9      A.   We had a call with Mr. Johnson
10 right after that.
11     Q.   When was the call?
12     A.   I don't remember the date or
13 time.  We had a call with him.  To clarify,
14 Mr. Johnson's concern under point 2,
15 "Therefore, in our opinion, it is a big
16 mistake not to pursue the H-1B case as an
17 alternative."
18     Q.   Was -- was Ms. Bouveng on the
19 call with you and Mr. Johnson?
20     A.   She initiated the call, yes.
21     Q.   So -- and -- and it's your
22 testimony that Ms. Bouveng agreed to continue
23 with the H-1B petition; is that true?
24     A.   Yes.  It was a dual track.
25     Q.   So did you and she submit an

Page 64

1  application for the H-1B visa?
2      A.   I believe we did.
3      Q.   Okay.  Let's put this away.
4          Now, Ms. Bouveng thought that
5  she could become a citizen because her mother
6  was an American citizen, true?
7      A.   Yes.
8      Q.   And isn't it also true that Ms.
9  Bouveng applied for an American passport?
10     A.   I believe she did.
11     Q.   Did she ever get the American
12 passport?
13     A.   I don't know.
14     Q.   In order for her to get the
15 American passport, she would have needed a
16 passport from her mother to show that her
17 mother was an American citizen, true?
18     A.   I believe so.
19     Q.   Did you ever see Ms. Bouveng's
20 mother's passport?
21     A.   No.
22     Q.   Were you aware that
23 Ms. Bouveng's mother's passport was in
24 Ms. Bouveng's apartment in April 2014?
25     A.   No.

Page 65

1      Q.   Were you aware that
2  Ms. Bouveng's mother's passport disappeared
3  from the apartment sometime after you were in
4  it?
5      A.   No.
6      Q.   Okay.  Now, by whom are you
7  employed, if anyone?
8      A.   Rephrase the question, please.
9      Q.   By whom are you employed, if
10 anyone?
11     A.   New York Global Group, NYG
12 Capital.
13     Q.   Do you have a title with New
14 York Global Group?
15     A.   Yes.
16     Q.   What's the title?
17     A.   Chief Executive Officer.
18     Q.   Are you paid a salary by New
19 York Global Group?
20     A.   Yes.
21     Q.   What's your salary?
22     A.   200,000.
23     Q.   A day, a week, a year, a month?
24     A.   Per year.
25     Q.   Do you receive any other

17 (Pages 62 to 65)

Golkow Technologies, Inc. - 1.877.370.DEPS

Benjamin Wey

Page 66

1  compensation besides your salary from New
2  York Global Group?
3      A.  No.
4      Q.  In -- in the year 2000 --
5  withdrawn.
6          Have you done your 2014 taxes?
7          MR. SHER:  I'm going to object
8  to this line of questioning.  What is the
9  relevance of this line of questioning
10 because you're not entitled to judgment
11 discovery at this point?
12         MR. RATNER:  Okay.
13 BY MR. RATNER:
14     Q.  How -- who else -- who else is
15 employed by New York Global Group?
16     A.  James Baxter.
17     Q.  What's his position?
18     A.  Chairman and general counsel.
19     Q.  Is he paid a salary?
20     A.  No.
21     Q.  Does he receive any
22 compensation?
23     A.  Yes.
24     Q.  How does he get his
25 compensation?  How is that determined?

Page 67

1      A.  He's an independent contractor.
2      Q.  He gets a 1099?
3      A.  Yes.
4      Q.  How much did he get in his --
5  on his 1099 in 2014?
6      A.  I don't remember.
7      Q.  Does New York Global Group have
8  any other employees?
9      A.  Yes.
10     Q.  Who?
11     A.  Melinda Cruz.
12     Q.  What's her title?
13     A.  Office manager.
14     Q.  Anyone else?
15     A.  Yes.
16     Q.  Who else?
17     A.  Christy -- Christy Vaquez.
18     Q.  What's her title?
19     A.  Receptionist.
20     Q.  And anyone else?
21     A.  No.
22     Q.  In 2014, besides Mr. Baxter,
23 were there any other independent contractors
24 working for New York Global Group?
25     A.  Yes.

Page 68

1      Q.  Who?
2      A.  Cleaning people.
3      Q.  Okay.  Anyone else?
4      A.  Outside law firms.
5      Q.  Anyone else?
6      A.  Business consultants.
7      Q.  In 2014, was Mr. Scholander
8  paid any money by New York Global Group?
9      A.  No.
10     Q.  In 2014, was Mr. Harris paid
11 any money from New York Global Group?
12     A.  No.
13     Q.  Was Messrs. -- either
14 Mr. Scholander or Mr. Harris paid any money
15 personally from you?
16     A.  No.
17     Q.  Do you know what
18 Mr. Scholander's source of income is?
19     A.  Don't know.
20     Q.  Or Mr. Harris?
21     A.  Don't know.
22     Q.  How many employees does New
23 York Global Group have?
24     A.  Please clarify the question.
25     Q.  How many employees does New

Page 69

1  York Global Group have?
2      A.  Four.
3      Q.  Okay.  Did you ever tell anyone
4  or did New York Global Group ever tell anyone
5  that it had 110 full-time employees?
6      A.  No.
7          MR. RATNER:  Okay.  Let's mark
8  this as Exhibit 15, which is Plaintiff's
9  Bates numbers 1084, 1085, 1086 and 1087.
10         (Exhibit 15, Document Bates
11 numbered Plaintiff's 1085 through 1087,
12 marked for identification.)
13 BY MR. RATNER:
14     Q.  Do you recognize what this
15 document is?
16     A.  Yes.
17     Q.  And this is something called a
18 Training/Internship Placement Plan, true?
19     A.  Yes.
20     Q.  And it's from the U.S.
21 Department of State, true?
22     A.  True.
23     Q.  United States Department of
24 State, that's a part of the United States
25 government --

18 (Pages 66 to 69)

Benjamin Wey

Page 78

1  BY MR. RATNER:
2  Q. Are you aware if Mr. Baxter or
3  you told anyone that Micheala Wey was the --
4  an HR manager at New York Global Group?
5  MR. SHER: Same objection.
6  A. I don't know.
7  (Exhibit 16, Document Bates
8  numbered Defendants' 634 and 635, marked for
9  identification.)
10  BY MR. RATNER:
11  Q. Okay. I'd like to show you
12  Exhibit 16, which is Bates numbered
13  Defendants' 634 and 635.
14  MR. SHER: Where do I find that
15  in the binder? Is it in order of Bates
16  numbers?
17  MR. RATNER: No. It was right
18  after the Training/Internship Placement Plan.
19  MR. SHER: Okay. Got it.
20  MR. RATNER: It should be the
21  next document.
22  THE WITNESS: Got it.
23  BY MR. RATNER:
24  Q. And if you look at the middle
25  on the right-hand side of this document, it

Page 79

1  says, "Contact person, full name," and it
2  says under that, "James M. Baxter."
3  Do you see that?
4  A. Could you point it to me?
5  Q. Yeah. It's on the first page.
6  A. Oh, yeah, I do.
7  Q. Okay.
8  A. Thank you.
9  Q. Then it says, "Title, executive
10  chairman." Do you see that?
11  A. Yes.
12  Q. And then it says, "HR manager
13  (full name)." And HR manager is human
14  resources; would that be fair to say?
15  A. Yes.
16  Q. And it says, "James M.
17  Baxter" -- "Baxter" and "Micheala Wey," true?
18  A. Could you repeat the question?
19  Q. Yeah. It says -- under, "HR
20  manager (full name)," it lists two people --
21  A. Yes.
22  Q. -- "James M. Baxter" and
23  "Micheala Wey," true?
24  A. Yes.
25  Q. And on the line under that, it

Page 80

1  says, "Number of employees at training/intern
2  site," and it says the number seven, true?
3  A. Yes.
4  Q. And it says, "Gross annual
5  revenue over $25 million," true?
6  A. True.
7  MR. SHER: You're asking if the
8  document -- if how you read the document is
9  true or if the information is true?
10  MR. RATNER: That's a good
11  question, Mr. Sher.
12  BY MR. RATNER:
13  Q. Where -- where -- I read the
14  document accurately, true?
15  A. Yes.
16  Q. But is it true or false that
17  there are seven employees at the training
18  site?
19  A. I don't remember.
20  Q. Is it true or false that NYGG's
21  gross annual revenue is over $25 million?
22  A. In the New York location,
23  false.
24  Q. How about in the China
25  location?

Page 81

1  A. Yes.
2  Q. Okay. And as a matter of fact,
3  if you look at the second page of this
4  document, who's Heidi Silverstone?
5  A. She's the representative of
6  ASSE Aspire --
7  Q. Okay.
8  A. -- a visa sponsor firm.
9  Q. And she got the information --
10  do you know where she got the information
11  that she used to fill out this particular
12  document?
13  A. Don't know.
14  Q. Did she make a visit to New
15  York Global Group's headquarters?
16  A. Yes.
17  Q. And when she made her visit to
18  the headquarters, did you talk to her?
19  A. No.
20  Q. Did Mr. Baxter talk to her?
21  A. I don't know.
22  Q. Did Micheala Wey talk to her?
23  A. No.
24  Q. And -- and Ms. Silverstone
25  certified, did she not, if you look at the

21 (Pages 78 to 81)

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 158

1    MR. RATNER: 001 through -- it's
2 the LCOR Bates number -- 009.
3    MR. SHER: It ends at 009?
4    MR. RATNER: Yeah. The exhibit
5 I'm showing him is only pages 1 through 9.
6    MR. SHER: He's just asking you
7 about 1 to 9.
8    THE WITNESS: Oh, okay.
9    A.   Yes, it was a lease.
10 BY MR. RATNER:
11   Q.   Okay. And in order to become
12 her guarantor, you had to fill out an
13 application also, right?
14   A.   Yes.
15   MR. RATNER: And let's look at
16 Exhibit 21, which, Mr. Sher, is page 25.
17   (Exhibit 21, Application to
18 become guarantor, marked for identification.)
19 BY MR. RATNER:
20   Q.   And page 25, is that the
21 application you filled out in order to become
22 the guarantor for the apartment?
23   A.   Yes.
24   Q.   And one of the things they
25 asked you in order to induce you to become

Page 159

1 guarantor of the apartment is what your
2 monthly gross income was, right?
3    MR. SHER: Objection to form.
4 BY MR. RATNER:
5    Q.   Well, if you look on the
6 left-hand column -- I'll withdraw that
7 question.
8    If you look at the left-hand
9 column --
10   A.   Yes.
11   Q.   -- go down to the third box.
12   It asks your work, right?
13   A.   Yes.
14   Q.   And it says, "Present employer,
15 New York Global Group"?
16   A.   Yes.
17   Q.   And position is CEO --
18   A.   Yes.
19   Q.   -- right?
20   A.   Uh-huh.
21   Q.   The date you began this job,
22 2002, right?
23   A.   Yes.
24   Q.   And gross monthly income, it
25 says, "$40,000 a month," right?

Page 160

1    A.   Yes.
2    Q.   That's what it says?
3    A.   Yes.
4    Q.   Was that true or false?
5    A.   Absolutely true.
6    Q.   Okay.
7    A.   Salary plus bonus at the end of
8 each year, that's about right.
9    Q.   And would it be fair to say
10 that -- that you reported that income on your
11 federal income tax return?
12   A.   I don't know what was the
13 arrangements. The income per month is always
14 calculated based on a guaranteed salary
15 plus an unguaranteed year-end performance
16 bonus, which could be more or less than a
17 particular person's compensation. That's the
18 industry practice in the financial services
19 industry.
20   Q.   Okay. Well, let's look at
21 Exhibit 22 now, which is page 27.
22   (Exhibit 22, Document Bates
23 numbered 27, marked for identification.)
24   A.   Yes.
25 BY MR. RATNER:

Page 161

1    Q.   And that's something from your
2 accountants, Most & Company?
3    A.   From a CPA firm, yes.
4    Q.   Yeah. And they say that in
5 2012 you reported federal income tax income
6 of 1.7 million, right? Is that accurate?
7    A.   Gross fees of the LLC, yes.
8    Q.   Okay. It said, "As reported on
9 Mr. Wey's 2012 Federal Individual Income Tax
10 Return," right?
11   A.   Yes.
12   Q.   Okay. Now, the monthly rent on
13 this apartment was how much?
14   A.   I don't quite recall.
15   Q.   If I told you it was $3,365 a
16 month, would that refresh your recollection?
17   A.   Yes.
18   Q.   And you paid a part of that
19 rent, right?
20   A.   Yes.
21   Q.   How much did you pay each
22 month?
23   A.   I think I paid about $2,000 per
24 month, 2200, 2,000. I don't remember.
25   Q.   Did you -- and you paid it

|     | Page 194 |     | Page 196 |
| --- | --- | --- | --- |

Page 194

1    apartment, that's about right.
2         Q.   Did you ever tell Chemme that
3    you made $30 million a year?
4         A.   I don't make $30 million a
5    year.
6         Q.   I didn't ask you that.  I asked
7    you if you ever told her that you make $30
8    million a year.
9         A.   I don't remember I did.  If I
10   did, it was misspoken.
11        Q.   Did you ever see any videotape
12   or other recordings of Ms. Bouveng and
13   Mr. James Chauvet?
14        A.   Yes.
15        Q.   How many videotapes or other
16   recordings did you see of Ms. Bouveng and
17   James Chauvet?
18        A.   I don't remember.
19        Q.   Was it more than one?
20        A.   Yes.
21        Q.   Was it more than two?
22        A.   Yes.
23        Q.   Was it more than five?
24        A.   I don't remember.
25        Q.   Was it more than ten?

Page 195

1         A.   I don't remember.
2         Q.   When for the first time did you
3    see a videotape or other recording of
4    Ms. Bouveng and James Chauvet?
5         A.   I don't remember.
6         Q.   Would it -- at any time before
7    April 22nd, did you see a video -- a
8    videotape or other recording of Hanna Bouveng
9    and James Chauvet?
10        A.   I believe I saw something on
11   the Instagram or Facebook or some social
12   media website before, before the termination.
13        Q.   At any time before April 22,
14   2014, did you see a recording of Ms. Bouveng
15   and Mr. Chauvet in the apartment building
16   where Ms. -- where Ms. Bouveng rented an
17   apartment?
18        A.   No.
19        Q.   Did you ever see any recordings
20   or videotapes of Ms. Bouveng and Mr. Chauvet
21   kissing?
22        A.   I probably did.
23        Q.   When for the first time did you
24   see a videotape of Mr. Chauvet and
25   Ms. Bouveng kissing?

Page 196

1         A.   I don't remember.
2         Q.   Was this -- was the videotape
3    of Ms. Bouveng and Mr. Chauvet kissing
4    something you found on the internet or
5    someplace else?
6         A.   I don't remember.
7         Q.   Did you see a videotape of Mr.
8    Chauvet and Ms. Bouveng kissing in February
9    2014?
10        A.   I don't remember.
11        Q.   Do you have in your possession,
12   either at home or on a computer someplace or
13   at work, the videotape you saw of Mr. Chauvet
14   and Ms. Bouveng kissing?
15        A.   I have not looked.
16        Q.   That's not the question.  The
17   question is, do you have it?
18        A.   I don't know.
19        Q.   Who knows?
20        A.   I will look into it.
21        Q.   At any time before April 22,
22   2014, did you see a videotape or other
23   recording of Ms. Bouveng and Mr. Chauvet
24   hugging?
25        A.   I probably did.  I don't

Page 197

1    remember.
2         Q.   Where did the video --
3    withdrawn.
4              Where did the videotape or
5    other recording show that they were hugging?
6    Was it inside, outside, in a building, on the
7    street or someplace else?
8         A.   I don't remember.
9         Q.   Did you see a videotape of them
10   hugging before April 22, 2014?
11        A.   I don't remember.
12        Q.   Did you -- did you ever see a
13   videotape or other recording of Mr. Chauvet
14   and Ms. Bouveng having intimate relations?
15        A.   Yes.
16        Q.   When did you see that?
17        A.   I don't remember.
18        Q.   Was -- were they having
19   intimate relations in an apartment or --
20   or in a dwelling, in a lobby, on the street?
21   Where were they having these intimate
22   relations?
23        A.   It was inside a building.  I
24   don't remember when that was.
25        Q.   Were the recordings of

Page 330

1    Q.   Is it you do, you don't, or --
2  or you don't know?
3    A.   I don't know.
4    Q.   Well, I want those videos, too.
5    A.   I will look for them, and if
6  they are available, they will be given to
7  you.
8         MR. RATNER:  Off the record a
9  second.
10        THE VIDEOGRAPHER:  The time is
11 now 6:00 p.m.  Going off the record.
12        (Whereupon, a brief recess is
13 taken.)
14        THE VIDEOGRAPHER:  The time is
15 now 5:08.  We're going back on the record.
16        MR. RATNER:  6:08.
17        THE VIDEOGRAPHER:  Sorry.
18 6:08.
19 BY MR. RATNER:
20   Q.   Mr. Wey, I want to show you
21 what's marked as Exhibit 33.
22        (Exhibit 33, April 24th e-mail
23 between Benjamin Wey to Hanna Bouveng, marked
24 for identification.)
25 BY MR. RATNER:

Page 331

1    Q.   It's an e-mail dated April 24th
2  from you to Hanna with a copy to Chemme.  Do
3  you see that?
4    A.   Yes.
5    Q.   Okay.  And you ask her to take
6  down the LinkedIn reference, right?
7    A.   Yes.
8    Q.   And eventually she did that,
9  right?
10   A.   A few days later.
11   Q.   Okay.  You didn't ask her
12 anyplace in this e-mail to return company
13 property, true?
14   A.   Not in this e-mail.
15        (Exhibit 32, Document Bates
16 numbered 960 through 970, marked for
17 identification.)
18 BY MR. RATNER:
19   Q.   Okay.  Now, I'd like to show
20 you what's been marked as Exhibit 32, which
21 consists of pages marked 960 to 96 -- to 970.
22        Do you see that?
23        MR. SHER:  I just want to note
24 for the record that Exhibit 32 appears to be
25 redacted, and we haven't received a redaction

Page 332

1  log.  We ask you to produce one.
2         MR. RATNER:  I can represent to
3  you that the only thing that's been redacted
4  from that was communication between
5  Ms. Bouveng and us.  Nothing involving
6  Mr. Wey or any communications with Mr. Wey
7  and anyone outside -- between Mr. Wey and
8  anyone or anyone that had nothing to do with
9  us and Hanna.
10 BY MR. RATNER:
11   Q.   So I'd like you to look at page
12 963, and there's a picture on the top of page
13 963 of -- of Hanna and Mr. Chauvet; is that
14 true?
15   A.   I have no idea.
16   Q.   Well, is that Ms. Bouveng's
17 photograph there?
18   A.   Yes.
19   Q.   Okay.  And if you turn back to
20 page 962, if you look at the left-hand side
21 of the exhibit, there's a picture of you,
22 right?
23   A.   Yes.
24   Q.   And next to you, it says -- and
25 it's an investigative reporter.  You call

Page 333

1  yourself an investigative reporter, right?
2    A.   Yes.
3    Q.   "We are focused on Bouveng's
4  affiliation with drug dealers and her
5  contacts and these very troubling photos
6  discovered," right?
7    A.   Yes.
8    Q.   And this is part of some
9  Facebook messages that you sent to Nina
10 Chelidze?
11   A.   I cannot confirm who I sent it
12 to.
13   Q.   Okay.  But it's something you
14 sent to someone, right?
15   A.   Yes.
16   Q.   Okay.  And then the next page
17 is a picture on top of Ms. Bouveng with
18 someone who you can't identify; is that true?
19 Or was that Mr. Chauvet?
20   A.   I can only speculate it was
21 Mr. Chauvet.
22   Q.   Okay.  And below that is a
23 picture of a woman inserting a black dildo in
24 her vagina.  What's that all about?
25        MR. SHER:  Objection to form.

84 (Pages 330 to 333)

Benjamin Wey

Page 334

1  A. This picture is among the many
2  pictures searched online associated with
3  Hanna Bouveng and James Chauvet.
4  BY MR. RATNER:
5  Q. Was this picture from Hanna
6  Bouveng's Instagram account?
7  A. I don't -- I don't think so.
8  Q. Was this picture from James
9  Chauvet's Instagram account?
10  A. I don't know.
11  Q. Was it from James Chauvet's
12  Facebook page?
13  A. I don't know.
14  Q. Well, how -- other than the
15  fact that it's a picture of a black penis in
16  a white vagina, how is it in any way
17  associated with Hanna Bouveng and James
18  Chauvet?
19  A. Because this particular sex
20  toy, if I could call it, was found in Hanna
21  Bouveng's apartment.
22  Q. Who found it in Hanna Bouveng's
23  apartment?
24  A. I found it.
25  Q. When?

Page 335

1  A. After she left the apartment.
2  Q. Did that somehow offend you
3  that she had a sex toy?
4  A. Not at all.
5  Q. And did you find this picture
6  of a white woman and a black dildo in her
7  apartment?
8  A. No.
9  Q. So you had to go find a picture
10  of a white woman with a black dildo and --
11  and send it to someone, right?
12  A. Not at all. Not true.
13  Q. Well, how did you get that
14  picture?
15  A. The pictures were searched
16  according to online searches in names
17  associated with Hanna Bouveng and James
18  Chauvet, party lives, and this picture
19  appears to be some -- some form of a nature
20  involving that dildo found in her apartment.
21  I cannot confirm one way or the other.
22  Q. Does that purport to be a
23  picture of Hanna Bouveng's vagina?
24  A. I have no idea.
25  Q. Who found this picture?

Page 336

1  A. Researchers.
2  Q. These Chinese researchers?
3  A. In Asia.
4  Q. And you said that
5  they -- when they did research looking into
6  Hanna Bouveng and James Chauvet, this is a
7  picture that appeared; is that what you're
8  telling us?
9  A. They did global searches. Many
10  photos came up.
11  Q. And this is one of the photos
12  that came up when you looked up Hanna Bouveng
13  on the internet or James Chauvet on the
14  internet or both of them on the internet,
15  right?
16  MR. SHER: Objection.
17  Foundation.
18  BY MR. RATNER:
19  Q. Is that what you're telling us?
20  A. My understanding is those
21  names, yes.
22  Q. So why in heaven's name would
23  you send this to someone?
24  A. Please repeat the question.
25  Q. Why in heaven's name would you

Page 337

1  send this to someone?
2  A. Well, to be frank with you, in
3  hindsight, I probably shouldn't have done it.
4  Q. No. But why did you do it?
5  What the hell were you thinking? Withdrawn.
6  What in heaven's name did you
7  think when you sent this?
8  A. I was so upset, I tell, you. I
9  felt a strong sense of betrayal. Every day
10  she came to my office. She said, Ben, I'm so
11  grateful to you. You're my mentor. You
12  changed my life. Her father says the same
13  thing to me.
14  And I -- I felt so angry, upset
15  after I had to terminate her. I felt her
16  life was ruined by James Chauvet, and Mr.
17  Chauvet's criminal record certainly
18  contributed to that particular anger.
19  And in hindsight, I -- I should
20  not have sent it to anybody. I don't care
21  who that is. That was not appropriate.
22  Q. I mean, you -- you -- you were
23  like really angry, like, that she betrayed
24  you at the end of April 2014, right?
25  A. I discovered numerous lies

85 (Pages 334 to 337)

Golkow Technologies, Inc. - 1.877.370.DEPS

Benjamin Wey

Page 338

1   she -- she told.  I thought it was not
2   necessary, and I just felt like, you know, I
3   was her mentor.  And she told me that every
4   single day, Ben, how grateful I am to you.
5   You give me such a beautiful life.
6           Her father said the same thing
7   to me.  Her aunt said the same thing to me.
8   Every day.  I felt almost responsible for her
9   better life as a mentor, as a dear friend.
10      Q.   So that you felt that because
11  of that you had to send a pornographic
12  picture to a friend, Nina Chelidze, right?
13      A.   This picture came up along with
14  many other searches.
15      Q.   So you felt that you had to
16  send a pornographic picture to Nina Chelidze,
17  right?
18      A.   No.  I had no idea who I sent
19  it to, but it appears that I sent it to
20  somebody.  Whoever that was on the receiving
21  end of it was not an appropriate thing to do.
22  I -- I regret.
23      Q.   Okay.
24      A.   That's the bottom line.
25      Q.   And you sent it in, like, three

Page 339

1   full months after April 22nd.  You sent it on
2   July 22, 2014.  I mean, wasn't your sense of
3   anger someone lessened by then?
4       A.   I have no idea of the date.  I
5   don't seem to find this date or -- one way or
6   the other.
7            MR. RATNER:  Exhibit -- Exhibit
8   30.  Thank you.
9            (Exhibit 30, April 29, 2014
10  e-mail from Benjamin Wey to Hanna Bouveng,
11  marked for identification.)
12  BY MR. RATNER:
13      Q.   That's an e-mail that you sent
14  to Hanna on April 29, 2014, right?
15      A.   Yes.
16      Q.   Okay.  And it's a three-page
17  e-mail with a photograph attached as the
18  fourth page -- or, a video attached?
19      A.   Yes.
20      Q.   And the video is in the lobby
21  of the building on April 20, 2014, right?
22      A.   April 22, 2:46 a.m., yes.
23      Q.   Actually, it says, 4/20/14 at
24  11:03 p.m., at least the one on mine does.
25      A.   It says, April 22, 2014, 2:46

Page 340

1   a.m.
2       Q.   Okay.  In any event -- okay.  I
3   got the wrong one.  That's fine.  All right.
4   April 22nd.
5            And that's Hanna and
6   Mr. Chauvet walking into the building, right?
7       A.   Yes.  In early morning, drunk,
8   yes.
9       Q.   Okay.  And you could tell that
10  they were drunk from that video, right?
11      A.   I could tell, yes.
12      Q.   All right.  If you look at the
13  third paragraph, you say, "Hanna, I could
14  never understand how a talented young lady
15  like Hanna would date a man with a criminal
16  history and works as a nightclub promoter."
17           You said that?
18      A.   Yes.
19      Q.   And then back on the fourth
20  sentence, you say, "Wake up, Hanna.  Was it
21  better sex or better alcohol," right?
22      A.   Yes.
23      Q.   "Was it better sex or better
24  alcohol that kept you blind?"
25           Who are you comparing the

Page 341

1   better sex to?
2            Was it better sex that James
3   Chauvet gave her than you gave her or
4   something else?
5       A.   This most likely was written in
6   the middle of anger.  If I could change the
7   word, I'd change the word to good instead of
8   better.  That would be more appropriate in
9   the English language, and my native language
10  is Chinese-Mandarin.
11      Q.   Okay.
12      A.   It should be good, if I could
13  change that.
14      Q.   Turn to the next page.  Second
15  paragraph, last line, "Does he give you
16  better sex or more alcohol?"
17           Better sex than who, Mr. Wey,
18  better sex than you?
19      A.   No, not at all.  I would say
20  it's more like good sex or good alcohol.
21  That would be more appropriate in the English
22  language.  Again, my native language is
23  Chinese.
24           In writing in the middle of
25  anger, I probably -- I most likely and

86 (Pages 338 to 341)

Golkow Technologies, Inc. - 1.877.370.DEPS