# EXHIBIT C

James Baxter, Esquire

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW YORK

CASE NO. 14-CV-5474 (PGG)

- - -

HANNA BOUVENG,            :

      Plaintiff,    :

   vs.                    :

NYG CAPITAL LLC d/b/a/    :

NEW YORK GLOBAL GROUP     :

GROUP, FNL MEDIA LLC,     :

and BENJAMIN WEY,         :

      Defendants.   :


VIDEOTAPED DEPOSITION OF

JAMES BAXTER, ESQUIRE

March 11, 2015

New York, New York

- - -

REPORTED BY:  DANA N. SREBRENICK, CRR CLR

- - -

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph/917.591.5672 fax

deps@golkow.com

Page 26

1  A. Yes. I think that's their
2  company under whose umbrella these -- these
3  people are brokers.
4  Q. Are there any other brokers
5  employed at Cambridge Alliance Capital
6  besides Scholander and Harris?
7  A. Yes.
8  Q. How many?
9  A. I don't know.
10 Q. Are there any other broker --
11 withdrawn.
12    Does New York Global Group have
13 any sort of business relationship with
14 Cambridge Alliance Capital?
15 A. There's no ongoing relationship
16 with them.
17 Q. Did New York Global Group ever
18 do business with Cambridge Alliance Capital?
19 A. I would say no.
20 Q. Did New York Global Group ever
21 do business with William Scholander?
22 A. No.
23 Q. Did New York Global Group ever
24 do business with Talman Harris?
25 A. No.

Page 27

1  Q. Did William Scholander ever go
2  on a business trip with Benjamin Wey?
3  A. He may have.
4  Q. Well, did William Scholander
5  ever go on a business trip with you and
6  Benjamin Wey?
7  A. Yes. I -- I know Talman Harris
8  did, and Scholander may have also done.
9  Q. Did Talman Harris ever go on a
10 business trip with you and Benjamin Wey?
11 A. Yes.
12 Q. When was that?
13 A. I don't remember.
14 Q. Is -- are either Scholander or
15 Harris Mr. Wey's stockbrokers?
16 A. I don't know.
17 Q. Does New York Global Group have
18 any money invested with Cambridge Alliance
19 Capital?
20 A. Not to my knowledge.
21 Q. Where did you meet Mr. Wey for
22 the first time?
23 A. In his office.
24 Q. Where was the office?
25 A. 40 Wall Street.

Page 28

1  Q. Is that where the office still
2  is?
3  A. Yes.
4  Q. Before meeting Mr. Wey, did you
5  know you were going to meet Benjamin Wey?
6  A. Yes.
7  Q. Yeah? And did you know that he
8  had a company called New York Global Group?
9  A. Yes.
10 Q. Did you do any research before
11 meeting Mr. Wey into the business of New York
12 Global Group?
13 A. Yes.
14 Q. What did that research consist
15 of?
16 A. I looked on the internet at
17 various online blogs and newspaper reports
18 relating to him.
19 Q. What did -- what did -- and so
20 you'd not only researched New York Global
21 Group, but you also researched Benjamin
22 Wey --
23 A. Right.
24 Q. -- is that fair?
25 A. Right.

Page 29

1  Q. What did you learn about New
2  York Global Group and Benjamin Wey during
3  that on -- as a result of that online
4  research?
5  A. That he had been attacked
6  frequently by market manipulating short
7  sellers.
8  Q. Did you learn anything about
9  the business of New York Global Group when
10 you did your research?
11 A. Some, but not much.
12 Q. Did you learn that they were
13 involved in something called reverse mergers?
14 A. I was aware of that.
15 Q. Yeah. What's a reverse merger?
16 A. Reverse merger is a financial
17 technique in which a -- a viable private
18 company merges with a registered shell
19 corporation, which is registered with the SEC
20 and has public shareholders.
21 Q. And the private companies that
22 Mr. Wey was doing reverse mergers for, were
23 those Chinese companies?
24 A. Yes, I think, generally.
25 Q. And did the SEC look kindly on

Page 30

 1  this reverse merger business?
 2          MR. SHER:  Objection to form.
 3  BY MR. RATNER:
 4      Q.   You can answer.
 5      A.   There was a -- a negative
 6  attitude toward reverse mergers by the SEC.
 7      Q.   The SEC didn't like that at
 8  all, right?
 9          MR. SHER:  Objection to form.
10  BY MR. RATNER:
11      Q.   You can answer.
12      A.   The SEC was -- was -- did not
13  understand reverse mergers and were
14  influenced by people who came to tell them
15  they were bad and put a political and
16  propaganda campaign against them.
17      Q.   Right.  The SEC shut down the
18  reverse merger business; is that true?
19      A.   Substantially.
20      Q.   Right.  And -- and the SEC is
21  the United States Securities and Exchange
22  Commission?
23      A.   Yes.
24      Q.   They're the entity that
25  regulates the securities business in the

Page 31

 1  United States?
 2      A.   One of them, yes.
 3      Q.   What's another one that
 4  regulates the securities business?
 5      A.   Well, FINRA regulates, and the
 6  stock exchanges regulate as well.
 7      Q.   And there are also state
 8  regulators in --
 9      A.   There are state regulators.
10      Q.   You got to let me finish my
11  question.
12      A.   I -- I beg your pardon.
13      Q.   Okay.  I'm going to try to let
14  you finish your answer, and you got to let me
15  try to finish --
16      A.   Sounds fair.
17      Q.   -- my question.
18      A.   Sounds fair.
19      Q.   The -- the -- did you do any
20  research into whether Mr. Wey had ever been
21  disciplined or sanctioned or criticized by
22  any federal or state securities regulator
23  before meeting with him?
24      A.   I don't remember.
25      Q.   Did you come to learn at some

Page 32

 1  point that Mr. Wey had been disciplined by a
 2  federal or state regulator?
 3      A.   Yes.
 4      Q.   When did you first come to
 5  learn that?
 6      A.   I don't remember.
 7      Q.   Was it before or after you went
 8  to work for him?
 9      A.   I don't remember.
10      Q.   Had you known that he had been
11  disciplined by a federal or state regulator
12  before you went to work for him, would that
13  have influenced you taking the job with him?
14      A.   Not based on what I know about
15  the very minor skirmish that he had 15 years
16  ago.
17      Q.   Okay.  What was that skirmish?
18      A.   Mr. Wey came here on a
19  scholarship from China to go to college in
20  Oklahoma.  He then got an MBA, master of
21  business administration, in Oklahoma and got
22  a job at a small brokerage firm, member of
23  the then called NASD, now FINRA, and asked
24  them to let him be a registered
25  representative and study to pass the Series 7

Page 33

 1  exam as a broker.
 2          He -- he told them that he in
 3  business school had set up a registered
 4  investment advisory company, which cleared
 5  through Bear Stearns in New York, and he
 6  wanted to make clear that when he went to
 7  work for these two cousins in their little
 8  brokerage firm that his registered investment
 9  advisory firm was not part of the deal and
10  was completely separate.
11          They said fine and when they
12  hired him, they put in his paperwork for NASD
13  that he had -- that he owned a -- a
14  registered investment advisory firm away from
15  their brokerage firm.
16          He was hired.  He went to work
17  studying.  And after a while, these two
18  cousins realized that his clients in his --
19  his registered investment advisory business
20  were much more substantial than any of the
21  customers of the brokerage firm.  They had a
22  lot of money.
23          And they said, Why don't you
24  bring your -- your -- your customers in from
25  the registered advisory firm into our firm,

Page 34

1  and we'll sell them penny stocks?  And he
2  said, No.  That was not part of the deal.
3  I'm not bringing them in.
4       And they then fired him and
5  reported to NASD that he was fired for
6  violating an NASD rule which requires a
7  broker to give written notice of any outside
8  business interest.  The NASD took a look at
9  it and did nothing.
10      Years later, when Mr. Wey had
11 an opportunity to sell his business, when he
12 had already moved to New York, he had an
13 offer of millions of dollars from England.
14 They said, We have a problem with this open
15 item with the NASD, so he hired a lawyer.
16      THE WITNESS:  Am I talking too
17 much?  Okay.  I was just trying to give the
18 full story of what it was.
19 BY MR. RATNER:
20    Q.   Well, how did you learn this
21 story?
22    A.   I did research on it, and I
23 also talked to Mr. Wey and looked at
24 documents.
25    Q.   Okay.  And Mr. Wey, was he not,

Page 35

1  prohibited as a result of his agreement from
2  operating as a broker in the State of
3  Oklahoma, true?
4       MR. SHER:  Objection to form.
5  Do you want to show him the document?
6    A.   Well, I -- I know what you're
7  asking about, but it's not what I was talking
8  about.  Okay.  That's another situation
9  altogether.
10 BY MR. RATNER:
11    Q.   Well --
12    A.   I never quite finished on the
13 other one.
14    Q.   Okay.  Isn't it -- isn't it
15 true that Mr. Wey was -- is prohibited from
16 acting as a broker in the State of Oklahoma?
17    A.   He signed a consent that he
18 would never apply to be a broker in Oklahoma.
19 He signed that after he had gone out of the
20 brokerage business and moved to New York.  He
21 did not admit any violations when he signed
22 that.
23    Q.   And Mr. Wey agreed to be
24 censured by the State of Oklahoma; is that
25 true?

Page 36

1    A.   Yes.
2    Q.   And he agreed to be censured by
3  the State of Oklahoma in 19 -- in 2005, true?
4    A.   It went on much earlier than
5  that, but by the time the documentation was
6  complete, it was later, some many years
7  later.
8    Q.   Okay.  And one of the things
9  that he was accused of by the State of
10 Oklahoma was recommending -- well, one of the
11 things he was accused of by the State of
12 Oklahoma was failing to disclose certain
13 risks associated with the purchase of
14 securities to his customers, true?
15    A.   I don't know what allegations
16 they made.  He didn't admit to any of them.
17    Q.   And -- and he was also accused
18 of failing to disclose to his customers
19 certain consulting arrangements he had with
20 the companies in which he was recommending
21 stock, true?
22    A.   I don't remember.
23    Q.   Well, let me show you what
24 yesterday was marked as Plaintiff's Exhibit
25 10.  Have you ever seen that before?

Page 37

1    A.   I don't know.  I'm just looking
2  at it now.
3    Q.   Okay.  The question was, have
4  you ever seen this before?  It's sort of a
5  yes or no question, which doesn't require
6  reading the entire document.
7    A.   I'm -- I'm -- I'm still
8  puzzling over whether I've ever seen this.
9       MR. RATNER:  Okay.  Let's go
10 off --
11   A.   Maybe, if I read more pages, it
12 will --
13      MR. RATNER:  That's fine.
14   A.   -- jog my memory.
15      MR. RATNER:  Let's go off the
16 record while he reads it, please.
17      THE VIDEOGRAPHER:  The time is
18 now 10:57.  We're going off the record.
19      (Whereupon, a brief recess is
20 taken.)
21      THE VIDEOGRAPHER:  The time is
22 now 10:57, and we're back on the record.
23 BY MR. RATNER:
24   Q.   Had you seen this before going
25 to work for Mr. Wey or with Mr. Wey, would

10 (Pages 34 to 37)

Page 38

1  that have influenced your decision to work
2  with him?
3      A.   No.
4      Q.   Why not?
5      A.   Because brokerage firms like
6  Morgan Stanley and J.P. Morgan have 80 to 100
7  situations like this every year.  This is
8  part of the brokerage business, to have some
9  regulator make some allegations, and you
10 agree to settle it without going to the
11 trouble of the distraction of long hearings
12 and bringing in witnesses and being taken
13 away from your business.  So you get rid of
14 it by settling it without admitting any of
15 the allegations.
16          This is a very normal part of
17 the business, and so, no, it wouldn't.
18     Q.   So it's a normal part of the
19 business for a broker to be censured; is
20 that -- that your testimony?
21     A.   There are many cases of
22 censure.  I'd say there are enough that it is
23 somewhat normal.
24     Q.   And it's a normal part of the
25 business for a broker to be barred and agree

Page 39

1  to be barred from selling securities in a
2  particular state, true?
3          That's what your testimony is?
4      A.   I don't know if it's normal or
5  not.
6      Q.   And Mr. Wey's censure and
7  agreement to be barred from selling
8  securities in Oklahoma, that's just normal,
9  everyday business in the brokerage industry,
10 true?
11     A.   I don't know that that's so.
12     Q.   Yeah.  And as a matter of fact,
13 it isn't.  You know that.
14          MR. SHER:  Can you let him
15 finish his answer?
16 BY MR. RATNER:
17     Q.   I thought -- did you finish
18 your answer?
19     A.   No.  This guy, Faught, the head
20 of securities in Oklahoma, was a very strong
21 democrat who resented the fact that Ben Wey
22 was a republican advising Governor Keating
23 and getting a lot of publicity for it.
24          When -- when the newspapers
25 asked Ben whether he had any advice for

Page 40

1  Mr. Faught, he said he should think more
2  internationally and not just focus on
3  Oklahoma.
4          When the paper came to
5  Mr. Faught, they said, What do you say?
6  Mr. Ben Wey says you should be more
7  international.  He said, I say he's under
8  investigation today.  And he sent a messenger
9  over to Benjamin Wey's office and began this
10 investigation.
11     Q.   How do you know that?
12     A.   I know because I've talked to
13 Ben Wey, and I've talked to a very fine
14 lawyer in Oklahoma who is aware of it and is
15 a next door neighbor of Mr. Faught who said
16 over the -- over the fence, I'm getting rid
17 of these Chinese in Oklahoma.
18     Q.   So -- so your testimony is that
19 this was a hatchet job, basically?
20     A.   I believe it was.
21     Q.   And it was discriminating
22 against a Chinese individual; is that --
23     A.   In part.
24     Q.   When the SEC objected to and
25 shut down the reverse merger business, was

Page 41

1  that also a hatchet job?
2      A.   It was a successful propaganda
3  campaign by a -- certain groups.
4      Q.   And when we're talking about
5  reverse mergers, that's -- what we're talking
6  about is getting money from Chinese companies
7  and secretly investing them in American
8  companies, so -- withdrawn.
9          When we're talking about
10 Mr. Wey's reverse -- reverse merger business,
11 that involves helping Chinese companies
12 secretly invest in American companies, true?
13         MR. SHER:  Objection to form.
14     A.   False.  Totally wrong.
15 BY MR. RATNER:
16     Q.   What's the -- what's -- so if
17 New York Global Group doesn't do reverse
18 mergers now or doesn't advise on reverse
19 mergers now, what does New York Global Group
20 do?  What's the business?
21     A.   We have diversified into a
22 number of businesses.  One of our businesses
23 is to help the investor clients of -- in
24 China to invest their money throughout the
25 world.

11 (Pages 38 to 41)