# EXHIBIT E
# PART 1 OF 2

Plaintiff's Exhibit

4

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## OFFICE OF HEARING OFFICERS

| | |
|---|---|
| DEPARTMENT OF ENFORCEMENT, | Disciplinary Proceeding |
| Complainant, | No. 2009019108901 |
| v. | Hearing Officer—LOM |
| WILLIAM SCHOLANDER (CRD No. 2938044) | **HEARING PANEL DECISION**[*] |
| and | August 16, 2013 |
| TALMAN HARRIS (CRD No. 3209947), | |
| Respondents. | |

As alleged in the First Cause of Action, Respondents committed fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5, and FINRA Rules 2020 and 2010. For this misconduct, each Respondent is barred from associating with any FINRA member firm in any capacity.

As alleged in the Second Cause of Action, Respondents engaged in outside business activities without giving prior written notice to the firm that employed them, in violation of NASD Rule 3030 and FINRA Rule 2010. For this misconduct, each Respondent would be fined $10,000, but, in light of the bar, this sanction is not imposed.

The Third Cause of Action alleging that Respondents violated NASD Rule 3110 and FINRA Rule 2010 by causing a books and records violation is dismissed.

### Appearances

Jeffrey P. Bloom and Michael J. Dixon, Rockville, Maryland, representing the Department of Enforcement.

Denis Patrick Kelleher, Kelleher Clayman & Rosenberg, LLP, New York, New York, representing Respondent Talman Harris.

Jon-Jorge Aras, Philadelphia, Pennsylvania, representing Respondent William Scholander.

---

[*]  This decision has been redacted.

## I.    INTRODUCTION

The Financial Industry Regulatory Authority, Inc. ("FINRA") Department of

Enforcement ("Enforcement") brought this disciplinary action against Respondents, William

Scholander and Talman Harris (collectively, "Respondents"), two registered securities

representatives.[1]  Enforcement's allegations cover a period when Respondents were first

employed by Seaboard Securities, Inc. ("Seaboard") and then were later employed by a firm they

hoped (with two partners) to acquire, First Merger Capital, Inc. ("First Merger").  In the end,

Respondents' acquisition plan failed to come to fruition.  They left First Merger after the events

in issue here and are now employed at a third firm.[2]

This decision sets forth the findings and conclusion of the Hearing Panel after a hearing

on the charges.  It also explains the sanctions imposed for the violations found.[3]

---

[1]     FINRA is a self-regulatory organization ("SRO") that is responsible for regulatory oversight of securities
firms and associated persons who do business with the public.  It was formed in July 2007 by the consolidation of
NASD and the regulatory arm of the New York Stock Exchange ("NYSE").  FINRA is developing a new
"Consolidated Rulebook" of FINRA Rules that includes NASD Rules.  The first phase of the new Consolidated
Rulebook became effective on December 15, 2008.  See FINRA Regulatory Notice 08-57 (Oct. 2008).  Because the
Complaint in this case was filed after December 15, 2008, FINRA's Procedural Rules apply to the proceeding.  The
applicable FINRA and/or NASD Conduct Rules are those that existed when the conduct in issue occurred.  FINRA's
Rules (including NASD Rules) are available at www.finra.org/Rules.

[2]     FINRA has jurisdiction over this disciplinary proceeding, pursuant to Article V, Section 4 of FINRA's By-
Laws, because the Complaint alleges misconduct that occurred while Respondents were registered, first with one
firm, Seaboard, and then with a second, First Merger.  Respondents were registered with a third FINRA member
firm when the Complaint was filed on January 31, 2012, and are still registered at that third firm.

[3]     A three-day hearing was held on January 29 through 31, 2013, before a three-person panel consisting of the
Hearing Officer and two industry representatives.  Four witnesses testified.  They included both Respondents, a
FINRA examiner (referred to here as "Examiner"), and Maureen Gearty ("Gearty"), one of Respondents' partners in
a planned purchase of a securities broker-dealer firm.  Exhibits were admitted into evidence (referred to here as JX-1
et seq. for Joint Exhibits, CX-1 et seq. for Enforcement Exhibits, and RX-1 et seq. for Respondents' Exhibits).  The
exhibits included excerpts of On-The-Record ("OTR") interviews of Respondents and others.  The parties filed post-
hearing briefs on the legal standard for finding a fraud violation:  Department of Enforcement's Post-Hearing Reply
Brief ("Enf. PH Br."); Talman Harris' Post Hearing Motion ("Harris PH Br."); and Post-Hearing Memo on behalf of
Scholander ("Scholander PH Br.").

01013

## A.   Allegations

Enforcement alleges three types of violations: (i) fraud,[4] (ii) outside business activities,[5] and (iii) books and records.[6] One type of alleged violation occurred while Respondents were at Seaboard (outside business activities); the others occurred while Respondents were at First Merger (fraud and books and records).[7]

Enforcement alleges that while Respondents were at Seaboard they cultivated business with DEER and received a $350,000 payment from DEER, without prior written notice to Seaboard. Respondents then used the DEER payment to assist in setting themselves up at First Merger while they were still at Seaboard. Once they joined First Merger, Respondents sold DEER securities to customers without disclosing to those investors DEER's previous funding of Respondents' business activities.

The alleged books and records violation is separate. It involves the payment of commissions to Respondents after they joined First Merger. Respondents were paid their commissions in an unorthodox manner through another individual's personal account, instead of through a First Merger account. As a result, the firm's books and records were not true and

---

[4]    The First Cause alleges that Respondents fraudulently failed to disclose material information to investors in violation of Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5, and FINRA Rules 2020 and 2010.

[5]    The Second Cause alleges that Respondents received compensation for an outside business activity away from their then-current firm without prior written notice to the firm, in violation of NASD Rule 3030 and FINRA Rule 2010.

[6]    The Third Cause alleges that Respondents caused their firm's books and records to be false and inaccurate in violation of NASD Rule 3110 and FINRA Rule 2010.

[7]    Both the outside business activities violation and the fraud violation involve Respondents' business with a Chinese issuer, Deer Consumer Products, Inc. ("DEER"). Accordingly, those two claims are related, even though one involves conduct while Respondents were at Seaboard and the other involves conduct while Respondents were at First Merger.

3

01014

accurate. Enforcement alleges that Respondents were the "cause" of the deficiencies in the firm's books and records.

**B. Summary Of Hearing Panel's Findings And Conclusions As To Violations**

A substantial amount of Respondents' business involved offering and selling the securities of Chinese companies introduced to them by Person A, a promoter of U.S.-listed Chinese companies.[8] With the encouragement and assistance of Person A and his attorney, Person B, Respondents took steps to acquire their own securities brokerage firm while they were still with Seaboard. To carry out the plan, Respondents partnered with another registered representative who was a protégé of Person A, Ronen Zakai, and a woman who was designated to be the office manager of their firm, Maureen Gearty.[9]

At the behest of Person A or his surrogate, Person B, and as part of the plan to acquire a securities brokerage firm, Scholander and Gearty went to China to visit DEER. The purpose of the trip was to receive a payment from DEER. DEER intended to sell securities in the United States and invited investment bankers and others, including Scholander and Gearty, who could help DEER with its offering. Scholander and Gearty represented the firm they intended to acquire, First Merger, not the firm that employed Scholander at the time, Seaboard. Scholander understood that there was a business opportunity with DEER, and that a payment would be made in connection with the trip to China, but he did not seek the opportunity or the payment for Seaboard.

---

8 Person A's name is spelled in different ways in different documents.

9 Scholander, Harris, and Zakai were each to hold a 33% interest in First Merger when they acquired the firm; Gearty was to hold a 1% interest. Scholander, Harris, and Zakai planned to be managing partners of First Merger, while Gearty was designated the operations manager.

Shortly after Scholander and Gearty made the trip to China, DEER made a $350,000 payment to an account that Gearty set up for the purpose of receiving the payment. The name on the account was First Merger Capital (Delaware) ("First Merger Delaware"). Scholander, Harris, Zakai, and Gearty used the funds to assist them in setting up a new office of First Merger, the broker-dealer. They hired vendors and made expenditures that they viewed as business expenses of the firm they planned to purchase, First Merger. Scholander and Harris also were directly reimbursed for some expenses from the DEER payment. Scholander and Harris did not give prior written notice of their outside business activities to their employer firm, Seaboard, which was a violation of NASD and FINRA Rules, as alleged by Enforcement in the Second Cause of Action.

Respondents then joined First Merger as employees. While they were at First Merger they sold DEER securities without disclosing to customers that they had received a $350,000 payment from DEER. The information they failed to disclose was material to investors in evaluating the objectivity and reasonable basis for Respondents' advice and recommendations. The omission of that information was misleading because, without disclosure, investors were led to believe that Respondents were fulfilling their duty to act in the best interests of their clients. Respondents deceived their customers and committed fraud, as alleged by Enforcement in the First Cause of Action.

The allegations relating to commissions and books and records are separate. Respondents and their two partners, Zakai and Gearty, never obtained the required regulatory approval to become owners of First Merger, so the existing owner continued to control the firm, including the payment of commissions. According to the evidence, he refused to pay Respondents their commissions except through Gearty's personal account. As a result, the

01016

firm's books were false and inaccurate because the records did not reflect the payment of those commissions to Scholander and Harris.

The Hearing Panel finds that the evidence failed to show that Respondents had authority over, or influence on, how the commissions were paid or how they were reflected in the firm's books and records. Nor did the evidence show that they sought to have the commissions paid in this manner. Rather, they were simply passive recipients of the payments. Accordingly, the Panel concludes that Respondents did not "cause" the firm's violation of books and records requirements and dismisses the Third Cause of Action.

### C.  Threshold Issue Concerning $350,000 Payment By DEER And Respondents' Credibility

Respondents' defense to the fraud and outside business activities claims involves the same threshold factual issue: Did Respondents receive the $350,000 payment from DEER? Respondents assert that they did not. They assert that the payment was a "consulting fee" paid to Gearty alone. They reason from that premise that, because they received no compensation for outside business activities, they had no outside business activities that required prior written disclosure to Seaboard. They also reason that they had nothing to disclose to investors who purchased DEER securities from them and could not have committed fraud.

As further discussed below, the Hearing Panel finds that Scholander and Harris are not credible. Their explanation for the $350,000 payment by DEER – that it was a "consulting fee" paid to Gearty alone – is not believable and is contradicted by the evidence. Gearty was a "back office" operations and office manager who had never been to China and had never had any previous contact with DEER. Scholander and Harris, in contrast, had previously been to China to visit issuers and had previously sold DEER securities. Gearty performed no services for

6

DEER. Scholander and Harris, in contrast, promoted its securities before and after they joined First Merger.

In light of Respondents' actions in fall 2009 to implement their plan to set up their own office and acquire First Merger, and the application of most of the DEER payment to facilitate that plan (including the direct reimbursement of some expenses incurred by Scholander and Harris), the Hearing Panel finds that the $350,000 payment by DEER was made to, and for the benefit of, Respondents. The threshold factual issue on which Respondents' defense depends is decided against them.

## II.   FINDINGS OF FACT

### A.   Respondents' Background

Respondent William Scholander has been employed at thirteen different firms in investment-related positions since he entered the financial services industry in 1997. Respondent Talman Harris also has been employed at many firms since entering the financial industry in 1998. Harris currently holds his eighteenth investment-related position. Scholander and Harris are now both registered with Radnor Research & Trading Company ("Radnor"), and a partnership jointly owned by Scholander and Harris owns the New York branch office of Radnor.[10]

Scholander and Harris met in the late 1990s, when they both were working at the same broker-dealer, and since July 2002 they have operated as partners. Since July 2007 they have owned the branch of each firm with which they have been associated except for the broker-dealer that they planned to buy with Zakai and Gearty, First Merger.[11]

---

[10]   Hearing Tr. (Scholander) at 47-56; CX-26 (Scholander CRD as of 08/13/2012) at 3-9; Hearing Tr. (Harris) at 181-87; CX-27 (Harris CRD as of 08/13/2012) at 3-16.

[11]   Hearing Tr. (Scholander) at 47-56; Hearing Tr. (Harris) at 789-90.

01018

B.   **Respondents' Conduct**

    *(1)   Respondents' Prior Dealings With Person A And DEER*

       Respondents have close ties to Person A, a promoter of Chinese companies.  Respondents

met Person A when they were at Benchmark Securities, from 20XX to 20XX.[12]  At that time,

Person A was an officer of Benchmark, although his registration had previously terminated in

20XX and he had settled a FINRA disciplinary proceeding against him in 20XX.  Since 20XX,

he has not been registered or associated with any FINRA member firm.[13]  He ran (and continues

to run) Corp. P, a consulting firm that promotes Chinese companies and assists U.S.-listed

Chinese firms in obtaining financing.[14]

       Ever since Respondents left Benchmark in July 2003, their business interests have been

intertwined with Person A and the companies he runs and promotes.  From Benchmark,

Respondents joined Corp. S, which shared an office suite with Corp. P and subleased space from

Corp. P.[15]  CRD records indicate that Corp. P owned 75% or more of Corp. S.[16]  Person A is

president of Corp. P.[17]

---

[12]     Hearing Tr. (Scholander) at 51-52, 742.

[13]     CX-21 (Person A's CRD as of 08/13/2012) at 3, 5-6.

[14]     CX-22 (snapshot of Corp. P website homepage) at 2; CX-23 (snapshot of Corp. P website biography of founder).  According to the website of Corp. P, it does not sell securities in the United States, but rather "introduces" Chinese companies to capital.  Corp. P maintains that this ensures that it has no conflicts of interest with duly licensed securities broker-dealers or investment bankers.  CX-22 (snapshot of Corp. P website homepage) at 2.

[15]     Hearing Tr. (Scholander) at 51-52.

[16]     CX-24 (Corp. S CRD as of 08/10/2012) at 3.  Person A's wife and relative were listed as indirect owners of Corp. S through their ownership of Corp. P.  *Id.* at 2; Hearing Tr. (Examiner) at 296-98.

[17]     CX-23 (snapshot of Corp. P website biography of founder).  In addition to their business relationships with Person A, Respondents socialized with him and knew his wife.  Hearing Tr. (Scholander) at 70-71.  Scholander also introduced his sister to Person A, and she worked for Person A for a time.  Hearing Tr. (Scholander) at 750-51.

01019

Respondents remained with Corp. S until 2007, when it went out of business.[18]  Even though Respondents' business affiliations changed, however, they remained in the same office space with Corp. P.[19]  Eventually, Respondents joined First Merger in February 2010 and moved to another location.  Shortly afterward Person A's firm, Corp. P, followed First Merger to its new location.[20]

Over the years, Person A and Person B introduced Respondents to various U.S.-listed Chinese companies, including DEER, AgFeed, SmartHeat, CleanTech, and Nova Lifestyles.[21]  Respondents offered and sold the stock of such Chinese companies.[22]  Respondents first sold DEER stock in 2008, in the first part of a private placement, while they were with a firm called Martinez-Ayme.[23]  Later, Respondents sold DEER stock, in a second part of the private placement, while they were registered with Seaboard.[24]

Person A promoted a sense of connection between the Respondents and the Chinese companies, including DEER.  One of the ways he did this was by bringing representatives of the

---

[18]    Hearing Tr. (Scholander) at 53-54.

[19]    Hearing Tr. (Scholander) at 53-60.  Respondents went from Corp. S briefly to Legend Securities.  They decided, however, that they wanted to own their own branch of a brokerage firm and started a branch of a firm called Basic Investors.  When Basic Investors went out of business in October 2008, they opened a branch of Martinez-Ayme.  They left that firm in March 2009 and opened a branch of a firm that they were introduced to by Person A, Seaboard.

All of these branch offices owned by Scholander and Harris occupied the same office suite with Corp. P.  The entrance to the suite had a sign for Corp. P in the reception area.  The sign for the broker-dealer firm was inside the suite at the entry for the subleased space and was smaller.  Hearing Tr. (Scholander) at 57-58.

[20]    Hearing Tr. (Scholander) at 62.

[21]    Hearing Tr. (Scholander) at 66-71.  Gearty testified that Person B was Person A's attorney and friend, as well as the attorney for DEER and other Chinese companies.  She said that he worked out of Person A's offices at Corp. P.  Hearing Tr. (Gearty) at 507-08.

[22]    Hearing Tr. (Scholander) at 66-68, 73-75, 112-15, 121.

[23]    Hearing Tr. (Harris) at 790-93.

[24]    Hearing Tr. (Harris) at 803.

9

Chinese companies to meet Respondents, including representatives of DEER.[25] Another way

that he promoted a sense of connection and commitment was to send brokers to China to visit

Chinese companies he represented.[26] Scholander and Harris and others who worked with them

went on trips to China to visit some of these companies. Sometimes the companies would pay

the expenses for such a trip; sometimes the Respondents' broker-dealer firm would pay.[27]

At First Merger, transactions in the stock of Chinese companies related to Person A

represented the vast bulk of the business. The FINRA Examiner presented a summary chart of

the gross commissions from all customer purchase and sale activity at First Merger from

February 2010 through November 2010.[28] The chart showed that the securities of three Chinese

companies (DEER, SmartHeat, and CleanTech) represented a total of 78% of all commissions at

the firm during the period. All other securities amounted to 22%.[29] Total gross commissions for

all purchases and sales during that period were $2,508,593.40.[30] DEER purchases and sales

constituted 11% of commissions on all purchases and sales, for a total amount of $273,770.05.[31]

---

[25]    Hearing Tr. (Harris) at 190-91; Hearing Tr. (Scholander) at 70.

[26]    See Hearing Tr. (Gearty) at 452-53; Hearing Tr. (Harris) at 824, 881-83; CX-29 (excerpt of OTR of Erik Jason Anderson) at 7-9 of 10.

[27]    Hearing Tr. (Scholander) at 69-74; Hearing Tr. (Harris) at 824, 881-83. Similarly, Zakai went on at least one trip to China arranged through Person A. Hearing Tr. (Gearty) at 452-53.

[28]    CX-1 (chart of gross commissions on customer purchase and sale activity, Feb. – Nov. 2010).

[29]    Hearing Tr. (Examiner) at 386-90; CX-1 (chart of gross commissions on customer purchase and sale activity, Feb. – Nov. 2010).

[30]    CX-1 (chart of gross commissions on customer purchase and sale activity, Feb. – Nov. 2010).

[31]    Id.

10

01021

forty-two customers purchased DEER from Scholander and Harris during the specified ten-month period.[32]

### (2)   *Genesis Of Respondents' Plan To Acquire Brokerage Firm*

At the suggestion of Person B, Person A's attorney, Respondents developed a plan to purchase a securities broker-dealer firm with Zakai and Gearty.   In fall 2009, Scholander and Harris met Zakai, who had been at a brokerage firm called GunnAllen. Zakai also had connections to Person A.   There was evidence that he, too, had traveled to China with Person A.[33]  Initially, Zakai was looking for space to sublease.   Respondents tried to recruit him to join their firm, Seaboard, but he decided not to join them because he wanted to start his own firm.[34]

Zakai introduced Scholander and Harris to Maureen Gearty, who also worked at GunnAllen.   Although she had multiple licenses, her experience was in operations and trading. Scholander knew her as a "back office person."[35]  Zakai told Scholander that Gearty "was a great assistant."[36]  Harris also understood she was an assistant at Gunn Allen.[37]  She had been the operations manager and office manager at a branch of GunnAllen for four years.   She described her duties as ranging from maintaining client records and filling in on the order entry desk to

---

[32]   CX-2 (Respondents' customers' purchases of DEER, Feb. – Nov. 2010). The exhibit gives a total number of customers that is incorrect (thirty-five).  When the individual entries for each month are added together the total is forty-two.

[33]   Hearing Tr. (Gearty) at 452-53.

[34]   Hearing Tr. (Scholander) at 77-78.

[35]   Hearing Tr. (Scholander) at 78-79, 89.

[36]   Hearing Tr. (Scholander) at 78.

[37]   Hearing Tr. (Harris) at 198-99.  Harris tried initially to inflate Gearty's importance by calling her a "partner," but he eventually acknowledged that she had been introduced to him as an assistant.  He thought she was "a nice redhead" who could be helpful to them.  *Id.*

01022

making sure that there was toilet paper in the men's room and light bulbs in the office. In that position she made approximately $50,000 a year plus a bonus.[38]

At the Hearing, Scholander volunteered that it was Person B who proposed that the four of them – Scholander, Harris, Zakai, and Gearty – open their own firm.[39] Zakai was already in the process of trying to acquire a firm but, upon the suggestion by Person B, the four then began discussing the possibility of acquiring a broker-dealer firm together.[40]

Zakai calculated that it would take around $300,000 "give or take" to acquire and establish their own firm. He discussed with Scholander and Harris the amount each should contribute to the plan, telling them that he and each of them would have to contribute $100,000. Gearty was not required to contribute any cash.[41]

### (3) Initial Steps In Fall 2009 To Implement Plan

Zakai and Gearty began implementing the plan to acquire a securities broker-dealer in fall of 2009. Zakai left GunnAllen in September 2009.[42] Gearty left GunnAllen in October 2009.[43]

---

[38]    Hearing Tr. (Gearty) at 447-49.  Gearty was to make $72,000 a year at First Merger.  Hearing Tr. (Gearty) at 473.

[39]    Hearing Tr. (Scholander) at 80.

[40]    Hearing Tr. (Scholander) at 80-81.

[41]    CX-33 (excerpt of Zakai OTR) at 9-13 of 23.

[42]    Hearing Tr. (Gearty) at 450.  Around the time he left GunnAllen, Zakai was suspended from associating in any capacity with a securities brokerage firm.  He had consented to an Acceptance, Waiver and Consent ("AWC") with FINRA relating to his borrowing money from a customer without providing notice to his firm.  Pursuant to the AWC, Zakai was suspended for 30 days from association with any FINRA member firm and fined $5,000.  The suspension ran from October 19, 2009, to November 17, 2009.  CX-13 (Aug. 23, 2010, letter to FINRA by attorney representing First Merger in connection with change of ownership) at 9.

[43]    Hearing Tr. (Gearty) at 475.

01023

Gearty spent her time working in the space shared by Corp. P and Seaboard. She testified that she and Zakai were in and out of the Seaboard space, although they were not registered with Seaboard. She said she saw Respondents every day and reported to them what she was doing.[44] Scholander confirmed that he saw Gearty and Zakai on "pretty much" a "daily basis," although, in an apparent attempt to deny that Gearty was working with Respondents, he specified that she and Zakai were in the shared reception area of Corp. P.[45]

With the help of a business broker, Zakai identified a securities brokerage firm to buy. That firm, Brentworth & Company, was owned by Mark Simonetti. Zakai also retained a consulting firm to help set up operations and apply for SEC approval of a change in ownership of Brentworth.[46]

Gearty testified that Person A discussed the acquisition plan with her and Respondents and Zakai. According to Gearty, Person A said that "the guys" had to open LLCs to facilitate the purchase of a broker-dealer. She was not told to open an LLC because her ownership interest in the broker-dealer was going to be so small.[47]

In late September or early October, after a meeting with Person A, Scholander and Harris joined Zakai and Gearty on a trip to New Jersey to meet Simonetti and discuss the purchase of Brentworth. At a dinner with Simonetti, the group discussed the purchase price and their plans.[48]

---

[44]   Hearing Tr. (Gearty) at 475-77. Gearty testified that she also saw Person A every day during this period if he was in the office. Hearing Tr. (Gearty) at 479.

[45]   Hearing Tr. (Scholander) at 79-80, 717.

[46]   Hearing Tr. (Gearty) at 465-69.

[47]   Hearing Tr. (Gearty) at 458-60, 463. At the hearing, Harris claimed it was Zakai and Gearty who told him and Scholander that they needed to open separate LLC's or corporations. Hearing Tr. (Harris) at 832. Regardless of who said it had to be done, it is not in dispute that Respondents each used a separate entity as part of the process of acquiring the broker-dealer.

[48]   Hearing Tr. (Gearty) at 468-70. Scholander said he first met Simonetti in New Jersey and that Harris was there as well, confirming at least that much of Gearty's testimony. Scholander maintained, however, that it was

13

In the fall of 2009, Zakai established RRZ as a holding company for the broker-dealer,[49] and in October 2009 RRZ entered into an agreement to purchase Brentworth. The name Brentworth was changed to First Merger.[50]

### (4)   Respondents' Steps To Implement Business Plan Prior To Leaving Seaboard

Although still employed by Seaboard, Respondents Scholander and Harris took steps to further their business as future owners of First Merger. Each of them began to use a separate entity to facilitate the acquisition of an ownership interest in First Merger. Scholander's company was Infinite Dragon, Inc.[51] He obtained a $65,000 loan from his family to fund Infinite Dragon. By check dated November 2, 2009, Infinite Dragon deposited the money in a law firm escrow account. Scholander testified at the hearing that he did not retain control over the distribution of those funds. The funds were released to pay Simonetti, effective November 20, 2009.[52]

Harris's entity was First Auriga, Inc.[53] Harris, like Scholander, obtained money to fund his contribution to the purchase of First Merger from a family member, in Harris's case, his

---

understood that Zakai and Gearty were going to buy Simonetti's firm. Scholander and Harris were there because – should they decide to join Zakai and Gearty – it would be at Simonetti's firm. Hearing Tr. (Scholander) at 728.

[49]   RRZ was primarily owned by Zakai's wife and brother-in-law, with Gearty holding a 1%-2% interest. Hearing Tr. (Gearty) at 460-63.

[50]   Hearing Tr. (Gearty) at 467-70; CX-10 (assignment of right to purchase First Merger from RRZ to Scholander, Harris, Zakai, and Gearty, reciting October 13, 2009 agreement to purchase Brentworth); CX-12 (amended and restated First Merger purchase and sale agreement, reciting October 13, 2009 agreement to purchase the company).

[51]   Hearing Tr. (Gearty) at 458-59, 463, 470-71, 535-36; Hearing Tr. (Scholander) at 709-11, 758-60.

[52]   Hearing Tr. (Scholander) at 709-15, 758-63. In support of the group's application for approval of a change of ownership for First Merger, Scholander testified that Infinite Dragon had committed $65,000 to the acquisition of First Merger. Id. Although Scholander had a pre-existing attorney-client relationship with the law firm that held the money in escrow, at the hearing, he maintained that the money had been released from escrow without his approval. He claimed that Zakai had authorized the release of the funds.

[53]   Hearing Tr. (Harris) at 831-32.

14

mother. Harris made a contribution to the acquisition by a check that was paid on February 5, 2010, written on his First Auriga bank account. Harris set up the account sometime in advance of writing that check, once he had received his mother's contribution.[54]

Respondents and Zakai began incurring expenses in 2009 that they considered business expenses of their brokerage firm acquisition. Harris charged some portion of four gym memberships at a Manhattan club called Setai for himself, Scholander, Zakai, and another (he says Gearty; she says Person A) on his American Express credit card in fall 2009. He was reimbursed in the amount of $14,500 on December 24, 2009, from the account used to receive the DEER "consulting fee." Harris testified that he was reimbursed because the memberships were treated as a business charge.[55]

There was additional evidence that Respondents were involved in activities in furtherance of the plan to acquire First Merger before they left Seaboard. A graphic designer was hired to create First Merger business cards, stationery, logo and website.[56] Mock-ups of the business cards were circulated for review to Scholander and Harris on February 3, 2010, which was before Respondents joined First Merger.[57] Obviously, the work had to have been done prior to that time. Indeed, the graphic designer was paid in early January 2010 out of the First Merger

---

[54]     Hearing Tr. (Harris) at 831-38. RX-18 (First Auriga, Inc. bank statement for January 30, 2010, through February 26, 2010); RX-19 (Harris's mother's bank statement for the period November 10, 2009, through December 8, 2009).

[55]     Hearing Tr. (Harris) at 891-96; Hearing Tr. (Gearty) at 518-19; CX-7 (bank statement showing $14,500 payment on December 24, 2009, from First Merger Delaware account to American Express).

[56]     Hearing Tr. (Gearty) at 525-26, 548; CX-14 (draft business cards). There is no dispute that the graphic designer was hired, did the work, and was paid before Respondents joined First Merger. The only dispute is whether Respondent Harris was the one who recommended her or not. Gearty says he was; he says he was not. Hearing Tr. (Gearty) at 526-27; Hearing Tr. (Harris) at 854-55. The dispute is not determinative. It is plain from the circumstances that the graphic designer was working on First Merger business cards for Respondents before they joined First Merger. Thus, it is equally plain that Respondents were taking steps to implement the plan to acquire First Merger well before they actually joined the firm.

[57]     CX-35 (email string to which draft mock-up was attached).

01026

Delaware account, which was more than a month prior to Respondents' joining First Merger.[58]
The business cards for Scholander, Harris, and Zakai designated each of them as a managing
partner of First Merger. Gearty's title on her business card was operations manager. The cards
of others designated them as a senior account executive or an account executive. Harris
responded to the circulation of the mock-ups with comments, copying Scholander, but neither of
them indicated that the titles on the business cards were incorrect.[59]

     The business cards reflect a well-formed plan to acquire First Merger and the expenditure
of financial resources from the account funded by DEER in pursuit of the plan. They also
indicate that Scholander, Harris, and Zakai intended to be in charge, and that Gearty was to be in
a subordinate role.

        (5)    *Respondents Agree To Be Liable For Activities On Behalf Of First*
               *Merger As Of October 13, 2009*

     Significantly, a later-created document shows that Scholander, Harris, Zakai and Gearty
agreed to shoulder responsibility for their activities on behalf of First Merger as of October 13,
2009. Even though the ownership change from Simonetti to Respondents and their two partners
was not approved by FINRA in October 2009 (and was never approved), Respondents and their
two partners indemnified Simonetti for their activities on behalf of First Merger starting on
October 13, 2009. In an Amended and Restated First Merger Capital, Inc. Purchase and Sale
Agreement dated August 17, 2010, Scholander, Harris, Zakai and Gearty agreed that they would
indemnify and hold harmless the seller, Simonetti, against any losses, claims, damages,
expenses, liabilities, customer complaints, SEC, FINRA and/or state enforcement actions or

---

[58]    Hearing Tr. (Gearty) at 525-26; CX-7 (bank statement). A check for $4,000 was written to the graphic
designer on January 8, 2010. It was written on the First Merger Delaware bank account that received the $350,000
DEER payment, as further discussed below.

[59]    Hearing Tr. (Scholander) at 763-67; CX-14 (draft business cards); CX-35 (e-mail string to which draft
mock-up was attached).

01027

investigations incurred by them or any employee or independent contractor of the broker-dealer since October 13, 2009. The extent of each person's liability was to be "in proportion to their respective ownership interest in the [firm]." Accordingly, Scholander, Harris, and Zakai were 33% liable, and Gearty only 1% liable. The four all signed the document, along with Simonetti.[60]

### (6)   Scholander's and Gearty's Trip To China

In early November 2009, Scholander and Gearty went to China to advance their future business as First Merger[61] and collect a fee from DEER.[62] He was still at Seaboard; she had already left GunnAllen and was unemployed at the time. Although the two of them disagree on just how the trip came about and on why DEER paid a $350,000 "consulting fee" afterward, many of the details are not in dispute.

Scholander's version of how the trip to China came about is the following. He testified that he was in a conversation with Gearty when Person B came into the office. Scholander then introduced Person B to Gearty. While Gearty was there, Person B suggested that Scholander go on a due diligence road show to see DEER. Scholander agreed to go and then was called away.

---

[60]   CX-12 (amended and restated First Merger purchase and sale agreement, reciting October 13, 2009 agreement to purchase the company).

In connection with the application for FINRA approval of the change of ownership, attorneys for First Merger stated in an August 23, 2010 letter to FINRA staff that Simonetti and RRZ Management Inc. (a holding company) had entered into a purchase and sale agreement on October 13, 2009. CX-13 (letter dated Aug. 23, 2013, from attorney for First Merger to FINRA in connection to application for approval of ownership change) at 4 of 19. The letter further explained that after approval of the change in ownership, Scholander, Harris, and Zakai would each own 33% of the firm and Gearty would own 1%. *Id.* The letter recites that these four persons had discussions in fall of 2009 regarding working together to form or purchase a broker-dealer. *Id.* at 6 of 19.

[61]   Gearty testified that she and Scholander identified themselves as being from the broker dealer, using the name First Merger or some variant on it. Hearing Tr. (Gearty) at 491-92.

[62]   Gearty testified that it was understood before the trip that she and Scholander were going to get a fee. Hearing Tr. (Gearty) at 483-84. She said that the fee initially was going to be $250,000 (*id.*), but later it was increased to $350,000. Hearing Tr. (Gearty) at 494-97.

01028

He said that Gearty remained talking to Person B and told Person B she had never been to China. When Scholander returned, Person B was saying to Gearty that she might be able to "do something for DEER over there." Scholander booked the airfare for the two of them on his credit card. Less than a week later, Scholander and Gearty left for China.[63]

Gearty's version is slightly different. She testified at the hearing that Scholander called her into Person A's personal office and told her she was going to China to see DEER. They immediately bought tickets, charging the airfare for both of them on Scholander's credit card. Person A told her to bring in her passport so that he could arrange for a visa. Back in the Seaboard offices, Scholander and Harris told her that they were going to get a fee in connection with the trip to DEER. Within a week, Gearty left for China with Scholander.[64]

Regardless of whether it was Person A who initiated the discussion of the trip to China, as Gearty testified, or it was Person B, as Scholander testified, both Gearty and Scholander testified that the trip took place in early November 2009 and that it was hastily put together. Both indicated that Scholander charged the airfare on his credit card. Both of them also testified that Gearty had never been to China before.

To a large extent, at the hearing Scholander and Gearty agreed on what they did in China. They stayed only two nights. On the day between arriving and leaving, they spent a few hours at a DEER showroom, along with 20-30 investment bankers and other visitors. At the showroom, they met some DEER representatives and looked at DEER products. After that, they went to a

---

[63]     Hearing Tr. (Scholander) at 717-20.

[64]     Hearing Tr. (Gearty) at 479-85.

01029

shopping mall to see DEER products on display. Other than visiting DEER in China, they gave no advice and provided no services to DEER.[65]

The only difference in their testimony regarding what happened on the trip was that Scholander testified that he was separated from Gearty for the span of about an hour. He said that Gearty went with a group of ten to twenty people some place separate from Scholander's group. Scholander speculated that, while Gearty was separate from him, she entered into an agreement to provide services to DEER in exchange for the $350,000 "consulting fee."[66] Gearty testified that she followed Scholander and was not apart from him except to go to the ladies room.[67]

Afterward, DEER transferred $350,000 to an entity Gearty created for the purpose of receiving the money, First Merger Delaware. First Merger Delaware received the payment on December 17, 2009.[68]

Gearty testified that the "consulting fee" was for the purpose of assisting the four of them, including Scholander and Harris, to open a broker-dealer firm. She testified that it "was completely understood."[69] She said they all had a "giggle" about how easy it was to obtain the money.[70] Scholander testified that the fee belonged to Gearty alone.[71]

---

[65]   Hearing Tr. (Scholander) at 91-92, Hearing Tr. (Gearty) at 489-90, 493-94.

[66]   Hearing Tr. (Scholander) at 100-02, 771-72.

[67]   Hearing Tr. (Gearty) at 489.

[68]   Hearing Tr. (Examiner) at 383-84; Hearing Tr. (Gearty) at 609; CX-7 (bank statement) at 7. Gearty testified that she opened the First Merger Delaware account because Zakai had personal financial issues that somehow interfered with his opening a bank account, and Scholander and Harris could not take receipt of the DEER payment because they were still at Seaboard. Hearing Tr. (Gearty) at 508-09.

[69]   Hearing Tr. (Gearty) at 496-97, 498-99.

[70]   Hearing Tr. (Gearty) at 494. The amount of the fee initially was going to be $250,000, but at some point the fee was increased to $350,000. Gearty testified that there was no explanation for the increase. She described

19

Gearty testified that neither she nor the Respondents did any consulting or advisory work for DEER to earn the $350,000 payment.[72]  Scholander testified at the hearing that he did no consulting or advisory work to earn the fee and that he was unaware of what Gearty might have done to earn the fee.[73]

For the reasons more fully set forth below in the discussion concerning credibility, the Hearing Panel rejects Scholander's testimony as untrustworthy and inconsistent with the facts.

(7)    *Application Of DEER Payment For Respondents' Benefit*

Respondents and their partners, Zakai and Gearty, used the DEER payment for expenses of the brokerage firm they planned to acquire and also to reimburse Respondents directly for expenses they attributed to their business at First Merger.[74]  Gearty testified that Scholander and Harris closely monitored and directed where the money from DEER flowed;[75] Scholander denied being involved.[76]  Regardless of their two contradictory stories about Respondents' control over

---

how the group, including Scholander and Harris, "kind of high-fived each other on it" in elation.  Hearing Tr, (Gearty) at 495-96.

[71]    Hearing Tr. (Scholander) at 718-20.

[72]    Hearing Tr. (Gearty) at 501-03.

[73]    Hearing Tr. (Scholander) at 100-01, 719.

[74]    In connection with the application to FINRA for approval of the proposed change in ownership from Simonetti to Respondents and their two partners, First Merger's attorneys sent FINRA a letter dated August 23, 2010, explaining how their branch of First Merger was funded.  The letter plainly said that the $350,000 "consulting fee" from DEER was the initial source of funding for the group's acquisition of First Merger.  CX-13 (letter dated Aug. 23, 2013, from attorney for First Merger to FINRA in connection with application for approval of ownership change) at 6 of 19.  That letter identified the fee as a payment to Gearty pursuant to a consulting agreement. However, the letter also explained that Scholander had developed "a strong relationship" with DEER, and that it was Scholander who introduced First Merger and Gearty to DEER management.  The letter reported that Gearty used the funds in large part for location, furniture, equipment and other facility expenses.  *Id.*

[75]    Hearing Tr. (Gearty) at 505 ("I kept them updated on every minute of everything that I did, yes.").  She testified that Scholander gave her instructions in connection with arrangements to receive the $350,000 DEER payment and that he and Harris knew about every transfer out of the account.  Hearing Tr. (Gearty) at 505-15. Although she was the person authorized to disburse the money received from DEER, she took her instructions from Respondents and Zakai.  Hearing Tr. (Gearty) at 497-99.

[76]    Hearing Tr. (Scholander) at 726.

01031

the funds, there was uncontroverted evidence as to how the funds were actually used.  Bank
statements of First Merger Delaware were put in evidence,[77] and Gearty testified regarding the
checks written on the account.[78]  Respondents did not dispute the accuracy of the check records
or the testimony regarding what the records showed.

      First Merger Delaware directly paid some of the expenses of setting up the new office of
First Merger out of the DEER consulting fee.  For example, a check for $138,541.50 was written
on January 8, 2010,[79] as a pre-payment of rent for the new space the securities broker-dealer,
First Merger, was going to take.[80]  Another rent-related check for $15,393.50 was written on
January 8, 2010 to the real estate broker.[81]  Still other checks were written in January 2010 for
furniture and services for the securities broker-dealer, First Merger.[82]

      First Merger Delaware also directly reimbursed Respondents for certain expenses they
incurred in 2009 as business expenses of First Merger.  In this regard, Scholander was
reimbursed from the DEER "consulting fee" for his November trip to China to see DEER.  A
check drawn on the First Merger Delaware account set up to receive the DEER fee, was dated
January 27, 2010, and written in the amount of $6,075.46.[83]  On December 24, 2009, Harris was
reimbursed from the same account for the $14,500 he had charged to his American Express card

---

[77]    CX-7 (Bank statement).

[78]    Hearing Tr. (Gearty) at 509-40.

[79]    Hearing Tr. (Gearty) at 523; CX-7 (Bank statement).

[80]    Hearing Tr. (Gearty) at 523.

[81]    Hearing Tr. 9 (Gearty) at 524; CX-7 (Bank statement).

[82]    Hearing Tr. (Gearty) at 524-26, 531-32; CX-7 (Bank statement).

[83]    Hearing Tr. (Gearty) at 535-36, 631; CX-7 (Bank statement).

21

01032

for the gym memberships."[84]  Both of these reimbursements occurred before Scholander and

Harris actually joined First Merger, and they were for charges that Scholander and Harris viewed

as business expenses relating to First Merger.[85]

By February 4, 2010, the entire $350,000 DEER "consulting fee" had been consumed,

and the First Merger Delaware account was closed toward the end of February.[86]

        (8)    *Respondents Join First Merger On February 11, 2010*

Respondents officially joined First Merger on February 11, 2010, at the same time that

the firm opened its new office.[87]  At that time, however, the SEC had not yet approved the

proposed change in ownership, and Simonetti still retained ownership.  The group hired new

counsel to assist in the application for SEC approval.  In connection with that work, RRZ, the

entity created as a potential holding company, transferred its right to purchase First Merger to the

four individuals who had planned the acquisition, Zakai, Scholander, Harris, and Gearty.  The

executed transfer document called for the three men each to hold a 33% interest in the brokerage

firm and for Gearty to hold a 1% interest.[88]

        (9)    *Lack Of Prior Written Notice Of Outside Business Activities*

It is undisputed that Respondents did not give Seaboard prior written notice of their

outside business activities away from the firm.  Scholander claimed only that he had orally told a

compliance person at Seaboard that he was going to China.[89]  There was no documentation of

---

[84]    Hearing Tr. (Harris) at 892-96; CX-7 (Bank statement).

[85]    Hearing Tr. (Harris) at 891-96 (gym memberships were reimbursable business expenses).

[86]    Hearing Tr. (Gearty) at 537-40; CX-7 (Bank statement).

[87]    Hearing Tr. (Harris) at 835; Hearing Tr. (Scholander) at 107-08; CX-26 (Scholander CRD as of 08/13/2012) at 4; CX-27 (Harris CRD as of 08/13/2012) at 4.

[88]    CX-10 (agreement assigning right to purchase First Merger to Respondents, Zakai, and Gearty).

[89]    Hearing Tr. (Scholander) at 773-74.

22

this conversation or corroboration.  Even if it were true that Scholander talked to someone at Seaboard about his trip to China, it is impossible to know what he told the person and whether he explained that he was going as part of an outside business activity away from the firm.

Scholander admitted that he did not tell the compliance person that the trip to China represented any kind of business opportunity for Seaboard or that a payment of some kind was going to result from the trip.[90]  Scholander testified that the trip was for his personal education so that he would learn more about DEER.[91]  He said he had no expectation of compensation, and that "[a]ctually, the feedback from the product line and seeing the products was compensation enough for me."[92]

### (10)   Respondents' Sales of DEER Securities without Disclosure of DEER Payment

While at First Merger, Respondents offered and sold DEER securities without disclosing to investors the payment that Respondents had received from DEER.  They testified that they did not disclose it because they did not receive it and did not think they needed to disclose it.  They often used the telephone because they had many overseas clients.[93]

### (11)   Commissions Not Accurately Recorded

Respondents and Gearty all testified at the hearing that Respondents received payment of money denominated as commissions from First Merger through Gearty's personal account because Simonetti insisted that Respondents would only be paid their commissions if the money flowed through Gearty's personal account.  Simonetti purportedly had some reason related to

---

[90]   *Id.*

[91]   Hearing Tr. (Scholander) at 169-73, 781.

[92]   Hearing Tr. (Scholander) at 170.

[93]   Hearing Tr. (Scholander) at 743-44, 784-85;  Hearing Tr. (Harris) at 826-29.

23

01034

taxes for this requirement. Scholander and Harris testified that they wanted their money and the only way they were going to get it is if they accepted Simonetti's terms. Simonetti paid $350,000 to Gearty's personal account, and Gearty then paid most of this money to Scholander and Harris.[94]

First Merger was at the time paying its representatives from three different accounts, First Merger Capital, RRZ, and First Merger Delaware, the account funded by the DEER "consulting fee." A compliance consultant firm later reviewed the broker-dealer's books and records and had the broker-dealer amend them so that payments would be made only through First Merger Capital and RRZ, the owner of the branch at the time. In no case did the firm's books and records reflect any payment of commissions through Gearty's personal account.[95]

### C.    Credibility

The Hearing Panel does not credit Scholander's hearing testimony or his OTR. Nor does the Hearing Panel credit Harris's hearing testimony.

#### (1)    Scholander's Hearing Testimony Is Not Credible

The Hearing Panel finds that Scholander's testimony is not credible for at least two reasons: (i) his explanation for the DEER "consulting fee" defies common sense; and (ii) he has changed his testimony in ways that suggest that he has falsified his story throughout the investigation and proceeding.

---

[94]    The purported commission payments to Scholander and Harris were reflected in Gearty's personal bank statement for April 14, 2010, through May 13, 2010. CX-18 (Gearty bank statement for Apr. 14, 2010, through May 13, 2010) at 3, 5.

It was never explained at the hearing how the particular amount of the commissions was calculated or how Respondents became entitled to $350,000 in commissions for the March 2010 pay period (CX-16 (Apr. 14, 2010, agreement with First Merger regarding payment of $350,000 in commissions)). The figure does not relate in any clear way to other figures and charts analyzing commissions. See CX-1 (chart of gross commissions on customer purchase and sale activity, Feb. – Nov. 2010) and CX-2 (Respondents' customers' purchases of DEER, Feb. – Nov. 2010).

[95]    Hearing Tr. (Examiner) at 425-26.

24

     a.    **Scholander's explanation for the DEER "consulting fee" is not plausible**

On its face, Scholander's story is not credible. Scholander claimed that Person B arranged for DEER to pay Maureen Gearty $350,000 after having met her only recently and learning that she had never been to China. According to Scholander, Person B did this despite the fact that Gearty's experience was as a "back office" person and office manager, and she had no expertise to justify such a consulting fee. Scholander offered no explanation for why Person B would do this.

The details of Scholander's story also are sketchy. He testified that he and Gearty were with several dozen investment bankers and others at DEER's showroom for a couple of hours. He claimed that she went with a separate group of visitors for an hour or so, and speculated that she must have sealed the deal for the "consulting fee" during this period. Again, Scholander offered no explanation for why DEER would make some arrangement with Gearty, or why DEER would do it separately from Scholander, who had worked with DEER since 2008.

Nor did Scholander provide a good reason for his going to China if not to accompany Gearty and receive a fee to assist in setting up and acquiring a broker-dealer firm. He claimed that he went on the trip as due diligence. But he spent only a couple of hours at the DEER showroom in the company of a group of investment bankers and other visitors. He did not meet any DEER executives to talk about its business prospects. He did not go to any DEER factories. When he returned, he depended on internet research on DEER to provide a basis for recommending the stock to investors, which he could have done without going to China. He had already been selling DEER securities on the basis of private placement memoranda ("PPMs")

01036

prepared by the company and he continued using the PPMs when he offered and sold DEER stock after returning from China.[96]

        b.    **Scholander's Attempt To Alter His Prior Testimony At His OTR Interview Reveals His Disregard For The Truth**

      Scholander attempted to change his investigative testimony by submitting a conflicting affidavit, after learning that Enforcement intended to charge him with violations. The changes in Scholander's testimony were fundamentally at odds with what he originally said in his OTR interview. This conduct reveals a disregard for the obligation to testify truthfully and renders Scholander's hearing testimony untrustworthy.

      Scholander gave an OTR interview on July 8, 2010, while he was employed by First Merger and still working with Harris, Zakai, and Gearty with the goal of acquiring the broker-dealer firm, and before any charges were brought against him.[97] It was about eight months after Scholander and Gearty went to China to visit DEER.[98]

      At his OTR interview, Scholander testified that he had gone on the trip in March or April of 2010, after he had joined First Merger, and he treated the $350,000 "consulting fee" paid by DEER as a fee paid to First Merger. He tried to justify the fee by describing advisory services he had performed for DEER. He clearly stated that he himself had provided advice to DEER in connection with that payment. For example, Scholander responded to a question about what was done to earn the fee by testifying that he and Harris, as well as Gearty, had been on a conference call with Person B, in which they gave their "opinions in the company and what they can do to improve and appeal to the investors. I believe that'[s] what the gist of it was. I spoke a couple

---

[96]    Hearing Tr. (Scholander) at 767-71, 779-80, 783-85.

[97]    Hearing Tr. (Scholander) at 93-96.

[98]    CX-34 (Scholander affidavit) at 2, ¶¶ 10-11.

01037

of times on that. That's about it."[99]  He was then asked about the first time he had participated in a call like that. He responded, "It was a couple of calls. I'm not sure of the time frame. Maureen [Gearty] and I also went to China to go visit the company before the advisory fee. We actually sat down with them there and discussed them actually, how they're going to grow. They were discussing Bank of Montreal as well and asking about them. I said, 'It's a very prestigious firm, and I'm glad that you picked going with them as well.'"[100]

In his OTR interview Scholander was directly asked, "In connection with the consulting agreement between First Merger and DEER, did you provide services to DEER personally?" He responded, "We just provided advice. That's it." Then he was asked, "But were you involved in that?" He responded, "Yes." He was asked what the advice concerned. He responded "Well, we went to China. We were talking about their products, and I was giving my advice to put them in different stores and what I felt firsthand how I would sell their product."[101]

Over a year later, after receiving a "Wells call" in which Enforcement informed Scholander and his counsel of the charges it intended to bring against him, Scholander submitted an affidavit dated July 22, 2011. This was after he had been terminated from First Merger and no longer worked with Zakai and Gearty. The affidavit purported to "clarify and correct" statements appearing on pages 219 to 246 of the OTR transcript. In fact, rather than merely clarifying the prior testimony, the affidavit set forth an entirely different version of the facts relating to the $350,000 payment by DEER.

---

[99]    Hearing Tr. (Scholander) at 94-95.

[100]   Hearing Tr. (Scholander) at 95.

[101]   Hearing Tr. (Scholander) at 93-102.

27

In his affidavit, Scholander denied that he had anything to do with providing services to DEER in connection with the $350,000 payment. His earlier plain statements at his OTR that he personally gave advice in connection with the DEER payment were "clarified" by the assertion that Gearty had pursued the fee and provided services for it all by herself.[102]

At the hearing, Scholander explained away the discrepancy[103] by saying that he must have been "confused" at his OTR interview, and that he had been speaking in the "royal we" of First Merger as whole.[104]  When Scholander was asked at the hearing if there had been any triggering event between his OTR interview and the affidavit a year later that caused his memory to be clearer, however, Scholander admitted that there had been no such event.[105]

Scholander's affidavit also unveiled misstatements in Scholander's investigative testimony that were likely intentional, further undermining his credibility.  At his OTR interview in July 2010, Scholander stated that his trip to China with Gearty occurred only a few months before, in March or April 2010, while he was employed by First Merger.  In the July 2011 affidavit a year later, Scholander "corrected" his testimony to indicate that the trip actually occurred in November 2009, which was prior to his joining First Merger and while he was at Seaboard.  Scholander did not explain how he could have been confused about the timing of the trip – saying it was only three or four months before, and after he had joined First Merger – when the trip actually occurred the previous year in November, while he was still at Seaboard.

---

[102]   CX-34 (Scholander affidavit).

[103]   Hearing Tr. (Scholander) at 94-100.

[104]   *Id.* at 96.

[105]   Hearing Tr. (Scholander) at 160-61.

01039

Scholander's "correction" of his testimony on this point only came after the Wells notice alerted him that FINRA staff might well have information revealing that his OTR was inconsistent with the truth.[106]

The Hearing Panel finds that there is no explanation for the changes in testimony from the OTR interview to the affidavit except for Scholander's desire to avoid a potential charge of lying under oath at his OTR about the timing of the trip to DEER. Given what the Hearing Panel believes was a brazen attempt to falsify his original investigative testimony, Scholander's hearing testimony denying any connection to the $350,000 payment by DEER is not trustworthy. The Hearing Panel does not credit his hearing testimony regarding the China trip or the $350,000 DEER payment.[107]

### (2)   Harris's Hearing Testimony Is Demonstrably False

Harris supported Scholander's story about the trip to China. His testimony in that regard is discredited because, for the reasons discussed above, that version of the facts is not believable.

Harris also made other assertions that are inconsistent with the evidence. For example, he claimed that he did not engage in business activities on behalf of First Merger and away from Seaboard but, rather, waited until he joined First Merger. The reimbursement for gym memberships from the DEER consulting fee in December 2009, while he was still at Seaboard, demonstrates that his hearing testimony in this regard was not truthful. Similarly, the business

---

[106]   Hearing Tr. (Scholander) at 95-100; CX-34 (Scholander affidavit) at 2, ¶ 11.

[107]   Still other aspects of Respondent's hearing testimony cause the Hearing Panel to view his assertions with skepticism. For example, when Scholander was confronted with the business cards that the graphic designer had prepared before Respondents ever joined First Merger, he said that he had not given himself the title of managing partner and it was not on his business card (which is how he testified in his OTR). He maintained that he had orally told the graphic designer that it was a mistake to designate him as managing partner of First Merger on his business card. There was email correspondence with drafts of the business cards that showed that Scholander and Harris were given an opportunity to make corrections to the draft cards and never mentioned this supposed error in the written response discussing other, less important issues. CX-35 (email string to which draft mock-up was attached); Hearing Tr. (Scholander) at 764-67.

29

cards designating Harris, Scholander, and Zakai as managing partners of First Merger and Gearty as operations manager were created while Harris and Scholander were still at Seaboard, undercutting Harris's insistence in his hearing testimony that he did nothing to further his acquisition of an ownership interest in First Merger until he joined that Firm.

Finally, Harris also insisted that he was not an owner of First Merger, and that he joined the firm in February 2010 only as an employee. While Harris and his colleagues may not have been official owners of the firm, this testimony is inconsistent with the true circumstances. Respondents agreed to indemnify Simonetti for their actions or the actions of any employee or independent contractor of First Merger starting on October 13, 2009. This undertaking of responsibility for potential liability demonstrates that they were, in fact, engaged in business on behalf of First Merger in fall of 2009 and that they were acting as persons in charge of the firm's activities, not simply as employees.[108]

---

[108]  Contrary to the testimony of Scholander and Harris, Gearty testified that the trip to China in fall of 2009 was made for the express purpose of obtaining the DEER payment, and that she and the three men – Scholander, Harris, and Zakai – took a number of steps that fall and winter to implement their plan of acquiring First Merger, including spending monies from the DEER payment on office rent, furniture, and design services. She explained that she set up the account to receive the DEER payment because the three men were unable to receive it directly – Scholander and Harris because they were still with Seaboard, Zakai because he allegedly had no bank account.

Although Gearty's testimony is unnecessary to finding Respondents' version of events inconsistent with the facts and therefore false, her testimony bolsters the Panel's findings and conclusions. The Hearing Panel found her hearing testimony credible both because of the level of detail and because her testimony, unlike Respondents' testimony, was consistent with other evidence.

Respondents urged that Gearty's hearing testimony should be disregarded because it differed from her testimony at her OTR interview. Respondents focused on the fact that she did not say at her OTR interview that Person A was involved in the trip to China to see DEER and other matters relating to the plan to acquire First Merger. At the hearing Gearty testified that Person A was involved in those matters, including the trip to see DEER in China. The difference is immaterial to these proceedings. In either version of the story, it is plain that Gearty took direction from others who had closer ties and longer experience with DEER. She went to China to see DEER because she was told to go, not because she had any useful expertise.

Furthermore, Gearty explained why her hearing testimony should be believed even though she admitted that in her OTR she had concealed Person A's involvement in setting up the China trip to see DEER. When she gave her investigative testimony, she was working with Respondents. When she gave her hearing testimony, she was not. She said that in connection with her OTR interview she was "instructed" to keep Person A's name out of her OTR. She said that she complied with that instruction because she was in "fear of my potential partners" and felt "intimidated." Hearing Tr. (Gearty) at 615-19. She said, "After knowing these guys a few months, you know, I

III.   **Conclusions of Law**

A.   **Respondents Committed Rule 10b-5 Securities Fraud And Other Violations, As Alleged In The First Cause Of Action**

(1)   *The Applicable Statute And Rules Prohibit Fraud In The Offer And Sale Of Securities*

Section 10(b) of the Securities Exchange Act of 1934 broadly proscribes securities fraud in violation of rules promulgated by the Securities and Exchange Commission ("SEC"), including Rule 10b-5. Section 10(b) provides, "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails … [t]o use or employ, in connection with the purchase of sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."[109] Rule 10b-5 makes it unlawful "To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." The First Cause of Action also alleges violations of FINRA Rule 2020 and NASD Rule 2110, but, since the Hearing Panel finds

---

was told what to do all the time and I had to do what I was told, that kind of thing. And I was afraid of them. It's as simple as that." Hearing Tr. (Gearty) at 660.

Gearty's expression of fear is not outlandish in light of one of the items reported by the attorneys for Respondents and their two partners in applying for FINRA approval of the change in ownership of First Merger. The attorneys reported that a Legacy Disclosure on CRD reflects that Scholander had been charged with Menacing, a Class B Misdemeanor, in Criminal Court for the City of New York. According to his attorneys, in March 1989 Scholander pleaded guilty to the charge of Menacing, received 100 hours of community service, and a $90 surcharge was imposed. CX-13 (letter dated Aug. 23, 2013, from attorney for First Merger to FINRA in connection to application for approval of ownership change) at 10 of 19. Menacing is defined in the applicable New York statute as intentionally placing or attempting to place another person in fear of death, imminent serious physical injury, or physical injury. N.Y. CLS Penal § 120.15 (2013).

[109]   15 U.S.C. § 78j.

31

01042

that Respondents committed Rule 10b-5 fraud, those other Rules were also violated and need not

be separately discussed here.[110]

A civil enforcement action for Rule 10b-5 securities fraud requires proof of the

following: (i) a false statement or a misleading omission; (ii) of a material fact; (iii) made with

the requisite scienter or state of mind; (iv) using the jurisdictional means; (v) in connection with

the purchase or sale of a security.[111]

### (2) *Enforcement Proved The Elements Of Rule 10b-5 Securities Fraud*

Enforcement established the elements of securities fraud under Rule 10b-5, despite

Respondents' contentions otherwise. First, there was an omission of fact. The Hearing Panel

has found as a factual matter that the $350,000 DEER payment was made to Respondents and

---

[110]    FINRA Rule 2020 proscribes fraud in language similar to Section 10(b), stating: "No member shall effect
any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other
fraudulent device or contrivance." Although similar to Section 10(b), FINRA Rule 2020, unlike the federal statute,
does not require proof of scienter. *Dep't of Enforcement v. Fillet*, No. 2008011762801, 2011 FINRA Discip. LEXIS
70, at *20 n. 45 (OHO Dec. 13, 2011), *appeal docketed* (Jan. 10, 2012). A violation of Section 10(b) encompasses a
violation of FINRA Rule 2020. *See Dep't of Enforcement v. Thomas Weisel Partners, LLC*, No. 2008014621701,
2013 FINRA Discip. LEXIS 1, at *15 (NAC Feb. 15, 2013).

NASD Conduct Rule 2110 requires member firms and their associated persons to observe "high standards
of commercial honor and just and equitable principles of trade." This Rule applies to all business-related conduct.
*Dep't of Enforcement v. Shvarts*, No. CAF980029, 2000 NASD Discip. Lexis 6, at *11-18 (NAC June 2, 2000);
*Dep't of Enforcement v. Trende*, No. 2007008935010, 2011 FINRA Discip. LEXIS 54, *11 and nn.12 & 13 (OHO
Oct. 4, 2011). It requires members of the securities industry not merely to conform to legal requirements but to
conduct themselves with integrity, fairness, and honesty. *See, e.g., Heath v. SEC*, 586 F.3d 122, 131-139 (2d Cir.
Nov. 2009).

Recently, the NAC quoted the SEC in describing NASD Rule 2110 "as an industry backstop for the
representation, inherent in the relationship between a securities professional and a customer, that the customer will
be dealt with fairly and in accordance with the standards of the profession." *Dep't of Enforcement v. Golonka*, No.
2009017439601, 2013 FINRA Discip. LEXIS 5, at *22 (NAC Mar. 4, 2013) (quoting *Dante J. DiFrancesco*,
Exchange Act Rel. No. 66113, 2012 SEC LEXIS 54, at *17 (Jan. 6, 2012)).

It should be obvious that committing fraud and other violations of law and SRO Rules is inconsistent with
the high standards of ethical conduct required by Rule 2110. *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178,
182 (2d Cir.), *cert. denied*, 385 U.S. 817 (1966).

[111]    *SEC v. Familant*, 2012 U.S. Dist. LEXIS 179007, at **19 (Dec. 19, 2012) (unlike a plaintiff in a private
damages action, the SEC does not have to show in a civil enforcement suit that actual harm resulted); *SEC v. Woolf*,
835 F. Supp. 2d 111, 118 (E.D. Va. 2011) (in civil enforcement action SEC must prove false statement or omission
of material fact with scienter in connection with purchase or sale of securities); *SEC v. PIMCO*, 341 F. Supp. 2d
454, 463-64 (S.D.N.Y. 2004) (same) (citing *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).

01043

their two partners to assist them in setting up an office of First Merger, and Respondents did not

disclose that fact to customers when Respondents offered and sold DEER securities.  Second,

Respondents used the jurisdictional means to sell DEER securities.  They testified that many of

their customers were overseas and that they used the telephone in connection with transactions

with their customers.

Respondents nevertheless argue that the other elements of Rule 10b-5 fraud were not

proven.  They contend that Respondents had no duty to disclose the omitted information, that the

information was not material, that Respondents did not have scienter, and that the omission was

not "in connection with" a purchase or sale of a security.[112]  The Hearing Panel rejects all four

arguments, treating the first two together since they are closely related.

### a. Respondents had a duty to disclose the $350,000 payment from DEER because it was material information bearing on a conflict of interest

The Hearing Panel concludes that the $350,000 payment from DEER was material and

should have been disclosed to investors when Respondents offered and sold DEER securities.

*Respondents had a duty to disclose material information.*  The duty to disclose material

information is clear.[113]  It arises "from a relationship of trust and confidence between parties to a

transaction."[114]  A registered representative has that kind of relationship with his or her

---

[112]     Respondents frame their four legal arguments as follows: (i) "there was no proof at the hearing … that the respondents were under a duty to disclose the $350,000 payment from DEER" (Harris PH Br. at 1); (ii) "the failure to disclose the $350,000 payment from DEER was not material" (*id.*); (iii) "Whether Respondents possessed the necessary mental state as defined by scienter under Rule 10b-5" (Scholander PH Br. at 1); (iv) "Whether a one-time fee constitutes consideration necessary as to satisfy Rule 10b-5's 'in connection with' requirement for the future sale of securities" (*id.*).

[113]     Respondents recognize that they had a duty to disclose the information if the information was material. Harris PH Br. at 3 ("There are only two ways that [Enforcement] can establish a duty to disclose: (1) through an explicit regulatory or statutory requirement, or (2) when the omitted information is otherwise material.").

[114]     *See, e.g., Dep't of Market Regulation v. Burch*, No. 2005000324301, 2011 FINRA Discip. LEXIS 16, at *23 (NAC July 28, 2011) (quoting and citing *Chiarella v. United States*, 445 U.S. 222, 230 (1980)).

33

customers and owes the customer a duty to conduct business fairly and in the best interest of the customer.[115]

*The omitted information was material.* The duty to conduct business fairly and to act in the best interest of the customer gives rise to an obligation to disclose information regarding any actual or potential conflicts of interest, because only with full disclosure of such information can an investor adequately assess the objectivity of the broker's advice and recommendations and evaluate whether the broker is complying with the duty to act in the customer's best interest.[116] Accordingly, in a variety of contexts, it has been held that brokers and broker-dealer firms must disclose compensation they receive in excess of normal commissions, because such extra compensation gives rise to a conflict of interest.[117]

---

[115]   *See, e.g., Richard N. Cea*, Exchange Act Rel. No. 8662, 44 S.E.C. 8, 18 (Aug. 6, 1969); *Mac Robbins & Co.*, Exchange Act Rel. No. 6846, 41 S.E.C. 116 (July 11, 1962); Investment Advisers Act Rel. No. 1406, 1994 SEC LEXIS 797 (Mar. 16, 1994) ("shingle theory" posits that firm and its registered representatives can provide expert advice, will conduct business fairly and in best interest of the customer, and will make recommendations only with a reasonable basis for believing the securities suitable for the customer).

[116]   *Dep't of Enforcement v. DaCruz*, No. C3A040001, 2007 NASD Discip. LEXIS 1, at *24 (NAC Jan. 3, 2007) "When a registered representative recommends a stock to a customer, he must disclose 'material adverse facts, including any self-interest that could influence the … recommendation.'" (citing *Richard H. Morrow*, Exchange Act Rel. No. 40392, 53 S.E.C. 772, 781 (1998) (finding material that broker failed to disclose to his customers an anticipated "equity kicker" earned from sales of securities and paid by a third party and determining that broker had an obligation to disclose his compensation to customers). "If a representative fails to disclose extra compensation that he anticipates earning from a sale, a customer cannot weigh whether the representative may be recommending the stock for the representative's own financial interest, rather than based on the investment value of the security." *DaCruz*, 2007 NASD Discip. LEXIS 1, at *24-25 (finding material that brokers probably would receive undisclosed substantial sales incentive). *See also Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir. 1979) (failure to inform customer of possible conflict of interest was an omission of material fact in violation of Rule 10b-5); *Gary Plastic Packaging Corpl v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 242 (2d Cir. 1985) (commissions on CDs sold to public had to be disclosed).

[117]   *See, e.g., G. Bradley Taylor*, 2002 SEC LEXIS 2429, at *22 (Sept. 24, 2002) (broker barred where he failed to disclose that issuer had given him stock and stock options to promote the stock); *Kevin D. Kunz*, 2002 SEC LEXIS 105, at *22 (Jan. 16, 2002), *aff'd*, 64 Fed Appx. 659 (10th Cir. 2003) (broker suspended for, *inter alia*, failing to disclose his financial relationship with the issuer of the security he recommending); *Dep't of Enforcement v. Meyers*, No. C3A040023, 2007 NASD Discip. LEXIS 4, *20-27 (NAC Jan. 23, 2007) (probable receipt of incentive payment on sale of stock had to be disclosed); *DaCruz*, 2007 NASD Discip. LEXIS 1, at *24-28 (same).

01045

A registered representative must disclose material information fully and completely when recommending an investment,[118] including information regarding a broker's financial or economic incentive in connection with a stock recommendation. The failure to do so constitutes a violation of the anti-fraud provisions.[119]

Respondents claim that materiality can only be established by customer testimony, and, because no customers testified at the hearing, materiality was not established.[120] Respondents are incorrect.

Information regarding an actual or potential conflict of interest is material if a reasonable investor would consider it important in making an investment decision, or if its disclosure would be viewed by an investor as significantly altering the total mix of information made available.[121] That is an objective standard. Customer testimony is not required to determine whether the omitted information is material.[122] Furthermore, the requirement to disclose financial arrangements like the one here applies regardless whether a customer has complained or lost

---

[118]    *Burch, supra,* 2011 FINRA Discip. LEXIS 16, at *23 (citing *De Kwiatkowski v. Bear, Stearns & Co.,* 306 F.3d 1293, 1302 (2d Cir. 2002)).

[119]    *SEC v. Hasho,* 784 F. Supp. 1059, 1110 (S.D.N.Y. 1992).

[120]    Harris PH Br. at 2-3. Respondents have confused materiality, which must be proven in both private litigation and regulatory actions alleging securities fraud, with reliance. Reliance is only involved in private litigation. A private plaintiff must prove reliance on the false or misleading statements in order to obtain damages. Reliance is a subjective test; materiality is an objective test. *See, e.g., SEC v. Morgan Keegan & Co.,* 678 F.3d 1233, 1244-1251 (11th Cir. 2012).

[121]    *Basic v. Levinson,* 485 U.S. 224, 240 (1988); *SEC v. Morgan Keegan, supra,* 678 F.3d at 1244-51.

[122]    *Dep't of Enforcement v. Jordan,* No. 2005001919501, 2009 FINRA Discip. LEXIS 15, at *18 n.7 (NAC Aug. 21, 2009) (rejecting argument "that a finding of materiality must be grounded in evidence that customers 'actually believed' that the omissions altered the total mix of information. This argument lacks merit. '[T]he reaction of individual investors is not determinative of materiality, since the standard is objective, not subjective.'") (citing *RichMark Capital Corp.,* Exchange Act Rel. No. 48758, 2003 SEC LEXIS 2680, at *15 (Nov. 7, 2003), *aff'd,* 86 Fed. Appx. 744 (5th Cir. 2004)). In *RichMark,* the district court said that testimony of individual investors is not determinative of materiality since the standard is objective, not subjective.

35

01046

money. Without disclosure of such a conflict of interest, a customer is deprived of the opportunity to make an informed decision.[123]

The SEC's decision in *Kevin D. Kunz*[124] is similar to the case at hand and gives guidance. In *Kunz* a registered representative had previously worked for an issuer directly and, at the time the representative was selling the issuer's securities, he still had a financial connection by virtue of a consulting relationship with the issuer. The representative in *Kunz*, like the Respondents here, received a payment from the issuer that was denominated a "consulting fee." The issuer, like DEER in this case, was financing the broker-dealer firm that the representative and another person had started. The SEC made plain that these types of financial ties are important and have to be disclosed. It said, "The existence of these relationships would have been material to any prospective investor. When a broker-dealer has a self-interest (other than the regular expectation of a commission) in serving the issuer that could influence its recommendation, it is material and should be disclosed."[125] The Hearing Panel's conclusion here that Respondents in this case had a duty to disclose the $350,000 payment by DEER is consistent with the SEC's decision in *Kunz*.

---

[123]    *RichMark Capital Corp.*, 2003 SEC LEXIS 2680 (broker-dealer firm and its principal committed fraud when they failed to disclose investment banking agreement with the issuer of stock they promoted). As the SEC explained, compensation by the issuer was a strong financial incentive to promote the issuer's stock, and those financial ties would have been material to investors in trying to evaluate the extent to which the recommendations they received might have been based on personal economic benefit of firm and its principals. Even if firm provided valuable services to issuer and stock was a good investment, respondents still were obligated to disclose their financial incentive in recommending the issuer's stock so that they could make an informed decision.

        *See also DaCruz, supra,* 2007 NASD Discip. LEXIS 1, *35-36 (citing *Louis Loss*, The SEC and the Broker-Dealer, 1 Vand. L. Rev. 516, 522 (1948), which states that a registered representative "must not bring his own interests into conflict with his client's. If he does, he must explain in detail what his own self-interest in the transaction is in order to give his client an opportunity to make up his own mind whether to employ an agent who is riding two horses.").

[124]    *Kunz,* 2002 SEC LEXIS 105, at *23.

[125]    *Id.* (citing *In re Michael A. Niebuhr,* 52 SEC 546, 552 (1995)).

01047

  b. **Respondents had scienter because they knowingly or, at a minimum recklessly, omitted material facts concerning a conflict of interest**

  Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud."[126] That mental state is demonstrated where the defendant or respondent acted intentionally or recklessly in a way to deceive or mislead investors.[127] In connection with a material omission, scienter is established by showing that the defendant or respondent had actual knowledge of the material information and yet omitted to disclose it to investors.[128]

  Unquestionably, Respondents knew that they and their colleagues were receiving a payment of $350,000 from DEER to assist them in setting up their First Merger office and eventually acquiring ownership of the firm. They omitted this material information with knowledge, or, at a minimum, recklessly.[129] In either case, Enforcement proved Respondents' scienter.[130]

---

[126] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

[127] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 n.3 (2007); *Burch, supra*, 2011 FINRA Discip. LEXIS 16, at *32.

[128] *Burch, supra*, 2011 FINRA Discip. LEXIS 16, at *33-34 (citing cases).

[129] Respondents remark that "counsel of First Merger Capital was engaged in the handling and disclosure of the DEER payment to FINRA through the 1017 process [of applying for a change in ownership of the broker-dealer] from the very start." Scholander PH Br. at 7. They suggest that respondents "reasonably relied on counsel and acted in good faith upon that advice and guidance." *Id.* These assertions are meant to show that Respondents did not act with scienter. However, Respondents failed at the hearing to adduce any evidence of what was said to counsel and whether counsel was informed of all the relevant facts before Respondents sold DEER securities to their customers at First Merger. Respondents also failed to provide any evidence as to what advice counsel gave after receiving the relevant information. To invoke reliance on counsel as a means of countering evidence of scienter, a person must "show that he made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith." *Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994).

[130] Respondents argue that scienter was not proven because Respondents sold DEER securities in its private placement prior to joining First Merger and because when they were at First Merger their clients sold more DEER securities than they bought. Scholander PH Br. at 6-7. The argument is incoherent. No matter the other transactions, the Respondents committed fraud in those transactions in which they offered and sold DEER securities while at First Merger without disclosing the DEER payment and the conflict of interest it created.

01048

### c. The omission occurred in connection with the purchase or sale of a security

Respondents admitted that while they were with First Merger, they solicited both old and new investors to invest in DEER securities and that they did not disclose the DEER payment to those investors. They also admitted that they shared in commissions generated from sales of DEER by other brokers at First Merger, and that the other brokers did not disclose the DEER payment. As a factual matter, the material omission occurred in connection with purchases of a security.[131]

Respondents are incorrect when they argue that, as a legal matter, only a false or misleading statement regarding the security or its value qualifies as connected to a purchase or sale.[132] The U.S. Supreme Court has endorsed the SEC's broad reading of Section 10 of the Exchange Act and Rule 10b-5 to cover "a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds."[133] The Court has held that the misappropriation of the proceeds of a securities

---

Respondents further argue in their post-hearing briefs that they relied on counsel and that the DEER payment was disclosed to FINRA through the application for approval of the change of ownership. *Id.* This argument also fails. There was no evidence of what, if anything, was reported to compliance at First Merger regarding the DEER payment or whether permission was sought to sell the securities without disclosure of the payment to customers. The mere mention of the DEER payment in the application for change of ownership does not establish a reliance on counsel defense.

[131]    Hearing Tr. (Harris) at 227-28.

[132]    Scholander PH Br. at 4.

[133]    *SEC v. Zandford*, 535 U.S. 813, 819 (2002) ("[N]either the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act"). *Id.* at 820.

Obviously, the Supreme Court's decision controls this case and Respondents are incorrect when they say "The controlling law in this enforcement action is federal as interpreted and applied by the Second Circuit Court in regards to Count I of the Complaint [concerning the securities fraud claim]." Scholander PH Br. at 2.

01049

transaction violates Section 10 and Rule 10b-5, even though the securities transaction was lawful and the securities and their value were not misdescribed.[134]

The omission here of information material to evaluating the advice and recommendations of the persons offering the securities was in connection with securities transactions.[135] Enforcement proved this element of securities fraud.

**B.      Respondents Failed To Notify Their Firm, Seaboard, Of Their Outside Business Activities, As Alleged In The Second Cause Of Action**

NASD Rule 3030 prohibits registered persons from engaging in business activities without notifying their FINRA member employer in writing. It provides in pertinent part, "No person associated with a member in any registered capacity shall be employed by, or accept compensation from, any other person as a result of any business activity, other than a passive investment, outside the scope of his relationship with his employer firm, unless he has provided prompt written notice to the member." Respondents' assertion that they did not receive the payment is their defense to this charge. Since the Hearing Panel finds that Respondents did in fact receive the payment in connection with a business trip to China and for the purpose of assisting them to acquire a broker-dealer business, Respondents' defense fails.

**C.      Respondents Were Not the Cause Of Inaccuracies In First Merger's Books And Records, Contrary To The Allegations Of The Third Cause Of Action**

NASD Rule 3110(a) requires every FINRA member firm to make and preserve books and records in conformity with the relevant laws and regulations. It provides, "Each member

---

[134]    *Zandford*, 535 U.S. 813, 819. *See also Kenneth Bauer*, 26 S.E.C. 770 (1947); *Southeastern Securities Corp.*, 1949 SEC LEXIS 135, 29 S.E.C. 609 (1949).

[135]    Respondents are confused about the relationship of the omitted information to the transaction and the way in which the information was material. They argue that there was "no evidence how the $350,000 DEER payment actually altered the 'total mix' of information about DEER stock." Harris PH Br. at 4. The omission was material to an evaluation of the objectivity of Respondents' advice and recommendation of DEER. It is irrelevant whether $350,000 was material to DEER.

39

shall make and preserve books, accounts, records, memoranda, and correspondence in conformity with all applicable laws, rules, regulations and statements of policy promulgated thereunder and with the Rules of this Association and as prescribed by SEC Rule 17a-3." Implicit in this requirement is that a firm's books and records must be true and accurate. Regulatory oversight is premised on the reliability and accuracy of the books and records of a member firm.[136] As the SEC has recognized, "preserved records are the primary means of monitoring compliance with applicable securities laws."[137]

There is no dispute that Respondents received monies denominated commissions that were not reflected in their firm's books and records as commissions. Nor is there any dispute that they knew that the funds were to be routed to them in an unusual way through the personal account of another person, Maureen Gearty, the office manager.

Respondents deny, however, any responsibility for the failure of the firm's books and records to reflect accurately the payment of the commissions. They contend that they had no choice in the matter if they wanted to be paid, and that they were not responsible for the firm's books and records.

The Hearing Panel concludes that the record does not demonstrate that Respondents "caused" the inaccuracies in the broker-dealer's books and records. There is no evidence in the record that they submitted incorrect information that contributed to the inaccuracies in the firm's books and records or that they sought payment off the firm's books and records. There is no evidence that Respondents had any authority or influence over what was entered into the firm's

---

[136]    *Dep't of Enforcement v. Respondent*, No. 2008014969001 (OHO Apr. 27, 2012) (citing cases), available at FINRA's public website under OHO Redacted Disciplinary Decisions, www.finra.org/Industry/Enforcement/Adjudication/OHO/RedactedDecisions/2012/.

[137]    *See* Rel. No. 34-44238; 66 Fed. Reg. 22916, *22917 (May 7, 2001); *vFinance Investments, Inc.*, Exchange Act Rel. No. 62448, 2010 SEC LEXIS 2216, *23 n. 12 (July 2, 2010).

40

01051

books and records or the people responsible for keeping those books and records. To the contrary, the evidence was that Simonetti retained ownership of the firm and the power to direct those responsible for the firm's books and records. The evidence was that Simonetti dictated the unusual manner of payment and caused the resulting inaccuracies in the firm's books and records. Respondents simply received the payment. As passive recipients of the payment, Respondents did not "cause" the firm's violation of books and records requirements.

IV.     **Sanctions**

      A.    **Respondents Are Each Barred For The Fraud Violations Proven In Connection With The First Cause Of Action**

In connection with charges of fraud, the FINRA Sanction Guidelines[138] recommend a range of sanctions, depending on the circumstances. For negligent misconduct, the Sanction Guidelines recommend a suspension of up to 30 days and a fine ranging from $2,500 to $50,000. For intentional or reckless misconduct, the Sanction Guidelines recommend that a respondent be suspended for at least 10 business days and up to two years, along with a fine ranging from $10,000 to $100,000. In egregious cases, adjudicators may consider barring an individual respondent.[139]

The Sanction Guidelines suggest that the particular sanctions be crafted by focusing on the Principal Considerations applicable in all cases.[140] The Principal Considerations applicable here lead the Hearing Panel to conclude this is an egregious case. The misconduct was intentional, or, at best, reckless.[141] The misconduct was part of a pattern of financial connection

---

[138]    FINRA Sanction Guidelines (2011) ("Sanction Guidelines"), available at www.finra.org/sanctionguidelines.

[139]    Sanction Guidelines at 88.

[140]    *Id.*

[141]    Sanction Guidelines at 7, Principal Consideration 13.

41

01052

to Chinese issuers whose securities Respondents promoted. That connection was not an aberration.[142]  Respondents received a substantial monetary gain from their misconduct.[143]

The Hearing Panel finds no mitigating factors.[144]  Although it was established that Respondents have no disciplinary history, the absence of such a history is not mitigating.[145]  Respondents also have not acknowledged their misconduct[146] or attempted to remedy it.[147]

The Hearing Panel does find that a particularly aggravating factor here is Respondents' attempt to conceal their wrongdoing by false statements in OTR and hearing testimony.[148]  Scholander's purposeful falsehoods in his investigative testimony and subsequent affidavit cast substantial doubt on his fundamental integrity and the likelihood that he will be deterred from wrongdoing in the future.  Harris's hearing testimony also was riddled with demonstrable falsehoods.

Truth-telling is a fundamental requirement for participation in the securities industry.  Investors depend upon the honesty and integrity of broker-dealers and registered representatives

---

[142]   Sanction Guidelines at 7, Principal Consideration 16.

[143]   Sanction Guidelines at 7, Principal Consideration 17.

[144]   Respondents have advanced no mitigating factors.  All their arguments are aimed at showing they committed no violations.  However, the Hearing Panel has examined the kinds of facts that constitute potential mitigating factors under the Sanction Guidelines.  *Saad v. SEC*, 718 F.3d 904, at *22-25 (D.C. Cir. June 11, 2013).  The Panel concludes that the evidence does not reveal any mitigating circumstances in this case.

[145]   *Michael A. Rooms*, Exchange Act Rel. No. 51467, 2005 SEC LEXIS 728 (Apr. 1, 2005), *aff'd*, 444 F.3d 1208, 1214 (10th Cir. 2006); *Dep't of Enforcement v. Balbirer*, No. CO7980011, 1999 NASD Discip. LEXIS 29 (NAC Oct. 18, 1999) (registered persons are required to comply with the law and FINRA's Rules as part of their terms of admission to the securities industry).

[146]   Sanction Guidelines at 6, Principal Consideration 2.

[147]   Sanctions Guideline at 6, Principal Consideration 4.

[148]   Sanction Guidelines at 6, Principal Consideration 10.

42

01053

when considering and following their advice and recommendations.[149]  FINRA also can only

exercise its self-regulatory responsibilities effectively with the truthful cooperation of its

members and their associated persons.[150] Notably, when a respondent is charged with a violation

of FINRA Rules 8210 and 2010 for failing to respond truthfully, completely, and timely to a

request for information in connection with an investigation, a bar is the standard sanction.[151]

Even when a response is partial or incomplete, the presumption is that a bar is appropriate, unless

the person can demonstrate that the response was substantially complete.[152]

In light of Respondents' disregard for the truth, overarching concerns with building

public confidence in the financial markets,[153] improving overall standards of conduct in the

industry,[154] and protecting investors,[155] support a bar.  The Hearing Panel doubts Respondents'

commitment or ability to comply with the federal securities laws and regulatory requirements

going forward.

---

[149]    *See Dep't of Enforcement v. Patel*, No. C02990052, 2001 NASD Discip. LEXIS 42, at *27-28 (May 23, NAC 2001) ("In light of our duty to protect the investing public and to ensure the integrity of the market, we would be remiss in not acting decisively in cases, like the present matter, where the evidence calls into question the honesty and the veracity of a person associated with a member firm.  As the SEC has noted, the securities industry 'presents a great many opportunities for abuse and overreaching, and depends very heavily on the integrity of its participants.'" (citing *Bernard D. Gorniak*, 52 SEC at 373 (1995)).

[150]    *Dep't of Enforcement v. Hansen*, No. 2005001085001, 2008 FINRA Discip. LEXIS 2, *8-13 (Jan. 10, 2008).

[151]    The critical nature of FINRA's reliance on the truthful cooperation of its members and their associated persons is demonstrated by the automatic sanction of a bar for a failure to provide full and complete testimony and documents in response to a request pursuant to FINRA Rules 8210.  Sanction Guidelines at 33.

[152]    *Id.*

[153]    Sanction Guidelines at 1.

[154]    Sanction Guidelines at 1, 2 (General Principle No. 1).

[155]    *Id.* at 1.

43

01054

Accordingly, for the fraud violations charged in the First Cause of Action, the Hearing

Panel believes that the Respondents each should be barred from association with any FINRA

member firm in any capacity.

**B.     Respondents Each Would Be Fined $10,000 For The Outside Business Activities Violations Proven In Connection With The Second Cause Of Action**

Given the bar imposed for the fraud violations committed by Respondents, other

sanctions are not additionally imposed. The Hearing Panel does explain, however, its view as to

what would be the appropriate sanction for the outside business activities.

The Second Cause of Action charges Respondents with engaging in an outside business

activity without giving their employer broker-dealer written notice. The Sanction Guidelines

recommend a suspension of up to 30 days where there is no aggravating conduct and a

suspension of up to one year where there is aggravating conduct. If aggravating conduct is

substantial (as where there are many activities or there is customer harm), adjudicators may

consider a longer suspension or a bar. Fines for this kind of misconduct can range from $2,500

to $50,000.[156]

The Hearing Panel concludes that each Respondent should be fined $10,000 for their

failure to notify Seaboard in writing of the payment they received from DEER.

**V.     ORDER**

The Hearing Panel finds that Respondents violated Section 10(b) of the Securities

Exchange Act of 1934, SEC Rule 10b-5, and FINRA Rules 2020 and 2010, as alleged in the First

Cause of Action. For this misconduct, each Respondent is barred from associating with any

FINRA member firm in any capacity.

---

[156]     Sanction Guidelines at 5. General Principle No. 6 allows increasing a fine by the amount of a respondent's financial benefit. *Id.*

44

01055

The Hearing Panel finds that Respondents engaged in an outside business activity without giving their employer firm written notice, in violation of NASD Rule 3030 and FINRA Rule 2010, as alleged in the Second Cause of Action. In light of the bar, no additional sanction is imposed for this violation. If a sanction were imposed, it would be appropriate for this misconduct to fine each Respondent $10,000.

The Hearing Panel finds that Enforcement failed to prove by a preponderance of the evidence that Respondents caused the books and records of their broker-dealer firm to be false and inaccurate. The Third Cause of Action is dismissed. [157]

Accordingly, each Respondent is barred from association with any FINRA member firm in any capacity. Respondents are also ordered to pay the costs of the hearing. The total amount is $7809.79, which includes a $750 administrative fee and the cost of the transcript. [158] The assessed costs shall be due on a date set by FINRA, but not sooner than 30 days after this decision becomes FINRA's final disciplinary action in this proceeding.

<div style="text-align: right">

_____

Lucinda O. McConathy
Hearing Officer for the Hearing Panel
</div>

Copies to:

William Scholander (via overnight courier and first-class mail)
Tallman Harris, (via overnight and first-class mail)
Denis Patrick Kellerher, Esq. (via electronic and first-class mail)
Jon-Jorge Arias, Esq. (via electronic and first-class mail)
Jeffrey P. Bloom, Esq. (via electronic and first-class mail)
Michael J. Dixon, Esq. (via electronic mail)
Jeffrey D. Pariser (via electronic mail)

---

[157]    The Hearing Panel has considered and rejects without discussion any other arguments made by the Parties that are inconsistent with this decision.

[158]    Each Respondent is responsible for paying one half of the costs. Accordingly, each Respondent's share is $3904.89.

01056

Plaintiff's Exhibit

__55__

BEFORE THE NATIONAL ADJUDICATORY COUNCIL

FINANCIAL INDUSTRY REGULATORY AUTHORITY

| | |
|---|---|
| In the Matter of | |
| Department of Enforcement, | **DECISION** |
| Complainant, | Complaint No. 2009019108901 |
| vs. | Dated: December 29, 2014 |
| William Scholander<br>New York, NY, | |
| and | |
| Talman Harris<br>Garden City, NY, | |
| Respondents. | |

**Respondents fraudulently omitted material facts when soliciting purchases of securities and engaged in outside business activities without providing their employer with prompt written notice. Held, findings and sanctions affirmed.**

**Appearances**

For the Complainant: Jeffrey P. Bloom, Esq., Leo F. Orenstein, Esq., Michael J. Dixon, Esq., Department of Enforcement, Financial Industry Regulatory Authority

For Respondents: Jon-Jorge Aras, Esq., Samuel Halterman, Esq.

-i-

## TABLE OF CONTENTS

I.  BACKGROUND ......................................................................................................................2

II. PROCEDURAL HISTORY......................................................................................................3

III. FACTS ...................................................................................................................................4

    A.  Respondents' Business Ties to Person A and Person B and Their Business
        Relationship with DEER.................................................................................................4

    B.  Person A Introduces Respondents to Ronen Zakai, Who Invites Respondents
        to Acquire a Broker-Dealer with Him and Maureen Gearty.................................5

    C.  Scholander and Gearty Travel to China to Visit DEER and Receive a Fee ........7

    D.  Events Around and After the China Trip .............................................................8

    E.  Respondents and Zakai Spend the $350,000 in Furtherance of Their Plan to
        Acquire First Merger and Open a Branch Office.................................................9

    F.  Respondents Sell DEER Securities Without Disclosing the $350,000 Payment
        or Their Relationship with DEER.......................................................................11

    G.  Developments in Spring and Summer 2010 .......................................................11

    H.  Respondents Fail to Disclose to Seaboard Securities Their Business
        Relationship with DEER or the $350,000 Fee....................................................12

IV.  DISCUSSION ....................................................................................................................12

    A.  Fraud .................................................................................................................12

        1.  Omission of Material Facts....................................................................13

            a.  The $350,000 Payment from DEER Was Used by Scholander,
                Harris, and Zakai in Furtherance of Their Plan to Acquire a
                Broker-Dealer ...........................................................................14

            b.  Scholander's and Harris' Hearing Testimony About the
                $350,000 Payment Was Not Credible.........................................15

            c.  Respondents' Challenges to Gearty's Testimony ......................17

                i. Respondents' Motion to Dismiss or for a New Hearing........18

                ii. Respondents' Motion to Introduce Additional Evidence.......19

- ii -

|  |  | d. | The $350,000 Payment and Respondents' Business Relationship with DEER Were Material Facts ...................................................... 20 |
|  | 2. |  | "In Connection With" the Offer, Sale, or Purchase of Securities ............ 25 |
|  | 3. |  | Scienter ....................................................................................................... 25 |
|  |  | a. | Respondents Acted at Least Recklessly ......................................... 25 |
|  |  | b. | Respondents' Arguments That They Lacked Scienter Are Meritless ......................................................................................... 26 |
|  | B. |  | Outside Business Activities ................................................................................. 29 |
| V. | SANCTIONS ........................................................................................................................... 30 |
|  | A. |  | Fraudulent Omissions .......................................................................................... 30 |
|  | B. |  | Outside Business Activities ................................................................................. 33 |
| VI. | CONCLUSION ........................................................................................................................ 34 |

-2-

### Decision

From February 2010 through November 2010, William Scholander ("Scholander") and Talman Harris ("Harris") (together, "respondents") sold $961,825 of Deer Consumer Products, Inc. ("DEER") securities to customers. When doing so, respondents did not disclose that they recently received from DEER a $350,000 fee for advisory services, which they spent in furtherance of a plan to acquire a broker-dealer. In addition, neither Scholander nor Harris disclosed to their firm the activities in which they engaged that led to the $350,000 fee or that they received the fee. We are asked to decide: (1) whether respondents' failure to disclose the $350,000 fee and their business relationship with DEER was a fraudulent omission of material fact, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 thereunder, and FINRA Rules 2020 and 2010; (2) whether respondents engaged in outside business activities without giving prompt written notice to their employing firm, in violation of NASD Rule 3030 and FINRA Rule 2010; and (3) the appropriate sanctions for any such violations.[1] Because we find that respondents omitted material facts in connection with their sales of DEER, did so with scienter, and failed to give prompt notice to their firm of their outside business activities for DEER, we affirm the Hearing Panel's findings that respondents committed fraud and engaged in outside business activities violations. We also affirm the bars imposed by the Hearing Panel for respondents' fraudulent omissions.

I.   Background

Since 1997, Scholander has associated with 13 firms and registered with 11 firms. From March 2009 to February 2010, Scholander was registered with Seaboard Securities, Inc. ("Seaboard Securities"), as a general securities representative. From February 2010 to March 2011, Scholander was registered with First Merger Capital, Inc. ("First Merger"), as a general securities representative and (beginning in March 2010) an investment banking limited representative.

Since 1998, Harris has associated or registered with 16 member firms. From May 2009 to February 2010, Harris was registered with Seaboard Securities as a general securities representative. From February 2010 to March 2011, Harris was registered with First Merger as a general securities representative, an investment banking limited representative, and, during the last month of that association, a general securities principal.

Respondents first met each other in the late 1990s when they worked for the same firm. Since 2002, Scholander and Harris have operated as partners and have generally worked at the same firms. Since 2007, respondents have co-owned branch offices, except during their tenure at First Merger, when they attempted to acquire the firm with two other persons. Harris and Scholander are currently registered with another member firm and jointly own a branch office.

---

[1]   The conduct rules that apply in this case are those that existed at the time of the conduct at issue.

-3-

II.   Procedural History

On January 31, 2012, FINRA's Department of Enforcement ("Enforcement") filed a three-cause complaint against Scholander and Harris.  Cause one alleged that respondents made fraudulent sales of securities issued by DEER, in willful violation of Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and FINRA Rules 2020 and 2010.  The crux of Enforcement's allegations was that respondents sold DEER securities to customers while fraudulently omitting to disclose that respondents had a consulting agreement with DEER and received $350,000 from DEER pursuant to that agreement.  Cause one also alleged that respondents failed to disclose the same information to other First Merger representatives who sold DEER securities, causing those representatives not to disclose the information to their customers.  Cause two alleged that respondents engaged in outside business activities in violation of NASD Rule 3030 and FINRA Rule 2010 by entering into a financial consulting agreement with DEER while registered with, and without disclosing that agreement in writing or otherwise to, Seaboard Securities.  Cause three alleged that respondents caused First Merger's books and records to be false and misleading in not reflecting actual commission payments to individual representatives, in violation of NASD Rule 3110 and FINRA Rule 2010.  Respondents filed an answer denying the allegations and raising several affirmative defenses.

On August 16, 2013, the Hearing Panel issued a decision finding that respondents engaged in fraud and in outside business activities without providing prompt written notice to their firm.  The Hearing Panel barred respondents for their fraud violations.  For respondents' outside business activities violations, the Hearing Panel indicated that a $10,000 fine imposed on each respondent would have been appropriate but did not impose those fines in light of the bars imposed.  Finally, the Hearing Panel dismissed the allegations of books and records violations.[2]  Respondents filed this appeal.[3]

---

[2]     Enforcement has not appealed the Hearing Panel's dismissal of cause three.  We exercise our discretion not to address the allegations in cause three.

[3]     On July 23, 2014, while this appeal was pending and after the parties filed appellate briefs and made oral arguments, FINRA's Office of General Counsel ("OGC") informed the parties that the Office of Hearing Officers ("OHO") transmitted to OGC five exhibits that were admitted into evidence but which were inadvertently omitted from both the index to the record and the certified record that OHO transmitted to OGC on October 3, 2013.  Subsequently, respondents moved to dismiss the proceeding on the grounds that the "entire *de novo* nature of the NAC hearing has been compromised" by the omission of the five exhibits.  Respondents' motion is denied.  Respondents were given early notice, via the index, that the exhibits were not included in the record, but they did not raise any objection for more than eight months.  Moreover, respondents have not been prejudiced.  Respondents had a full opportunity to rely on the exhibits in making their written and oral arguments and could have sought leave to file additional briefing if they felt that additional briefing was necessary.  In addition, the NAC Subcommittee that was empaneled in this proceeding had the opportunity to review and consider the five exhibits when it was preparing its recommended decision.

01869