# EXHIBIT F

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW YORK

CASE NO. 14-CV-5474 (PGG)

- - -

HANNA BOUVENG,                    :

      Plaintiff,            :

  vs.                             :

NYG CAPITAL LLC d/b/a/            :

NEW YORK GLOBAL GROUP             :

GROUP, FNL MEDIA LLC,             :

and BENJAMIN WEY,                 :

      Defendants.           :


VIDEOTAPED DEPOSITION OF

MICHAELA WEY

March 12, 2015

New York, New York

- - -

REPORTED BY:  DANA N. SREBRENICK, CRR CLR

- - -

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph/917.591.5672 fax

deps@golkow.com

Page 22

1    A.   I am not aware of how FNL and
2  where FNL receives any income.
3    Q.   And do you receive any income
4  from FNL Media?
5    A.   I do not receive any income
6  from --
7    Q.   Do you receive -- do you
8  receive income from any source?
9    A.   Yes.
10   Q.   Who do you receive income from?
11   A.   It's an investment income.
12   Q.   Personal investment --
13   A.   Yes.
14   Q.   -- income?
15       The apartment that you live in,
16  is that a condominium?
17   A.   Yes.
18   Q.   Do you own the condominium?
19       MR. SHER:  Objection.
20  Relevance.
21       What does this have to do with
22  the claims and defenses?
23       MR. RATNER:  Do -- do you --
24  are you -- are you prohibiting her from
25  answering that question?

Page 23

1        MR. SHER:  Well, I think until
2   I'm persuaded this is not judgment discovery,
3   I'm -- I'm open to hearing how it's relevant
4   to the claims and defenses.
5        MR. RATNER:  I -- I think it's
6   both background information and could --
7   could go to her bias in the case, which I
8   think we're entitled to develop, such as --
9   same with her sources of income.  Stuff like
10  that.
11       MR SHER:  How does it go to her
12  bias?
13       MR. RATNER:  If -- if someone
14  else owns it and is paying for it and -- and
15  that's where she's living, it could affect
16  her bias in the case.
17       MR. SHER:  So the question is
18  does she own the -- the apartment?
19       MR. RATNER:  Uh-huh.
20       MR. SHER:  Do you mind if I
21  confer with my client?
22       MR. RATNER:  Absolutely not.
23       MR. SHER:  Okay, I'm going to
24  direct her not to answer that.
25       MR. RATNER:  Okay.

Page 24

1   BY MR. RATNER:
2     Q.   Are there common charges on the
3   apartment?
4     A.   Yes.
5     Q.   Who pays the common charges?
6     A.   I do.
7     Q.   Do you have --
8          (Whereupon, a brief discussion
9   is held off the record.)
10         MR. SHER:  She's willing to
11  answer the earlier question.  Mrs. Wey is
12  willing to answer your earlier question about
13  the apartment.
14  BY MR. RATNER:
15    Q.   Who owns the apartment?
16    A.   I partially own it.
17    Q.   Who -- who else owns it?
18    A.   A trust owns it.
19    Q.   What's the name of the trust?
20    A.   I don't believe this is
21  relevant.
22         MR. SHER:  Okay.  I think -- I
23  think the name of the trust is beyond the
24  scope.
25         MR. RATNER:  Okay.

Page 25

1   BY MR. RATNER:
2     Q.   Do you have any financial
3   interest in New York Global Group?
4     A.   No.
5     Q.   Do you have any -- have you
6   ever heard of New York Global Group Asia?
7     A.   Yes.
8     Q.   Do you have any financial
9   interest in New York Global Group Asia?
10    A.   No.
11    Q.   Do you know what, if anything,
12  is the connection between New York Global
13  Group in New York and New York Global Group
14  Asia?
15    A.   I believe they -- they are
16  co- -- co-brand entities.
17    Q.   What's a co-brand entity?
18    A.   Entity that uses the same brand
19  name.
20    Q.   Does New York Global Group
21  New York receive any income from New York
22  Global Group Asia?
23    A.   Yes.
24    Q.   How much, on an annual basis or
25  any other basis that you know?

Page 26

1    A.    I am not aware. I would have
2  to look at -- go back to the records.
3    Q.    Okay. And would -- would the
4  income of New York Global Group New York from
5  New York Global Group Asia be part of the
6  records and books of New York Global Group
7  that you're familiar with?
8    A.    Yes.
9    Q.    Okay. Does New York Global
10 Group New York receive income from any other
11 source other than New York Global Group Asia?
12   A.    Yes.
13   Q.    What other sources?
14   A.    From other consulting -- from
15 other companies, for consulting projects.
16   Q.    Are any of those companies
17 located in the United States?
18   A.    I believe so.
19   Q.    Do you know the names of any of
20 those companies?
21   A.    I would have to go back to the
22 records.
23   Q.    Okay. Does New York Global
24 Group in New York also receive income from
25 businesses or entities in China?

Page 27

1    A.    I would have to go back and
2  look.
3    Q.    And how about from business or
4  entities in -- in Europe?
5    A.    Again, I would have to go back
6  and look.
7    Q.    And do you know what FIKA is,
8  F-I-K-A?
9    A.    Yes.
10   Q.    What's FIKA? What is --
11   A.    FIKA?
12   Q.    F-I-K-A.
13   A.    It's called FIKA.
14   Q.    FIKA. FIKA, FIKA. You say
15 FIKA, I say FIKA.
16   A.    FIKA is a coffee chain --
17 coffee chain company.
18   Q.    Is it a coffee chain company
19 here in the United States?
20   A.    Yes.
21   Q.    Do you have any ownership
22 interest in FIKA?
23        MR. SHER: Objection.
24 BY MR. RATNER:
25   Q.    You can answer.

Page 28

1    A.    This --
2         MR. SHER: Yeah, this is --
3    A.    This is beyond the scope.
4         MR. SHER: This is not relevant
5  to this case.
6         MR. RATNER: Huh?
7         MR. SHER: Her personal --
8  personal financial interests are not relevant
9  to this case.
10        I'm -- I'm directing her not to
11 answer.
12 BY MR. RATNER:
13   Q.    Does your husband have any
14 financial interest in FIKA, FIKA?
15        MR. SHER: Same -- same
16 objection.
17        I'm directing her not to
18 answer.
19 BY MR. RATNER:
20   Q.    What, if anything, did you do
21 to prepare for today's deposition?
22   A.    I reviewed the complaint.
23   Q.    Anything else?
24   A.    I reviewed the transcript from
25 December hearing.

Page 29

1    Q.    Anything else?
2    A.    No.
3    Q.    Did you meet with Mr. Sher?
4    A.    No.
5    Q.    Did you meet with any lawyer?
6    A.    Yes.
7    Q.    Who?
8    A.    I met with Mr. -- with our
9  attorney -- in-house lawyer.
10   Q.    Mr. Baxter?
11   A.    No, with Mr. Warren Raiti.
12   Q.    Who?
13   A.    With Mr. Raiti.
14   Q.    How long did you meet with him?
15   A.    For about three hours.
16   Q.    When was that?
17   A.    Yesterday.
18   Q.    Did you review your husband's
19 deposition transcript?
20   A.    No.
21   Q.    Did you review Mr. Baxter's
22 deposition transcript?
23   A.    No.
24   Q.    Did you talk to Mr. Baxter at
25 all about his deposition?

Page 62

1  Q. You and he own a house in the
2  Hamptons?
3  A. We have a house in the
4  Hamptons.
5  Q. Do you own it or rent it?
6  A. We own it.
7  Q. And is it in your name, his
8  name, both?
9     MR. SHER: Objection. We're --
10 BY MR. RATNER:
11 Q. Or neither?
12    MR. SHER: -- beyond the scope
13 of this deposition.
14    (Whereupon, a brief discussion
15 is held off the record.)
16    MR. RATNER: I'll move on.
17 BY MR. RATNER:
18 Q. During the summer of 2013, did
19 you and your husband go to the house in the
20 Hamptons together?
21 A. I don't remember what exactly
22 we did in the summer of two-thousand four- --
23 '13, but normal -- under normal
24 circumstances, we would go to the house
25 together in the summer, yes.

Page 63

1  Q. During the summer of 2013, did
2  you ever go to the house in the Hamptons
3  without your husband?
4  A. I don't know whether it
5  happened during the summer of 2013, but at
6  certain occasions, I do go to the house in
7  the Hamptons without my husband.
8  Q. And during the summer of 2013,
9  did your husband go to the house in the
10 Hamptons without you?
11 A. I don't know.
12 Q. Before -- do I -- do I
13 understand your testimony that, before hiring
14 Ms. Bouveng, Mr. Wey traveled to Sweden in
15 order to see if she was telling him the truth
16 about her family connections?
17    Is that your --
18 A. That is my understanding, yes.
19 Q. Okay. That's what he told you?
20 A. He didn't say it in this
21 specific way.
22 Q. Well, what exactly did he tell
23 you?
24 A. I don't remember what exactly
25 he told me.

Page 64

1  Q. When he went to Sweden, when
2  was that?
3     MR. SHER: Objection to form.
4  BY MR. RATNER:
5  Q. To check out Ms. Bouveng's
6  story?
7  A. I don't know. It must have
8  been before he hired her.
9  Q. When did he hire her? When did
10 she start working at New York Global Group?
11 A. I believe she started working
12 in October 2013.
13 Q. Now, during -- during -- from
14 October 2013 through April 2014, how often
15 would you be out of town?
16 A. I'm not able to answer this
17 question. I don't -- I don't remember.
18 Q. Do you -- do you go out of town
19 regularly?
20 A. I did not go out of town
21 regularly.
22 Q. Once a month?
23 A. What does it mean to go out of
24 town?
25 Q. To sleep someplace other than

Page 65

1  your New York City apartment.
2  A. Probably -- yes, possibly once
3  a month.
4  Q. Where would you go?
5  A. I would go to China.
6  Q. Why would you go to China?
7  A. Because I have a family there.
8  Q. And you'd bring your kids to
9  China?
10 A. No.
11 Q. When you went to China, would
12 your husband go with you?
13 A. No.
14 Q. Do you and he have an open
15 marriage?
16 A. What is an open marriage?
17 Q. That you date other people.
18 A. I don't think that is an --
19 this is an appropriate question.
20 Q. Oh, yes, it is, and Mr. Sher
21 didn't object.
22    Do you and your husband have an
23 open marriage?
24 A. Absolutely not.
25 Q. How long -- when you'd take

17 (Pages 62 to 65)

Page 66

1  these trips to China, how long would they be
2  for?
3          MR. SHER: Objection to form.
4      A.  Ten days at a time.
5  BY MR. RATNER:
6      Q.  Who'd stay with your children?
7      A.  My husband and my nanny.
8      Q.  Now, you -- you said -- when
9  you went to China, did -- did you meet with
10 people from New York -- NYGG Asia?
11     A.  No.
12     Q.  Do you have any personal
13 businesses in China?
14     A.  Yes.
15     Q.  Were any of those businesses
16 associated with NYGG?
17     A.  No, excuse me.  Personal
18 business, meaning -- no, I don't have any
19 business, corporate business.  My son goes to
20 school in China.  This is why I go to China.
21     Q.  Okay.  You said you went to
22 Luxembourg because Mr. Wey asked you for some
23 help on a project?
24     A.  Correct.
25     Q.  Has he asked you for help on

Page 67

1  projects before that?
2      A.  He has asked me for some help
3  on projects before, yes.
4      Q.  What kind of projects?
5      A.  Same nature, investments.
6  He -- yeah, investment projects.
7      Q.  About how often would you help
8  him on these investment projects?
9      A.  Maybe once a year.
10     Q.  Are -- are you aware if your
11 husband paid -- helped anyone else with the
12 rent -- with rent besides Ms. Bouveng?
13     A.  I'm not aware of that.
14     Q.  Do you know a woman by the name
15 of Chemme Koluman?
16     A.  No.
17     Q.  Are you aware that from time to
18 time your husband visited Ms. Bouveng at the
19 apartment on Broad Street?
20     A.  I am not -- I don't know.  I
21 don't know.
22     Q.  Did he ever tell you he went to
23 that Broad Street apartment?
24     A.  Yeah, he said he was there,
25 yes.

Page 68

1      Q.  What did he tell you he did
2  there?
3      A.  He didn't tell me anything
4  about what he did there.
5      Q.  When did you find out that
6  Ms. Bouveng got fired?
7      A.  On the day she got fired.
8      Q.  Did you know he was -- Mr. Wey
9  was going to fire her before he fired her?
10     A.  No.
11     Q.  How did you find out he fired
12 her?
13     A.  He called me.
14     Q.  That was on April 22, 2014?
15     A.  If this is the day she got
16 fired, then that would be the day.
17     Q.  Okay.  What time of day did he
18 call you?
19     A.  I don't remember.
20     Q.  Was it morning, middle of the
21 day, afternoon, evening?
22     A.  I don't know.
23     Q.  Where were you when he called
24 you?
25     A.  I don't know.

Page 69

1      Q.  Where was he when he called
2  you?
3      A.  I don't know where he was.
4      Q.  Did he call you on a cell phone
5  or on a landline?
6      A.  I don't remember.
7      Q.  Were you in your apartment?
8      A.  I don't remember.
9      Q.  What did he say to you when he
10 called you, as best as you can, verbatim?
11     A.  He said he had to terminate
12 Hanna.  He was very upset.  He said that she
13 lied to him and that she was too much risk
14 for him and his company and he couldn't
15 tolerate it anymore.
16     Q.  Did he tell you what she lied
17 to him about?
18     A.  He -- she lied to him whether
19 she went out last night and stayed late, and
20 she also lied to him about whether there was
21 somebody else staying in the apartment at the
22 time.
23     Q.  Did he tell you why she was too
24 much of a risk to the company?
25     A.  We had discussed it over time