UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HANNA BOUVENG,

                Plaintiff,

      – against –

NYG CAPITAL LLC d/b/a NEW YORK
GLOBAL GROUP, NYG CAPITAL LLC
d/b/a FNL MEDIA LLC, and BENJAMIN
WEY,

                Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  June 2, 2015

**MEMORANDUM
OPINION & ORDER**

14 Civ. 5474 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Hanna Bouveng brings this action against Defendants NYG Capital LLC,

d/b/a New York Global Group ("NYGG"), FNL Media LLC, and Benjamin Wey.  Plaintiff's

claims arise out of her employment at NYGG and her relationship with Wey, NYGG's chief

executive officer.  See Second Amended Complaint ("SAC") (Dkt. No. 40).  The SAC asserts

claims for sexual harassment, hostile work environment, gender discrimination, and retaliation

under the New York State Human Rights Law ("NYSHRL") and the New York City Human

Rights Law ("NYCHRL"), and state law claims for assault, battery, intentional infliction of

emotional distress, defamation, and breach of contract.  (Id. ¶¶ 161-227)  Defendants have

moved to dismiss a number of Plaintiff's claims, pursuant to Federal Rule of Civil Procedure

12(b)(1) and 12(b)(6).  (Dkt. Nos. 48-49)  For the reasons stated below, Defendants' motion will

be granted in part and denied in part.

# BACKGROUND

## I.    FACTS[1]

Plaintiff Hanna Bouveng – a twenty-five year old Swedish citizen – was employed by Defendants pursuant to a J1 visa from approximately October 1, 2013 until April 22, 2014.  (SAC (Dkt. No. 40) ¶¶ 1-2)  Defendant NYGG is an investment advisor and venture capital firm based in Manhattan.  (Id. ¶¶ 3-4)  Defendant FNL Media is a wholly owned subsidiary of NYGG that publishes The Blot Magazine ("The Blot" or "Blot"), an online digital publication.  (Id. ¶¶ 5-6)  NYGG and FNL Media operate as a joint enterprise and share the same management, ownership, and offices in New York City.  (Id. ¶ 7)  Defendant Wey is the chief executive officer of NYGG and the publisher of The Blot.  (Id. ¶¶ 9-10)

In early July 2013, Wey and Bouveng met for lunch in the Wall Street area. Bouveng's understanding was that the purpose of the lunch was to discuss employment/intern possibilities for Bouveng in New York.  (Id. ¶ 26)  Wey told Bouveng that what he "really want[ed] [was] a girlfriend[.]"  (Id.)  Bouveng stated that she was not interested in having a relationship with Wey and the lunch ended.  (Id.)  Nonetheless, the next day Wey offered Bouveng a job at NYGG, and Bouveng accepted his offer.  (Id. ¶ 27)

From about October 1, 2013, until she was fired on or about April 22, 2014, Plaintiff worked at NYGG as Director of Corporate Communications.  (Id. ¶ 30)  Throughout Plaintiff's employment, Wey repeatedly commented on her appearance, purchased tight clothes for her, placed his arm around her waist, kissed her on the cheek, and ogled her.  (Id. ¶¶ 35-37,

---

[1]  For purposes of Defendants' motion, the facts pleaded in the SAC are presumed to be true. See Bldg. Indus. Elec. Contractors Ass'n v. City of New York, 678 F.3d 184, 187 (2d Cir. 2012) ("In assessing the legal sufficiency of [plaintiff's] claim[s] [on a motion to dismiss], [the court] must accept factual allegations in the complaint as true and draw all reasonable inferences in favor of the non[-]moving party.") (citing DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010)).

39, 41-42)  Wey – a married father of three – initially insisted that Plaintiff accompany him to dinner at least two nights a week.  (Id. ¶¶ 12, 40)  As time passed, Wey began to insist that Plaintiff "spend most if not all evenings with him, both during the work week and on weekends . . . ."  (Id. ¶ 40)  Wey complained to Plaintiff about his marriage and stated that he wanted to leave his wife for her; took her to social gatherings; and told her that she could only advance in her career "by sticking close to him."  (Id. ¶¶ 38, 40, 44, 46-48)  Eventually, Wey told Plaintiff that he wanted to kiss her and make love to her.  (Id. ¶ 45)  Plaintiff "did her best to brush off and ignore [Wey's] [overtures]."  (Id.)

In November 2013, after a meeting with a potential client, Wey brought Plaintiff to his penthouse hotel room and attempted to kiss her.  (Id. ¶¶ 50-51)  Plaintiff "stood up and told [Wey] she had to go back to the office," but Wey "suddenly pulled Plaintiff . . . into a bedroom, then towards him, grabbed and embraced her with both arms, and kissed her passionately on the neck."  (Id. ¶ 52)  Plaintiff told Wey to stop and "stormed toward the door."  (Id.)  The two then returned to NYGG's offices.  (Id.)

Soon after this incident, Plaintiff accompanied Wey on a business trip to Boston. (Id. ¶¶ 53-54)  During dinner one night, Wey "repeatedly reached under the table and touched Plaintiff's thigh."  (Id. ¶ 54)  After dinner, Plaintiff – who was inebriated – "discovered that [Wey] had only booked one hotel room with a king bed."  (Id. ¶ 55)  Wey then attempted to have sexual intercourse with Plaintiff, despite her resistance.  (Id.)  Wey eventually stopped, however, and "did not assault her again during their stay."  (Id.)

In November 2013, Wey began urging Plaintiff "to move out from the apartment she shared with friends to her own place in lower Manhattan."  (Id. ¶ 56)  Wey "promised that NYGG would help Plaintiff find an apartment."  (Id. (emphasis omitted))  On December 1, 2013,

Plaintiff moved into an apartment that Wey found for her in lower Manhattan, which was "a short walk from [NYGG's] offices."  (Id. ¶ 57)  Wey told Plaintiff that "NYGG would help her pay the additional costs of living alone at the apartment as part of her compensation, and that he would act as her guarantor."  (Id. (emphasis omitted))  Plaintiff assumed that this meant NYGG was giving her a raise, but she never received a raise.  (Id. ¶¶ 57-58)  Instead, during the first week of December 2013, Wey invited himself over to Plaintiff's apartment, demanded that she sit close to him, and "began massaging her shoulders and then kissing her neck."  (Id. ¶ 59)  Plaintiff rejected Wey's advances, and he left the apartment.  (Id.)  In the weeks that followed, Wey "glared at and refused to speak to Plaintiff" at work, and Plaintiff "worried that she was going to be fired, lose her apartment, and lose her J1 Visa."  (Id. ¶ 60)

In mid-December 2013, while on a business trip to Dubai, Plaintiff and Wey again shared a bed.  (Id. ¶ 62)  One night, Wey got into the bed naked, "repeatedly called out Plaintiff's name, and pawed at her, but Plaintiff was non-responsive."  (Id. ¶ 63)  The next night, Wey got into the bed naked again, "hugged Plaintiff from behind, and pressed his erection against her," but Plaintiff refused his advances.  (Id. ¶ 64)  Plaintiff again worried that she would lose her job, but after these incidents Wey "behaved toward Plaintiff . . . as if nothing had happened."  (Id. ¶¶ 65-66)

At a dinner one night after the trip to Dubai, Wey gave Plaintiff a $2,000 Prada handbag as a "year-end bonus from NYGG," and then "plied Plaintiff with drinks."  (Id. ¶ 66 (emphasis omitted))  After dinner, Wey accompanied Plaintiff to her apartment, and forced her to have sexual intercourse with him.  (Id. ¶ 67)  Plaintiff was "alarmed, disgusted, and devastated."  (Id.)

4

Over the next two months, Wey "plied Plaintiff . . . with alcohol" and forced her to have sexual intercourse with him on approximately three additional occasions.  (Id. ¶ 70) "After the last episode in approximately early February 2014, Plaintiff . . . remained steadfast in her refusal to succumb to Wey's sexual advances, regardless of the consequences."  (Id. (emphasis omitted))

Plaintiff alleges that Wey retaliated against her as a result.  Wey repeatedly threatened to fire Plaintiff, to ruin her reputation on Wall Street, and to arrange for her J1 visa to be withdrawn.  (Id. ¶ 71)  He began "stalking" Plaintiff, her family, and her friends via text messages, emails, phone calls, and in-person visits.  (Id. ¶¶ 72-75)  Wey also emailed NYGG executives suggesting that Plaintiff might not be qualified for her job, and told Plaintiff in mid-April 2014 that if they did not have "an intimate relationship" by August 1, 2014, he would turn over her apartment to other NYGG employees.  (Id. ¶¶ 75-76, 78, 84)

On April 22, 2014, Wey entered Plaintiff's apartment, found a male friend sleeping on the couch, demanded that the friend leave immediately, and ordered that Plaintiff vacate the apartment.  (Id. ¶¶ 90-91)  That same day, Wey terminated Plaintiff's employment and told her that NYGG would no longer sponsor her visa.  (Id. ¶ 92)

Wey then began sending emails and making phone calls to Plaintiff, her family, and her friends asserting that Plaintiff was sleeping with "a Black man" and "dangerous criminal," alleging a "sex scandal," and claiming that Plaintiff was terminated for cause due to her "alcohol abuse" and constant partying.  (Id. ¶ 96-106, 109)  On April 29, 2014, Plaintiff's lawyers sent a cease and desist letter to Wey.  (Id. ¶ 110)  His harassment of Plaintiff, her friends, and her family continued, however (see id.), and on July 21, 2014, Plaintiff filed the instant lawsuit.  (Dkt. No. 1)

The day after Plaintiff filed this action, Wey began posting Facebook messages and photographs in which he "tagged" Plaintiff, her friends, and her family.[2]  (Id. ¶ 123)  Many of these photos showed Plaintiff's face together with stock images of explicit pornography and drug use.  (Id. ¶ 123)  The photos were accompanied by messages defaming, harassing, and seeking to intimidate Plaintiff, her friends, and her family.  (Id. ¶ 124)

Between July 24, 2014 and the filing of the SAC, NYGG and Wey published a series of articles concerning Plaintiff in The Blot Magazine, all of which Wey allegedly wrote or edited.  (Id. ¶ 129)  For example, on July 24, 2014, Defendants published an article entitled: "Want to Trap Swedish Women?  Ask Criminal James Chauvet."[3]  (Id. ¶ 131)  The article describes Plaintiff as a "Swedish party girl who had just landed in New York's nightclubs after a year of providing 'entertainment' in the nightclubs and casino houses of Hong Kong and Macau," and includes photographs of Plaintiff's father, aunt, and brother.  (Id. (quotation marks omitted))

After an August 1, 2014 court conference – during which Plaintiff's counsel informed this Court that Plaintiff had returned to Sweden because of Wey's harassment – Defendants published an article entitled, "BREAKING NEWS:  Sexual Harassment Accuser Hanna Bouveng Fled America," along with a photograph of Plaintiff and Chauvet next to a photograph showing lines of cocaine.  (Id. ¶ 136-37 (quotation marks omitted))  This article

---

[2]  "When you tag someone [on Facebook], you create a link to their profile. . . .  For example, you can tag a photo to show who's in the photo or post a status update and say who you're with. If you tag a friend in your status update, anyone who sees that update can click on your friend's name and go to their profile . . . .  When you tag someone, they'll be notified.  Also, if you or a friend tags someone in your post, the post could be visible to the audience you selected plus friends of the tagged person . . . ."  What Is Tagging and How Does It Work?, FACEBOOK, https://www.facebook.com/help/124970597582337 (last visited June 1, 2015).

[3]  James Chauvet is the African-American man Wey found in Plaintiff's apartment on April 22, 2014.  (SAC (Dkt. No. 40) ¶¶ 90-91, 95, 96)

asked: "Hanna Bouveng left the U.S.? Which legitimate person would do that if she had a real case? Who is she hiding from? From the truth?" (Id. ¶¶ 137-38 (quotation marks omitted)) In another August 1, 2014 article, Defendants state that Plaintiff "evaded responsibilities and America's judicial justice, after having falsely accused a Wall Street financier Benjamin Wey of 'sexual harassment.'" (Id. ¶ 139 (quotation marks omitted)) In an August 3, 2014 Blot article, Defendants assert that Bouveng had been fired from NYGG "for alcohol abuse, drug use and connections with drug dealers." (Id. ¶ 141 (quotation marks omitted)) On August 14, 2014, Wey sent a similar defamatory article to the chief executive officer of Manpower Sweden, Inc., the "largest employment placement agency in Sweden." (Id. ¶ 143) Defendants also published defamatory remarks concerning Plaintiff's lawyers, describing their firm as "shady," "ambulance chasers," "a bunch of scumbags," "low lives," and "as bad and dirty as it gets." (Id. ¶ 142 (quotation marks omitted))

In August 2014 – after Plaintiff had returned to Sweden – Wey traveled to Sweden. (Id. ¶¶ 136, 146) On August 19, 2014, Wey appeared at a bar in Plaintiff's small hometown, approached Plaintiff's 19-year-old cousin and friends, and asked them about Plaintiff. (Id. ¶ 147) After learning of Wey's presence in Sweden, Plaintiff applied to the Swedish police for a restraining order. (Id. ¶¶ 147-49) On August 25, 2014, Wey approached Plaintiff in a café in Stockholm, "stared at [her] lecherously," and "said in a creepy voice: 'Wow.'" (Id. ¶ 150) Plaintiff reported this incident to the police, and they provided her with a surveillance alarm phone and instructed her to activate the device if she saw Wey again. (Id. ¶ 151-52)

On August 28, 2014, Plaintiff and Defendants entered into an agreement (the "Agreement") in which Defendants agreed to (1) "refrain from adding and, to the extent within

their control, remove Internet postings concerning Bouveng, [Plaintiff's law firm, Morelli Alters Ratner], the Bouveng Action, the Weiss Action, 'Swedish Party Girls,'" and a number of other individuals[4]; and (2) "cease from initiating communications via email, correspondence, text messages, telephone calls, Facebook postings and/or messages, tagging, Instagram, Twitter and other social media with Bouveng and the Bouveng Contacts."[5]  (Id. ¶ 153; Stipulation and Agreement (Dkt. No. 32), Ex. A ¶ 3)  In return, Plaintiff agreed to withdraw her August 12, 2014 motion for a preliminary injunction and agreed not to refile the motion or seek similar injunctive relief.  (Stipulation and Agreement (Dkt. No. 32), Ex. A ¶ 4)  The Agreement provides for liquidated damages in the amount of $10,000 in the event that any party violates the Agreement. (Id. ¶ 7)  Plaintiff asserts, however, that beginning on September 17, 2014, and continuing to the present, Defendants repeatedly violated the Agreement by posting numerous offending articles on The Blot and on Twitter.  (SAC (Dkt. No. 40) ¶ 156)

On October 2, 2014, Defendants filed a lawsuit against Plaintiff in New York County Supreme Court alleging that Plaintiff had fraudulently induced Wey to enter into the

---

[4]  The "Weiss Action" refers to a lawsuit that Yonatan Weiss brought against NYGG, FNL Media, and Wey.  (Weiss v. NYG Capital LLC et al., No. 14 Civ. 8743 (PGG) (S.D.N.Y. Nov. 3, 2014))  NYGG and FNL Media employed Weiss as a graphic designer from October 2013 until June 2014, and he worked alongside Bouveng during that time.  See Weiss v. NYG Capital LLC et al., No. 14 Civ. 8743, Complaint (Dkt. No. 1) ¶¶ 2, 23.  In his lawsuit, Weiss alleges that he witnessed Wey's sexual harassment of Bouveng, and that he "reported this sexual harassment to lawyers investigating Hanna Bouveng's complaints . . . ."  (Id. ¶ 17)  Weiss contends that, as a result, Defendants subjected him to unlawful retaliation by terminating his employment.  (Id. ¶¶ 17-18)  On November 3, 2014, Weiss sued NYGG, FNL Media, and Wey for retaliation pursuant to Title VII, 42 U.S.C. § 2000e-2(a).  (Id. ¶¶ 44-47)

[5]  The "Bouveng Contacts" include:  Plaintiff's father, Nils Sundqvist; Plaintiff's aunt, Helena Bouveng; Plaintiff's brother, Oskar Bouveng; and Plaintiff's friends and acquaintances, Chemme Koluman, Nina Chelidze, James Chauvet, Sophie Darsot, Yonatan (Yoni) Weiss, and Sherwin M. Zanjanian.  (Stipulation and Agreement (Dkt. No. 32), Ex. A ¶ 3a)

Agreement and had subsequently breached the Agreement. [6]  (Id. ¶ 157)  On October 20, 2014, Defendants delivered copies of the complaint in that case to Plaintiff's father in Sweden and to one of Plaintiff's close friends in New York City.  Accompanying the complaint was an anonymous cover letter stating:  "YOU HAVE BEEN SUED IN THE SUPREME COURT OF THE STATE OF NEW YORK.  ATTACHED IS A COMPLAINT THAT HAS BEEN FILED AGAINST YOU – A PUBLIC RECORD."  (Id. ¶ 158 (emphasis in original))  Plaintiff asserts that the purpose of this lawsuit and related correspondence was to intimidate prospective witnesses and further retaliate against Plaintiff.  (Id.)

## II.     PROCEDURAL BACKGROUND

Plaintiff filed the instant action on July 21, 2014.  (Dkt. No. 1)  On July 25, 2014, she moved by order to show cause for a preliminary injunction.  (Dkt. No. 4)  On August 12, 2014, Plaintiff filed the First Amended Complaint.  (Dkt. No. 15)  On August 29, 2014, the parties submitted a joint letter advising this Court of the Agreement, pursuant to which Plaintiff withdrew her motion for a preliminary injunction.  (Dkt. No. 27)

Plaintiff filed the SAC on October 24, 2014.  (Dkt. No. 40)  That same day, Plaintiff submitted a letter requesting leave to renew her motion for a preliminary injunction based on Defendants' alleged ongoing retaliation against her.  (Dkt. No. 42)  This Court conducted a two-day hearing on Plaintiff's motion for a preliminary injunction on December 15 and 16, 2014.  (Dec. 15-16, 2014 Hearing Tr. (Dkt. Nos. 58, 60))

The SAC asserts claims against all Defendants for (1) quid pro quo sexual harassment under the NYSHRL and the NYCHRL; (2) hostile work environment under the NYSHRL and the NYCHRL; (3) gender discrimination under the NYSHRL and the NYCHRL;

---

[6]  On October 7, 2014, this lawsuit was removed to this Court.  Wey v. Bouveng, No. 14 Civ. 8079 (PGG) (S.D.N.Y. Oct. 7, 2014) (Dkt. No. 1).

(4) retaliation under the NYSHRL and the NYCHRL; (5) assault; (6) battery; (7) intentional infliction of emotional distress; (8) defamation/slander; and (9) breach of contract.  (SAC (Dkt. No. 40) ¶¶ 161-227)  Plaintiff seeks compensatory damages of more than $300 million and punitive damages of $400 million.  (Id. at 64-66)[7]  Plaintiff also seeks injunctive relief in connection with her retaliation allegation under the NYCHRL.  (Id. ¶¶ 195-98)

Pending before the Court is Defendants' Rule 12(b)(6) motion to dismiss (1) the NYSHRL and NYCHRL claims against FNL Media; (2) the assault and battery claims against NYGG and FNL Media; (3) the defamation claim against NYGG; (4) the intentional infliction of emotional distress claim against all Defendants; and (5) Plaintiff's request for injunctive relief in connection with her NYCHRL retaliation claim.  (Dkt. Nos. 48-49)  Pursuant to Fed. R. Civ. P. 12(b)(1), Defendants have also moved to dismiss Plaintiff's breach of contract claim for lack of subject matter jurisdiction.  (Id.)  In the alternative, Defendants move to dismiss the breach of contract claim against FNL Media for failure to state a claim pursuant to Rule 12(b)(6).  (Id.)

## DISCUSSION

## I.    LEGAL STANDARDS

A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). When subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of 'showing by a preponderance of the evidence that subject matter jurisdiction exists.'"  APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (quoting Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003) (citation omitted)).  In deciding a motion to dismiss for lack of subject matter jurisdiction, "a

---

[7]  The page numbers referenced in this Order correspond to the page numbers designated by the Electronic Case Filing system.

district court . . . may refer to evidence outside the pleadings." Makarova, 201 F.3d at 113

(citing Kamen v. A T & T Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).

   A Rule 12(b)(6) motion challenges the legal sufficiency of the claims asserted in a

complaint.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  To

meet this standard, a complaint's factual allegations must permit the Court, "draw[ing] on its

judicial experience and common sense," "to infer more than the mere possibility of misconduct."

Id. at 679.  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged

in the complaint," Kassner v. 2nd Avenue Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007)

(citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir.

2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez

v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).  For purposes of a motion to dismiss, the "complaint

is deemed to include any written instrument attached to it as an exhibit or any statements or

documents incorporated in it by reference," and the court may consider any document "which is

integral to the complaint."  Int'l Audiotext Network, Inc. v. Am. Tel. and Telegraph Co., 62 F.3d

69, 72 (2d Cir. 1995) (citations and quotation marks omitted).  Additionally, "[i]t is well

established that a district court may rely on matters of public record in deciding a motion to

dismiss under Rule 12(b)(6) . . . ."  Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d

Cir. 1998) (citations omitted).

## II. NYSHRL AND NYCHRL CLAIMS AGAINST FNL MEDIA

   FNL Media argues that the NYSHRL and NYCHRL claims against it must be

dismissed because FNL Media "was not Plaintiff's 'employer' within the meaning of these

statutes, and therefore [FNL Media] does not fall within any of these statutes' prohibitions."
(Def. Br. (Dkt. No. 49) at 11)

A.   **Applicable Law**

The NYSHRL and the NYCHRL make it "an unlawful discriminatory practice . . .
[f]or an employer . . . because of an individual's . . . sex . . . to discharge from employment such
individual or to discriminate against such individual in . . . terms, conditions or privileges of
employment."  N.Y. Exec. L. § 296(1)(a); see also N.Y.C. Admin. Code § 8-107(1)(a).  Under
the NYSHRL, it is likewise "an unlawful discriminatory practice . . .  [f]or any employer . . . to
discharge, expel or otherwise discriminate against any person because he or she has opposed any
practices forbidden under this article or because he or she has filed a complaint, testified or
assisted in any proceeding under this article."  N.Y. Exec. L. § 296(1)(e).  An anti-retaliation
provision in the NYCHRL similarly prohibits employers from "retaliat[ing] or discriminat[ing]
in any manner against any person because such person has . . . opposed any practice forbidden
under this chapter . . . ."  N.Y.C. Admin. Code § 8–107(7)).

Under the "single employer" doctrine, plaintiffs may assert claims under the
NYSHRL and the NYCHRL against parties who are not their direct employers.  Although
generally "a corporate entity is liable for the acts of a separate, related entity only under
extraordinary circumstances," Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996), under the
"single employer" doctrine a plaintiff can hold a party liable as his or her employer "where there
are 'sufficient indicia of an interrelationship between the immediate corporate employer and the
affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated
corporation is jointly responsible for the acts of the immediate employer.'"  Chin-McKenzie v.
Continuum Health Partners, 876 F. Supp. 2d 270, 294 (S.D.N.Y. 2012) (quoting Schade v. Coty,

Inc., No. 00 Civ. 1568, 2001 WL 709258 (JGK), at *6 (S.D.N.Y. June 25, 2001) (citations

omitted)).  "The most common example of a 'single employer' or 'single integrated entity' is a

parent and a wholly owned subsidiary."  Echevarria v. Insight Med., P.C., No. 13 Civ. 3710

(KPF), 2014 WL 7250956, at *13 (S.D.N.Y. Dec. 22, 2014) (citing Arculeo v. On-Site Sales &

Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005)).  Application of the "single employer" doctrine

may also be appropriate where "separate corporations . . . operate under common ownership and

management."  Lima v. Addeco, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) (citing Arculeo, 425

F.3d at 198; Parker v. Columbia Pictures Indus., 204 F.3d 326, 341 (2d Cir. 2000)), aff'd sub

nom. Lima v. Adecco &/or Platform Learning, Inc., 375 F. App'x 54 (2d Cir. 2010).  "Where

two entities are deemed part of a single integrated enterprise, then both entities are 'subject to

joint liability for employment-related acts.'"  Id. (quoting Laurin v. Pokoik, No. 02 Civ. 1938

(LMM), 2004 WL 513999, at *4 (S.D.N.Y. Mar. 15, 2004)).

      To "determine whether two or more entities constitute a 'single employer' under

the New York [State] Human Rights Law," courts "apply a four-factor test."  Turley v. ISG

Lackawanna, Inc., 774 F.3d 140, 155-57 (2d Cir. 2014). [8]  "'Under this test, "[two corporations]

---

[8]  In Turley, the Second Circuit explained that its "case law instructs [courts] to apply the same
four-factor inquiry [used in Title VII cases] to determine whether two or more entities constitute
a 'single employer' under the New York [State] Human Rights Law."  Turley, 774 F.3d at 156
(citing Brown v. Daikin Am. Inc., 756 F.3d 219, 226-28 (2d Cir. 2014)).  The court noted that
"[a]pplying the [same] test under both federal and state statutes serves the stated goal of the New
York Court of Appeals 'to resolve federal and state employment discrimination claims
consistently.'"  Id. (citing Aurecchione v. N.Y. State Div. of Human Rights, 98 N.Y.2d 21, 25
(2002); Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010); Argyle Realty Assocs. v. N.Y. State
Div. of Human Rights, 65 A.D.3d 273, 277 (2d Dep't 2009)) (footnote omitted).

Courts must, of course, "analyze NYCHRL claims separately and independently from any
federal and state law claims."  Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102,
109 (2d Cir. 2013) (citations omitted); see also Velazco v. Columbus Citizens Found., 778 F.3d
409, 411 (2d Cir. 2015).  With respect to the four-factor "single employer" test, however, courts
have employed the Title VII standard to NYCHRL claims.  See, e.g., Echevarria, 2014 WL

cannot be found to represent a single, integrated enterprise in the absence of evidence of

(1) interrelation of operations, (2) centralized control of labor relations, (3) common

management, and (4) common ownership or financial control.”'” Id. at 156 (quoting Brown v.

Daikin Am., Inc., 756 F.3d 219, 226 (2d Cir. 2014) (quoting Cook v. Arrowsmith Shelburne,

Inc., 69 F.3d 1235, 1240 (2d Cir. 1995))).  “Although no one factor controls the analysis, the

second, ‘centralized control of labor relations,’ is the most significant.”  Id. (citing Cook, 69 F.3d

at 1240-41) (internal footnote omitted).  Moreover, “[w]hether two related entities are

sufficiently integrated to be treated as a single employer is generally a question of fact not

suitable to resolution on a motion to dismiss.”  Brown, 756 F.3d at 226 (citations omitted).

### B.   Analysis

The SAC contains sufficient factual allegations to demonstrate that NYGG and

FNL Media constitute a “single, integrated enterprise.”  See Cook, 69 F.3d at 1240 (quotation

marks and citation omitted).  The SAC states that “Defendant FNL Media . . . was and remains a

division of and/or the wholly-owned subsidiary of Defendant NYGG,”[9] and that “Defendants

NYGG and FNL Media LLC operated as a single or joint enterprise.”  (SAC (Dkt. No. 40) ¶¶ 5-7

(emphasis omitted))  The SAC also pleads that, “[t]hroughout Plaintiff’s employment,

Defendants NYGG and FNL Media shared the same offices on Wall Street, as well as the same

management, ownership, and interrelated operations.”  (Id. ¶ 7 (emphasis omitted))  The SAC

further alleges that Defendant Wey is the “highest-ranking executive, manager, supervisor and

---

7250956, at *12-13; Fried v. LVI Servs., Inc., No. 10 Civ. 9308 (JSR), 2011 WL 2119748, at *1-
7 (S.D.N.Y. May 23, 2011); Fowler v. Scores Holding Co., 677 F. Supp. 2d 673, 680-81
(S.D.N.Y. 2009); Dias v. Cmty. Action Project, Inc., No. 07 Civ. 5163 (NGG) (RER), 2009 WL
595601, at *1-3 (E.D.N.Y. Mar. 6, 2009).

[9]  Although Defendants argue that this “allegation is false” (Def. Br. (Dkt. No. 49) at 7 n.2), on a
motion to dismiss this Court must accept as true factual allegations concerning the relationship
between NYGG and FNL Media.  See Kassner, 496 F.3d at 237.

employee" of both NYGG and FNL Media.  (Id. ¶¶ 9-10)  The SAC goes on to state that
"[t]hroughout [Plaintiff's] employment with Defendant [NYGG], Plaintiff . . . also worked for
Defendant FNL Media LLC."  (Id. ¶ 2 (emphasis omitted))  "While Plaintiff . . . was formally
employed by Defendant NYGG, throughout her employment with Defendant NYGG she was
assigned by [Defendant Wey] to work for Defendant FNL Media, including on its business
development."  (Id. ¶ 8 (emphasis omitted))  Plaintiff also "attended internal meetings with
[Defendant Wey] and General Counsel James Baxter and various Defendant FNL Media
employees . . . concerning Blot Magazine content (which Defendant Wey dictated), budget, and
marketing . . . ."  (Id. (emphasis omitted))  These allegations demonstrate that NYGG and FNL
Media have interrelated operations, common management, and common financial ownership.
See Turley, 774 F.3d at 156.

        Defendants argue, however, that the SAC does not plead facts demonstrating that
NYGG and FNL Media share "centralized control of labor relations."  See id.; Def. Br. (Dkt. No.
49) at 13 ("The crucial inquiry remains whether FNL, which runs a digital news magazine,
controlled Plaintiff's employment at NYGG, an international business consulting firm.").  The
SAC does not specifically plead that NYGG and FNL Media exercised joint control over
Plaintiff's employment at NYGG.  However, the SAC alleges that (1) Wey was the highest-
ranking executive at both NYGG and FNL Media; (2) Wey assigned Plaintiff to work on certain
projects for FNL Media; (3) Plaintiff performed work for FNL Media at Wey's direction; and (4)
Wey made the decision to terminate Plaintiff's employment.  (SAC (Dkt. No. 40) ¶¶ 8-10, 89,
92)

        Given that the question of "[w]hether two related entities are sufficiently
integrated to be treated as a single employer is generally a question of fact not suitable to

resolution on a motion to dismiss," Brown, 756 F.3d at 226; see also Salemi v. Boccador, Inc.,
No. 02 Civ. 06648 (GEL), 2004 WL 943869, at *4 (S.D.N.Y. Apr. 29, 2004) ("Whether a parent
and subsidiary meet the standard for integration . . . is ultimately an issue of fact for the jury."),
the SAC's allegations are sufficient at the motion to dismiss stage.  Defendant FNL Media's
motion to dismiss Plaintiff's NYSHRL and NYCHRL claims will be denied.

## III.    ASSAULT AND BATTERY CLAIMS AGAINST NYGG AND FNL MEDIA

Defendants argue that the assault and battery claims against NYGG and FNL
Media must be dismissed because "they are based on alleged [intentional tortious conduct] by
Wey that cannot be attributed to NYGG and FNL [Media]," given that these acts were not within
the scope of Wey's duties and were not in furtherance of NYGG and FNL Media's interests.
(Def. Br. (Dkt. No. 49) at 13)  Plaintiff concedes that NYGG and FNL Media cannot be held
liable for either assault or battery based on Wey's alleged "kissing, fondling, grabbing, pulling,
groping, molesting and/or forcing sexual relations upon Plaintiff."  (Pltf. Opp. Br. (Dkt. No. 52)
at 16; SAC (Dkt. No. 40) ¶ 204; see also Adorno v. Corr. Servs. Corp., 312 F. Supp. 2d 505, 517
(S.D.N.Y. 2004) ("New York courts have repeatedly found no vicarious liability for claims
involving sexual misconduct, including sexual assault.") (citations omitted))  Because Plaintiff's
battery claim is based entirely on allegations of Wey's sexual contact with her (SAC (Dkt. No.
40) ¶ 204), that claim will be dismissed as to both NYGG and FNL Media.

Plaintiff argues, however, that the SAC states a claim for assault against NYGG
and FNL Media based on Wey's behavior towards Plaintiff at the time of her termination.  (Pltf.
Opp. Br. (Dkt. No. 52) at 16-20)  The SAC alleges that, on April 22, 2014, Wey

> summoned Plaintiff . . . from [a job training program near her apartment] to meet
> him outside.  Defendant then confronted Plaintiff in a sinister manner, asking:
> "Did you have a good time yesterday?"  Plaintiff responded affirmatively.
> Defendant then told her he was just at her apartment and found a "Black man"

> there.  Plaintiff said:  "Yes, that's my friend James."  Defendant then shouted at
> Plaintiff:  "You fucking bitch!  You're a liar.  I want you out of the apartment
> today!" . . . Defendant then told Plaintiff coldly:  "I'm terminating your
> employment and no longer sponsoring your visa.". . . .  Thereafter, . . . Defendant
> escorted Plaintiff . . . to her [apartment] building, and asked the Building Manager
> to accompany them to Plaintiff's apartment.  The apartment was empty, and the
> embarrassed Building Manager was allowed to leave.  However, Defendant
> refused to leave the premises until Plaintiff packed her things and left . . . .  [Later
> that day,] as Plaintiff . . . and [her friend] left the apartment, [Defendant Wey]
> screamed at the top of his lungs:  "You can tell that Black guy James to go fuck
> himself!" and slammed the door in their face.

(SAC (Dkt. No. 40) ¶¶ 91, 93, 95)  Plaintiff argues that Wey's conduct constitutes assault, and

that he was acting in the course of, and within the scope of, his employment "when he fired Ms.

Bouveng and evicted her from her . . . apartment."  (Pltf. Opp. Br. (Dkt. No. 52) at 17)

### A.   **Applicable Law**

"Under New York law, '[a]n "assault" is an intentional placing of another person

in fear of imminent harmful or offensive contact.'"  Girden v. Sandals Int'l, 262 F.3d 195, 203

(2d Cir. 2001) (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108

(2d Cir. 1993)).  "The plaintiff must show that the defendant intended 'either to inflict personal

injury or to arouse apprehension of harmful or offensive bodily contact.'"  Wahlstrom v.

Metro-N. Commuter R. Co., 89 F. Supp. 2d 506, 528 (S.D.N.Y. 2000) (quoting Rivera v. Puerto

Rican Home Attendants Servs., Inc., 930 F. Supp. 124, 133 (S.D.N.Y. 1996)).  "Thus, although

plaintiff need not prove actual contact, she must allege some physical menace against [her]

body."  Id. (internal quotation marks and citation omitted) (alteration in Wahlstrom).

### B.   **Analysis**

Wey's conduct on the day that he terminated Plaintiff's employment does not

amount to actionable assault.  Accepting the SAC's allegations that Wey screamed profanities at

her, "[h]arsh words or verbal threats, standing alone, do not constitute assault."  Kravtsov v.

Town of Greenburgh, No. 10 Civ. 3142 (CS), 2012 WL 2719663, at *16 (S.D.N.Y. July 9, 2012) (collecting cases).   "'[W]ords not accompanied by circumstances inducing a reasonable apprehension of bodily harm, such as movements of drawing back a fist, aiming a blow, or the show of a weapon, do not constitute an assault.'"   Castro v. Local 1199, 964 F. Supp. 719, 732 (S.D.N.Y. 1997) (quoting Williams v. Port Authority of New York and New Jersey, 880 F. Supp. 980, 994 (E.D.N.Y. 1995)).   The SAC does not allege facts demonstrating that it would have been reasonable for Plaintiff to believe that she was in danger of imminent bodily harm.   See Castro, 964 F. Supp. at 732 ("the actions that plaintiff asserts constitute an assault – plaintiff's interpretation of [defendant's] remarks as a threat, [defendant] 'slamming' the table with his hand and moving his chair closer to plaintiff during the course of the exchange – were 'forward-looking' and were not accompanied by gestures that would cause plaintiff to reasonably believe that she was in danger of imminent bodily harm").   Wey's alleged conduct at the time of Plaintiff's termination does not constitute assault.   Accordingly, Plaintiff's assault claim against NYGG and FNL Media will be dismissed.

## IV.   DEFAMATION CLAIM AGAINST NYGG

The SAC alleges that Defendants defamed Plaintiff by issuing "written statements . . . via emails, text message, Facebook posts and blog messages on Defendants' internet magazine 'The Blot.'"   (SAC (Dkt. No. 40) ¶ 216)  The SAC states that Defendants "broadcast [these statements] to Defendant NYGG's business contacts, to the [CEO] of Manpower Sweden, Inc., to the U.S. State Department, to Plaintiff's former employers and to Plaintiff's family and friends, as well as to the public at large . . . ."  (Id. ¶ 214 (emphasis omitted))  Defendants argue that the defamation claim against NYGG must be dismissed

"because it is based on alleged acts by Wey that cannot be attributed to [NYGG] as a matter of law."  (Def. Br. (Dkt. No. 49) at 15)

      A.    **Applicable Law**

        "Under New York law, an employer can be held vicariously liable for a defamatory statement made by one of its employees, but only if the employee made the statement in the course of performance of her duties."  Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1166 (E.D.N.Y. 2003) (citing Rausman v. Baugh, 248 A.D.2d 8, 10 (2d Dep't 1998); Seymour v. New York State Electric & Gas, 215 A.D.2d 971, 973 (3d Dep't 1995); Murray v. Watervliet, 130 A.D.2d 830, 831 (3d Dep't 1987); Riviello v. Waldron, 47 N.Y.2d 297 (1979)); see also Garrison v. Toshiba Bus. Solutions (USA), Inc., 907 F. Supp. 2d 301, 307 (E.D.N.Y. 2012) ("An employer is liable for the defamatory conduct of an employee under a respondeat superior theory only if the employee, in committing the act complained of, was acting within the scope of his employment.") (citations omitted).

        "In determining whether an employee is engaged in conduct within the scope of his employment, the following factors are relevant":

> "(1) whether the employee's act fell within the discretion and control of the employer; (2) whether the employee acted under the express or implied authority of the employer; (3) whether the employee's act was in furtherance of the employer's interests; (4) whether the employee's acts were in the 'discharge of duty' to the employer; (5) whether the act was in execution of the employer's orders or part of the work assigned by the employer; and (6) whether the acts were 'so closely connected' with what the employee was hired to do, and 'so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of employment.'"

Cruz v. Marchetto, No. 11 Civ. 8378 (RWS), 2012 WL 4513484, at *7 (S.D.N.Y. Oct. 1, 2012) (quoting Perks, 251 F. Supp. 2d at 1166).  "'[W]here an employee's actions are taken for wholly personal reasons, which are not job related, his or her conduct cannot be said to fall within the

scope of employment[.]'" Perez v. City of New York, 79 A.D.3d 835, 836 (2d Dep't 2010)

(quoting Beauchamp v. City of New York, 3 A.D.3d 465, 466 (2d Dep't 2004)); see also TC v.

Valley Cent. Sch. Dist., 777 F. Supp. 2d 577, 602 (S.D.N.Y. 2011) ("When an employee's

conduct is motivated by 'personal reasons unrelated to the employer's interest,' such conduct is

outside the scope of employment[.]'") (quoting Ierardi v. Sisco, 119 F.3d 183, 188 (2d Cir.

1997)), on reconsideration sub nom. DC v. Valley Cent. Sch. Dist., No. 7:09-CV-9036 (WWE),

2011 WL 3480389 (S.D.N.Y. June 29, 2011).  "An employee's act is within the scope of

employment if 'the act was done while the servant was doing his master's work, no matter how

irregularly, or with what disregard of instruction.'" Lipkin v. U.S. S.E.C., 468 F. Supp. 2d 614,

623 (S.D.N.Y. 2006) (quoting Riviello, 47 N.Y.2d at 302).

> **B.    Analysis**

Plaintiff argues that NYGG is vicariously liable for Wey's defamatory statements

because Wey (1) is "the highest-ranking officer of Defendants NYGG and FNL Media";

(2) "'dictated and controlled all content disseminated on The[]Blot'"; and (3) "sent many of his

defamatory emails in his capacity as CEO [of NYGG], informing business colleagues, Plaintiff's

friends, family and the State Department of his purported rationale for firing Ms. Bouveng from

her employment."  (Pltf. Br. (Dkt. No. 52) at 20)

The SAC alleges, for example, that Wey,

> under the guise of NYGG's "Legal and Regulatory Compliance Department," . . .
> emailed a list of NYGG business contacts, including Plaintiff Hanna Bouveng's
> friend Chemme [Koluman] . . . , that Plaintiff's employment and visa sponsorship
> were terminated "for cause," due to "dishonest acts, possible illegal drug use or
> lies that could expose [NYGG] to potential violations of laws and regulations."

(SAC (Dkt. No. 40) ¶ 105 (emphasis omitted))  Defendant NYGG argues that all of Wey's messages, including this one, "were of a personal nature and had no apparent business purpose." (Def. Reply Br. (Dkt. No. 57) at 11)  This Court disagrees.

Wey's alleged defamatory statements "may be regarded as methods, even though quite improper ones, of carrying out the objectives of [his] employment."  See Cruz, 2012 WL 4513484, at *7 (internal quotation marks and citation omitted).  As to the messages that Wey allegedly emailed to NYGG's business contacts, Wey purported to send these communications on behalf of NYGG's "Legal and Regulatory Compliance Department."  (SAC (Dkt. No. 40) ¶ 105 (quotation marks omitted))  In these messages, Wey informed NYGG's business contacts of his reasons for having terminated NYGG's Director of Corporate Communications.  As NYGG's CEO, Wey would appear to have the authority to send such communications to NYGG's business contacts.

To the extent that Wey's other alleged defamatory statements address the merits of this lawsuit, attack Bouveng's credibility, or otherwise undermine Bouveng's legal claims, a jury could conclude that these statements were made to protect NYGG from liability and in the course and performance of Wey's duties as NYGG's CEO.  These statements assert that this lawsuit has no merit because Plaintiff is unworthy of belief, given her alleged drug use, alcohol abuse, and moral depravity.  See, e.g., id. ¶ 138 (Blot article entitled "BREAKING NEWS: Sexual Harassment Accuser Hanna Bouveng Fled America," stating that "'Hanna Bouveng left the U.S.?  Which legitimate person would do that if she had a real case?  Who is she hiding from?  From the truth?  It sure seems like it.'") (emphasis in original); id. ¶ 139 (Blot article stating "that after learning she was subject to immediate arrest and deportation for entering the United States illegally, Plaintiff Hanna Bouveng 'packed up her belongings and fled America,'

and 'evaded responsibilities and America's judicial justice, after having falsely accused [] Wall Street financier Benjamin Wey of "sexual harassment."'") (emphasis omitted); see also Pltf. Prelim. Injunc. Hearing Ex. 102[10] at 2 (Blot article dated October 18, 2014, entitled "Hanna Bouveng, Sexual Harassment Extortionist Fled America, Back to Sweden") ("After blackmailing an investigative journalist and Wall Street financier Benjamin Wey with a failed $10 million extortion plot, the frivolous 'sexual harassment' accuser and extortionist, Swedish party girl Hanna Bouveng was caught at New York's JFK international airport trying to flee America."); id. ("A bizarre twist in the Swedish party girl Hanna Bouveng's frivolous 'sexual harassment' claim against a well respected Wall Street financier and investigative reporter Benjamin Wey, new development has just emerged:  like a burglar stealing under the cover of dark clouds, the accuser of 'sexual harassment[,]'[] the chain smoker and party girl Hanna Bouveng fled America on July 25, 2014 and rushed back to her hometown of Vetlanda, Sweden . . . ."); id. at 3 ("Legal experts say that the fleeing of Swedish vixen Hanna Bou[veng] from the United States was

---

[10] "In considering a motion to dismiss, the Court may consider documents attached as an exhibit thereto or incorporated by reference, documents that are 'integral' to plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken." Thomas v. Westchester Cnty. Health Care Corp., 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (internal citations omitted).  "To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents."  Id. at 275-76 (citations omitted).

The SAC – filed on October 24, 2014 (Dkt. No. 40) – alleges that,

> [c]ommencing on or about July 24, 2014 through approximately the present, Defendants NYGG and Defendant Benjamin Wey commenced publishing a series of retaliatory and defamatory articles concerning Plaintiff Hanna Bouveng in its digital publication, TheBlot Magazine.  On information and belief, these articles were and continue to be written and/or edited by Defendant Benjamin Wey.

(SAC (Dkt. No. 40) ¶ 129 (emphasis omitted)).  The SAC also alleges that "[s]ince approximately September 17, 2014, Defendants NYGG and Defendant Benjamin Wey have repeatedly violated the [August 28, 2014] Agreement by publishing at least eight more highly offensive, defamatory, threatening and retaliatory articles to date in TheBlot Magazine."  (Id. ¶ 156 (emphasis omitted))  The SAC's allegations sufficiently identify the October 18, 2014 Blot article to permit this Court to consider it in connection with Defendants' motion to dismiss.

caused by her scandal-riddled lawyers David Ratner and Martha McBrayer at the ambulance

chaser law firm Morelli Alters Ratner, acting in concert to evade legal consequences, after she

had lied in a sworn affidavit submitted to the highly regarded New York Federal Judge Paul

Gardephe, on the same day when Bouveng fled America."); id. ("Further, according to public

records, there is not a shred of evidence presented to the federal court that would support any of

Hanna Bouveng's 'sexual harassment' allegations against the well-regarded investigative

reporter and Wall Street financier.") (emphasis in original); id. at 6 ("HANNA BOUVENG,

FRIVOLOUS LAWSUIT IN SHAMBLES") (emphasis in original); id. at 7 ("'If Hanna

Bouveng were so innocent, people may start wondering why she would want to leave America

and give the impression of a failed extortion attempt on a highly respected Wall Street

investment banker.'") (quoting "Dr. Zhang Qianfan, Professor of Law at Peking University").

      Given that (1) Plaintiff brought legal claims against NYGG; (2) Wey is the CEO

of NYGG; (3) Wey is allegedly the author of all the defamatory statements concerning Plaintiff;

and (4) the defamatory statements concerning Plaintiff appear designed to undermine Plaintiff's

legal claims, a jury could find – based on the allegations of the SAC – that Wey made these

statements as part of an effort to shield NYGG from legal liability.  In seeking to cast doubt on

the merits of Plaintiff's suit and to undermine Plaintiff's credibility, Wey is serving NYGG's

interests and acting in his capacity as NYGG's CEO.  See Haugh v. Schroder Inv. Mgmt. N.

America Inc., No. 02 Civ. 7955 (DLC), 2003 WL 21136096, at *2 (S.D.N.Y. May 15, 2003)

(permitting plaintiff to assert a defamation claim against the parent company of plaintiff's former

employer and the CEO of that parent company, based on CEO's statements in a magazine article

concerning the reasons for plaintiff's termination).  Even if Wey's remarks concerning Plaintiff

were made in part out of spite, that would not change the fact that his communications were

made as part of his employment and in furtherance of NYGG's interests.  See Perez v. City of New York, 79 A.D.3d 835, 836 (2d Dep't 2010) ("An act is within the scope of employment when it is 'performed while the employee is engaged generally in the business of his employer, or if his act may be reasonably said to be necessary or incidental to such employment', or where the act has the purpose '"to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business[.]"'") (citations omitted) (emphasis added); Griebsch v. Weaver, No. 7:05-CV-0958, 2005 WL 2260374, at *3-4 (N.D.N.Y. Sept. 16, 2005) (employee's allegedly defamatory statements about plaintiff were within the scope of her employment, even if she made those statements "intentionally," "for a wrongful purpose," or with "personal motives").

In considering a motion to dismiss, "the Court must accept well-pleaded factual allegations as true, 'drawing all reasonable inferences in the plaintiff's favor.'"  DiMatteo v. Sweeney, Gallo, Reich & Bolz, LLP, No. 13 Civ. 8451 (PAC), 2014 WL 4449797, at *2 (S.D.N.Y. Sept. 9, 2014) (quoting Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc., 637 F.3d 112, 115 (2d Cir. 2011)).  "Moreover, the determination of whether a particular act was within the scope of the servant's employment is heavily dependent on factual considerations, and therefore the question is ordinarily one for the jury."  E.E.O.C. v. Die Fliedermaus, 77 F. Supp. 2d 460, 473 (S.D.N.Y. 1999) (citing Riviello, 47 N.Y.2d at 302); see also Walker v. Weight Watchers Int'l, 961 F. Supp. 32, 35 (E.D.N.Y. 1997) ("Determination of whether an employee was 'doing the master's work' is such a fact specific inquiry that it is most often a jury question.") (citation omitted).  Accordingly, NYGG's motion to dismiss Plaintiff's defamation claim will be denied.

## V.      INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

Defendants argue that Plaintiff's intentional infliction of emotional distress

("IIED") claim "should be dismissed against all defendants because it is duplicative of her other

tort claims."  (Def. Br. (Dkt. No. 49) at 17)  They also argue that the IIED "claim[] against

NYGG and FNL should . . . be dismissed for the additional reason that [it is] based on alleged

acts by Wey that cannot be attributed to NYGG or FNL as a matter of law."  (Id.)

### A.      Applicable Law

"To make out a claim for intentional infliction of emotional distress under New

York law, a plaintiff must plead:  (1) extreme and outrageous conduct; (2) intent to cause, or

reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal

connection between the conduct and the injury; and (4) severe emotional distress."  Lee v. Sony

BMG Music Entm't, Inc., 557 F. Supp. 2d 418, 426 (S.D.N.Y. 2008) (citation omitted).  "New

York sets a particularly high bar for conduct that is so 'extreme and outrageous' that it is

actionable under this tort."  Sharabura v. Taylor, No. 03 Civ. 1866 (JG), 2003 WL 22170601, at

*4 (E.D.N.Y. Sept. 16, 2003) (citation omitted).  "[P]laintiff must plead and prove conduct

which is so extreme and outrageous that it 'transcends the bounds of decency as to be regarded

as atrocious and intolerable in a civilized society.'"  Pawlicki v. City of Ithaca, 993 F. Supp. 140,

145-46 (N.D.N.Y. 1998) (quoting Shapiro v. Cnty. of Nassau, 202 A.D.2d 358, 358 (1st Dep't

1994) (citation omitted)).

"[A]lthough the New York Court of Appeals has not set forth detailed guidelines

for when the [IIED] tort may be available, it has cautioned that a claim for IIED may not be

sustainable 'where the conduct complained of falls well within the ambit of other traditional tort

liability.'"  Turley, 774 F.3d at 159 (quoting Fischer v. Maloney, 43 N.Y.2d 553, 557–58

(1978)); see also Lan Sang v. Ming Hai, 951 F. Supp. 2d 504, 530 n.10 (S.D.N.Y. 2013) ("IIED claims are routinely dismissed where they 'fall[] well within the ambit of other traditional tort liability.'") (quoting Gonzalez v. Bratton, 48 F. App'x 363, 365 (2d Cir. 2002) (internal quotation marks and citation omitted)) (alteration in Lan Sang); Hanly v. Powell Goldstein, LLP, No. 05 Civ. 5089 (KMW), 2007 WL 747806, at *6 n.9 (S.D.N.Y. Mar. 9, 2007) ("IIED claims are, in general, '[p]recluded where the offending conduct is embraced by a traditional tort remedy.'") (quoting McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc., 256 A.D.2d 269, 270 (1st Dep't 1998)) (alteration in Hanly), aff'd, 290 F. App'x 435 (2d Cir. 2008).

"New York courts have[, for example,] . . . exclude[d] claims for intentional infliction where a cause of action for defamation may be asserted on the facts of the case." Turley, 774 F.3d at 159 (citing Brancaleone v. Mesagna, 290 A.D.2d 467 (2d Dep't 2002); Herlihy v. Metro. Museum of Art, 214 A.D.2d 250 (1st Dep't 1995); Butler v. Del. Otsego Corp., 203 A.D.2d 783 (3d Dep't 1994)).  Where an "IIED claim alleges an injury distinct from the defamation injury, [however,] the IIED claim does not impermissibly duplicate the defamation claim," and it should not be dismissed on that basis.  Hanly, 2007 WL 747806, at *6 n.9.

B.    **Analysis**

Here, the SAC alleges that Wey "molested, assaulted, battered, harassed, humiliated, degraded, disparaged, defamed and retaliated against Plaintiff," and thus intentionally inflicted emotional distress on her.  (SAC (Dkt. No. 40) ¶ 209)  To the extent that Plaintiff's IIED claim is based on Wey's sexual contact with her, however – whether rape, tortious menacing, or unwanted touching – the traditional tort remedies of assault and battery apply.  See Girden, 262 F.3d at 203 ("'It does not matter that the penal law lays down specific

elements for the various offenses or degrees of offenses that entail unwanted touching. . . .  In the civil context . . . , the common meanings of "assault" and "battery" subsume all forms of tortious menacing and unwanted touching.'  Thus, 'a rape is an undisputed assault and battery' under New York law.") (quoting United Nat'l Ins. Co., 994 F.2d 105, 108 (2d Cir. 1993) and citing 6A N.Y. Jur.2d Assault – Civil Aspects § 2) (internal citation omitted).   Accordingly, to the extent that Plaintiff's IIED claim is based on Wey's actual or threatened sexual contact with her, it must be dismissed, because such conduct is addressed by the traditional tort remedies of assault and battery.

Wey's defamatory Internet postings, emails and text messages are similarly addressed by the traditional tort remedy of defamation.

Plaintiff's remaining allegations – including those concerning Wey's encounter with Plaintiff in the Stockholm café (see Pltf. Opp. Br. (Dkt. No. 52) at 22) – do not meet the "extreme and outrageous" standard that is applicable under New York law.  This alleged conduct is not "so extreme and outrageous that it 'transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society.'" Pawlicki, 993 F. Supp. at 145-46.

Plaintiff's IIED claim will be dismissed as to all Defendants.

## VI.   INJUNCTIVE RELIEF

Defendants argue that Plaintiff's claim for injunctive relief – asserted in connection with her retaliation claim under the NYCHRL – should be dismissed because (1) it "would constitute an unlawful prior restraint on Wey's right of free speech in violation of the First Amendment"; and (2) "neither absence of an adequate remedy at law nor irreparable harm is adequately pled."  (Def. Br. (Dkt. No. 49) at 20)

"However, a request for permanent injunctive relief should not be dismissed at the pleading stage unless the underlying claim upon which relief is sought is dismissed." Marino v. Nw. Mut. Life Ins. Co., No. 00 Civ. 3212 (MBM), 2001 WL 262574, at *3 (S.D.N.Y. Mar. 14, 2001) (citing In re Lloyd's Am. Trust Fund Litig., 954 F. Supp. 656, 682 (S.D.N.Y. 1997) (citation omitted)); see also Messinger v. JPMorgan Chase Bank, N.A., No. 13 Civ. 2444 (AJN), 2014 WL 904528, at *2 (S.D.N.Y. Mar. 7, 2014) ("Rather than determining the appropriate remedy, '[t]he Court's task on a motion to dismiss is to consider the factual allegations in [plaintiff]'s complaint to determine if they plausibly suggest an entitlement to relief.'") (quoting RJ Capital, S.A. v. Lexington Capital Funding III, Ltd., No. 10 Civ. 24 (PGG), 2011 WL 3251554, at *16 (S.D.N.Y. July 28, 2011)) (alterations in Messinger).

Here, Defendants do not argue that the claim on which injunctive relief is sought – retaliation under the NYCHRL – is improperly pled as to NYGG or Wey. Moreover, this Court has rejected FNL Media's argument that the SAC fails to plead a NYCHRL retaliation claim against it. Accordingly, Plaintiff's request for permanent injunctive relief in connection with her NYCHRL retaliation claim will not be dismissed.

## VII.   BREACH OF CONTRACT CLAIM

### A.   Subject Matter Jurisdiction

Defendants argue that this Court lacks jurisdiction over Plaintiff's breach of contract claim, which alleges that Defendants breached the August 28, 2014 Agreement. Defendants contend that (1) "there is no independent basis for subject matter jurisdiction" over the breach of contract claim; and (2) this Court lacks supplemental jurisdiction over the claim because it "stems from a settlement agreement allegedly breached by new misconduct post-dating the complaint." (Def. Br. (Dkt. No. 49) at 25; Def. Reply Br. (Dkt. No. 57) at 13)

### 1.     Applicable Law

"The principal federal statute governing diversity jurisdiction, 28 U.S.C. § 1332, gives federal district courts original jurisdiction of all civil actions 'between . . . citizens of different States' where the amount in controversy exceeds $75,000." Lincoln Prop. Co. v. Roche, 546 U.S. 81, 89 (2005) (quoting 28 U.S.C. § 1332(a)(1)) (citation omitted). "'The amount in controversy is determined at the time the action is commenced.'" HICA Educ. Loan Corp. v. Meyer, No. 12 Civ. 4248 (DLC), 2014 WL 1694928, at *2 (S.D.N.Y. Apr. 23, 2014) (quoting Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Trust Co. of Chicago, 93 F.3d 1064, 1070 (2d Cir. 1996)). "'[T]he sum claimed by the plaintiff . . . controls if the claim is apparently made in good faith.  It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify a dismissal.'" Doctor's Associates, Inc. v. Hamilton, 150 F.3d 157, 160 (2d Cir. 1998) (quoting A.F.A. Tours v. Whitchurch, 937 F.2d 82, 87 (2d Cir. 1991) (citation and internal quotation marks omitted)) (emphasis in A.F.A. Tours).  "A plaintiff's good faith belief as of the filing date may be ascertained by reference to the pleadings and any facts on that subject adduced in discovery[.]"  Chase Manhattan Bank, 93 F.3d at 1070 (citation omitted).  "'If the right of recovery is uncertain, the doubt should be resolved . . . in favor of the subjective good faith of the plaintiff.'"  Id. (quoting Tongkook Am., Inc. v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir. 1994) (citation omitted)).

### 2.     Analysis

Here, Defendants do not dispute that Plaintiff and Defendants are "citizens of different States," but instead argue that the breach of contract claim does not "meet the $75,000 amount in controversy requirement for diversity jurisdiction."  (Def. Br. (Dkt. No. 49) at 25)  The August 28, 2014 Agreement requires any party that breaches its terms to pay the innocent

party $10,000 in liquidated damages per breach.  (SAC (Dkt. No. 40) ¶ 221; Stipulation and

Agreement (Dkt. No. 32), Ex. A ¶ 7)  The SAC alleges that, on September 14, 2014, Plaintiff

"discovered that Defendants NYGG, FNL Media and Benjamin Wey had violated . . . the

Agreement four times by continuing to publish offensive, defamatory and retaliatory articles."

(SAC (Dkt. No. 40) ¶ 222 (emphasis omitted))  The SAC also alleges that, since then,

Defendants "have continued to repeatedly violate the Agreement by publishing at least four more

highly offensive, defamatory, threatening and retaliator[y] articles to date."  (Id. ¶ 225 (emphasis

in original))  The SAC asserts that "Defendant [Wey] has also repeatedly posted those articles on

his Twitter account."  (Id. ¶ 156)   Plaintiff claims that she has "incurred economic damages . . .

in an amount not less than [$120,000]" in connection with her breach of contract claim.  (Id. ¶

227)

       Defendants argue that Plaintiff has not adequately pled the necessary amount in

controversy.  (Def. Br. (Dkt. No. 49) at 25-26)  This Court disagrees.  The Agreement provides

for $10,000 in liquidated damages for each alleged breach, and the SAC pleads at least eight

such breaches.  (SAC (Dkt. No. 40) ¶¶ 221-22, 225)  The SAC also pleads that Plaintiff has

suffered economic damages of $120,000 as a result of Defendants' alleged breaches.  (Id. ¶ 227)

These allegations are sufficient to satisfy the amount in controversy requirement.

     **B.**    **Failure to State a Claim Against FNL Media**

       FNL Media argues that, "[r]egardless of whether the breach of contract claim is

permitted in this action, it should be dismissed as to FNL, because FNL was not a signatory to

the [Agreement][.]"  (Def. Br. (Dkt. No. 49) at 27)

### 1.   **Applicable Law**

"Generally, a 'contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the "alter ego" of the party.'" Endeavor Capital Holdings Grp., LLC v. Umami Sustainable Seafood, Inc., No. 13 Civ. 4143 (NRB), 2014 WL 3897577, at *4 (S.D.N.Y. Aug. 7, 2014) (quoting Wolfson v. Conolog Corp., No. 08 Civ. 3790 (LTS) (MHD), 2009 WL 465621, at *3 (S.D.N.Y. Feb. 25, 2009)); see also Global Entm't Inc. v. New York Telephone Co., No. 00 Civ. 2959 (SHS), 2000 WL 1672327, at *7 (S.D.N.Y. Nov. 6, 2000).  "'An exception to this rule exists, however, where a non-party manifests an intent to be bound by the contract.'"  Malmsteen v. Universal Music Grp., Inc., 940 F. Supp. 2d 123, 136 (S.D.N.Y. 2013) (quoting Travelers Cas. & Sur. Co. v. Dormitory Authority–State of N.Y., 735 F. Supp. 2d 42, 80 (S.D.N.Y. 2010)) (internal quotation marks and citation omitted), appeal withdrawn, No. 13-2157 (2d Cir. Jan. 27, 2014).

### 2.   **Analysis**

Here, it is clear that FNL Media is not a party to the Agreement.  The first paragraph of the Agreement states:  "This Stipulation and Agreement . . . is entered into on this 28th day of August 2014 by and among Hanna Bouveng ('Bouveng'), Morelli Alters Ratner Law Firm ('MAR'), Benjamin Wey ('Wey') and NYG Capital LLC ('NYG') (collectively, the 'Parties')."  (Stipulation and Agreement (Dkt. No. 32), Ex. A ¶ 1)  The Agreement is signed by: (1) David Ratner, on behalf of MAR; (2) Hanna Bouveng; (3) Benjamin Wey, on behalf of himself and NYGG; and (4) Justin Sher, on behalf of Sher Tremonte LLP.  (Id. at 7)  Moreover, the SAC does not allege that (1) Wey or anyone else acted as FNL Media's agent in signing the Agreement; (2) the Agreement was assigned to FNL Media; or (3) FNL Media manifested an

intent to be bound by the Agreement.  See Endeavor Capital Holdings Grp., 2014 WL 3897577, at *4.

The SAC likewise does not allege that Wey or NYGG is the "alter ego" of FNL Media for purposes of the alleged breaches of the Agreement.  Under the "alter ego" theory of liability, courts have held non-parties to a contract liable for breaches of the contract where the non-party (1) is a "dominating" or parent company to a signatory of the contract, and (2) causes the signatory to breach the contract.  See Kaliner v. Mt. Vernon Monetary Mgmt. Corp., No. 07 Civ. 4643 (LMM), 2008 WL 4127767, at *2 (S.D.N.Y. Sept. 3, 2008) ("Interpreting New York law, the Second Circuit has found it appropriate to pierce the corporate veil or to hold third parties to a contract liable on an alter ego theory when the dominating company has caused a party to a contract to breach a contract for the dominating company's benefit.") (citing Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985); Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004)) (footnote omitted).

> In order to state a claim under an alter ego theory of liability, plaintiff must allege: (1) that [the non-party] exercised such complete domination over its subsidiaries in relation to the alleged breaches such that the other defendants had no separate will of their own; and (2) that this domination was used to commit a wrong against plaintiff which proximately caused [her] injuries.

Campo v. 1st Nationwide Bank, 857 F. Supp. 264, 270-71 (E.D.N.Y. 1994) (citations omitted).

Here, although the SAC alleges that "NYGG and FNL Media operated as a single or joint enterprise," and that FNL Media is the "wholly-owned subsidiary of Defendant NYGG" (SAC (Dkt. No. 40) ¶¶ 5, 7 (emphasis omitted)), it does not allege that FNL Media dominated or controlled any of the signatories to the Agreement, including Wey or NYGG.  See Global Entm't, Inc., 2000 WL 1672327, at *7 (finding that a contract did not bind a non-party where "the only relevant allegations are that . . . [the non-party] is a 'service affiliate' or 'subsidiary' [of

a signatory to the contract]").   The SAC likewise does not allege that FNL Media caused any

signatory to breach the Agreement by publishing "offensive, defamatory and retaliatory articles

about [Plaintiff]."  See SAC (Dkt. No. 40) ¶ 154.

      The breach of contract claim against FNL Media will be dismissed.

## CONCLUSION

      For the reasons stated above, Defendants' motion to dismiss is granted as to:

(1) the assault and battery claim against Defendants NYGG and FNL Media; (2) the intentional

infliction of emotional distress claim against all Defendants; and (3) the breach of contract claim

against FNL Media.  Defendants' motion to dismiss is otherwise denied.  The Clerk of the Court

is directed to terminate the motion (Dkt. No. 48).

Dated: New York, New York
     June 1, 2015

                  SO ORDERED.

                  _____

                  Paul G. Gardephe
                  United States District Judge