UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HANNA BOUVENG,

              Plaintiff,

    v.

NYG CAPITAL LLC d/b/a NEW YORK GLOBAL
GROUP, FNL MEDIA LLC, and BENJAMIN
WEY,

              Defendants.

Case No. 14-CV-5474 (PGG)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO
PLAINTIFF'S CLAIMS FOR DEFAMATION AND RETALIATION**

DENTONS US LLP
Glenn Colton
Gary Meyerhoff
1221 Avenue of the Americas
New York, New York 10020
Tel.  (212) 768-6700

*Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

I.    Plaintiff Fails To Follow Well-Established New York Legal Principles That Render The Overwhelming Majority Of Statements She Advances Non-Actionable ................................................................................................... 4

    A.    Plaintiff Will Be Unable To Prove That Many Of The Statements Are Assertions Of Fact And Not Expressions Of Opinion ............................................ 5

    B.    Plaintiff Has To Prove To The Court That The Statements Fall Within The Four Recognized Defamation *Per Se* Categories .................................................... 8

    C.    Plaintiff Will Be Unable To Prove That Many Of The Statements Concern Her And Not Others ............................................................................................ 9

    D.    Plaintiff Will Be Unable To Prove That Certain Statements About Her Were False Because She Has Admitted Their Truth .......................................................10

II.    New York's Trend Towards Limitations On The *Per Se* Categories Based On First Amendment Concerns Suggests Parallels Between Defamation And Retaliation Standards ................................................................................................. 11

III.    Analysis Of The Statements In Dispute ........................................................................ 12

    A.    Plaintiff's Serious Crime Claims .......................................................................... 12

        1.    Most Of The Statements Do Not Quality Because They Fail To Assert That Plaintiff Committed A Specific, Serious Crime ..................................... 12

        2.    Extortionist/Blackmailer Is Not Actionable; When Referenced In The Context Of A Disputed Lawsuit, It Is Considered An Opinion ...................... 14

        3.    Prostitution Is Not A Serious Crime For Defamation *Per Se* Purposes ............ 16

        4.    Statements That Fail To Assert Any Specific Crime Cannot Constitute Serious Crime Defamation *Per Se* ................................................................ 17

        5.    The "Cocaine Dealer" Language Applies To James Chauvet ......................... 18

    B.    Plaintiff's Alleged Injury To Trade Or Profession Claims ..................................... 19

        1.    Plaintiff Has To Prove That The Statement Targets An Inability To Perform Specific Duties Or Tasks In A Particular Trade Or Profession ........................ 19

       2.   The Injury To Trade Or Profession Statements Plaintiff Offers Do Not Come Close To Meeting The Applicable Standard .......................................... 22

C.      Plaintiff's Loathsome Disease Claims ...................................................................... 24

D.      Plaintiff's Imputing Unchastity To A Woman Claims ........................................... 24

CONCLUSION .................................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld*,
   80 N.Y.2d 130, 603 N.E.2d 930 (1992) .......................................................................5

*Alf v. The Buffalo News, Inc.*,
   100 A.D.3d 1487, 953 N.Y.S.2d 797 (4th Dep't 2012) *aff'd*, 21 N.Y.3d 988,
   995 N.E.2d 168 (2013) ..............................................................................................10

*Aronson v. Wiersma*,
   65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985) ............................4, 20

*Bonanni v. Hearst Communications, Inc.*,
   872 N.Y.S.2d 221 (3d Dep't 2009) ...........................................................................8

*Brian v. Richardson*,
   87 N.Y.2d 46, 660 N.E.2d 1126 (1995) ..................................................................5, 7

*Campanella v. Cnty of Monore*,
   853 F. Supp. 2d 364 (W.D.N.Y. 2012) .................................................................14, 15

*Cassini v. Advance Publications, Inc.*,
   125 A.D.3d 467 (1st Dept 2015) ...............................................................................25

*Cavallaro v. Pozzi*,
   28 A.D.3d 1075, 814 N.Y.S.2d 462 (4th Dep't 2006) ...................................13, 14, 17

*Celle v. Filipino Reporter Enters.*,
   209 F.3d 163 (2d Cir. 2000) ....................................................................................4, 9

*Corsini v. Morgan*,
   123 A.D.3d 525, 999 N.Y.S.2d 380 (1st Dep't 2014) ............................................14, 17

*D'Lima v. Cuba Mem'l Hosp., Inc.*,
   833 F.Supp.2d 383 (W.D.N.Y. 2011) .....................................................................21, 22

*Diaz v. NBC Universal, Inc.*,
   337 F. App'x 94 (2d Cir. 2009) .................................................................................9

*DiFolco v. MSNBC Cable L.L.C.*,
   831 F. Supp. 2d 634 (S.D.N.Y. 2011) .......................................................................7

*Geisler v. Petrocelli*,
   616 F.2d 636 (2d Cir.1980) .......................................................................................9

*Gentile v. Grand Street Medical Associates*,
   79 A.D.3d 1351, 911 N.Y.S.2d 743 (3d Dep't 2010)............................................................15

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974)..............................................................5

*Harris v. Hirsh*,
   228 A.D.2d 206, 643 N.Y.S.2d 556 (1st Dep't 1996).......................................................18, 21

*Immuno AG. v. Moor-Jankowski*,
   77 N.Y.2d 235, 567 N.E.2d 1270 (1991).................................................................................5, 6

*Kerik v. Tacopina*,
   __ F. Supp. 3d ___, 2014 WL 6791615 (S.D.N.Y. Dec. 3, 2014)....................................11, 19

*Kirch v. Liberty Media Corp.*,
   449 F.3d 388 (2d Cir. 2006).......................................................................................................10

*Konig v. WordPress.com*,
   112 A.D.3d 936, 978 N.Y.S.2d 92 (2d Dep't 2013)...................................................................8

*Korry v. International Telephone &Telegraph Corp.*,
   444 F. Supp. 193 (1978) ...........................................................................................................20

*Liberman v. Gelstein*,
   80 N.Y.2d 429, 605 N.E.2d 344 (1992)............................................................................ *passim*

*Lihong Dong v. Ming Hai*,
   108 A.D.3d 599, 969 N.Y.S.2d 144 (2d Dep't 2013) ..........................................................9, 10

*Long v. Marubeni America Corp*,
   406 F. Supp. 2d 285 (S.D.N.Y 2005)........................................................................................15

*Mann v. Abel*,
   10 N.Y.3d 271, 885 N.E.2d 884 (2008)...........................................................................6, 7, 8

*Marchuk v. Faruqi & Faruqi*,
   LLP, No. 13 CIV. 1669 (AKH), 2015 WL 363625 (S.D.N.Y. Jan. 28, 2015) ........................14

*Melius v. Glacken*,
   94 A.D.3d 959, 943 N.Y.S.2d 134 (2d Dep't 2012)................................................................14

*Meloff v. N.Y. Life Ins. Co.*,
   240 F.3d 138 (2001).....................................................................................................................9

*Millus v. Newsday, Inc.*,
   89 N.Y.2d 840, 675 N.E.2d 461 (1996)......................................................................................5

*Morrow v. Wiley*,
  73 A.D.2d 859, 423 N.Y.S.2d 658 (1st Dept 1980)....................................................25

*Pitcock v. Kasowitz, Benson, Torres & Friedman LLP*,
  74 A.D.3d 613, 903 N.Y.S.2d 42 (1st Dep't 2010) ................................................10

*Privitera v. Town of Phelps*,
  79 A.D.2d 1, 435 N.Y.S.2d 402 (4th Dep't 1981) ................................................13

*Proskin v. Hearst Corp.*,
  14 A.D.3d 782, 787 N.Y.S.2d 506 (3d Dep't 2005)...............................................10

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
  813 F. Supp. 2d 489 (S.D.N.Y. 2011)...................................................................21

*Rinaldi v. Holt, Rinehart & Winston*,
  42 N.Y.2d 369, 397 N.Y.S.2d 943 (1977) ............................................................10

*Rufeh v. Schwartz*,
  50 A.D.3d 1002, 858 N.Y.S.2d 194 (2d Dep't 2008)............................................21

*Ruta v. Delta Airlines, Inc.*,
  322 F. Supp. 2d 391 (S.D.N.Y. 2004)...................................................................21

*Sadowy v. Sony Corp of Am.*,
  496 F. Supp. 1071 (S.D.N.Y. 1980).....................................................................22

*James v. Gannet Co., Inc.*,
  40 N.Y.2d 415, 386 N.Y.S.2d 415 (1976) ............................................................24

*Steinhilber v. Alphonse*,
  68 N.Y.2d 283, 501 N.E.2d 550 (1986)..................................................................8

*Stephan v. Cawley*,
  24 Misc. 3d 1204(a), 890 N.Y.S.2d 371 (N.Y. County 2009)................................14

*Stern v. Cosby*,
  645 F. Supp. 2d 258 (S.D.N.Y)...................................................................9, 11, 25

*Trustco Bank of New York v. Capital Newspaper Div. of the Hearst Corp.*,
  213 A.D.2d 940, 624 N.Y.S.2d 291 (1995) .........................................................14

*Weldy v. Piedmont Airlines, Inc.*,
  985 F.2d 57 (2d Cir. 1993)...................................................................................13

*Zimmerman v. Kallimopoulou*,
  56 Misc. 2d 828, 290 N.Y.S.2d 270 (Civ. Ct. 1967) ............................................25

**Statutes**

New York State Constitution's Article I, §8 ..................................................................1

NYCHRL ...........................................................................................................1, 11

N.Y. Penal Law § 230.00.....................................................................................17

United States Constitution Amend. I ...................................................................1

**<u>INTRODUCTION</u>**

On June 3, 2015, less than a week before the then-scheduled June 8, 2015 trial, Plaintiff delivered to Defendants a list of 1,800 statements from 53 separate exhibits (Plaintiff's Trial Ex. 116) that purport to constitute actionable defamation *per se* and to be the basis for retaliation claims under the NYCHRL statute. The overwhelming majority of these statements are either opinions, are true, or do not qualify as defamation *per se*. It is well-settled that it is an issue for the Court, not the jury, to determine whether such statements are actionable.

At the Court's June 5, 2015 pre-trial conference, Plaintiff contended (and the Court considered) that some or all of these exhibits would come in under Plaintiff's retaliation claim, obviating the need for analysis of whether each statement constitutes actionable defamation. Defendants argue: (1) if the bulk of the statements go to the jury and are non-actionable as a matter of law, the risk of unfair prejudice of seeing hundreds of arguably disparaging (but not actionably defamatory) statements would not be eliminated through jury instructions, (2) the risk of jury confusion, an unmanageable trial, and an interminable trial will remain, and (3) as to retaliation, the possibility of punishing Defendants for speech protected by the First Amendment could render the NYCHRL statute, as applied, unconstitutional.[1] Recognizing these concerns, the Court instructed the parties to attempt to agree on narrowing the list of 1,800 to a size manageable enough to enable Court review.

At a telephone conference with the Court on Monday, June 8, 2015, Plaintiff's counsel reported that his team had attempted to reduce their own list, but that effort -- still not completed

---

[1] As argued below, the only way to ensure avoidance of conflicts between the United States Constitution's First Amendment, as well as the New York State Constitution's Article I, §8, and the NYCHRL statute as applied is to review the statements under defamation standards. The fairest prediction on the level of overlap between defamation standards and the standards needed to ensure protection of free speech rights on Plaintiff's retaliation claim is that the two standards are similar, if not identical. A review under defamation standards also would serve, hopefully, to narrow the record sufficiently to avoid jury confusion and allow for proper management of a trial of reasonable length.

as of that time -- would leave between 500 and 700 statements for review. Over the weekend, Defendants had requested Plaintiff to look closely at Defendants' theories and case law support for why Plaintiff's claims were not supportable and consider a real reduction to the list, but Plaintiff refused. (*See* List Emails, Ex. A).[2]  Plaintiff's review eliminated many statements (June 7, 2015 list, Ex. B), but did not materially address the issues presented by the original list of 1,800.  The Court recognized Defendants' right, under well-settled authority, to have the Court review the alleged statements to determine whether they are actionable before the trial begins.

Accordingly, the Court adjourned the trial date and established a briefing schedule for the parties to present selected exhibits, with a manageable number of statements, for a ruling. This process would allow the parties to brief their positions, obtain rulings as to certain statements, and assuming that some statements would be held to be actionable, then apply those rulings as a guide in narrowing the list of remaining statements to a manageable list of ones the Court would permit to go to the jury.  Defendants selected Exhibits 61, 76, and 118 from Plaintiff's proposed trial exhibits, which Plaintiff agreed are representative. (*See* Exhibit Emails, Ex. C.)[3]  The three exhibits contain 37 statements Plaintiff contend to be actionable.[4]

This memorandum begins with a discussion of the overarching legal principles that apply to every statement Plaintiff advances as purportedly actionable; the statements are then organized

---

[2] References to "Ex. __ " are to the Seventh Declaration of Gary Meyerhoff, submitted herewith.

[3] For the reasons set forth herein and in previous arguments presented to the Court, Defendants reserve the right to seek rulings, before trial, on the remainder of the statements Plaintiff may seek to admit into evidence in support of her claims for defamation and retaliation.

[4] After Defendants identified three articles for briefing, Plaintiff revised again the June 7, 2015 list of statements for those articles, eliminating six of the statements.  When Defendant's counsel pointed out that such elimination defeated the purpose of the exercise unless Plaintiff agreed to remove all similar exhibits from the remainder of the revised list, Plaintiff's counsel agreed to do so. (Ex. C.)  Plaintiff's eleventh-hour removal of statements from exhibits about to be scrutinized by the Court underscores Defendants' concern that Plaintiff's agenda is to burden Defendants, the Court, and ultimately the jury with whatever overbroad list of statements she can pass along, without conducting a good faith, non-frivolous analysis.

into the four defamation *per se* categories Plaintiff has identified as applying to the statements, with further legal analysis of the standards applying in those four categories. Defendants have created a chart -- Ex. D (a copy of which also is attached to this Memorandum) -- from Plaintiff's revised list for Exhibits 61, 76 and 118. The chart assigns a letter to each statement (Ex. 61-A, Ex. 61-B . . .), identifies which of the four categories Plaintiff advances, contains a brief indication of Defendants' position, and includes a cross-reference to the discussion of the statement in this memorandum. Defendants have annotated the three exhibits (Exs. E, F, and G) so the Court can see each statement in the context of the entire document.

Defendants are concerned that applying the Court's rulings to the remaining statements cannot be accomplished quickly and without further Court involvement. The record is lengthy. In two days, Plaintiff could not even complete the job of revising her list once. Any revision requires close inspection of hundreds of statements on hundreds of exhibit pages. Even if Plaintiff can determine quickly which remaining exhibits she will press, Defendants will need time to review the material. Further discussions between the parties are likely, and additional resolution by the Court may be required.[5] Thereafter, a complicated, detailed, and time-consuming redaction project will have to ensue, followed by Defendants' review of the redacted exhibits (spanning hundreds of pages), and possible follow up (either between the parties or with the Court). While cumbersome, Defendants do not see a better way to deal with these issues.

_____

[5] As the Court is aware, Plaintiff's initial list of 1,800 statements (Trial Ex. 116) identified the *per se* categories Plaintiff asserted would apply to each statement. In the June 7 list (Ex. B), Plaintiff -- without explanation -- removed these identifications, leaving Defendants either to hunt through the longer, prior list to find Plaintiff's positions or to guess. It was only after Defendants had identified Exhibits 61, 76, and 118 that Plaintiff added back an identification of the *per se* categories she is claiming. Whether aimed at creating additional confusion for Defendants or not, the remainder of the revised list does *not* contain identification of the categories Plaintiff claims to apply. Following the Court's ruling, when Plaintiff determines which of the remaining statements if any she seeks to press, if Plaintiff does not re-insert the categories upon which she makes her claim, Defendants will seek an order from the Court directing Plaintiff to do so.

# I. PLAINTIFF FAILS TO FOLLOW WELL-ESTABLISHED NEW YORK LEGAL PRINCIPLES THAT RENDER THE OVERWHELMING MAJORITY OF STATEMENTS SHE ADVANCES NON-ACTIONABLE

Determining whether particular words are defamatory "presents a legal question to be resolved by the court[s] in the first instance." *Aronson v. Wiersma,* 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138, 1139 (1985). To determine whether a statement is reasonably susceptible to a defamatory meaning, the Second Circuit, relying upon long-standing New York law, has instructed as follows:

> First . . . courts must give the disputed language a fair reading in the context of the publication as a whole. Challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing.
>
> Second, courts are not to strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous. A fair reading controls.
>
> Finally, the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed. It is the meaning reasonably attributable to the intended reader that controls.

*Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 177-78 (2d Cir. 2000) (internal citations and quotations omitted).

There are, at a minimum, four general legal bases upon which Plaintiff's lengthy list of statements fail to meet libel standards: they are not assertions of fact (and are instead non-actionable opinion), they do not constitute libel *per se,* they are statements about others (not "of or concerning" Plaintiff herself), or they are demonstrably not false (based on the already-existing record). Defendants will address these legal concepts generally as a threshold matter, and then turn to the statements at issue to address these and other sub-issues in more detail.

**A.  Plaintiff Will Be Unable To Prove That Many Of The
Statements Are Assertions Of Fact And  Not Expressions Of Opinion**

Expressions of opinion are privileged and, no matter how offensive, may not be the

subject of an action for defamation.  *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 243, 567

N.E.2d 1270, 1273 (1991);  *Millus v. Newsday, Inc*., 89 N.Y.2d 840, 842, 675 N.E.2d 461, 462

(1996).   The Supreme Court summarized the underlying theory behind this principle as follows:

> Under the First Amendment there is no such thing as a false idea.
> However pernicious an opinion may seem, we depend for its correctness
> not on the conscience of judges and juries but on the competition of
> other ideas.  But there is no constitutional value in false statements of
> fact.

*Gertz v. Robert Welch, Inc*., 418 U.S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974).

The key inquiry in differentiating an actionable false statement from a non-actionable,

constitutionally protected opinion is whether the challenged expression, however labeled by

defendant, "would reasonably appear to state or imply assertions of objective fact."  *Immuno*

*AG*., 77 N.Y.2d at 243, 567 N.E.2d 1270 at 1273.   The factors to consider include:  (1) whether

the specific language at issue has a precise meaning which is readily understood; (2) whether the

statements are capable of being proven true or false; and (3) whether either the full context of the

communication in which the statement appears or the broader social context and surrounding

circumstances are such as to signal ... readers or listeners that what is being read or heard is

likely to be opinion, not fact.  *Brian,* 87 N.Y.2d at 51, 637 N.Y.S.2d at 347.

Under New York law, this fact versus opinion analysis is distinctly context oriented.  The

Court must consider the content of the whole communication, its tone and apparent purpose, and

will avoid "the fine parsing [of an alleged defamatory communication] … that may be required

under Federal law."  *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 145, 603 N.E.2d

930, 938 (1992).  These factors are particularly important with the exhibits at issue here --

articles in TheBlot Magazine, a publication with a sensationalist flavor that uses colorful and imprecise language, composite images, and other stylistic features to create its own tone.

Courts, thus, cannot begin by examining each challenged statement individually and determining in isolation whether specific words are couched in loose, figurative or hyperbolic language. *Immuno AG.* 77 N.Y.2d at 254, 567 N.E.2d at 1281. *See also Mann v. Abel*, 10 N.Y.3d 271, 276, 885 N.E.2d 884, 886 (2008)  Doing so "without knowing the full context in which [the challenged statements] were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context." *Immuno AG.* 77 N.Y.2d at 255, 567 N.E.2d at 1281.

When the Court considers whether TheBlot articles contain assertions of fact, it must consider how the public would consider the tawdry content and distinctive tenor and whether it would credit words within such articles to be assertions of fact.   The articles are replete with such language:  " a Swedish woman aspiring to be the next Lindsay Lohan"; "[James Chauvet is] like a rat that roams around New York City's subway looking for trash"; "[James Chauvet in jail ] where gang rape was like serving daily yogurt"; "in the world of fashion models, a 25 year old woman is almost like a grandma"; "Instead of gold, Bouveng found a 'pile of charcoal.'" Each article contains attention-grabbing graphics similar to those a reader might find in a supermarket tabloid, with outrageous, bold, sensationalist, and even humorous captions splashed across the front ("Busted", "Exposed" "Happy Bitch Day" etc.) or exaggerated parodies and images designed to incite a strong reaction (a politician's head superimposed in an obvious and rudimentary fashion on Kim Kardashian's naked body, a pig with the word "gold digger" underneath it, etc).

Certain wordings in the articles are, even in isolation, non-actionable opinions that are

simply too vague or oblique to be treated as assertions of fact.   But given the purpose, tone and

tenor of the articles, the public would not credit the assertions contained in the articles as being

factual.   The predominant tone of the articles are "rife with rumor, speculation and seemingly

tenuous inferences" which  "furnishe[s] clues to the reasonable reader that [the articles are]

something less than serious, objective reportage."  *Brian v. Richardson*, 87 N.Y.2d 46, 53, 660

N.E.2d 1126 (1995); *DiFolco v. MSNBC Cable L.L.C.*, 831 F. Supp. 2d 634, 650 (S.D.N.Y.

2011) (complete context of website posting about a television host, including that host believed

cleavage was a way to pay dues and that she "pouted like a spoiled child" indicated that contents

represented opinion, rather than fact).

In *Mann v. Abel*, 10 N.Y.3d 271, 885 N.E.2d 884 (2008), the New York Court of Appeals

overruled a jury and intermediate appellate by finding that statements in an independent

newspaper in an article entitled, "Borrelli on par with Marie Antoinette" (referring to Rye Town

Councilman Mike Borrelli) were not defamatory.  Under a subheading, entitled "Who is the real

Mann?" the plaintiff was described as a "political hatchet Mann" and "one of the biggest powers

behind the throne" in the Town of Rye government.  Defendant wrote that it appeared that

"Mann pulls the strings" and questioned whether Mann was "leading the Town of Rye to

destruction." The article identified Mann as playing an "instrumental" role in a decision by the

Port Chester School Board, some 35 years earlier, to discontinue its practice of allowing high

school students from the Blind Brook School District to attend Port Chester High School.  The

Court of Appeals explained that "the tenor of the column, including allegations that Mann was a

'political hatchet Mann' who appeared to 'pull[ ] the strings', clearly signals the reader that the

piece is likely to be opinion, not fact."   The court rejected sifting through the article to parse out

specific defamatory statements that arguably could constitute false factual allegations, focusing

instead on the article as whole being an expression of protected opinion. *Id.,* 10 N.Y. at 276-77.

The same mode of analysis should apply here. While certain statements Plaintiff has listed simply could not qualify as assertions of fact even when viewed in isolation, the entire purpose and tenor of the articles in TheBlot Magazine, with their colorful language, pictures, and captions, does not convey the seriously parsed reporting of individual verified facts.

*See Bonanni v. Hearst Communications, Inc*., 872 N.Y.S.2d 221 (3d Dep't 2009) (article about policeman's conduct more likely to be viewed as opinion given tenor; "at long last [plaintiff] is going to be shown the street instead of pounding it"); *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290, 501 N.E.2d 550, 553 (1986) ("statement's verbal context would clearly suggest to the ordinary person that [negative comments] . . . like the rest of the message, was not intended to be understood as an assertion of fact. . . . [It] would be taken by the ordinary person not literally, but figuratively"); *Konig v. WordPress.com,* 112 A.D.3d 936, 978 N.Y.S.2d 92 (2d Dep't 2013) (statement during a sharply contested election was non-defamatory, where a reasonable reader would find generalized reference to "downright criminal actions" by candidates in post entitled "Would You Buy A Used Car From These Men" as merely conveying opinion).

**B.    Plaintiff Has To Prove To The Court That The Statements Fall Within The Four Recognized Defamation *Per Se* Categories**

In the Joint Pre-Trial Order, Plaintiff stipulated:

> With respect to Plaintiff's claim for Defamation (twelfth cause of action), the parties agree that because Plaintiff will not be seeking economic damages, and because defamation claims based on statements that do not constitute defamation *per se* require evidence and proof of special damages (which are economic damages), Plaintiff will need to establish that the statements it claims to be defamatory constitute defamation *per se* under New York law.

Joint Pre-Trial Order § xiii(12).

8

Under New York law, the words at issue here can be considered defamation *per se* only if they consist of statements: (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman. *Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 605 N.E.2d 344, 347 (1992). While these categories developed in the law of slander, and the written statements at issue here fall under the law of libel, the existence of separate standards for slander and libel is antiquated. The Second Circuit -- as well as dozens of other state and federal courts applying New York law -- routinely apply the law in these four categories to libel cases. *See Meloff v. N.Y. Life Ins. Co.,* 240 F.3d 138 (2001); *Celle v. Filipino Reporter Enters., Inc.,* 209 F.3d 163, 176 (2d Cir.2000); *Stern v. Cosby,* 645 F. Supp. 2d 258, 290 (S.D.N.Y) (holding that under *Meloff* and *Celle,* the *Liberman* slander *per se* standards apply in libel cases).

Further, Plaintiff stipulated during the June 5, 2015 Pre-Trial Conference that she would not be seeking to extend beyond these four categories in arguing for actionable defamation. (Transcript, Ex. H, p. 23-24.) Thus, for purposes of ruling on Plaintiff's defamation claim, nothing other than the four categories need be considered.

### C. Plaintiff Will Be Unable To Prove That Many Of The Statements Concern Her And Not Others

Many of the statements Plaintiff intends to rely upon concern arguably disparaging statements about her family, friends, or lawyers (for example, James Chauvet, Helena Bouveng, and lawyers at the Morelli Alters Ratner firm). Plaintiff cannot recover in defamation for statements made about others. Plaintiff must establish that the alleged defamatory statements published were "of and concerning" herself. *Diaz v. NBC Universal, Inc*., 337 F. App'x 94, 96 (2d Cir. 2009); *see also Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980); *Lihong Dong v. Ming Hai*, 108 A.D.3d 599, 600, 969 N.Y.S.2d 144 (2d Dep't 2013).

Statements about persons or entities other than Plaintiff are not actionable as defamation. *Id.; Alf v. The Buffalo News, Inc.,* 100 A.D.3d 1487, 1488, 953 N.Y.S.2d 797, 799 (4th Dep't 2012) *aff'd*, 21 N.Y.3d 988, 995 N.E.2d 168 (2013) (affirming dismissal of complaint when an average reader would conclude that the company was the subject of defamatory statements and not plaintiff, its chairperson and sole shareholder). *See Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006) ("The 'of and concerning' requirement stands as a significant limitation on the universe of those who may seek a legal remedy for communications they think to be false and defamatory and to have injured them.")

**D.      Plaintiff Will Be Unable To Prove That Certain Statements**
**         About Her Were False Because She Has Admitted Their Truth**

Plaintiff bears the burden of proving that the statements at issue are false; the inquiry only advances to the issue of whether the statements are defamatory after falsity is established. *Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 380, 397 N.Y.S.2d 943 (1977).  Courts can decide, before trial, whether a plaintiff can demonstrate the requisite falsity.  Where the core of a statement is true, and a plaintiff argues that innuendo suggests it to be defamatory, there can be no defamation.  *See Proskin v. Hearst Corp.,* 14 A.D.3d 782, 787 N.Y.S.2d 506 (3d Dep't 2005) (statement that plaintiff, an attorney, had modified a will was non-defamatory, even though the statement's context made it seem like plaintiff had acted unlawfully).

Under New York law, where a plaintiff's emails (for example) demonstrate that a statement is "substantially true," a defamation claim will be dismissed. *Pitcock v. Kasowitz, Benson, Torres & Friedman LLP,* 74 A.D.3d 613, 903 N.Y.S.2d 42 (1st Dep't 2010).  Here, as discussed below, Plaintiff has admitted relevant facts that render certain of the statements at issue substantially true.

II.    **NEW YORK'S TREND TOWARDS LIMITATIONS ON THE *PER SE***
       **CATEGORIES BASED ON FIRST AMENDMENT CONCERNS SUGGESTS**
       **PARALLELS BETWEEN DEFAMATION AND RETALIATION STANDARDS**

Defendants contend that First Amendment limitations on the scope of a retaliation claim

under the NYCHRL statute should be treated not only as overlapping with common law

defamation standards, but as co-terminus with them.  In other words, Defendants believe that the

First Amendment is not likely to be implicated if the statements the Court admits into evidence

on the retaliation claim have been vetted by the Court and found to constitute actionable

defamation.   Plaintiff, however, is likely to argue for a less onerous burden on introducing into

evidence articles from TheBlot Magazine in support of her retaliation claim.  For example, while

punishing Defendants for true speech, or opinion, may pose First Amendment problems, Plaintiff

may contend that meeting a test of simple defamation, as opposed to the higher standard of

defamation *per se,* may be sufficient to avoid First Amendment issues.

New York law suggests otherwise.  While Judge Chin, in *Stern v. Cosby,* made a case for

the possible expansion of defamation *per se* beyond the four categories, the holding was a

narrow one.  The Court held only that accusations of male promiscuity could be considered libel

*per se,* even though the traditional category applies only to female chastity.  *Stern,* 645 F. Supp.

at 289-90.[6]  That decision, not reviewed on appeal or relied upon since, hardly opened the

floodgates to a new, catch-all approach to defamation *per se.*

In a more recent case, *Kerik v. Tacopina,* this Court recently reaffirmed the notion that

New York has criticized slander *per se* and the resulting presumption of damages, and

"consequently [has] interpreted the categories restrictively."  2014 WL 6791615 at *21.  The

---

[6] Indeed, even Judge Chin, likely recognizing he was venturing into uncharted waters, was careful to find as well that even if libel *per se* was limited to four categories, a false accusation that Stern (an attorney) had had sex with his client's boyfriend, given an attorney's duty of loyalty, could constitute injury to his trade and profession.  *Id.* at 290.

Court noted the reference in *Liberman* to the potential for First Amendment problems associated with restricting speech, even in the defamation context, where special damages could not be proved: "[t]he presumed-damages rule has been found unconstitutional in certain First Amendment cases and criticized for use in defamation cases generally." *Id.,* citing *Liberman,* 605 N.E.2d at 348 n.1. The Court further noted, "Because the goal of defamation law should be to compensate individuals for harm to reputation, the trend should be toward elimination not expansion of the *per se* categories." *Id.* (citation omitted).

In other words, the tension between defamation law and the First Amendment renders decisions in cases in which no special damages can be proved suspect, and the only basis upon which the balance can even be considered to be fairly struck is if the *per se* categories are proved. Abandoning those categories here, where Plaintiff will not be proving special damages as to *any* claim -- including retaliation -- could render the use of such statements in support of retaliation unconstitutional. It is for this reason that Defendants believe that close analysis of each statement under the applicable defamation standard -- here defamation *per se* -- is necessary to avoid potential constitution issues that could arise through admission of non-defamatory statements on the retaliation claim.

III.    **ANALYSIS OF THE STATEMENTS IN DISPUTE**

    A.    **Plaintiff's Serious Crime Claims**

Plaintiff relies on the "serious crime" category for a majority of the statements in the three articles. Under New York law, mere allegations of criminal activity, or of minor crimes, do not qualify. A specific, serious crime needs to be asserted.

        1.    Most Of The Statements Do Not Qualify Because They Fail
             To Assert That Plaintiff Committed A Specific, *Serious* Crime

*Liberman* is the leading case cited for the standard in the serious crime category in New York state courts and in the Second Circuit:

> Not every imputation of unlawful behavior, however, is slanderous per se. "With the extension of criminal punishment to many minor offenses, it was obviously necessary to make some distinction as to the character of the crime, since a charge of a traffic violation, for example, would not exclude a person from society, and today would do little, if any, harm to his [or her] reputation at all" (Prosser § 112, at 789). Thus, the law distinguishes between serious and relatively minor offenses, and only statements regarding the former are actionable without proof of damage *(see,* Restatement § 571, comment *g* [list of crimes actionable as per se slander includes murder, burglary, larceny, arson, rape, kidnapping]).

*Liberman,* 80 N.Y.2d at 435.

Thus, in *Liberman,* an assertion that there was "a cop on the take from Liberman" was found to be a serious crime because it asserted the crime of bribery. On the other hand, the statement that "Liberman . . . threatened to kill me and my family" was not slanderous *per se* because a threat to kill, the crime of harassment, is a relatively minor offense. *Id.* at 435-36.

The Second Circuit expressly followed *Liberman* in *Weldy v. Piedmont Airlines, Inc*., 985 F.2d 57 (2d Cir. 1993), finding assault to be a serious, indictable crime. The court borrowed as a mode of analysis the concept of looking at whether the crime was an "indictable offense" from an earlier Fourth Department case, *Privitera v. Town of Phelps,* 79 A.D.2d 1, 3, 435 N.Y.S.2d 402, 404 (4th Dep't 1981).

In more recent state court cases, relying on *Liberman,* the focus has been on the type of crime asserted without reference to whether such crime is "indictable" under state or federal law. In *Cavallaro v. Pozzi,* 28 A.D.3d 1075, 814 N.Y.S.2d 462 (4th Dep't 2006), the court held the crime of adultery, a class B misdemeanor, to not be a serious crime. As the court observed, if the class B misdemeanors, the lowest grade of criminal offense, were deemed a serious crime, "then all crimes necessarily would constitute serious crimes and the use of the adjective 'serious'

in *Liberman* would be rendered superfluous." *Id.*, 814 N.Y.S.2d at 465. *See Corsini v. Morgan,* 123 A.D.3d 525, 999 N.Y.S.2d 380 (1st Dep't 2014) (assertion that plaintiff was a "stalker" insufficient because, as a class B misdemeanor, it does not rise to the level of a "serious crime"). *See also, Stephan v. Cawley,* 24 Misc. 3d 1204(a), 890 N.Y.S.2d 371 (N.Y. County 2009) (New York Post's statement that SEC and FBI are "investigating plaintiffs" and that plaintiffs were trying to "muddy the waters" not sufficient not enough to meet serious crime standard; even if imputed to be "unlawful behavior," it would not be a serious crime.)

      2.     Extortionist/Blackmailer Is Not Actionable; When Referenced
                In The Context Of A Disputed Lawsuit, It Is Considered An Opinion

In the context of discussing legal proceedings, such statements routinely have been held to constitute non-actionable opinions. *See Melius v. Glacken*, 94 A.D.3d 959, 959-60, 943 N.Y.S.2d 134 (2d Dep't 2012) ("[A] reasonable listener would have believed that calling the plaintiff an 'extortionist' who is seeking 'to extort money' was conveying the defendant's opinion as to the merits of the plaintiff's lawsuit and was not a factual accusation of criminal conduct."); *Trustco Bank of New York v. Capital Newspaper Div. of the Hearst Corp.*, 213 A.D.2d 940, 624 N.Y.S.2d 291 (1995) (town officer's use of word "extortion" in newspaper interview while discussing plaintiff's legal proceedings was "pure opinion"); *Marchuk v. Faruqi & Faruqi*, LLP, No. 13 CIV. 1669 (AKH), 2015 WL 363625, at *7 (S.D.N.Y. Jan. 28, 2015) (characterizing a plaintiff's lawsuit as "extortion" is not actionable);

Plaintiff's previously cited cases do not hold differently.[7] Plaintiff deceptively labels *Campanella v. Cnty of Monore,* 853 F. Supp. 2d 364 (W.D.N.Y. 2012) as holding that "words such as 'blackmailer' and 'aider and abettor' are *per se* defamatory." While the opinion references

---

[7] Plaintiff advanced the same group of defamation cases in two previously cited briefs -- her Trial Memorandum of Law (Document 165) and her opposition to Defendant's motion seeking identification of defamatory statements (Document 180). Defendants address those cases herein.

the general defamation *per se* category of criminal activity (along with the other categories), that case does not concern the serious crime category; there is no mention of blackmail, or even of aiding and abetting a crime. The case involves the trade/profession category as applied to accusations of violating company rules concerning "gossip, conduct unbecoming of an employee and lying." *Id.* at 371. *Long v. Marubeni America Corp*, 406 F. Supp. 2d 285 (S.D.N.Y 2005), did concern a defendant's statements about the plaintiff's lawsuit, but is distinguishable. In that case, the alleged defamatory statement did *not* call the plaintiff an extortionist for filing a lawsuit. Rather, the statements were about the facts underlying the lawsuit. The court drew the distinction that this Court should draw here: "'We believe the lawsuit will prove unfounded' is an expression of opinion; 'our position is that the plaintiff is a forger' is not." *Id.* at 297.

Unlike the e-mail at issue in *Long*, all of the statements describing Plaintiff as an "extortionist" are vague accusations unsupported by identifiable facts that, themselves, would not lead a reasonable reader to view the statement as anything more than Defendant's opinion. *See Gentile v. Grand Street Medical Associates*, 79 A.D.3d 1351, 911 N.Y.S.2d 743 (3d Dep't 2010) (statements following a lawsuit settlement that it was a "shame" that several people in the community wanted to make "easy money" and found a "few lawyers" who made a living "exploiting hard working people and corporations" were a medical center's opinion and could not form the basis of a defamation suit).

The statements involving references to extortion are 61-I, 76-A, 76-B, 76-D, 76-E, 76-M, 76-P, 118-B, 118-C, 118-D, and 118-E. Respectfully, the question for the Court is whether these statements were made in the context of an article discussing the propriety of a lawsuit or not, and all of them are just that. The only statement at issue in Ex. 61 is 61-I, which Plaintiff identifies as "in a mafia style, Hanna Bouveng . . . blackmailed a famous investigative reporter."

15

While Plaintiff sometimes claims to want these statements to be read in the context of an entire article, this is an instance where Plaintiff seeks to profit from referencing the statement in isolation. There is no question that Ex. 61 is an article about Hanna Bouveng's attempt to extort money through what the article is describing as a bogus sexual harassment lawsuit. Statement 61-I is an opinion for that reason. The same is true of all of the statements in Ex. 76 (A, B, D, E, M, and P). Even if the statement as excerpted into Plaintiff's chart does not appear to reference the sexual harassment lawsuit, the article certainly does.

While Ex. 118 is an article about Daily News reporter Barbara Ross, it concerns the Daily News' coverage of the sexual harassment lawsuit between Ms. Bouveng and Mr. Wey. Statement 118-B expressly references the "frivolous 'sexual harassment' lawsuit"; all of the statements in Ex. 118, when read in the context of the entire article, are expressions of opinion.

Defendants also believe that 76-F falls into this category. While 76-F does not reference "extortion," it similarly comments on the *bona fides* of the sexual harassment suit discussed therein, although specifically on the truth of an affidavit Plaintiff filed with the Court. The views expressed about that affidavit, just like views about the lawsuit, comes across like an opinion, not an assertion of fact. While the language includes speculation that Ms. Bouveng may have fled the country as a result (a reference to concerns about possible criminality), in context with the multiple statements attacking a frivolous lawsuit, this one should also be treated as an opinion.

       3.     Prostitution Is Not A Serious Crime For Defamation *Per Se* Purposes

Plaintiff asserts that several statements in Ex. 61 (A, B, C, G, J, K, and M) accuse Ms. Bouveng of a serious crime, presumably because they potentially allude to prostitution. As discussed in more detail below (under the unchaste woman category), some of these statements do not qualify as assertions of fact and, thus, are opinions. Regardless, even if the Court were to find that some of these statements are factual assertions that Ms. Bouveng is (or was) a

prostitute, that would not meet the serious crime standard.[8]

The crime of prostitution is also a class B misdemeanor.  N.Y. Penal Law § 230.00.  Just as with the class B misdemeanors deemed not to be serious crimes in *Cavallaro* and *Corsini* (discussed above), prostitution cannot constitute a serious crime.   The statements in Ex. 61 are not defamation *per se* on that basis.

      4.      Statements That Fail To Assert Any Specific Crime
              Cannot Constitute Serious Crime Defamation *Per Se*

Plaintiff asserts that statements merely using the word "crime" or "criminal" can constitute serious crime defamation *per se.*   There is no basis for such a claim.  Without knowing what crime is at issue there can be no way for the reader to believe that a serious crime has been alleged.  Statements 61-H and 76-G fail to specify any crime at all.  The following statements also fail on that basis:

- 61-N:  a link to a Blot article with a title that includes "FBI-Criminal-records-James-Chauvet-Hanna-Bouveng;" not specific enough to assert a serious crime or, frankly, anything specific enough to be a fact assertion "of or concerning" Plaintiff;

- 76-J:  another cross-reference, "View the FBI report on drug dealer James Chauvet:  FBI Criminal records James Chauvet -- Hanna Bouveng;"  also not specific enough to assert that Plaintiff committed a serious crime;

- 118-F and G:  118-F is an image of James Chauvet with colorful language that refers to James Chauvet as a criminal; while it does use the colorful caption "Busted," that is plainly colloquial and, in any event, does not assert any facts about a crime Plaintiff may have committed.  118-G does not assert that Plaintiff committed any crime.

In addition, Plaintiff contends that statements that she has "fled America" or is a "fugitive" constitute assertions that she has committed a serious crime.   These include 76-C, 76-D, 76-F, and 76-K.   Fleeing, or being a fugitive, is too vague and unspecific to be an assertion of

---

[8] While the Court might find that some of these statements constitute defamation *per se* under the unchaste woman category, Defendants respectfully request that the Court rule expressly on whether these statements meet the serious crime standard as well.  Such ruling is necessary in order to properly instruct the jury and could be useful in addressing the other articles.

a serious crime.  If it is Plaintiff's contention that such language concerns a serious crime, Plaintiff should identify that crime and support why it meets the "serious" standard.

Plaintiff also contends that assertions about her visa status -- that she could have been arrested or deported for not having a visa, or that she committed "visa fraud" (whatever that is)  -- is a serious crime.  Defendants cannot tell what crime Plaintiff is referring to, nor would the average reader of these articles.   For the same reasons, 76-N and 76-O cannot be serious crimes.

### 5. The "Cocaine Dealer" Language Applies To James Chauvet

Statements 118-A, 118-D, and 118-E use the language "cocaine dealer."  Defendants do not dispute that a factual assertion that Plaintiff is a drug dealer would constitute a serious crime.  However, the statements Plaintiff proffers need to be considered in context.   118-D is the image of Mr. Chauvet and Ms. Bouveng and the word "BUSTED" superimposed over a table that has a pile of cocaine.  While Plaintiff contends that this makes it appear as if she is associated with a serious crime involving cocaine, the caption below the picture -- separately identified by Plaintiff as statement 118-E -- makes it absolutely clear that James Chauvet is the person being referenced as a cocaine dealer and Ms. Bouveng is "the criminal's Swedish girlfriend."   In context, this picture and caption, and all references to drug dealing, are plainly targeted at Mr. Chauvet and not at Ms. Bouveng.  While there is an implication that Ms. Bouveng is a drug *user* due to her affiliations with an alleged drug dealer, drug use is not a crime in New York; accusations of drug use cannot constitute a serious crime.  *See Harris v. Hirsh*, 228 A.D.2d 206, 209, 643 N.Y.S.2d 556, 559 (1st Dep't 1996)(drug use not a crime in New York, much less a serious crime).

Statement 118-A is closer to the line, given that the use of language suggests that both Mr. Chauvet and Ms. Bouveng are cocaine dealers.   However, in the context of an article that makes it clear that it is referring to Mr. Chauvet as the dealer and Ms. Bouveng as the girlfriend, the average reader is likely to conclude just that.

## B. **Plaintiff's Alleged Injury To Trade Or Profession Claims**

### 1. Plaintiff Has To Prove That The Statement Targets An Inability To Perform Specific Duties Or Tasks In A Particular Trade Or Profession

Plaintiff seeks to sweep in statements about partying, alcohol abuse, drug use, or even her failure to complete her degree program as purported "injury in trade or profession," a complete misreading of the law surrounding a specifically defined *per se* category. As the *Liberman* court held:

> That exception, however, is "limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities" (Prosser § 112, at 791). Thus, "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him" (Restatement § 573, comment *c).*.

*Liberman,* 80 N.Y.2d at 436.

#### a. Plaintiff Has No Particular Trade Or Profession

Accordingly, the first question is whether Plaintiff even *has* a trade or profession that could qualify. In this Court's recent decision in *Kerik v. Tacopina,* __ F. Supp. 3d ___, 2014 WL 6791615 (S.D.N.Y. Dec. 3, 2014), Judge Koeltl rejected the notion that accusations of dishonesty could be trade and profession defamation *per se* because "plaintiff has not alleged what his current trade or business is, and how the defendant's accusations that the plaintiff [was dishonest] affect that trade." *Id.* at *22. Mr. Kerik, famous for having been (among other things) New York's Police Commissioner, plainly had a prior profession -- arguably in which a lack of honesty could affect his trade -- but that prior profession was not relevant.

Here, the Second Amended Complaint fails to assert that Plaintiff has an identifiable or specific trade or profession, for purposes of defamation analysis or otherwise. When allegedly defamed in the summer of 2014, she was two years out of college, had spent a year working a marketing job in Norway (half of the time while still at school), was taking classes at Berkeley College in New York, had worked as a "volunteer intern" in marketing at Upton Realty Group in Manhattan, had worked at NYGG as an intern/trainee, and is now employed as a waitress in a cafe. It is not credible for Plaintiff to claim she has a specific trade or profession with particularized job performance requirements for "injury to trade/profession" analysis.

In Plaintiff's brief opposing Defendants' motion for identification of alleged defamatory statements (Doc. 180), she suggests that the statements at issue are defamatory *per se* because they "falsely labeled Ms. Bouveng as . . . unfit for her former profession (e.g., a Swedish party girl, alcoholic, and drug addict.)" Former profession is irrelevant. *See Korry v. International Telephone &Telegraph Corp.,* 444 F. Supp. 193 (1978) (plaintiff's prior work in international relations not relevant to whether being called a communist impugned his trade or profession).

b. Even If Plaintiff Has A Trade Or Profession, The Standards For This Category Are More Rigorous Than She Claims

Even if the Court were to treat Plaintiff's entry level positions in which she may have performed marketing functions as having the trade or profession of "marketing," for statements to constitute defamation *per se,* they would have to suggest, specifically, an inability to perform specialized tasks that are identified with the trade or profession. Putting aside whether there are any such specialized tasks in "marketing," none of the statements at issue rises above the level of generality. Statements regarding a plaintiff's unsatisfactory job performance may be defamatory, but that is not enough to meet this *per se* category. *Aronson v. Wiersma,* 65 N.Y.2d 592, 593, 493 N.Y.SA.2d 1006 (1985). Statements about matters that suggest an inability to

work hard, or take work seriously, are insufficient. These are not defamatory *per se* because they constitute statements about her general character or qualities. *See Ruta v. Delta Airlines, Inc.*, 322 F. Supp. 2d 391, 404 (S.D.N.Y. 2004) (dismissing defamation *per se* claim of flight attendant because "New York courts, however, have long held that referring to someone as 'intoxicated' or 'drunk' is not slander per se," including string cite to such cases).

There are circumstances in which such statements, in context, have been found to possibly constitute defamation *per se*, but only if accompanied by specific language demonstrating an effect on a plaintiff's actual trade or profession. As courts logically have held, if not for this additional requirement of specificity, virtually any disparaging comment would become actionable on these grounds. *See Harris,* 228 A.D.2d at 209, 643 N.Y.S.2d at 559 (the charge of drug abuse was not specifically related to plaintiff's status in Metro North as a crew dispatcher, but rather, a "more general reflection upon the plaintiff's character", and, therefore, did not fall into the "trade, business or profession" exception).

The standard for specifics is high. In *Rufeh v. Schwartz*, 50 A.D.3d 1002, 858 N.Y.S.2d 194, 197 (2d Dep't 2008), allegations of fraud and deceit leveled at a plaintiff who is an officer at a financial firm was found to be "nothing more than a general reflection upon the plaintiffs' character or qualities. In *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,* 813 F. Supp. 2d 489 (S.D.N.Y. 2011), a business owner accused of treating her employees like garbage and firing an employee because he was gay were "not sufficiently targeted at the specific standards of performance relevant to her duties as the owner of Pure Power to qualify as defamation *per se."*

In prior briefing, Plaintiff has contended that the trade and profession category is far broader, but her cases fail to support that interpretation. Plaintiff cites *D'Lima v. Cuba Mem'l*

*Hosp., Inc.,* 833 F.Supp.2d 383 (W.D.N.Y. 2011), to support the notion that allegations of drug use are defamation *per se*. The reason it met the *per se* test, however, is because plaintiff was a dentist and the statement at issue concerned being impaired by drugs while performing procedures on patients, causing "a detrimental impact on patient care." *Id*. at 387. This is plainly an injury that involves a true profession (dentistry) and a non-generalized accusation about conduct that would have a specific effect on a dentist's ability to perform tasks unique to that profession. *Id*. 390. The case does not support drug use as defamation *per se* generally.

In *Sadowy v. Sony Corp of Am.,* 496 F. Supp. 1071 (S.D.N.Y. 1980), the court *did* allow a statement about a plaintiff's alcoholism to go to the jury as potential slander *per se,* but only after finding that other statements about an inability to perform specific aspects of the plaintiff's job were also going to the jury. One of these, that plaintiff had "disappeared from a dealer's open house for three days and they couldn't find him," uttered at a trade show to another member of plaintiff's profession, right after plaintiff had been fired, apparently could have been coupled with the statement about alcoholism to constitute a specific effect on ability to perform. *Id.* at 1078. *Sadowy* does not hold that calling an employee an alcoholic, without more, constitutes trade and profession defamation *per se*.

2.     The Injury To Trade Or Profession Statements Plaintiff
       Offers Do Not Come Close To Meeting The Applicable Standard

Plaintiff asserts that 8 of the statements concern injury in Plaintiff's trade or profession. Plaintiff initially contended, in her Ex. 116 list of 1800 statements, that labeling her a party girl, a user of drugs, or a user of alcohol was *per se* defamatory. Many of those statements were removed in Plaintiff's revised list, but not enough of them. Defendants believe that none of the statements Plaintiff places into this category are actionable because (i) she has alleged no trade or profession, (ii) she has no true trade or profession, and (iii) to the extent one could consider

22

her work in the marketing area to constitute a trade or profession, none of the statements at issue expressly challenge her ability to perform specialized tasks or duties called for in that profession; they do not rise above general reflections upon Plaintiff's character or qualities.

Statements 61-D and 76-L are identical; the entire paragraph in Ex. 61-D is restated in a later article, Ex. 76.   It characterizes her move to New York City by stating, "Unable to complete a degree program, Bouveng was searching for "gold in the streets of New York."   It is not even clear, from this statement, whether the assertion is that she could not finish school for some disparaging reason -- this is not defamatory at all.   To cause injury to trade or profession, it would have to assert something specific about Plaintiff's inability to perform certain duties or tasks required by her profession and this statement does not come close.

Although many statements involving Plaintiff's alcohol or drug use have been removed from the list, 61-L includes in its description of Plaintiff "a woman in love with alcohol."   As discussed above, factual assertions about a plaintiff's alcohol or drug use, without more (for example, specifics on how it would effect the performance of profession duties), is a description of qualities or character only.  If Plaintiff was an airline pilot, alcohol abuse might qualify, but she is not.  A specific finding that statements about Plaintiff's alcohol or drug use, is insufficient to constitute injury to trade or profession.  And such statements do not become defamation *per se* just because they reference employment.   Statement 76-H implies that her ability to be employed (through her Visa sponsorship) was impacted by alcohol and drug use.  It is conceivable that a false assertion regarding the use of alcohol or drugs has the potential to injure anyone's employment opportunities, but the law does not consider that enough to be defamation *per se.*   Reference to employment does not turn a generalized defamatory statement (a description of qualities or character) into injury to a trade or profession because it fails to assert

how the falsely labeled conduct renders one unable to perform the tasks of a specific profession.

Plaintiff also includes several statements involving her affiliation with a criminal or drug dealer, James Chauvet (76-C, 76-G, 76-I, 118-G), some of which state directly that employers should not tolerate such affiliations. Again, even if such affiliations make a person generally undesirable as an employee, or even if affiliation with a drug dealer implies drug use (and that is not even a certainty), such descriptions of Ms. Bouveng would not rise to the level of defamation *per se* -- they are in the same category of statements labeling her a party girl, a user of alcohol, or a user of drugs. They are too generalized to constitute trade or profession injury.

## C.    Plaintiff's Loathsome Disease Claims

There are two statements in the three articles that Plaintiff places into the loathsome disease category: 61-F and 61-H. There is a significant body of law on which diseases are loathsome, but resort to that law is unnecessary because these two statements simply fail to assert that Ms. Bouveng has any disease at all. 61-F asserts that *Mr. Chauvet* had been treated for STD's -- he may not even have them -- and then states that he "captured" another Swedish girl. These assertions follow a discussion of how Mr. Chauvet's work as a club promoter involves bringing Swedish girls to clubs to create business. This statement does not even assert as fact that Mr. Chauvet has an STD, much less that Ms. Bouveng has one. And 61-H is even more remote. It mentions drugs, alcohol, a nasty bathroom, and used needles, but does not assert that anyone has a disease, much less a loathsome or insidious one.

## D.    Plaintiff's Imputing Unchastity To A Woman Claims

As in the other categories, it is for the Court to decide whether words alleged to impute unchaste conduct to a woman are libelous *per se*. *James v. Gannet Co., Inc.,* 40 N.Y.2d 415, 386 N.Y.S.2d 415 (1976) (finding non-actionable an article stating that plaintiff, a belly dancer, had admitted to "selling her time to lonely old men with money, for as much as $400 an evening

in one case . . . ").   While New York still adheres to the "loathsome disease" and "unchastity"

categories, which Judge Chin (in *Stern v. Cosby*) aptly labels "antiquated and odd," a number of

factors create uncertainty as to whether the statements about Plaintiff in TheBlot can constitute

defamation *per se*.   The threshold question has to be whether oblique assertions or implications

would be viewed by the reading audience as definitive assertions of fact that Plaintiff is

"unchaste."

In addition, there is the question as to what "unchaste" means in today's world.  Certainly,

sexual activity out of wedlock no longer has the uniform societal opprobrium it once had.  And

after the sexual revolution in the 1960's, how many sexual partners does it take for the general

public to view a woman as unchaste?   While definitive assertions that a woman is a prostitute

may cross the line, anything less is arguably a matter of opinion.   *See Cassini v. Advance*

*Publications, Inc*., 125 A.D.3d 467 (1st Dept 2015) (allegedly false statement in magazine article

stating that plaintiff and her sisters used to throw parties in the 1960s that were attended by many

wealthy "older guys looking for action" was not defamation *per se;* given the overall context a

reasonable reader would not conclude that plaintiff was a prostitute or otherwise unchaste);

*Morrow v. Wiley*, 73 A.D.2d 859, 423 N.Y.S.2d 658 (1st Dept 1980) (statement that plaintiff

"often had men visitors to her apartment when her parents weren't home" not an actionable

imputation of unchastity;  *Zimmerman v. Kallimopoulou*, 56 Misc. 2d 828, 290 N.Y.S.2d 270

(Civ. Ct. 1967) (statement that woman "receives at least $15,000 per annum in gifts from friends

(especially men) and relatives" not libelous *per se* as imputing unchastity).

Defendants further note that the assertions in TheBlot Magazine about Plaintiff's sexual

behavior were made only after Plaintiff's salacious complaint, and its recklessly frivolous

assertion that Benjamin Wey had *forced* Hanna Bouveng to have sexual intercourse with him

25

(unsupported in her sworn testimony), had been carried to millions by *The New York Post*. The response in TheBlot, always made in the context of criticizing Plaintiff's lawsuit as an attempted extortion, did indeed include assertions that allude to Ms. Bouveng's possible promiscuity and use the type of language associated with a prostitute ("walking the streets," "working in massage parlors," associating with a pimp, etc.). However, as discussed above, given the sensationalist tone, casual use of language, and the absence of serious assertions of fact in TheBlot generally, it is Defendants' position that none of these statements would be viewed by the general public as being factual assertions that Ms. Bouveng is actually a prostitute. When viewed in context, the statements at issue should be treated as opinion.

There are eight statements at issue in this category, all in Exhibit 61. In context, the thrust of the article is a story that Mr. Chauvet, as a club promoter, uses "party girls" in his business. He attracts them to come to clubs as a marketing attraction for men. As the average reader can tell, such clubs are not necessarily houses of prostitution; men tend to go to clubs where there are many attractive women, and this appears to be Mr. Chauvet's business. The statements about Ms. Bouveng being one of these women does not necessarily suggest that she was engaged in sexual intercourse for money. To the contrary, the implication is that she participated in the party scene at these clubs with her friend, James Chauvet.

As to the particular statements, in context, four of them are simply too vague to suggest to a reasonable audience that the author is asserting that Ms. Bouveng is a prostitute:

- 61-A: Ms. Bouveng is referred to as a "party girl" and as a "sex slave?" with a question mark; this does not constitute an assertion that she is a prostitute.

- 61-E: This statement does not even refer to Ms. Bouveng, but rather to "Swedish-flavored loose women," tied to the article's story line about Mr. Chauvet's role in bringing party girls to clubs to attract male patrons.

- 61-G: This statement discusses Ms. Bouveng's conduct in modeling for money -- it says nothing about promiscuity or chastity.

- 61-K:  The statement references "Swedish girls like Hanna Bouveng" and what they "may" do in the midst of the club scene -- no assertion as to what Ms. Bouveng, herself, has done is made.

The remaining five statements (61-B, 61-C, 61-J and 61-M) each use language that indirectly implies -- through turns of phrase and colorful language -- that Ms. Bouveng may have worked as a prostitute.   While these statements are closer to the line, Defendants contend that, in the context of these articles, they do not constitute serious assertions of fact that Ms. Bouveng is or was a prostitute.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court enter rulings that the above-discussed statements do not constitute actionable defamation *per se,* indicating where possible the reasons for such rulings, and that the Court enter such other and further relief the Court deems just and proper.

Dated:  June 9, 2015
    New York, New York

Respectfully submitted,

s/Glenn Colton
_____

Glenn Colton
Gary Meyerhoff
1221 Avenue of the Americas
New York, New York 10020
Tel.  (212) 768-6700

*Attorneys for Defendants*

84255249\V-9

# EXHIBIT D

P: Prostitution/Unchastity
T: Unfit for Trade or Profession
L: Loathsome disease
C: Criminal

TT 61
2014.07.30
*TheBlot Magazine*: "BURNED: Swedish Party Girl Hanna Bouveng Swims in Criminal Hot Water"

| | | Quote | Classification | brief p. |
|---|---|---|---|---|
| A | P<br>C | "The pimp and the sex slave? Meet criminal James Chauvet (http://jameschauvet.com) and party girl Hanna Bouveng (http://hannabouveng.com)" | P: too vague in context<br>C: prostitution not serious crime | 26<br>16-17 |
| B | P<br>C | "…a party girl named Hanna Bouveng (http://hannabouveng.com) stood out from the crowd vying for the attention of drug dealers and male patrons ready to pay for some 'special services' at a price." | P: closer/still not assertion of fact<br>C: prostitution not serious crime | 27<br>16-17 |
| C | P<br>C | "Sources say that after spending six months walking the streets of Hong Kong and entertaining visitors to the massage parlors in Macau's casinos, Hanna Bouveng had some run-ins with the local Asian triads and had to leave Asia "in a hurry."" | P: closer/still not assertion of fact<br>C: prostitution not serious crime | 27<br>16-17 |
| D | T | "Unable to complete a degree program, Bouveng…" | T: unspecific as to profession | 23 |
| E | P | "At night, the bat turns into a rat and parties around town looking for "Swedish-flavored" loose women." | P: too vague in context | 26 |
| F | L | "After multiple reported treatments for sexually transmitted diseases (STD), it didn't take long for Chauvet to capture another gold-digging Swedish girl, a suspected alcoholic Hanna Bouveng (http://hannabouveng.com)." | L: not "of or concerning" HB | 24 |
| G | P<br>C | "Hanna Bouveng is a self-proclaimed 'model' who could barely make ends meet and was willing to pose nude to get 'any compensation.'" | P: too vague in context<br>C: prostitution not serious crime | 26<br>16-17 |
| H | C<br>L | "Between drugs and alcohol, sharing a bed and "merging" with James Chauvet in a nasty bathroom allegedly filled with used needles, the pair [Bouveng and Chauvet] floats around New York City preying on drunken Swedish women eager to 'dig up some American gold.'" | C: no crime specified<br>L: no disease specified | 17<br>24 |

| | | | | |
|---|---|---|---|---|
| I | C | "In July 2014, in a mafia style, Hanna Bouveng (http://hannabouveng.com) blackmailed a famous investigative reporter..." | C: extortion re: lawsuit is opinion | 15-16 |
| J | P | "Crimes and prostitution, the criminal James Chauvet (http://jameschauvet.com/) and Hanna Bouveng (http://hannabouveng.com)" | P: closer/still no assertion of fact | 27 |
| | C | | C: prostitution not serious crime | 16-17 |
| K | P | "So long as the money is paid, the alcoholic Swedish girls like Hanna Bouveng....may just jump on the donkeys." | P: vague/not of or concerning HB | 27 |
| | C | | C: prostitution not serious crime | 16-17 |
| L | T | "After a journey to the jail cell, James Chauvet was back in the streets, peddling cocaine and feeding the life of fantasy to the loose women of Sweden. Chauvet was looking for an easy target, a woman in love with alcohol. It didn't take long for Chauvet to set his eyes on Hanna Bouveng (http://hannabouveng.com)" | T: unspecific as to profession, alcohol not enough | 23 |
| M | P | "Hanna Bouveng (http://hannabouveng.com) prostitution and massage parlors?" | P: vague/not of or concerning HB | 27 |
| | C | | C: prostitution not serious crime | 16-17 |
| N | C | "(http://theblot.com/wp-content/uploads/2014/07/FBI-Criminal-records-James-Chauvet-Hanna-Bouveng.pdf)" | C: no crime specified | 17 |

TT 76
2014.10.18
*TheBlot Magazine* – "HANNA BOUVENG, SEXUAL HARASSMENT EXTORTIONIST FLED AMERICA, BACK TO SWEDEN"

| | | | | brief p. |
|---|---|---|---|---|
| A | C | "Hanna Bouveng, Sexual Harassment Extortionist Fled America..." | C: extortion re: lawsuit is opinion, fleeing not serious crime | 16,17 |
| B | C | Caption: "Swedish party girl extortionist Hanna Bouveng, fled America after a failed $10 million extortion plot with boyfriend criminal James Chauvet." | C: extortion re: lawsuit is opinion, fleeing not serious crime | 16 |
| C | C | "Hanna Bouveng, a Swedish party girl entangled with a twice convicted cocaine and gun criminal boyfriend James Chauvet is on the run and has fled America." | C: fleeing not serious crime | 17 |
| | T | | T: unspecific as to profession, affiliation with drugs not enough | 24 |
| D | C | "After blackmailing an investigative journalist and Wall Street financier Benjamin Wey with a failed $10 million extortion plot, the frivolous 'sexual harassment' accuser and extortionist, Swedish party girl Hanna Bouveng was caught at New York's JFK international airport trying to flee America." | C: extortion re: lawsuit is opinion, fleeing not serious crime | 16,17 |

| | | Content | Analysis | Page |
|---|---|---|---|---|
| E | C | Caption: "Helena Bouveng sponsored the James Chauvet – Hanna Bouveng blackmail on an American executive." | C: extortion re: lawsuit is opinion | 16 |
| F | C | "The timing of the party girl Hanna Bouveng's sudden departure from America is highly suspicious. Legal experts say that the fleeing of Swedish vixen Hanna Bouvneg [sic] from the United States...acting in concert to evade legal consequences, after she had lied in a sworn affidavit submitted to the highly regarded New York Federal Court Judge Paul Gardephe, on the same day when Bouveng fled America." | C: commentary on lawsuit is opinion, fleeing not serious crime | 16,17 |
| G | C | "HANNA BOUVENG, WARNING FROM THE FBI: 'NO EMPLOYER COULD TOLERATE AN EMPLOYEE'S AFFILIATION WITH DRUG DEALERS'" | C: no crime specified | 17 |
| | T | | T: unspecific as to profession, affiliation with drugs not enough | 24 |
| H | T | "Hanna Bouveng's former U.S. visa sponsor company ISSE [sic] International in California also terminated her visa sponsorship in April, after completing its own independent investigation into the alleged alcohol and cocaine abuses of the Swedish party girl Hanna Bouveng." | T: unspecific as to profession, alcohol not enough | 23 |
| I | T | "No employer could tolerate Hanna Bouveng's close affiliation with a cocaine dealer boyfriend, a twice convicted drug dealer and gun criminal James Chauvet." | T: unspecific as to profession, affiliation with drugs not enough | 24 |
| J | C | "...FBI Criminal records James Chauvet – Hanna Bouveng." | C: no crime specified | 17 |
| K | C | Caption: "...fleeing fugitive party girl Hanna Bouveng." | C: fleeing/fugitive not serious crime | 17 |
| L | T | "Unable to complete a degree program, Bouveng..." | T: unspecific as to profession | 23 |
| M | C | Caption: "Fugitive Hanna Bouveng and party girls, Nina Chelidze, cocaine dealer James Chauvet orchestrated a failed extortion plot on an American executive." | C: extortion re: lawsuit is opinion | 16 |
| N | C | "VISA FRAUD AGAINST HANNA BOUVENG: THE PEOPLE OF THE UNITED STATES VS. FRAUDSTER HANNA BOUVENG?" | C: average reader would not know if "visa fraud" is a serious crime | 18 |
| O | C | "Sources told the investigators led by a former NYPD police detective that Hanna Bouveng was in the United States on illegal visa status. It's almost certain that she could be arrested by the U.S. government agents upon retry into the United States. The State Department official confirmed that Hanna Bouveng's status would be a serious visa violation subject her to immediate arrest and deportation." | C: lost visa status not a serious crime | 18 |
| P | C | "...the next chapter of the Swedish 'model' Hanna Bouveng's saga of extortion plot." | C: extortion re: lawsuit is opinion | 16 |

| | | | | brief p. |
|---|---|---|---|---|
| A | C | " ...a pair of drug dealer criminals, one of whom, a Swedish party girl Hanna Bouveng has since fled America." | C: closer, but in context, clear that article references JC as the criminal and HB as his girlfriend | 18 |
| B | C | "...$10 million shakedown and extortion plot orchestrated by a twice convicted drug dealer James Chauvet and his co-conspirator girlfriend, party girl Hanna Bouveng." | C: extortion re: lawsuit is opinion | 16 |
| C | C | Caption: "...extortionist Hanna Bouveng." | C: extortion re: lawsuit is opinion | 16 |
| D | C | Image: Photograph of Hanna Bouveng and James Chauvet superimposed on a background photo depicting a pile of white powder, three lines of white powder, and several hundred dollar bills. In the foreground, the word "BUSTED" in brightly-colored block lettering. The caption reads, "Twice convicted cocaine dealer and illegal gun criminal James Chauvet, the criminal's Swedish girlfriend, party girl Hanna Bouveng, caught in a failed extortion plot." | C: no crime specified for HB; not "of or concerning" plaintiff; context makes clear that JC is the criminal | 18 |
| E | C | "A twice convicted cocaine criminal James Chauvet and his Swedish girlfriend, co-conspirator Hanna Bouveng..." | C: no crime specified for HB; not "of or concerning" plaintiff; I | 18 |
| F | C | Image: James Chauvet's purported mug shots next to a photograph of Hanna Bouveng and James Chauvet with "FBI: LOVE IN COCAINE" superimposed in brightly-colored block lettering and the caption, "Busted! NYPD Criminal James Chauvet Party Girl Hanna Bouveng," and the second caption, "Criminal James Chauvet, Swedish friend Hanna Boueng [sic], Photo Source: NYPD/FBI James Chauvet arrest 'mugshot", Hanna Bouveng/James Chauvet Facebook/Instagram Pages." | C: no crime specified for HB; not "of or concerning" plaintiff | 17 |
| G | C | Caption: "BARBARA ROSS, New York Daily News writer entangles in drug dealer activities, sponsors crack head and gun criminal James Chauvet, implicated the cocaine dealer's Swedish girlfriend Hanna Bouveng. Matthew Leish engaged in the cover up of the cocaine dealers." | C: no crime specified for HB; not "of or concerning" plaintiff | 17,24 |

84266736V-5