USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 3/31/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HANNA BOUVENG,

Plaintiff,

– against –

NYG CAPITAL LLC d/b/a NEW YORK GLOBAL GROUP, FNL MEDIA LLC, and BENJAMIN WEY,

Defendants.

**MEMORANDUM OPINION & ORDER**

14 Civ. 5474 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Hanna Bouveng brings this action against Defendants NYG Capital LLC, d/b/a New York Global Group ("NYGG"), FNL Media LLC ("FNL Media"), and Benjamin Wey alleging claims of (1) quid pro quo sexual harassment under the New York State Human Rights Law (the "NYSHRL") and New York City Human Rights Law (the "NYCHRL") against all Defendants; (2) retaliation under the NYSHRL and NYCHRL against all Defendants; (3) defamation against all Defendants; and (4) assault and battery against Defendant Wey.

Following a ten-day trial, a jury returned a verdict in Plaintiff's favor on all claims except the assault and battery claims against Defendant Wey. As to compensatory damages, the jury awarded Plaintiff (1) $500,000 on her quid pro quo sexual harassment claims under the NYSHRL and NYCHRL against all Defendants; (2) $1.5 million on her defamation claim against all Defendants; and (3) $1.00 on her retaliation claims under the NYSHRL and NYCHRL. As to punitive damages on her defamation claim, the jury awarded Plaintiff: (1) $10 million against Defendant Wey; (2) $1 million against Defendant NYGG; and (3) $5 million

against Defendant FNL Media. On Plaintiff's NYCHRL retaliation claim, the jury awarded her $1.00 as against each Defendant.

Defendants have moved under (1) Fed. R. Civ. P. 50 for judgment as a matter of law; (2) Fed. R. Civ. P. 59(a)(1)(A) for a new trial as to liability; and (3) Fed. R. Civ. P. 59 for a new trial or a remittitur concerning the damage awards. (Dkt. No. 255) For the reasons stated below, Defendants' motion for judgment as a matter of law or for a new trial as to liability will be denied. Defendants' motion for a new trial with respect to the compensatory and punitive damage awards will be granted unless Plaintiff accepts a remittitur as to (1) the compensatory damage award on her quid pro quo sexual harassment claim; and (2) the punitive damage awards against Wey and FNL Media.

## BACKGROUND

### I. THE EVIDENCE AT TRIAL

#### A. The Parties

Plaintiff Hanna Bouveng was raised in Vetlanda, Sweden. (Trial Tr. (Dkt. No. 236) at 896[1]) After high school, she obtained a bachelor's degree in media communication from Sweden's Halmstad University. (Id. at 897-98) Plaintiff was an exchange student in Hong Kong during her last semester, and then worked in marketing in Hong Kong for several months after completing her studies. (Id. at 899) She also worked as a model in Hong Kong. (Id. at 901)

After graduation, Plaintiff was employed at Pecto Media, a marketing company in Oslo, Norway, with banking and other corporate clients. (Id. at 898) Plaintiff had "sales and

[1] The trial transcript page numbers referenced in this opinion correspond to the consecutive page numbers that appear in the final trial transcripts. The page numbers of other documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Filing system.

branding" responsibilities at Pecto, and called on clients throughout Norway. (Id.) Plaintiff's responsibilities included making presentations to Pecto clients and obtaining renewal of Pecto's contracts with clients for annual marketing plans. (Id.) Plaintiff speaks Swedish, Norwegian, and English, and has also studied French, German, and Spanish. (Id.)

In 2012, Plaintiff came to New York City on a student visa to study marketing, management, and fashion at Berkeley College. (Id. at 900) She lived in a small apartment in the East Village with a friend from school. (Id. at 900-01)

Defendant Benjamin Wey is the chief executive officer and sole owner of Defendant New York Global Group, an international business consulting firm based in Manhattan. (Trial Tr. (Dkt. No. 232) at 487; Trial Tr. (Dkt. No. 234) at 759) NYGG also has offices in China, where it employs fifty people. (Trial Tr. (Dkt. No. 232) at 536) FNL Media – a limited liability company – is a "wholly owned subsidiary of New York Global Group" and the "parent company" of an online publication called The Blot Magazine ("The Blot"), of which Wey is the publisher. (Trial Tr. (Dkt. No. 228) at 267; Trial Tr. (Dkt. No. 242) at 1429) NYGG and FNL Media share office space at 40 Wall Street in Manhattan. (Trial Tr. (Dkt. No. 228) at 138, 144, 162)

Wey was born in China and moved to the United States to attend college at Oklahoma Baptist University, where he earned a bachelor's degree in business administration. (Trial Tr. (Dkt. No. 234) at 756-58) Wey also holds an MBA from the University of Central Oklahoma and a master's degree from Columbia University business school. (Id. at 759)

**B. Meeting and Job Offer**

During the summer of 2013, Plaintiff – then 24 years old – met Wey at a party at his house in the Hamptons. (Trial Tr. (Dkt. No. 232) at 526; Trial Tr. (Dkt. No. 236) at 903)

Wey later invited Plaintiff and a friend to a party at his penthouse apartment in Manhattan. (Trial Tr. (Dkt. No. 236) at 907) At these parties, Plaintiff told Wey about her family background, including that her grandfather had founded SAPA, a large, successful aluminum company in Sweden. (Trial Tr. (Dkt. No. 232) at 527; Trial Tr. (Dkt. No. 234) at 760; Trial Tr. (Dkt. No. 236) at 908, 914) Plaintiff also told Wey that she had finished her studies and was "looking for an internship or a job" in New York City. (Trial Tr. (Dkt. No. 236) at 908)

Later in the summer of 2013, Plaintiff and Wey met for lunch. (Id. at 909) According to Plaintiff,

> [Wey] ordered wine for us. And when we got the wine he asked me if he could move – jump over and sit next to me. And so he did. And then he started to [say] . . . that he was lonely and that he needed someone in his life and that he needed someone that he could show the world. . . . And then well he basically said that he wanted a girlfriend. So I told him that I was not interested. I think you have to keep on searching because I'm interested in a job. . . . So then he moved back over. And we had lunch. And that was it.

(Id. at 909-10)[2]

A few days later, however, Wey called Plaintiff and "basically said that he thought that [she] was brave that [she] would say no to him[,] [b]ecause a lot of people don't say no to him." (Id. at 910) Wey also told Plaintiff that she "should come in to discuss a position at his company," and she agreed to do so. (Id.)

In July 2013, Plaintiff met with Wey and James Baxter – NYGG's general counsel and chairman of the board – at NYGG's offices at 40 Wall Street. (Id. at 911; Trial Tr. (Dkt. No. 240) at 1255) Plaintiff testified that she was offered a marketing position at NYGG (Trial Tr. (Dkt. No. 236) at 911); Wey testified that he agreed to hire her as an intern. (Trial Tr.

---

[2] Wey testified that he "[does not] remember" going to lunch with Plaintiff. (Trial Tr. (Dkt. No. 232) at 527-28)

(Dkt. No. 232) at 529-30) Both sides agree that Plaintiff, Wey, and Baxter completed paperwork relating to Plaintiff's application for a J-1 visa, which would enable Plaintiff to work in the United States.[3] (Trial Tr. (Dkt. No. 232) at 528; Trial Tr. (Dkt. No. 236) at 911-12)

### C. Summer 2013 Trip to Sweden

In August 2013, after the J-1 visa paperwork had been submitted, Plaintiff returned to Sweden for an interview at the American embassy in connection with her visa application. (Trial Tr. (Dkt. No. 236) at 912) Wey told Plaintiff that "he would really like to" join her on the trip, so that she could "introduce [him] to some of the people [she] know[s]."[4] (Id.) Plaintiff drafted an itinerary for Wey's trip, proposing visits to Stockholm, Oslo, and Plaintiff's hometown of Vetlanda, and meetings with a number of senior Swedish business executives. (Defense Exhibit ("DX") BF; Trial Tr. (Dkt. No. 234) at 761-62) Plaintiff sent the itinerary to Wey via email, and ended her message with the word "Kram," which is Swedish for "hug." (DX BF; Trial Tr. (Dkt. No. 294) at 1036)

Wey testified that one of the reasons he traveled to Sweden in August 2013 was to learn about Nordica Life Insurance Company ("Nordica Life"). (Trial Tr. (Dkt. No. 232) at 539) The "people who were involved with Nordica were friends of [Plaintiff's] father," and Wey "came up with the idea that perhaps Nordica Life Insurance Company could be acquired by Chinese investors." (Id.) In the event of an acquisition, Wey believed that Plaintiff's father – Nils Sundqvist – would have "an important role in the company," and that Plaintiff herself would become Nordica Life's "director of marketing." (Id. at 540)

---

[3] ASSE, a "visa sponsor firm," obtained the J-1 visa for Plaintiff, with NYGG serving as the "host organization." (Trial Tr. (Dkt. No. 234) at 763)

[4] Wey testified that Plaintiff invited him. (Trial Tr. (Dkt. No. 232) at 538)

During this August 2013 trip, Plaintiff and Wey travelled to Vetlanda and to Vastervik, Sweden, where a preliminary meeting related to Nordica Life was conducted. (Trial Tr. (Dkt. No. 236) at 913) They also had meetings in Stockholm and Norway. (Id. at 913-14; DX BF) Plaintiff introduced Wey to her father and her cousin's uncle, and she took him to see the aluminum company that her grandfather had founded. (Trial Tr. (Dkt. No. 236) at 914) During this trip, Wey did not "make any sexual advances towards [Plaintiff]," and the "the conversation about him wanting a girlfriend [did not] come up again." (Id. at 913-14)

**D. Plaintiff's Employment at NYGG**

Plaintiff's employment at NYGG began on October 1, 2013. (Id. at 916) Plaintiff testified that when she started at NYGG, she wanted only a professional relationship with Wey. (Id.)

Plaintiff was given her own office, and was told that her responsibilities would be "marketing and communications." (Id. at 917) During her first month at NYGG, Plaintiff did "lobbying work" in Washington, D.C., and worked on NYGG's website and press releases. (Id. at 917-18) Plaintiff also researched individuals NYGG was scheduled to meet and the companies they worked for. (Id. at 918) Plaintiff's work also involved The Blot Magazine. (Id.) She attended meetings in which The Blot team discussed "everything from budget to [public relations] to strategies," and she "tried to coordinate meetings with other companies that would benefit The Blot's work." (Id.; see also Trial Tr. (Dkt. No. 228) at 161-62) During October 2013, Plaintiff worked from 9:00 a.m. to 5:00 p.m., and would attend after-work social events with Wey from "time to time." (Trial Tr. (Dkt. No. 236) at 919) Plaintiff was paid $1,250 every two weeks. (Trial Tr. (Dkt. No. 294) at 1031-32; Plaintiff's Exhibit ("PX") 130)

Although Wey testified that the "official classification of [Plaintiff's] status [at NYGG]" – for purposes of her J-1 visa – was "intern," Wey gave her the title of NYGG's "Director of Corporate Communications." (Trial Tr. (Dkt. No. 232) at 489, 530-31) Plaintiff's NYGG business cards and her NYGG email reflected this title. (Id. at 530-31) Plaintiff testified that Wey "thought that it would look good if we went to meetings and he . . . introduce[d] me as the director of corporate communications." (Trial Tr. (Dkt. No. 236) at 912) Wey confirmed that it "felt . . . appropriate to hold out to the world for marketing purposes that she was [NYGG's] director of corporate communications." (Trial Tr. (Dkt. No. 232) at 532)

Plaintiff testified that, when she first began work at NYGG, Wey's treatment of her "depended" on whether she "would accompany him to dinners or social events after work." (Trial Tr. (Dkt. No. 294) at 959) "If [she] did that, then he would be happy and treat [her] well. And if [she] would say that [she] was going to go to dinner with friends, then he would get upset and get pouty and did not talk to [her] and treat[ed] [her] differently." (Id.) Over time, Wey "got more aggressive regarding [Plaintiff's desire] to spend time with friends outside of work. He would bring [her] to [his] office and have these long monologues. As soon as [Plaintiff] had a dinner with a friend, he would bring [her] to [his] office the next day." (Id.) Between October 2013 and January 2014, Plaintiff went out to dinner with Wey "[w]eekly." (Id. at 962) "In the beginning it was with other people, business contacts, and then it started become more just him and [Plaintiff]." (Id.)

Wey "would [also] often compliment [Plaintiff] on [her] looks and how [she] dressed, and he would make comments about [her] body. . . . For example, if [she] said that [she] was going to go to the gym after work he would say, oh, you don't need that and you have a fit and thin body anyway." (Trial Tr. (Dkt. No. 294) at 961) Wey made these remarks both when

they were alone and when other employees were present, which made Plaintiff feel "[e]mbarassed."[5] (Id.) Alicia Lu – an associate editor for The Blot (Trial Tr. (Dkt. No. 228) at 145) – testified that "Wey was very complimentary of Ms. Bouveng and [was] always standing very close to her" at the office, and that Wey would often tell Plaintiff that "she looked beautiful, or looked very nice. . . . Things that you usually don't hear in the office from a superior to a subordinate." (Id. at 171-72) Yonatan Weiss – a graphic designer for The Blot – testified that Wey "often behave[d] in a lecherous manner [toward Plaintiff]. He would constantly comment on her physical appearance and shower heaps of praise on her physical appearance and her beauty and her stylishness and how glamorous and pretty she was." (Id. at 267, 270)

Wey also frequently touched Plaintiff at the office: "He would very often put his arm around me or come close to me, stand very close to me and kiss me on the cheek when he greeted me." (Trial Tr. (Dkt. No. 294) at 961-62) Plaintiff "never saw [Wey] touch other people." (Id. at 962) Lu testified that she observed Wey touch Plaintiff's behind, and that he "would put his arm around her." (Trial Tr. (Dkt. No. 228) at 172) Weiss similarly testified that Wey "often put his arm around [Plaintiff], around the small of her back, [and] always had her at his side whenever we were in meetings."[6] (Id. at 270)

**E. November 2013 Boston Trip**

On November 2, 2013, Wey gave a speech at a conference at Babson College in Boston. (Trial Tr. (Dkt. No. 232) at 474; DX BQ) The night before the speech, Wey drove from New York City to Boston with Plaintiff and her friend, Nina Chelidze. (Trial Tr. (Dkt. No. 232) at 475; Trial Tr. (Dkt. No. 236) at 920) After arriving in Boston, Wey dropped off Chelidze at a

[5] At trial, Wey did not dispute Plaintiff's testimony concerning his dinner invitations and comments on her appearance.

[6] At trial, Wey did not dispute these accounts.

friend's house, and he and Plaintiff "proceeded to the Boston Harbor Hotel." (Trial Tr. (Dkt. No. 232) at 475)

Wey testified that, although he and Bouveng arrived at the hotel together, Plaintiff left when they got there. (Id. at 475-76) Wey does not recall where Plaintiff went or whether she had any luggage; he likewise does not recall whether he dined that evening. (Id. at 475) Wey likewise denied that he and Plaintiff shared a room at the Boston hotel, and denied that he tried to have sex with Bouveng. (Id. at 535) Wey testified that Plaintiff "met [him] in the hotel the next morning" and he did not ask her where she spent the night. (Id. at 476) Wey further testified that, after the conference, he "left [Plaintiff] in Boston," because he "had to go see [his] nephew" at a school in Rhode Island. (Trial Tr. (Dkt. No. 236) at 869)

Plaintiff gave a much different account of the November 2013 Boston trip.[7] Plaintiff testified that, after she and Wey dropped off Chelidze, they drove to the Boston Harbor Hotel. (Id. at 921) Plaintiff further testified that, once at the hotel, they

> had dinner. Then we were going to go up to the room or check in. And [Wey] only booked one room. So we went up to that room.
>
> Q. And tell us what happened in the room.
>
> A. Well he – he started to come close to me. Started to kiss me on the neck. And he started to take off my coat. And then I asked him if he had condoms. And he said he hadn't, but that it was okay anyway because he was clean. And then I said I didn't want – that I didn't want to do anything. And he said okay. And he went to the bathroom. And I just changed and went to bed. And then nothing else happened.

(Id.) Plaintiff testified that she asked Wey if he had a condom because "[i]t was just something that [she] came up with to try to prevent what was going to happen." (Trial Tr. (Dkt. No. 294) at

[7] For purposes of its review under Fed. R. Civ. P. 59, the Court finds Bouveng's account of the Boston trip more credible than Wey's account.

959-60) She also testified that she "didn't sleep very well that night and [she] tried to lay as still as possible because [she] wanted to make it seem as if [she] was sleeping." (Id. at 960)

When Bouveng woke up the next morning, she did not discuss the previous night's events with Wey. (Trial Tr. (Dkt. No. 236) at 921-22) She also did not tell Chelidze or "Annie" – another friend who attended the Babson College conference – what had happened, because "[i]t was shameful" and she "didn't know what [she] was going to say." (Id. at 922)

After the conference, Plaintiff, Chelidze, Annie, and Wey drove back to Boston and had dinner there, and then she and Wey "said good-bye to [Chelidze] and Annie and [returned] . . . to the hotel." (Id.) Plaintiff did not "have any discussion with Mr. Wey about the fact that there was still only one room," because she "didn't know what [she] was going to say. I mean he knew that – he knew from the beginning what I wanted and he knew – he just knew what I wanted. And he still booked that room by himself." (Id. at 922-23) Plaintiff testified that she "slept on the couch that night," and that nothing happened between herself and Wey. (Id. at 923) The next day – on the drive back to New York City – they stopped at Wey's nephew's college, where Plaintiff walked around the campus while Wey visited with his nephew. (Id.)

Plaintiff testified that Wey initially treated her differently after the Boston trip:

> He was pretty cold and didn't talk to me, and that was the first days. He would put a lot of work pressure on me and then he would just switch and asked if we were about to go to dinner, so we did. And then he was all happy and everything was great.

(Trial Tr. (Dkt. No. 294) at 959)

**F. Broad Street Apartment**

In mid-November 2013, Plaintiff moved from her East Village apartment to an apartment at 25 Broad Street in lower Manhattan, close to NYGG's offices. (Trial Tr. (Dkt. No. 236) at 925; Trial Tr. (Dkt. No. 294) at 1051)

Plaintiff testified that the apartment move was Wey's idea: Wey "thought it would be a great idea for [her] to have [her] own apartment; that it would make [her] feel like . . . more of a professional successful business woman." (Trial Tr. (Dkt. No. 236) at 925) Plaintiff testified that Wey found the apartment for her; that she had never been to the building before Wey showed her the apartment; and that she signed the lease that same day. (Id. at 925-26)

On the lease forms, Plaintiff listed Wey as her "emergency contact" and as her "friend." (Trial Tr. (Dkt. No. 294) at 1052) Plaintiff testified that, while she was signing the paperwork, Wey "was standing over [her] shoulder and said that [she] should list him as a friend . . . because he lived . . . in Battery Park so he was near so if something were to happen he would be close." (Trial Tr. (Dkt. No. 240) at 1207)

Plaintiff also testified that she told Wey "that with the salary [she] had now [she] could not afford an apartment like that," and that Wey "said that he would raise [her] salary" to "something between five and seven thousand dollars a month," so that she could pay the rent. (Trial Tr. (Dkt. No. 236) at 926) Wey did not give Bouveng a raise, however. Instead, he "helped [her] pay [the rent] with cash," which she had to ask him for every month. (Id. at 927) Wey told Bouveng "not [to] tell anyone" how the rent at the 25 Broad Street apartment was being paid. (Trial Tr. (Dkt. No. 240) at 1207)

Wey, by contrast, testified that "[i]t was Ms. Bouveng's idea" to move into the Broad Street apartment, and that she found the apartment herself. (Trial Tr. (Dkt. No. 236) at 791) He also testified that Plaintiff "asked [him] to become guarantor for her apartment because she ha[d] no credit history in the United States and the building would not approve her to go on her own name as a tenant." (Id.) Wey stated that Plaintiff also "asked [him] to subsidize [the cost of the monthly rent]" because she could not afford it. (Id.) Wey conceded that he gave

Plaintiff cash every month to help pay the rent for the apartment, and that he did not "run the cash expense through NYG Capital LLC." (Id. at 793)

Wey further testified that he and Plaintiff reached an "agreement" whereby, "[b]efore she allows anybody to stay over at the apartment[, Wey] must be notified in advance." (Id. at 792) Wey stated that this was a "condition for [him being] guarantor because [his] liability was on the line. . . ." (Id.) Wey admitted, however, that the building required tenants to obtain liability insurance, and that Plaintiff had obtained a liability policy for the apartment. (Id. at 870-71)

## G. December 2013 Trips to China and Dubai

In December 2013, Plaintiff, Wey, and NYGG general counsel James Baxter traveled to China on business. (Trial Tr. (Dkt. No. 232) at 535; Trial Tr. (Dkt. No. 236) at 929) While in China, they did some sightseeing, and met with politicians, businessmen, and potential investors in NYGG. (Trial Tr. (Dkt. No. 232) at 536-37) They also met with Roger Li, a member of the "NYGG Asia team" and a "critical decision maker of that Chinese investor group." (Trial Tr. (Dkt. No. 236) at 821, 873) Wey, Plaintiff, and Baxter saw Li "[a]lmost on a daily basis" during their seven-to-ten-day trip (id. at 821), and some of the discussions with Li involved the potential Nordica Life transaction. (Id. at 822) Wey testified that Plaintiff told Li about her education and professional background, including that she had "a bachelor's degree in communications, and . . . extensive family connections in Sweden." (Id. at 823)

From China, Plaintiff and Wey traveled to Dubai. (Trial Tr. (Dkt. No. 232) at 537; Trial Tr. (Dkt. No. 236) at 930) Wey testified that the Dubai trip was the result of a "last-minute recommendation by a Chinese government official to introduce some business contacts [in connection with] [the] Nordica Life Insurance [deal]." (Trial Tr. (Dkt. No. 236) at 797) Wey

testified that "only one hotel room was procured at the Atlantis Hotel in Dubai," that he paid for the room, and that Plaintiff slept in that room while they were in Dubai. (Trial Tr. (Dkt. No. 232) at 476-77) Although the hotel bill for the Atlantis Hotel states that "2-0" guests stayed in the room (Trial Tr. (Dkt. No. 236) at 865; PX 113), Wey testified that he stayed at a friend's house while in Dubai. (Trial Tr. (Dkt. No. 232) at 479)

Plaintiff testified that she and Wey spent one night in Dubai. See Trial Tr. (Dkt. No. 294) at 1057. They "got to Dubai in the morning," and when they checked into the hotel, Bouveng learned that there "was only one room booked." (Trial Tr. (Dkt. No. 236) at 930) They left their bags at the hotel and attended meetings during the day. (Id.) They "had dinner at [the house of] one of Mr. Wey's acquaintances," and then they took a taxi back to the hotel. (Id. at 930-31) They went upstairs, and there "was only one room." (Id. at 931) According to Plaintiff, after they entered the room, Wey "went to the bathroom. And I changed and went to bed. Pretending I was falling asleep. And he crawled in the bed. And pushed himself against me. And he asked me how I could be so tired all the time. But then I just ignored him and he left me alone."[8] (Id.)

When asked why she did not confront Wey about booking only one room, Plaintiff testified as follows:

> I didn't know what I was going to say. . . . I was just in shock and humiliated and ashamed. And [I] didn't want to upset him. I saw how he could get [en]raged at the office. That he would scream to people. He would even scream to Mr. Baxter. . . . [I thought] [t]hat he would get angry, kick me out or . . . fire me, revoke my visa. . . . I thought that I would upset him. That he would come after me because I saw that if people didn't do what he wanted them to do or if they crossed his way then he would attack them with his magazine or if it was lawsuits or whatever it could be. And I was intimidated. I met all these powerful business

---

[8] For purposes of its review under Fed. R. Civ. P. 59, the Court finds Bouveng's account of events in Dubai more credible than Wey's account.

> people through him. . . . I'm not from the [S]tates. I don't know how it works here. I don't have any family here. My friends here are college students.

(Id. at 931-32)

Plaintiff further testified that, "[a]fter the Dubai trip and once [she] [was] back at New York Global Group," Wey "was treating [her] in the same manner as after the Boston trip. He was very pouty and chilly and would put a lot of work pressure on [her]," which made Plaintiff feel "[r]eally bad." (Trial Tr. (Dkt. No. 294) at 960)

### H. Plaintiff's Sexual Encounters With Wey

After Dubai, Wey and Plaintiff traveled to Copenhagen for a meeting concerning the Nordica Life acquisition. (Trial Tr. (Dkt. No. 236) at 932) Between December 24 and December 31, 2013, Wey was with his family on vacation in Costa Rica. (Id. at 804; DX BT) After Wey returned from his vacation, he and Bouveng went out for dinner and drinks. (Trial Tr. (Dkt. No. 236) at 932-33) At dinner, Wey "gave [Plaintiff] a Prada bag as a year-end bonus." (Id. at 933)

After dinner, Bouveng and Wey walked to Plaintiff's Broad Street apartment building, and Wey told her that he "wanted to come up for some tea." (Id.) Bouveng told Wey that she was tired, but he complained that she "never invite[d] [him] up . . . [and] never ha[d] time to do anything." (Id. at 934) He accompanied Bouveng to her apartment. (Id.) Plaintiff testified that inside the apartment, the following took place:

> We sat down on the couch. And I sat on the other end. And he asked me to come closer. So I did. And then he started to put his arm around me and started to . . . kiss me on the neck. And then he stood up and grabbed my hand and we walked into the bedroom. . . . And then he started to undress me. And he said he brought a box of condoms. And then we just laid down to bed. And we had sex.

(Id.)[9]

Plaintiff described her mental state as follows:

> I felt so used and weak and I was so ashamed that I let this happen. That I've been through my entire life and nothing like this has ever happened. And everything that I've ever been, strong, independent, he just took that away from me. So I was not that person anymore.

(Id.) Plaintiff did not speak to Wey about what happened that night; she testified that he "just came into the office the next day and pretended as if nothing happened, as if everything was okay." (Id. at 935)

Sometime after this first sexual encounter, Wey called Plaintiff and "said that he needed to talk to [her] and ask[ed] [her] if he could come to the apartment." (Trial Tr. (Dkt. No. 294) at 963) Plaintiff told him that she did not feel comfortable meeting at her apartment, so they met for dinner in lower Manhattan. (Id.) At dinner, Wey gave a "long monologue, around 45 minutes, that [Plaintiff] didn't appreciate the chance [she] got on Wall Street and that he thinks that [she] feel[s] entitled to things and that [she] need[s] to work for it." (Id.) Wey's remarks made Plaintiff feel "[r]eally bad and guilty." (Id.) After dinner, Wey and Bouveng returned to her apartment and had sex again. (Id. at 964) Plaintiff testified that Wey "tried to kiss me, and I pulled away and he still kept on doing that, and everything happened again." (Id.) She testified that she did not kiss Wey, hug him, or reciprocate in any way. (Id.) She also testified that she never wanted to have sex with Wey. (Id.) Afterwards, she felt "[b]lank." (Id.)

Plaintiff testified that she and Wey had sex two more times. (Trial Tr. (Dkt. No. 236) at 935) These encounters made Bouveng feel "more and more weak. That I didn't mean

---

9 Wey testified at trial that he and Plaintiff never had sex, and that he never attempted to have sex with her. (Trial Tr. (Dkt. No. 232) at 472) For purposes of its review under Fed. R. Civ. P. 59, the Court finds Bouveng's account of their relationship more credible.

anything. That everything that I felt and thought, that it didn't matter. I felt useless." (Id.) She did not tell anyone what was happening, however, because "[she] was ashamed."[10] (Id.)

On February 2, 2014, Wey came to Plaintiff's apartment at 9:00 a.m. (Trial Tr. (Dkt. No. 294) at 966; Trial Tr. (Dkt. No. 240) at 1205) Bouveng testified that "Wey came into the building and was knocking on my door. And he came in. . . . And then he – he wanted to have sex. And then I told him no." (Trial Tr. (Dkt. No. 240) at 1205) Plaintiff explained the circumstances as follows:

> . . . Mr. Wey was going to travel to China, and he wanted to meet me before then. So he came up to the apartment and he wanted to have sex again, and I said no. And then he would be very aggressive and pouty and try to make me feel guilty. And then he said that he was going to think about repercussions or consequences that he felt – he switched from that to work very quickly and said that he had to think about my role in the company. Then he left [for] China and he sen[t] an email to Mr. Baxter and myself that I needed training.

(Trial Tr. (Dkt. No. 294) at 966)

Bouveng further testified that, around the "[m]iddle or end of February [2014]," she "made a decision not to let [the sexual encounters] happen again." (Trial Tr. (Dkt. No. 236) at 935-36) She did not communicate this explicitly to Wey, however:

> I just thought that I would ease out of it, . . . just somehow try [to] make it stop. And I felt that I couldn't just say no, I just couldn't go up and make a decision . . . [because] he would definitely fire me. He would kick me out of the apartment. He would . . . revoke my visa. I thought that he was going to, you know, come after me. Like he said in the very beginning, no one ever said no to him before.

(Id. at 936) In order to ensure that sex between them "never happened again," Plaintiff "started to spend a lot more time with [her friends] [James] Chauvet and [Chemme] Koluman, and [she]

---

[10] Although all three complaints Bouveng filed in this action alleged that Wey "forced Plaintiff to have sexual intercourse with him," (see Second Amended Cmplt. (Dkt. No. 40) ¶¶ 67, 70, 204; First Amended Cmplt. (Dkt. No. 11) ¶¶ 62, 65, 152; Cmplt. (Dkt. No. 1) ¶¶ 62, 65, 152), Bouveng testified at trial that Wey used no physical force. (Trial Tr. (Dkt. No. 294) at 1063)

asked them to be in the apartment or [she] tried to be more around them so [she] wasn't going to be alone." (Trial Tr. (Dkt. No. 294) at 965) Koluman confirmed at trial that in February 2014, she and Plaintiff started spending more time together; Koluman testified that Plaintiff seemed "more stressed than usual" and "wanted [Koluman] to be around more than usual." (Trial Tr. (Dkt. No. 230) at 360)

Plaintiff testified that, after it became clear to Wey that she was rejecting his sexual advances, he became "more aggressive and put a lot more work pressure on [her] and expected things that seemed very difficult to accomplish in th[e] period of time that he required." (Trial Tr. (Dkt. No. 294) at 965)

**I. January 2014 Sweden Trip**

In late January 2014, Wey and Plaintiff met in Sweden for a "critically important business trip . . . to finalize the acquisition of Nordica Life Insurance and [to] confirm[] the management team in Sweden that would be running the business[,] as well as [to] work diligently towards entering into a term sheet towards the acquisition of Nordica Life Insurance. . . ." (Trial Tr. (Dkt. No. 236) at 805) Wey testified that he met with Plaintiff's father – "who was going to become the chief financial officer [of Nordica Life]" – and her father's friend Lars Forseth – "the chairman of Manpower Europe, who was going to become the chairman of Nordica Life Insurance." (Id. at 806) Wey also met with Plaintiff's aunt, Helena Bouveng, a member of the Swedish Parliament, "who was going to become a consultant to [the company]." (Id.)

During this trip, Plaintiff and Wey went to Café Linne, a Stockholm coffee shop, where they met with Plaintiff's father, Nils Sundqvist. (Id. at 809; Trial Tr. (Dkt. No. 294) at 1084; DX J) The three then traveled to Luxembourg, where Nordica Life is headquartered, and

met with the company's staff "to learn more about the business. . . ." (Trial Tr. (Dkt. No. 236) at 811) Extensive negotiations took place about "the acquisition of Nordica Life Insurance as well as related terms and conditions," and the parties ultimately entered into a "formal term sheet," which is dated February 5, 2014. (Id. at 812; DX BC) The term sheet reflects a "targeted closing date" of March 31, 2014. (DX BC at 2)

If the deal closed, "investors in Asia" would become the new owners of Nordica Life, together with Alan Klotz, the company's chairman and CEO. (Trial Tr. (Dkt. No. 236) at 814) Wey testified that Plaintiff's father – as CFO – and Lars Forseth – as executive chairman – would be running the business together with Klotz. (Id. at 815) Wey further testified that the "possibility for [Plaintiff] to become the director of marketing" of Nordica Life was also discussed. (Id.) Wey noted that Plaintiff "was the only bridge for us into this acquisition." (Id.)

**J. February and March 2014 Developments in the Nordica Life Transaction**

In mid-February 2014, Wey met with investors in China to obtain their approval "to proceed with . . . closing the [Nordica Life] transactions by March 31, 2014." (Id. at 816, 824; Trial Tr. (Dkt. No. 294) at 1090) Wey discussed with the Chinese investors his proposal that Plaintiff's father serve as CFO of Nordica Life. (Trial Tr. (Dkt. No. 236) at 824-25) The investors were "fine with his . . . professional qualifications," but they had "serious concerns about the close relationship involving Ms. Bouveng, [and] her family members. They considered that a concentrated management risk. If something goes wrong with Hanna Bouveng, we are losing [the] entire management team." (Id. at 825) Moreover, Roger Li told Wey that "Hanna Bouveng would not be qualified for the job" of marketing director at Nordica Life. (Id. at 826)

Wey told Li that he would "reach out to [his] colleague and general counsel[ – James Baxter – and ask him] to spend a few days with Ms. Bouveng in the office, provide some

training and arrive at somewhat of an assessment [of] how much time it [would] take for Ms. Bouveng to learn before the March 31, 2014 closing date . . . to reach some level of understanding of her professional qualifications in understanding the financial products." (Id. at 826-27)

In mid to late February 2014 – at Wey's direction – Baxter presented a four-day "intensive training course" on financial products to Bouveng, in an effort to prepare her to serve as Nordica Life's marketing director. (Trial Tr. (Dkt. No. 232) at 557-58; Trial Tr. (Dkt. No. 236) at 828; Trial Tr. (Dkt. No. 294) at 966-67, 1094-95; Trial Tr. (Dkt. No. 240) at 1263-64) Plaintiff's education and prior employment had not involved the financial products Baxter discussed. (Trial Tr. (Dkt. No. 294) at 967) Baxter testified that, "during the week we spent together . . . [Plaintiff] said she was worried she was going to get fired." (Trial Tr. (Dkt. No. 242) at 1442) Baxter understood Plaintiff's expressions of concern "to mean that she felt that it was obvious she . . . didn't know the material and wasn't learning." (Id.)

In a February 23, 2014 email, however, Wey told Nils Sundqvist – Plaintiff's father – that the intensive training course had been a success:

> I would like to tell you that I am very pleased with the progress that Hanna made last week in her intensive training program. It was not easy and I believe she did an excellent job learning the complex finance industry. . . . It was a training success and we learned great things about Hanna.

(PX 15 at 1)[11]

---

[11] Wey testified that he sent this email before he spoke to Baxter about Bouveng's performance during the training. When Wey spoke to Baxter the next day, he told Wey that "Hanna did a terrible job." (Trial Tr. (Dkt. No. 232) at 562; Trial Tr. (Dkt. No. 236) at 831) Wey testified that, at this point, he became concerned about whether Bouveng would be able to serve as Nordica Life's marketing director. (Trial Tr. (Dkt. No. 232) at 563) Wey did not communicate to anyone that Plaintiff was "no longer going to be head of the marketing division" at Nordica Life, however. (Id.)

Although Wey claims that Baxter told him on February 24, 2014, that Bouveng did a "terrible job" during the training, in late February or early March 2014, Wey put Plaintiff in charge of a Nordica Life re-branding project. (Trial Tr. (Dkt. No. 232) at 566-67) Wey also sent Plaintiff to Europe in late March 2014 to discuss the Nordica Life deal with two Swedish law firms and a marketing company. (Id. at 564-65; see also PX 20) Plaintiff gave a presentation to these firms concerning the ideas she and Wey had for Nordica Life. (Trial Tr. (Dkt. No. 294) at 969-70)

**K. Evidence Concerning Plaintiff's Job Performance**

Wey testified that Bouveng did a "great job" at work during October, November, and December of 2013. (Trial Tr. (Dkt. No. 232) at 534, 541) On January 1, 2014, Plaintiff received a written evaluation from NYGG, which was provided at the request of her visa sponsor firm. (Id. at 541; PX 8) The evaluation states that Plaintiff "[a]rrives promptly each day and keeps an appropriate demeanor"; has "[e]xcellent professional relations with both [co-workers and clients]"; "[w]orks hard in team environment and impresses clients with her understanding and articulate presentations"; and "[c]ompletes assigned work promptly and produces work with few areas which can be improved with supervision." (PX 8)

Wey testified that Bouveng's work performance began to decline during the last week of February 2014, however, and he observed a change in her behavior at work. (Trial Tr. (Dkt. No. 232) at 546, 553; Trial Tr. (Dkt. No. 236) at 837) Bouveng "was regularly late for work," and when he "ask[ed] her why [she was] always late she gave [him the] same answer, breakfast line was too long." (Trial Tr. (Dkt. No. 236) at 837) Wey also testified that "[h]er behavior in the office became somewhat . . . strange, erratic." (Id. at 838) For example, Wey "noticed that the lights in her office were always off, her head was often on the desk, and she had

droopy eyes. She was tired all the time[.]" (Id.) Wey "felt like she . . . just didn't care about her work anymore." (Id.)

In late March or early April 2014, Wey realized that Bouveng had missed the deadline for submitting an application for an H-1B visa, which is a work visa that would have allowed Plaintiff to stay in the United States for at least four years.[12] (Id. at 835-36) Wey testified that he had hired an immigration law firm to help Plaintiff obtain an H-1B visa, and that NYGG had paid $7,000 in legal fees associated with that work. (Id. at 834-35) Wey testified that because Plaintiff had missed the H-1B visa application deadline, she would have to wait an entire year to re-apply. (Id. at 836) Wey testified that this had a "major impact" on his decisions with respect to her employment, because "when her . . . internship visa [ran] out in February 2015, [NYGG] would lose her." (Id. at 836-37) Wey also testified, however, that as of March 2014, he still wanted Bouveng to obtain the H-1B visa, despite her alleged strange and erratic behavior. (Id. at 880)

In early to mid-April 2014, Wey sent Plaintiff to a brokerage firm – Cambridge Alliance Capital – so "that she could do some on the ground training starting from the very basic brokers' industry." (Id. at 832) At Cambridge, Plaintiff was given a Series 7 book to read, and she was instructed to cold-call people to ask if they would be interested in buying stocks or bonds. (Trial Tr. (Dkt. No. 294) at 977)

In an April 15, 2014 email to Plaintiff's father, Wey states that, "[f]or Hanna, the real issue is both [an] economic and lifestyle choice: She is young and she likes to have fun as a priority in her life. . . . I have recently asked some Wall Street friends of mine to do [Plaintiff] a

[12] Bouveng testified that she did not submit the H-1B visa application because she "did not want to work for Mr. Wey." (Trial Tr. (Dkt. No. 294) at 967)

big favor: Train Hanna from the ground up, and learn the first step of entry to Wall Street as a hard working marketing professional. . . . This is our last try." (PX 22 at 4-5)

**L. Plaintiff's Termination**

On April 21, 2014, Wey called Bouveng to a meeting at NYGG's offices. (Trial Tr. (Dkt. No. 294) at 978) At trial, Bouveng described the meeting as follows:

> It was a long meeting. And he was talking a lot. And he was talking about [how] he always wanted to see me. He always wanted to spend time with me. He wanted to have sex with me. He wanted to hug me. He wanted to kiss me. And he said that he's driven by passion. And if there is no passion then there's nothing there for him. He was talking a lot about – that I should stick close to him. And . . . he was saying that I don't have any friends. They don't like me. Or even if they do, they're not going to be able to be there for me anyway because they don't have resources. And he has resources because he's the top dog on Wall Street. And he was kind of saying that if I didn't start to spend more time with him he would have to start to look for someone else. In the beginning of the conversation he said that . . . I had until December 1 to change my mind. And then at the end of the conversation he said . . . that if I don't show him tangible love he's kicking me out by August 1. . . . [T]hroughout the entire conversation I didn't say much because he was doing a lot of talking. And then in the end of the conversation he just said you should think about it. And then we just said bye.

(Id. at 978-79)

On the morning of April 22, 2014, Wey went to Plaintiff's apartment. After his knocks on the door were not answered, Wey used a key to gain entry to the apartment. (Trial Tr. (Dkt. No. 240) at 1227-28) Inside Bouveng's bedroom, Wey found her African-American friend James Chauvet, with whom Bouveng had been at a nightclub the night before.[13] (Id. at 1226-28; see also Trial Tr. (Dkt. No. 232) at 489) Wey demanded Chauvet's name, social security number, and telephone number, and an explanation of what he was doing at the apartment. (Trial Tr. (Dkt. No. 232) at 517-18; see also Trial Tr. (Dkt. No. 240) at 1228) Chauvet explained

[13] As early as February 2014, Wey had obtained background information concerning Chauvet, including his photograph. (Trial Tr. (Dkt. No. 232) at 513-14)

that he was a friend of Bouveng. (Trial Tr. (Dkt. No. 240) at 1228) Wey asked, "did you fuck her?" (Id.) Wey told Chauvet that he was "going to call the cops and when I get back you better be gone." (Id.) Wey then left the apartment.[14] (Id.)

Wey went from Bouveng's apartment to the offices of Cambridge Alliance Capital, where Bouveng was receiving training. "[O]ne of the partners told [her] that [she] should go downstairs because Mr. Wey [was] waiting for [her]." (Trial Tr. (Dkt. No. 294) at 979) Plaintiff went downstairs to meet Wey, who asked her if she "had fun yesterday." (Id.) Wey said

> that he was just in my apartment. And I said well then you must have met my friend James. And then he screamed – he screamed ["]you fucking bitch. I'm gonna revoke your visa today. I want you out of the apartment today. You're no longer hired by New York Global Group.["]

(Id. at 979-80) Wey and Bouveng then walked to her apartment, where Wey told Bouveng "that [she] should pack [her] things." (Id. at 980) Wey told Bouveng, "I want you out now and I'm going to be []here until you are out." (Id.) Plaintiff's friend Chemme Koluman came to the apartment to help Bouveng pack; Wey told Koluman that "he felt betrayed." (Id. at 980-81) Bouveng packed her bags and brought them to the hallway outside her apartment. Wey then

---

[14] That same day, Wey sent the following email to Bouveng and her father:

> I got a call from [Plaintiff's] apartment building manager today. It was concerned someone may have broken into her apartment. Since I was the guarantor of the apartment, my assistance was needed. After we got into her apartment around 11 am today, the building manager and I saw a six-foot tall, homeless black man named "James" lying on her bed. The man was totally naked, dirty, totally drunk and perhaps on illegal drugs. It was suspected this man was an intruder. We were going to call the police to have him arrested. The fact is that the man was a "friend" of Hanna's and he was invited by Hanna to spend the night with her in her apartment, after a 2 am party last night at [a] night club . . . in New York City.

(PX 24)

"slammed the door in [her] face," "scream[ing] that [she] can go and tell that black guy James to go and fuck himself." (Id. at 982)

After Bouveng was fired and thrown out of her apartment, she "thought that everything was going to be over and that . . . [she] wouldn't have to deal with this man in [her] life ever again." (Id. at 984) After April 22, 2014, Bouveng never called, emailed, texted, or attempted to communicate with Wey in any fashion. (Id.)

## M. Wey's Post-Termination Communications With Bouveng

In the days and weeks following Bouveng's termination, Wey sent a number of emails to her family and friends, telling them that he had found a "naked, dirty, totally drunk" "homeless black man" in Bouveng's bed, and that she "par[ties] like crazy," is not "hanging out with the right people," and leads a "double life." (See, e.g., PX 24 (email to Plaintiff's father); PX 38 (email to Plaintiff's brother); PX 41 (email to Plaintiff's aunt, Helena Bouveng)) Wey attached to these emails photographs of Chauvet, Koluman, and Plaintiff at night clubs. (See, e.g., PX 36 (email to Plaintiff's father and aunt, Helena Bouveng)) Wey testified that he sent these emails and photographs to Plaintiff's family in order to inform them "about the reasons behind the termination." (Trial Tr. (Dkt. No. 232) at 596)

At trial, Plaintiff described her reaction to Wey's emails as follows:

> Q. . . . How did you feel that Mr. Wey was sending these e-mails to your father?
>
> A. It was embarrassing. And then I thought it was scary because I couldn't understand why Mr. Wey would send my father e-mails. And I could not understand the content of the e-mails that he is sending to my father.
>
> . . . .
>
> Q. Did you ever discuss with your father how he felt getting these e-mails?
>
> A. Yes.

Q. And how did those discussions with your father make you feel?

A. It stressed me out because – the impact and the effect it had on my father, who was in Vetlanda, in Sweden. It affected me a lot and it got me really upset, stressed, scared that he would keep on contacting him.

. . . .

Q. How do you feel that this letter, this e-mail was sent to your dad?

A. Embarrassing. Trying to humiliate me in front of my family. I felt that he's trying to make me look bad in front of everyone I know in order to isolate me. At it – it freaks you out when a person of his rank – he is the CEO . . . of a Wall Street company in private equity. And he would write to my father about my boyfriend and about sex and about alcohol. And it's just bizarre.

(Trial Tr. (Dkt. No. 294) at 985-86, 989)

On April 27 or 28, 2014, while Plaintiff was with her friends and former co-workers Yonatan Weiss and Alicia Lu, Plaintiff received a phone call from Wey. Weiss recorded the call on his cell phone. (Trial Tr. (Dkt. No. 228) at 272-73; Trial Tr. (Dkt. No. 240) at 1144) During the call, Wey pleaded with Bouveng to meet him for dinner or coffee, because he "really want[ed] to say something to [her]." (PX 105 at 1) Wey told Plaintiff that he had been investigating Chauvet and had videos of Chauvet going into Plaintiff's apartment as early as February 2014. (Id.) The phone conversation included the following:

Bouveng: [L]ast time we spoke you said if, if, if it's not any tangible love or if I can't give you time, then I, I'm done by first of August.

Wey: Hanna, you have been . . . cheating on me since the end of February. We have those videos. The first day was February 28.

Bouveng: Cheating? . . . what do you mean by cheating? . . .

Wey: Hanna, . . . I'm not answering. We're talking over telephone. All I wanna tell you, I reviewed the video since the end of February. . . .

(Id. at 4-5)[15]

Wey testified that he wanted to meet with Plaintiff to discuss Chauvet's criminal record.[16] (Trial Tr. (Dkt. No. 236) at 851) Wey also wanted to have a "more formal termination of the employment relationship because . . . [he] realized [he] had terminated [Bouveng] too abruptly without careful thinking and put her in a bad position." (Id.)

### N. Plaintiff's Counsel's Communications to Wey and the Filing of This Lawsuit

On April 29, 2014, Plaintiff's counsel – David Ratner of the law firm Morelli Alters Ratner – emailed the following letter to Wey:

> We represent Hanna Bouveng. We are writing to you in the hope that you understand the seriousness of the situation in which you now find yourself. We suggest that you have your lawyer contact us immediately in order to resolve this situation before we are forced to commence what is likely to be embarrassing litigation. Also, be warned, that if you take any further retaliatory action against our client such as contacting Ms. Bouveng and/or her family and/or her friends and/or her associates on the telephone or in person, we will file suit at once along with the concrete irrefutable evidence in our possession. We are also investigating whether your actions to date rise to the level of criminal misconduct that would require law enforcement intervention. If we do not hear from your lawyer by May 6, 2014, we will file anyway. Suit yourself.

(DX X)

Wey testified at trial that he regarded this letter as "an attempt to extort money from [him] by falsely claiming that [he] forced Ms. Bouveng to have sex with [him]." (Trial Tr.

---

[15] Lu testified that Bouveng had told her that Wey had told Bouveng that she would be "out by August 1" if she didn't give Wey "tangible love." (Trial Tr. (Dkt. No. 228) at 199) At trial, Wey denied ever making such a threat to Bouveng. (Trial Tr. (Dkt. No. 234) at 615) For purposes of its review under Fed. R. Civ. P. 59, the Court finds Bouveng's account more credible.

[16] Chauvet testified that he has two misdemeanor convictions for possession of a weapon and possession of controlled substances. (Trial Tr. (Dkt. No. 240) at 1221)

(Dkt. No. 232) at 480) Wey also interpreted the letter as a "threat[] to file some sort of a false allegation relating to Hanna Bouveng with law enforcement." (Trial Tr. (Dkt. No. 234) at 720)

On May 7, 2014, Ratner sent the following email to Wey:

> We . . . told you to stop harassing Ms. Bouveng, her family and her friends. Further, we told you that if you failed to contact us by May 6, 2014, we would take steps to enforce Ms. Bouveng's legal rights. You have failed to do as you were told. Accordingly, attached is the legal complaint we intend to file on Ms. Bouveng's behalf on Friday May 9. You have one more chance to avoid what surely will be expensive and embarrassing litigation for you, your company and your family. In addition, if you continue to contact Ms. Bouveng, her family or her friends in any manner whatsoever, she will take steps to obtain an order of protection and restraining order.

(DX Y1) Attached to the email was a draft complaint alleging, inter alia, that Wey "forced Plaintiff to have sexual intercourse with him" – while she was intoxicated – on approximately four occasions. (DX Y3, ¶¶ 59, 62) Wey testified that, based on this email and the draft complaint, he concluded that Bouveng and her counsel were "threaten[ing] to file a false charge of rape with [] law enforcement if I did not pay them money. . . ." (Trial Tr. (Dkt. No. 234) at 724)

Plaintiff testified that her J-1 visa expired when her employment with NYGG ended, and that she left the United States within 30 days of its expiration – i.e., by May 22, 2014. (Trial Tr. (Dkt. No. 294) at 1043-44) She also testified that she never told Wey or anyone else at NYGG or FNL Media that she had left the country. (Id.)

On May 22 and 24, 2014, however, Wey sent a number of Facebook messages to Camilla Blomqvist, Plaintiff's best friend in Sweden, indicating that he knew that Bouveng had returned to Sweden. (Trial Tr. (Dkt. No. 234) at 653-55; PX 103 at 4) On May 22, 2014, he wrote: "Hanna is back to Vetlanda Sweden. Left yesterday." (PX 103 at 4) On May 24, 2014, he wrote:

> Camilla, you should know that Hanna wants to get some money out of us through the threat of a lawsuit. . . . If she sues us, we will have to counter sue her – seeking millions of dollars in damage from her and her family for hurting our reputation. We will have to publish ALL of her relationships and photos with drug dealers, both in articles and in our counter lawsuit against her. All of her family and friends will be dragged in. . . . You should tell her that we have NO interest in her. We do not plan to publish any articles about her. . . . If she sues us, we will NOT give her a penny, and we will spend millions of dollars going after her forever.

(Id.) Wey also stated: "If Hanna Bouveng would like to have a 'fight,' welcome. Is she ready to have her entire family and friends involved in a counter suit against her seeking millions in damage against her brother, father, mother, aunt, uncle, friends, boyfriends. . . ." (Id. at 4-5)

Plaintiff filed the Complaint in this action on July 21, 2014. (Dkt. No. 1) The next morning, cameramen confronted Wey outside his apartment building, and the New York Post published an article concerning Bouveng's allegations in the Complaint. (Trial Tr. (Dkt. No. 234) at 725-26; Trial Tr. (Dkt. No. 236) at 867; Trial Tr. (Dkt. No. 242) at 1359; Court Ex. 2 (Stipulation))

**O. Articles About Bouveng in The Blot Magazine**

At trial, redacted versions of six articles from The Blot Magazine – the online publication owned by FNL Media and published by Wey – were received into evidence. (PX 61, 63, 64, 85, 87, 98) The parties stipulated that "[s]ome or all of the statements contained within [these articles] appeared . . . online at TheBlot.com on virtually a daily basis from late July 2014 until early June 2015, other than during the period August 28, 2014 to October 3, 2014." (Court Ex. 2 (Stipulation))

The first Blot article is entitled "BURNED: Swedish Party Girl Hanna Bouveng Swims in Criminal Hot Water." (PX 61) The author is listed as "Sam Patterson," which is a

pseudonym used by Wey and others at The Blot Magazine. (Trial Tr. (Dkt. No. 234) at 674)

The article contains the following statements, among others:

> **The pimp and the sex slave? Meet criminal James Chauvet . . . and party girl Hanna Bouveng**
>
> Of the many young Swedish women aspiring to be the next Lindsay Lohan . . . , a party girl named Hanna Bouveng . . . stood out from the crowd vying for the attention of drug dealers and male patrons ready to pay for some "special services" at a price.
>
> . . . .
>
> **Extortion artists, a failed $10 million extortion attempt on a Wall Street financier Benjamin Wey** . . .
>
> In July 2014, in a mafia style, Hanna Bouveng . . . blackmailed a famous investigative reporter and Wall Street Financier, Benjamin Wey. . . . The failed $10 million extortion attempt on Wey was orchestrated by a notorious Morelli Alters Ratner . . . law firm, which apparently used the alcoholic Hanna Bouveng . . . as free advertising.
>
> . . . .
>
> **Crimes and prostitution, the criminal James Chauvet . . . and Hanna Bouveng. . . .**
>
> Behind the flashy neon lights and loud rap music in New York's nightclubs are often problems of prostitution, illegal drug use, illegal gun possessions and shattered dreams of naïve Swedish women visiting New York – many of whom are looking for "sugar daddies" for some "good times," sources say. **So long as the money is paid, the alcoholic Swedish girls like Hanna Bouveng . . . may just jump on the donkeys.** According to the Federal Bureau of Investigation . . . , James Chauvet was twice arrested and convicted of cocaine dealing and illegal gun possession. . . .
>
> . . . .
>
> **Hanna Bouveng . . . , prostitution and massage parlors?**
>
> [Hanna Bouveng's] aunt is Helena Bouveng . . . , a junior member of the Swedish Parliament for the Vetlanda region. Readers may wonder to what extent the Hanna Bouveng . . . affilitation with cocaine dealers may affect Helena Bouveng['s] . . . already tough re-election campaign.

(PX 61) (emphasis in original)). The article includes photographs of Plaintiff, Chauvet, Koluman, and Helena Bouveng. (Id.)

The second Blot article is entitled "HANNA BOUVENG, Fake Sexual Harassment Accuser Fled America, BREAKING NEWS," and the author is listed as "Sam Patterson." (PX 63) This article contains the following statements, among others:

> **Hanna Bouveng . . . is on the run. After blackmailing an investigative journalist and Wall Street financier Benjamin Wey . . . with a failed $10 million extortion plot,** frivolous sexual harassment accuser Hanna Bouveng . . . caught on the run fleeing America. . . .
> The timing of Hanna Bouveng['s] sudden departure from America is highly suspicious. Legal experts say that the sudden departure of the Swedish "street walker" and "vixen" Hanna Bouv[en]g . . . from the United States may have a lot to do with her lawyers David Ratner and Martha McBrayer at the . . . law firm Morelli Alters Ratner . . . , acting in concert to evade legal consequences, after she lied in a sworn affidavit submitted to the New York federal court on the same day when she fled America.
>
> . . . .
>
> **Immediate arrest? The Hanna Bouveng visa fraud: The People of United States Vs. fraudster Hanna Bouveng?**
>
> Sources told the investigators led by a former NYPD police detective that Hanna Bouveng was in the United States on illegal visa status. It's almost certain that she could be arrested by the U.S. government agents upon re[-en]try into the United States. . . . [A] State Department official confirmed the Hanna Bouveng's status would be a serious visa violation subject[ing] her to immediate arrest and deportation.

(PX 63) (emphasis in original)) The article includes several images, including a photograph of Plaintiff and Chauvet with the word "BUSTED" printed next to it in large, brightly colored block letters. (Id. at 1)

The third Blot article is entitled "Wall Street Financier Fights Back at 'Fugitive' Hanna Bouveng," and the author is listed as "John Sterling." (PX 64) This article contains the following statements, among others:

> **Meet Hanna Bouveng . . . , "sexual harassment" accuser fled America, a "fugitive" hiding in Sweden. . . .**
>
> **Hanna Bouveng, "Sexual harassment" accuser without evidence**
>
> According [to] the U.S. State Department, a visitor terminated for visa violations may be barred from entering the United States for as many as 10 years. If [she] entered the U.S. illegally, Hanna Bouveng may be subject to immediate arrest and deportation. . . .
>
> **"Sexual harassment" sponsored by drug dealers, Hanna Bouveng's failed $10 million extortion attempt**. . . .

(PX 64 (emphasis in original)) The article also contains several images, including a photograph of Plaintiff and Chauvet with the caption: "Criminal pimp James Chauvet and his girl Hanna Bouveng." (Id. at 5)

The fourth Blot article is entitled "HANNA BOUVENG, CAUGHT WITH COCAINE AND GUN CRIMINAL, KICKED OUT OF AMERICA, SWEDISH SHAME," and the author is listed as "Sam Patterson." (PX 85) This article contains the following statements, among others:

> Hanna Bouveng, a Swedish party girl from Vetlanda, Sweden caught with entanglement with a twice arrested and convicted cocaine and gun criminal club promoter, boyfriend James Chauvet is on the run and has fled America, after blackmailing an American in a mafia-styled shakedown. Helena Bouveng, the Swedish fugitive Hanna Bouveng's aunt[,] has declined to comment on Hanna Bouveng's failed US$10 million extortion plot on an American journalist and finance executive.
>
> . . . .
>
> A bizarre twist in the Swedish party girl Hanna Bouveng's frivolous "sexual harassment" claim against a well respected Wall Street financier and investigative reporter Benjamin Wey, new development has just emerged: like a burglar stealing under the cover of dark clouds, the accuser of "sexual harassment", the chain smoker and party girl Hanna Bouveng fled America on July 25, 2014 and rushed back to her hometown of Vetlanda, Sweden.
>
> . . . .

> "Hanna Bouveng was terminated for alcohol abuse, hangover at work and her associates with a twice convicted drug and gun criminal James Chauvet, according to the FBI's investigative report on James Chauvet. We terminated Hanna Bouveng's short 6 month internship with us and so did her independent visa sponsor firm, after their own investigations into Hanna Bouveng's activities," said a New York Global Group executive.

(PX 85)

The fifth Blot article is entitled "NYPD ARREST RECORD, NIGHT CLUB PROMOTER JAMES CHAUVET, EXTORTIONIST HANNA BOUVENG SWIMS IN CRIMINAL HOT WATER," and the author is listed as "Sam Patterson." (PX 87) This article contains the following statements, among others:

> *Editor's Note: James Chauvet's extensive criminal records were verified by the NYPD and the FBI. . . .*
>
> **PARTY GIRL HANNA BOUVENG, FROM NEW YORK TO A WAITRESS IN A COFFEE SHOP, CAFÉ LINNE STOCKHOLM, SWEDEN . . . .**
>
> In early 2014, Hanna Bouveng worked as an intern at a prominent New York company on Wall Street before she was fired in April 2014 for associations with convicted cocaine criminals, alcohol abuse, lies and fraud. According to various media reports, Hanna Bouveng attempted and failed to extort more than $10 million out of her former employer.
>
> . . . .
>
> Before the Swedish party girl Hanna Bouveng's termination by an American company, Hanna Bouveng defrauded JP Morgan Chase bank in New York by writing bad checks without any money in her bank account. . . .

(PX 87 at 6, 8 (emphasis in original))

This article contains a number of images, many of which are collages of photographs with words superimposed. One of these images – a photograph of Plaintiff and Chauvet – has the words "Cocaine Dealer James Chauvet" and "Café Linne Waitress Hanna Bouveng" superimposed on it. (Id. at 3) Another image – a photograph of Plaintiff with

Chemme Koluman's brothers, who operate Café Linne – includes the street address of Café Linne in Stockholm. (Id. at 5)  Another image contains a collage of photographs of Plaintiff, Chauvet, and Helena Bouveng, and includes the words "Extortionist Hanna Bouveng," "Felon James Chauvet, Drug Dealer, Gun Criminal, Got Caught," and "FRAUD!  Helena Bouveng." (Id. at 11)  This article also includes a photograph of Plaintiff and Chauvet with the words "FBI: LOVE IN COCAINE. . ." and "BUSTED!  NYPD Criminal James Chauvet[,] Party Girl Hanna Bouveng" superimposed. (Id. at 14)  Another image superimposes a photograph of Plaintiff and Chauvet on top of a photograph of a white powdery substance on a tabletop, with the caption "BUSTED." (Id. at 19)

The last Blot article received in evidence – also authored by "Sam Patterson" – contains the following statements, among others:

> According to the FBI and the New York Police Department, Hanna Bouveng was deeply implicated in the James Cha[uv]et criminal acts:  FBI criminal record James Chauvet, Hanna Bouveng, cocaine dealing, gun criminal, prisoner
>
> . . .
>
> Since being fired from an internship in New York, the Swedish party girl and cocaine dealer's honey Hanna Bouveng has attempted to extort US$1 billion out of an American financier and investigative journalist – Benjamin Wey.
>
> . . .
>
> **VISA FRAUD AGAINST HANNA BOUVENG:  THE PEOPLE OF THE UNITED STATES V. FRAUDSTER HANNA BOUVENG?**
>
> Sources told the investigators led by a former police detective that Hanna Bouveng was in the United States on illegal visa status.  It's almost certain that she could be arrested by the U.S. government agents upon reentry into the United States. . . .

(PX 98 at 3, 4, 28-29 (emphasis in original)) This article also contains a number of images discussed above, as well as a photograph of Plaintiff with the word "FUGITIVE" and an image of a gavel superimposed. (Id. at 3)

At trial, the parties stipulated that Defendants

> caused comments to be added to some or all of the articles on TheBlot.com regarding Plaintiff which a) appeared under the names of people associated with Plaintiff such as her attorneys, friends or family, or under the names of well-known people and b) were not actually authored by the listed people. . . . [These] comments . . . were caused to be added to the articles about Plaintiff in an attempt to have links to the articles appear as high as possible in the list of search results from a search engine.

(Court Ex. 1 (Stipulation))

Defendants' use of such "search engine optimization" techniques (see Trial Tr. (Dkt. No. 228) at 153, 194) ensured that Blot articles would appear high up on the list of search results when a subject of those articles was searched online. Indeed, "[f]rom Summer 2014 until June 2015, if a user entered the name 'Hanna Bouveng' into Google.com, page one search results would yield links to articles on TheBlot.com containing stories about Plaintiff. . . ." (Court Ex. 2 (Stipulation), ¶ 3)

The statements contained in the six Blot articles received in evidence – and all statements substantially similar to them – were removed from TheBlot.com in early June 2015, shortly before trial commenced on June 15, 2015. (Id., ¶ 1)

At trial, Plaintiff testified at length about the emotional distress she suffered as a result of these online articles:

> Q. How did it make you feel to be called a sex slave to a pimp?
>
> A. Well, not good. It made me feel humiliated and it made me feel – like I didn't know . . . how I was going to react to this because I couldn't understand it. And it made me feel embarrassed. If I would apply for a job . . . my future employers would see this and what would they think about me[,] and people believe this.
>
> . . . .

[I felt] embarrassed and [it was] just kind of creepy and scary that anyone – that he – that Mr. Wey would write this. And it also made me angry . . . [that] he just gets to continue to try to break me down or destroy my life.

Q. [One of the articles] mentions that you are from the small town of Vetlanda. How did you feel that your home town was being published in this online magazine?

A. Embarrassed, and I felt that Mr. Wey was really trying to come after me. He is trying to write about Vetlanda. In Vetlanda everyone knows everyone and everyone talks. It wouldn't be pleasant for me to go there because even though how absurd this article is, it . . . portrays me like I'm some kind of prostitute and it made me feel like I can't go there. It doesn't make any sense that my former boss, he fired me and he keeps on writing this about me. It doesn't make any sense, what's going on here. It would be just too embarrassing to try to explain everything.

. . . .

Q. . . . How did it make you feel that your aunt was now being mentioned in The Blot article?

A. Not good. I mean, of course, this is not something [] for a parliament member to be a part of and I just felt that . . . he is trying to make her look bad and it's all because of me. He is trying to write about her, that she is some kind of cocaine dealer because of me. She didn't have anything to do with me. I don't have anything to do with cocaine dealing. Again, this is scary that one would go through th[ese] measures to do this.

Q. Has your relationship with your aunt changed at all since the publication of The Blot articles?

A. Yes.

Q. Tell us about that.

A. Well, we don't talk as much as before, and she didn't want to be involved. And she always calls me on my birthday. But she didn't do that this year, or last year.

. . . .

Q. . . . How did it make you feel that The Blot was now publishing where you worked[, at Café Linne]?

A. Not good. And it felt like an intent to destroy whatever I would do. I can't even serve coffee and he has to mention that name and try to drag it in all of his lies and everything.

. . . .

Q. How do you feel about the address of where you are working being published on the Internet?

A. I felt that he – I started to become paranoid. He is writing out . . . the address, where I work. It made me feel that I'm being watched, that he has someone watching. . . .

. . . .

Q. How do you feel your life has changed as a result of Mr. Wey's communications with your friends and family and the articles that are published on The Blot?

A. I lost a lot of friends and people don't want to be around me anymore. I really don't want to go out and see people either. I don't want to meet people. I don't want to post stuff or anything because I feel I will get abused and I feel bad. He is stalking me. So whatever I do, if I post it, I'm here at this café, he will know where I am. . . . I have applied for jobs, but I don't feel as confident as I did before. . . . [I]t's been a tough year.

(Trial Tr. (Dkt. No. 294) at 1018-23, 1025-26)

**P. Wey's August 2014 Trip to Sweden**

After moving back to Sweden, Bouveng was hired to work as a waitress at Café Linne, the Stockholm coffee shop owned by her friend Chemme Koluman's family. (Id. at 1016) Plaintiff testified that she did not want to return to Vetlanda, because she "knew that Mr. Wey knew where [she] come[s] from, and he knew where [she] was, and [she] was scared that he was going to come there or that he was going to have someone following [her] there." (Id.) As of the time of trial, Plaintiff still worked as a waitress at Café Linne. (Id.)

In August 2014, while Plaintiff was working at Café Linne, Wey appeared in the restaurant. Plaintiff had been standing with her "back towards the entrance," and then she "turned around and there [Wey] was, and he just said, [']wow,['] and . . . my entire stomach just froze. I panicked." (Id. at 1016-17) Plaintiff called the police, who came to the café and then escorted Plaintiff home. (Id. at 1017-18) The police also "gave [Plaintiff] an alarm phone." (Id.

at 1018) If Plaintiff presses a button on the phone, "the nearest police car will . . . get where [her] location is, and they will also be able to hear everything." (Trial Tr. (Dkt. No. 240) at 1197-98)

Wey testified that he traveled to Sweden in August 2014 "to attend [events associated with] the 375th anniversary of the Bronx." (Trial Tr. (Dkt. No. 236) at 857) Wey was invited to attend by the Bronx Chamber of Commerce. (Id.) Wey explained that he was in Stockholm for a boat tour with three friends, and that after the tour they stopped for lunch at Café Linne. (Id. at 859) Wey testified that he had "[n]o idea" that Plaintiff had returned to Sweden (Trial Tr. (Dkt. No. 234) at 654), and that he had not travelled to Sweden in August of 2014 with the intention of finding Bouveng. (Trial Tr. (Dkt. No. 236) at 860)

**Q. Expert Testimony Concerning Bouveng's Mental State**

Plaintiff offered no expert testimony at trial concerning her mental health or emotional state, or the emotional distress she had suffered as a result of Defendants' actions.

Defendants called Dr. Barbara Ziv – a psychiatrist – to offer an opinion as to whether Plaintiff had suffered any emotional injury as a result of Defendants' conduct. (Trial Tr. (Dkt. No. 228) at 208-11) Ziv interviewed Bouveng and administered the Minnesota Multiphasic Personality Inventory ("MMPI") test to her. (Id. at 211) The MMPI "assesses whether [the subject is suffering from a] psychiatric illness, [as well as the individual's] interpersonal functioning, their interpersonal style, their degree of openness, [and] symptomatology." (Id. at 211-12)

During Ziv's interview of Plaintiff, Bouveng did not "describe any psychiatric or psychological or emotional behaviors." (Id. at 224) Plaintiff did not report that she was depressed, had nightmares, had lost weight, or that she had not been able to apply for jobs. (Id.

at 230) "[S]he did not describe any emotional distress[;] [s]he didn't describe that she was depressed . . . [,] anxious[, or] . . . unhappy[;] [s]he didn't describe really any psychiatric or emotional symptoms." (Id. at 212) Moreover, nothing in what Bouveng told Ziv suggested that she suffered from "depression, anxiety, [or] phobias" as a result of Defendants' conduct. (Id.) The results of the MMPI were "consistent" with the interview, in that neither the interview nor the test results indicated that Plaintiff was suffering from psychiatric problems. (Id. at 224) Ziv concluded "that [Bouveng] had no psychiatric problems." (Id.)

Ziv testified that – before the events that give rise to this case – Plaintiff "had a good understanding of herself[,] . . . of what her desires were, [and] of how she wanted to proceed with her life." (Id. at 222) Ziv noted that – throughout her life – Bouveng has always been "self-directed [and] self-motivated," and has pursued her "vision," whether that involved studying in Hong Kong, obtaining multiple jobs in Oslo, or moving to New York (id. at 222-23):

> She knows what she wants. She knows how to pursue it. She's been very independent from a very early age and has navigated in a pretty complex world[]. Going to Hong Kong, going to Norway, coming to the United States. And she does this all on her own . . . . I found her to be a strong, independent, resourceful, resilient individual.

(Id. at 223)

On the basis of her interview of Plaintiff in April 2015 and the results of the MMPI test, Ziv concluded that Plaintiff "was functioning as she had prior to coming to New York," and "was functioning as she had her entire life." (Id. at 224) Ziv opined that "if you looked at her now versus looking at her two years ago[,] essentially you're seeing the same person." (Id.)

Although Plaintiff told Ziv that she felt paranoid because Wey had investigators following her, and that Wey "created a really big scar in [her] life [that she is] still working

with," Ziv concluded that Plaintiff had "moved on with her life," and that her emotional distress had not continued "in an ongoing way." (Id. at 231, 243)

Ziv found that Plaintiff was not suffering from even "subclinical" conditions, which are not "psychiatric conditions per se, but . . . conditions that are . . . just troubles. . . ." (Id. at 227) Instead, Plaintiff was "upset [] the way that people get upset . . . [or] disappointed . . . when something bad happens. It doesn't rise to the level of clinical concern." (Id. at 239) Ziv noted that Plaintiff had seen a therapist only once – in March 2015 – and that Plaintiff's failure to seek other counseling "is consistent with [Ziv's] finding that [Plaintiff doesn't] have [psychiatric] problems." (Id. at 224)

With respect to The Blot articles, Ziv testified that Plaintiff was upset that the lead results of Google searches concerning her name were headlines and images from Blot articles. (Id. at 251-53) Ziv testified that Plaintiff "was upset about being called a prostitute or a drug user," and about "the [online] presence of these articles. . . . [S]he was upset that . . . [Wey] seemed like the dog with the bone, like he wouldn't let go." (Id. at 253) Ziv further testified that although Plaintiff "was upset when [the Blot articles] were first posted," she "is relieved that [they are] no longer on the internet." (Id. at 253, 255)

## DISCUSSION

## I.   DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL AS TO LIABILITY

### A.   Legal Standards

Defendants have moved for judgment as a matter of law on Plaintiff's (1) quid pro quo sexual harassment claims under the NYSHRL and the NYCHRL; (2) retaliation claims under the NYSHRL and the NYCHRL; and (3) defamation claim. (Def. Br. (Dkt. No. 256) at 14-43)

The standard for granting judgment as a matter of law under Fed. R. Civ. P. 50 is "well established":

> Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor. In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. Thus, judgment as a matter of law should not be granted unless
>
> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant].

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (internal citations omitted); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133-34 (2d Cir. 2008) (same). The Second Circuit has noted that a party moving for judgment as a matter of law "faces a high bar." Lavin-McEleney v. Marist Coll., 239 F.3d 476, 479 (2d Cir. 2001).

Defendants' motion for a new trial on liability under Fed. R. Civ. P. 59(a)(1)(A) is subject to a

> less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) "may be granted even if there is substantial evidence supporting the jury's verdict," and (2) "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner," DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133–34 (2d Cir. 1998). That being said, for a district court to order a new trial under Rule 59(a), it must conclude that "'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice,'" i.e., it must view the jury's verdict as "against the weight of the evidence." Id. at 133 (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992) (internal citations omitted)).

Manley v. AmBase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003).

## B. Analysis

### 1. NYSHRL and NYCHRL *Quid Pro Quo* Sexual Harassment Claims

"Quid pro quo sexual harassment occurs 'when submission to or rejection of improper or unwelcome sexual conduct by an individual is used as the basis for employment decisions affecting such individual.'"[17] Alexander v. Westbury Union Free Sch. Dist., 829 F. Supp. 2d 89, 108 (E.D.N.Y. 2011) (quoting Clarke v. Pacifica Foundation, WBAI, No. 07 CV 4605(FB), 2011 WL 4356085, at *9 (E.D.N.Y. Sept. 16, 2011)). "The issue in a quid pro quo case is whether the supervisor has expressly or tacitly linked tangible job benefits to the acceptance or rejection of sexual advances; a quid pro quo claim is made out whether the employee rejects the advances and suffers the consequences or submits to the advances in order to avoid those consequences." Father Belle Cmty. Ctr. v. New York State Div. of Human Rights on Complaint of King, 221 A.D.2d 44, 50 (4th Dept. 1996) (citing Karibian v. Columbia Univ., 14 F.3d 773, 778 (2d Cir. 1994)). "'Tangible employment actions' include 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Alexander, 829 F. Supp. 2d at 108 (quoting Clarke, 2011 WL 4356085, at *9). "[E]mployment decisions predicated upon the existence or termination of consensual romantic relationships[, however,] do not [constitute quid pro quo sexual harassment]." Kahn v. Objective Solutions, Int'l, 86 F. Supp. 2d 377, 380 (S.D.N.Y. 2000). The jury was so instructed, (Trial Tr. (Dkt. No. 244) at 1595-98), and Defendants have not challenged the Court's charge.

---

[17] Although aware that different legal standards apply to claims under the NYSHRL and the NYCHRL, Plaintiff agreed that the more narrow NYSHRL standard would apply to both her NYSHRL sexual harassment claim and her NYCHRL sexual harassment claim. (See Trial Tr. 1165-66) Accordingly, this Court will analyze the jury's verdict based on the standard for quid pro quo sexual harassment under the NYSHRL.

Accordingly, Plaintiff can prevail on her quid pro quo sexual harassment claims by proving either that (1) she submitted to Wey's unwelcome sexual advances in order to avoid employment-related consequences (the "submission theory") or (2) she rejected Wey's unwelcome sexual advances and suffered employment-related consequences as a result (the "rejection theory"). (See Def. Br. (Dkt. No. 256) at 14-15)

**a. Submission Theory**

Defendants argue that a verdict based on a "[s]ubmission theory is unsupportable because the jury also found against Plaintiff on her claims for assault and battery," and "[o]n those findings, the jury had to conclude that if sexual contact actually occurred, it was not harmful or offensive to Plaintiff." (Id. at 15 (emphasis in original)) Defendants contend that "[t]he jury could not simultaneously find, on the sexual harassment claim, that Plaintiff had submitted to sex that was 'unwelcome.'" (Id.)

With respect to Plaintiff's battery claim against Wey, this Court instructed the jury that "[a] person who intentionally touches another person, without that person's consent, and thereby causes an offensive bodily contact, commits battery. . . . An offensive bodily contact is one that is done for the purpose of harming another or one that offends a reasonable sense of personal dignity, or one that is otherwise wrongful." (Trial Tr. (Dkt. No. 244) at 1620) Defendants have not challenged this charge, but they argue that "[n]o reasonable jury could conclude – and it would be an erroneous result to conclude – that Plaintiff submitted to an unwelcome sexual advance by having sexual relations, yet did not suffer any 'offensive bodily contact' that offended her 'personal dignity.'" (Def. Br. (Dkt. No. 256) at 16 (emphasis in original))

Plaintiff's battery claim and her submission theory quid pro quo sexual harassment claim do not rise and fall together, because the elements of these causes of action are different. In order to find Wey liable for battery, the jury had to find that Wey intentionally touched Plaintiff in an offensive way without her consent. See United Nat. Ins. Co. v. Waterfront New York Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993) ("A 'battery' is an intentional wrongful physical contact with another person without consent." (emphasis added) (citations omitted)). By contrast, in order to prevail on her quid pro quo sexual harassment claims, Plaintiff was not required to prove that her sexual relations with Wey were non-consensual. "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit. . . . The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986) (in a Title VII sexual harassment case, rejecting district court's finding that no actionable harassment occurred because, "'[i]f [plaintiff] and [her supervisor] did engage in an intimate or sexual relationship . . . , that relationship was a voluntary one'").[18] Accordingly, a jury finding that Wey did not commit battery – because Plaintiff agreed to have sexual intercourse with him – is not inconsistent with the jury's verdict finding Wey liable on Plaintiff's quid pro quo sexual harassment claims.

[18] Quid pro quo sexual harassment claims under the NYSHRL and Title VII are governed by the same standard. Figueroa v. RSquared NY, Inc., 89 F. Supp. 3d 484, 489-90 (E.D.N.Y. 2015); see also Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) (noting, in the context of a hostile work environment claim, that "New York courts require the same standard of proof for claims brought under the [Human Rights Law] as those brought under Title VII" (citations omitted)).

While Plaintiff needed to prove that Wey's conduct towards her was non-consensual in order to prevail on her battery claim, "[t]he correct inquiry [for her sexual harassment claims] is whether [Plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary" or consensual. Id. Based on the evidence at trial, a reasonable jury could conclude that Wey's sexual advances towards Plaintiff were unwelcome, and that he knew they were unwelcome.

Plaintiff testified that, during their November 2013 trip to Boston, she told Wey that she "didn't want to do anything" when he attempted to have sex with her, and that she slept on the couch the following night to avoid his advances. (Trial Tr. (Dkt. No. 236) at 921, 923). Similarly, during their trip to Dubai, Plaintiff ignored Wey and pretended to be asleep when he attempted to have sex with her. (Id. at 931) Plaintiff also testified that, during their second sexual encounter, she pulled away when Wey "tried to kiss [her]." (Trial Tr. (Dkt. No. 294) at 964) Plaintiff also testified that she did not kiss Wey, hug him, or reciprocate in any way when they had sex. (Id.) Accordingly, a reasonable jury could find that Plaintiff "by her conduct indicated that the alleged sexual advances were unwelcome." Meritor, 477 U.S. at 68.

A reasonable jury could also conclude that Plaintiff submitted to Wey's unwelcome sexual advances in order to protect her job at NYGG. Plaintiff testified that she was afraid to reject Wey's advances because she "didn't want to upset him." (Trial Tr. (Dkt. No. 236) at 931) Plaintiff "saw how he could get [en]raged at the office[,] [t]hat he would scream to people," and she thought that if she objected to Wey's sexual advances "he would get angry, kick [her] out or . . . fire [her], revoke [her] visa." (Id. at 931-32; see also id. at 936 (she "couldn't just say no . . . [because] he would definitely fire [her]. He would kick [her] out of the

apartment. He would . . . revoke [her] visa.)) Plaintiff also referenced her early conversation with Wey, in which he told her that "no one ever said no to him. . . ." (Id. at 936)

Defendants also argue that Plaintiff failed to prove that she suffered damages in connection with her "submission theory" quid pro quo sexual harassment claim. (Def. Br. (Dkt. No. 256) at 23-26) They argue that Plaintiff's testimony about the emotional distress she suffered after submitting to Wey's sexual advances is insufficient.

It is true that "[d]amages for emotional distress . . . cannot be assumed simply because discrimination has occurred." MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012) (citing Lopes v. Caffe Centrale LLC, 548 F. Supp. 2d 47, 55 (S.D.N.Y. 2008) ("[Plaintiff] must prove [her] entitlement to compensatory damages.")). Here, however, Plaintiff offered ample evidence as to the emotional distress she suffered as a result of having to submit to Wey's unwelcome sexual advances. Plaintiff testified that, after she and Wey had sex for the first time, she "felt so used and weak and I was so ashamed that I let this happen. That I've been through my entire life and nothing like this has ever happened. And everything that I've ever been, strong, independent, he just took that away from me." (Trial Tr. (Dkt. No. 236) at 934) Plaintiff testified that when they had sex again, she felt "[b]lank." (Trial Tr. (Dkt. No. 294) at 964) After two subsequent sexual encounters, Plaintiff "felt more and more weak. That I didn't mean anything. That everything that I felt and thought, that it didn't matter. I felt useless." (Trial Tr. (Dkt. No. 236) at 935) Based on this testimony, a reasonable jury could conclude that Plaintiff suffered some amount of emotional distress damages as a result of having to submit to Wey's sexual advances.[19]

---

[19] Defendants cite Patrolmen's Benevolent Ass'n of City of New York v. City of New York, 310 F.3d 43, 55 (2d Cir. 2002) for the proposition that

**b. Rejection Theory**

Defendants argue that the "[r]ejection theory [of quid pro quo sexual harassment] is unsupportable" here, because "[t]he only evidence of Plaintiff's rejections of sexual advances took place in 2013 and could not have been the cause of [her] termination [on April 22, 2014]." (Def. Br. (Dkt. No. 256) at 15) Defendants further argue that the damages evidence is insufficient under a "rejection theory." (Id.)

As an initial matter, this Court finds that the only "tangible employment action" on which Plaintiff can base her rejection theory quid pro quo sexual harassment claim is the termination of her employment at NYGG on April 22, 2014. At trial, this Court ruled that Plaintiff's one-week financial training with Baxter and her temporary assignment at Cambridge Alliance Capital do not constitute "tangible employment actions" because "[t]he evidence does

---

> [a] plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages. Rather, the plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, or the objective circumstances of the violation itself.

Patrolmen's Benevolent Ass'n, 310 F.3d at 55 (internal citations omitted). Here, a reasonable jury could conclude that – in addition to Plaintiff's testimony about the emotional distress she suffered after her sexual encounters with Wey – the "objective circumstances of the violation" warrant some amount of emotional distress damages. Here, the "objective circumstances" include that Wey, a 43-year old married father of three and the CEO of a Wall Street investment firm – who controlled not only Plaintiff's employment but also her visa status – pressured Plaintiff, a twenty-five year old foreign student working in her first U.S. job, into having sex with him as a condition of her employment. (Trial Tr. (Dkt. No. 232) at 487, 489-90; Trial Tr. (Dkt. No. 234) at 758; Trial Tr. (Dkt. No. 236) at 896; Trial Tr. (Dkt. No. 242) at 1407) In any event, as courts in this Circuit have explained, emotional distress awards are appropriate even where "'the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury.'" Caravantes v. 53rd Street Partners, LLC, No. 09 Civ. 7821(RPP), 2012 WL 3631276, at *22 (S.D.N.Y. Aug. 23, 2012) (quoting Olsen v. Cnty. of Nassau, 615 F. Supp. 2d 35, 46-47 (E.D.N.Y. 2009)); see also MacMillan, 873 F. Supp. 2d at 560-61; Press v. Concord Mortg. Corp, No. 08 Civ. 9497(PKC)(GWG), 2009 WL 6758998, at *7 (S.D.N.Y. Dec. 7, 2009).

not establish that either [of these assignments] 'caused a substantial detriment to [P]laintiff's employment relationship.'" (Trial Tr. (Dkt. No. 242) at 1515 (citing Gonzalez v. Beth Israel Med. Ctr., 262 F. Supp. 2d 342, 351 (S.D.N.Y. 2003))) Moreover, Plaintiff's testimony that Wey was (1) "pouty and increasingly aggressive at work if [Plaintiff] spurned his companionship," and (2) "increasing [Plaintiff's] workload and 'making her very nervous'" in early 2014 (see Pltf. Opp. Br. (Dkt. No. 270) at 10, 12 (citing Trial Tr. (Dkt. No. 294) at 959, 962; Trial Tr. (Dkt. No. 230) at 337)), does not constitute evidence of "tangible employment actions." Such conduct is not comparable to "'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or [] decision[s] causing a significant change in benefits.'" See Mormal v. Costco Wholesale Corp., 364 F.3d 54, 57-58 (2d Cir. 2005) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Accordingly, under a rejection theory of quid pro quo sexual harassment, Plaintiff was required to prove that she rejected Wey's sexual advances, and that he terminated her employment, at least in part, because she had rejected his advances.

There is evidence that after Plaintiff and Wey had sex four times during January 2014, she explicitly rejected his requests for sex, and took action to ensure that they would not have sex again. Plaintiff testified that, on February 2, 2014, Wey came to her apartment and told her he "wanted to have sex." (Trial Tr. (Dkt. No. 240) at 1205) Plaintiff "told him no." (Id.) And over the next several months, Plaintiff began spending her spare time with Chauvet and Koluman, in order to ensure that Wey would not be able to pressure her to have sex again. (Trial Tr. (Dkt. No. 294) at 965)

Despite Plaintiff's rejection of Wey "to his face" on February 2, 2014, and the steps she took to avoid spending time with him outside of work, Wey continued to pursue her.

Indeed, on April 21, 2014 – the day before her termination – Wey told Plaintiff that "he always wanted to see [her]. He always wanted to spend time with [her]. He wanted to have sex with [her]. He wanted to hug [her]. He wanted to kiss [her]." (Id. at 978) Wey urged Plaintiff to "stick close to him," because he was "the top dog on Wall Street." (Id.) He also made clear to Plaintiff that there would be consequences if she continued to reject his advances: Wey told Plaintiff that "if [she] didn't start to spend more time with him he would have to start to look for someone else." (Id.) Wey also set a deadline for Bouveng to comply: "he said that if [she did not] show him tangible love[,] he's kicking [her] out by August 1." (Id. at 979)

The next morning, Wey went to Plaintiff's apartment and found James Chauvet in her bed. (Trial Tr. (Dkt. No. 232) at 517-18; see also PX 24 (email from Wey to Plaintiff's father)) Wey asked Chauvet, "did you fuck her?," and then immediately called Plaintiff down from the offices of Cambridge Alliance Capital, screaming "you fucking bitch. I'm gonna revoke your visa today. I want you out of the apartment today. You're no longer hired by New York Global Group." (Trial Tr. (Dkt. No. 294) at 979-80; Trial Tr. (Dkt. No. 240) at 1227-28)

A reasonable jury could conclude that Wey fired Plaintiff when it became clear to him not only that she had rejected his sexual advances, but indeed had moved on to another man. Finding Chauvet in Bouveng's bed confirmed for Wey that Bouveng would not be succumbing to his sexual advances in the future. Indeed, Wey saw Bouveng's relationship with Chauvet as a "betrayal." He told Bouveng's friend Chemme Koluman on the day of Bouveng's firing that Bouveng had betrayed him (Trial Tr. (Dkt. No. 294) at 981), and in a call with Bouveng a few days later, Wey accused her of "cheating on [him] since the end of February." (PX 105 at 4) In

sum, there is ample evidence here that Wey terminated Bouveng's employment in retaliation for her sexual rejection of him.[20]

Defendants also argue that "Plaintiff offered no evidence at trial that she suffered emotional distress from being terminated." (Def. Br. (Dkt. No. 256) at 23) (emphasis in original) In support of this argument, Defendants cite Plaintiff's testimony that, after she was fired and thrown out of her apartment, she "felt free." (Id. (citing Trial Tr. (Dkt. No. 294) at 984)) Despite Plaintiff's testimony that she "felt free" after she was fired, a reasonable jury could conclude – based on the evidence at trial – that Plaintiff suffered significant emotional distress as a result of her termination from NYGG.

As an initial matter, the "objective circumstances of the [termination] itself" indicate that it likely caused emotional distress. See Patrolmen's, 310 F.3d at 55. The firing came without warning, immediately after Wey found Chauvet in Bouveng's bed. Wey told Plaintiff that he had just been at her apartment and found Chauvet, and then he screamed at her, "you fucking bitch. I'm gonna revoke your visa today. I want you out of the apartment today. You're no longer hired by New York Global Group." (Trial Tr. (Dkt. No. 294) at 979-80) Wey's actions left Plaintiff "in shock." (Id. at 980)

Other witnesses corroborated Bouveng's account of her emotional distress. Wey testified that Plaintiff was "angry" and "upset" as a result of her termination. (Trial Tr. (Dkt. No.

---

[20] Defendants argue that Plaintiff's rejection of Wey's sexual advances was not sufficiently clear, citing Bartle v. Mercado, 235 A.D.2d 651, 654 (1st Dept. 1997). (See Def. Reply Br. (Dkt. No. 284) at 12) In Bartle, the court found that the plaintiff's "own testimony evinces that she never communicated, by words or behavior, that [her boss's] contacts were uninvited, offensive or unwarranted," and that she "failed to openly communicate the 'unwelcomeness' of these contacts to [her boss]." Bartle, 235 A.D.2d at 654. Here, however, there is evidence that Plaintiff explicitly told Wey that she did not want to have sex with him. She also communicated to Wey – through her behavior – that she did not want to spend time with him outside of work.

234) at 623-24) Yonatan Weiss – Plaintiff's co-worker – testified that, several days after her termination – Plaintiff "was in a stressful state," because "[s]he [had been] kicked out of her apartment and lost her job and was worried she would get kicked out of the country." (Trial Tr. (Dkt. No. 228) at 272-73) Plaintiff's termination from NYGG also upended her dreams of working in marketing or public relations in New York. (See id. at 245-46; Trial Tr. (Dkt. No. 236) at 900-01) As a result of the termination, Plaintiff returned to Sweden and took a job as a waitress in a coffee shop, cleaning dishes and serving coffee, which was not her career goal. (See Trial Tr. (Dkt. No. 228) at 245; Trial Tr. (Dkt. No. 294) at 1016) In sum, there was ample evidence that Bouveng suffered emotional distress as a result of her termination from NYGG.

Defendants' motion for judgment as a matter of law on Plaintiff's quid pro quo sexual harassment claims will be denied. To the extent that Defendants seek a new trial as to liability on these claims, that motion will likewise be denied.

**2. NYSHRL and NYCHRL Retaliation Claims**

To prevail on a retaliation claim under the NYSHRL, a plaintiff "must demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (quoting Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012)). "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 112 (2d Cir. 2013) (citations omitted).

Defendants argue that Plaintiff did not prove that she engaged in a "protected activity," and thus both her NYSHRL and NYCHRL retaliation claims fail. (Def. Br. (Dkt. No. 256) at 26-31) Under both statutes, "protected activity" refers to, inter alia, (1) opposition to any statutorily prohibited discrimination, and (2) the commencement of a civil action alleging the commission of an act that would constitute statutorily prohibited discrimination. See N.Y. Exec. Law § 296(7); New York City Admin. Code § 8-107(7). "[T]o establish that [her] activity is protected, [a plaintiff] 'need not prove the merit of [her] underlying discrimination complaint, but only that [s]he was acting under a good faith, reasonable belief that that a violation existed.'" Knight v. City of New York, 303 F. Supp. 2d 485, 496 (S.D.N.Y. 2004) (quoting Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)), aff'd, 147 F. App'x 221 (2d Cir. 2005). The jury was so instructed (Trial Tr. (Dkt. No. 244) at 1601-02, 1612), and Defendants have not challenged the Court's charge.

At trial, Plaintiff contended that she engaged in protected activity under both statutes when (1) her lawyer sent a letter to Wey on April 29, 2014, threatening litigation against Wey (DX X); (2) her lawyer emailed a draft complaint to Wey on May 7, 2014 (DX Y1, Y3); and (3) she filed the Complaint on July 21, 2014 (Dkt. No. 1). (Trial Tr. (Dkt. No. 244) at 1602, 1612) Defendants argue that all of these communications "are, as a matter of law, exactly the kind of unsupportable and salacious activities that fail to deserve 'protected activity' status, warranting judgment as a matter of law on the retaliation claim[s]." (Def. Br. (Dkt. No. 256) at 27) Defendants' argument is premised on the notion that the letter, email, and complaint include "false allegations of forced sexual conduct." (Id. at 27-31)

**a. April 29, 2014 Demand Letter and May 7, 2014 Email with Draft Complaint**

As an initial matter, Plaintiff's counsel's April 29, 2014 letter says nothing about "forced sex" or "rape." (See DX X) Indeed, Wey conceded at trial that nothing in the April 29, 2014 letter made Wey think that Plaintiff was accusing him of forcing her to have sex with him. (Trial Tr. (Dkt. No. 232) at 483-87; see also DX X) Accordingly, Defendants' argument that the April 29, 2014 letter does not constitute "protected activity" – because it contains "false allegations of forced sexual conduct" – is rejected.

Plaintiff's counsel's May 7, 2014 email (DX Y) says nothing about "forced sex" or "rape," but the draft complaint attached to the email includes allegations that Wey "plied Plaintiff Hanna Bouveng with alcohol and, once she was intoxicated, forced her to have sexual intercourse with him." (DX Y3 at ¶ 62) At trial, Plaintiff testified that she and Wey had sex on four occasions, but that none of these sexual interactions involved Wey's use of "physical force." (Trial Tr. (Dkt. No. 294) at 1063; see also Trial Tr. (Dkt. No. 236) at 934; Trial Tr. (Dkt. No. 294) at 964). And although Plaintiff testified that she and Wey drank wine before having sex on one occasion (id. at 963-64), she did not testify that he "plied" her with alcohol or that she was intoxicated.

Defendants argue that the inconsistencies between the allegations in Plaintiff's draft complaint and her testimony at trial mandates a finding that the sending of the draft complaint to Wey does not constitute "protected activity." (Def. Br. (Dkt. No. 256) at 28-29) However, Defendants cite no case in which a court has held that the submission of a draft complaint to an employer does not constitute protected activity, because the draft complaint

included certain factual allegations that were not proven at trial.[21] Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, 716 F.3d 10, 14 (2d Cir. 2013), cited by Defendants, (Def. Br. (Dkt. No. 256) at 28-29), does not stand for that proposition. In Kelly, the Second Circuit stated that, under Title VII and the NYSHRL, "[a]n employee's complaint may qualify as protected activity . . . so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Kelly, 716 F.3d at 14 (internal quotation marks and citation omitted); see also Galdieri-Ambrosini, 136 F.3d at 292. Defendants have not argued that Plaintiff lacked a good faith, reasonable belief that Wey's actions constituted quid pro quo sexual harassment under the NYSHRL and NYCHRL. The fact that Plaintiff included allegations in her draft complaint that were not proven at trial says nothing about whether Plaintiff reasonably believed that Wey's actions constituted sexual harassment under the law. Accordingly, this Court concludes that a reasonable jury could have found that Plaintiff's counsel's May 7, 2014 email and the attached draft complaint constitute a protected activity under the NYSHRL and NYCHRL.

**b. July 21, 2014 Complaint**

Defendants argue that "Plaintiff's inclusion of the same false allegations of forced sexual conduct in her Complaint render the filing of that pleading a non-protected activity as well." (Def. Br. (Dkt. No. 256) at 29) They also complain that "[t]here are many other allegations included in the Complaint – salacious and embarrassing ones plainly targeting Mr. Wey's wife and family – that Plaintiff did not even attempt to prove at trial either."[22] (Id.)

---

[21] Nor would such a rule make sense. Complaints often contain a number of factual allegations that are not proven at trial, even where the claims set forth in those complaints are accepted by the jury.

[22] In this regard, Defendants list Complaint allegations stating that Wey "forced Plaintiff to wear sexy clothing in the office"; that Wey "had [negatively] commented about his marriage . . .

Defendants argue that, "[t]ogether with the knowingly false accusation of forced sexual relations, Plaintiff's behavior in filing the July 21 Complaint presents a compelling case for denying 'protected activity' status, much like the case before Judge Hellerstein in Marchuk v. Faruqi & Faruqi, LLP, [100 F. Supp. 3d 302 (S.D.N.Y. 2015)]." (Id. at 30-31)

In Marchuk, plaintiff "filed a 22-page [sexual harassment] complaint" that "was anything but ordinary." The pleading contained "every salacious detail" and "was as replete with incendiary language and vituperative attacks as any complaint [the court] [had] seen." Marchuk, 100 F. Supp. 3d at 310. The court also stated that, because plaintiff was "represented by experienced counsel who know well what a pleading should contain, . . . the decision to file this unprofessional document . . . reflects an intent to extend the litigation from the courts to the press." Id. The court concluded that "[i]f the character of pleadings can remove a Title VII lawsuit's 'protected activity' status, then this pleading did so." Id.

Marchuk provides no support for Defendants' argument here, because the Marchuk court did not hold that "the character of pleadings can remove a . . . lawsuit's protected activity status." Indeed, the court's use of the word "[i]f" makes clear that it was asking a rhetorical question, and not announcing a new rule of law. Moreover, the court did not rely on the "character of the pleadings" in finding against the plaintiff on her Title VII and NYSHRL retaliation claims; instead, it concluded that plaintiff had not suffered an adverse employment action. Id. at 311. The Marchuk plaintiff's NYCHRL retaliation claim failed because she had not suffered an adverse employment action and could not recover any damages. Id. at 312-13.

---

'approximately daily'"; and that Wey's "close friend Talman Harris told Plaintiff: "Ben loves you.'" (Def. Br. (Dkt. No. 256) at 29-30)

In sum, Defendants have not demonstrated that the filing of a sexual harassment complaint loses its status as a "protected activity" where the complaint contains factual allegations that are not proven at trial.

Defendants' motion for judgment as a matter of law on Plaintiff's NYSHRL and NYCHRL retaliation claims is denied. To the extent that Defendants seek a new trial as to liability on these claims, that motion will likewise be denied.

### 3. Defamation Claim

Plaintiff agreed prior to trial to limit her defamation claim to statements that constitute defamation per se under New York law. (See June 5, 2015 Conf. Tr. (Dkt. No. 200) at 16-17, 23-24; Pltf. Pre-Trial Br. (Dkt. No. 198) at 2) "The New York Court of Appeals has recognized four categories of statements as defamatory per se: (1) those that accuse the plaintiff of a serious crime; (2) those that 'tend to injure another in his or her trade, business or profession'; (3) those that accuse the plaintiff of having a 'loathsome disease'; or (4) and those that impute 'unchastity to a woman.'" Stern v. Cosby, 645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009) (citing Liberman v. Gelstein, 80 N.Y.2d 429, 435 (1992)). Plaintiff initially identified approximately 1,800 statements from Blot articles that she argued constituted defamation per se. (See June 11, 2015 Conf. Tr. (Dkt. No. 216) at 25-36; Trial Tr. (Dkt. No. 226) at 4-9; Trial Tr. (Dkt. No. 228) at 124-31) Plaintiff subsequently agreed to narrow her proof to 66 allegedly defamatory statements contained in six Blot articles. (See PX 61; 63; 64; 85; 87; and 98)

In addition to proving that each statement constitutes defamation per se, Plaintiff was required to prove that (1) the statement "concern[s] the plaintiff"; (2) one or more of the Defendants communicated the statement to someone other than Plaintiff; (3) the statement is false – i.e., not "substantially true"; (4) one or more of the Defendants acted at least negligently

in publishing the statement[23]; and (5) Plaintiff suffered damages as a result of the publication of the statement.[24] See Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000) (citations omitted). The jury was so instructed. (Trial Tr. (Dkt. No. 244) at 1620-27)

Defendants argue that 39 of the 66 allegedly defamatory statements in evidence "reference Plaintiff's involvement in extortion, visa fraud, or bank fraud," and that, "[a]s to extortion and bank fraud, Plaintiff simply failed to present evidence sufficient to establish that those statements were false." (Def. Br. (Dkt. No. 256) at 31-32) Defendants further argue that, "as to all three categories, Plaintiff did not present evidence sufficient to establish that it was negligent for Defendants to have concluded that the statements were accurate." (Id. at 32)

**a. Statements Accusing Plaintiff of Extortion**

Defendants argue that Plaintiff's counsel's April 29, 2014 letter to Wey (DX X), and Plaintiff's counsel's May 7, 2014 email to Wey attaching a draft complaint (DX Y1, Y3), constitute extortion, and that accordingly their statements accusing Plaintiff of extortion are not false, and in any event they did not act negligently in publishing statements accusing Plaintiff of

---

[23] This Court rejected Defendants' argument (Dkt. No. 213 at 8-12) that a "grossly irresponsible" standard applied (Trial Tr. (Dkt. No. 242) at 1502-03), and instructed the jury using a negligence standard. (Trial Tr. (Dkt. No. 244) at 1626). See Krauss v. Globe Intl., 251 A.D.2d 191, 194 (1st Dept. 1998) (in a case involving a private plaintiff and a matter of private concern, "plaintiff need show only that defendants were negligent in publishing the story"); see also Albert v. Loksen, 239 F.3d 256, 270 n.12, 271 (2d Cir. 2001) ("declin[ing] to decide whether . . . negligence or some other level of fault is applicable" in a defamation action involving a private plaintiff and a matter of private concern).

[24] "New York law has long recognized that '[w]hen statements fall within' established categories of per se defamation, 'the law presumes that damages will result, and they need not be alleged or proven.'" Zherka v. Amicone, 634 F.3d 642, 645 (2d Cir. 2011) (footnote omitted) (quoting Liberman, 80 N.Y.2d at 435). Plaintiff's counsel stated at the charge conference, however, that he was "content with" a charge that did "not include any language on presumed damages." (Trial Tr. (Dkt. No. 244) at 1528) Accordingly, the jury was instructed that Plaintiff was required to prove actual damages in order to recover on her defamation claim. (Trial Tr. (Dkt. No. 244) at 1629)

extortion. (Def. Br. (Dkt. No. 256) at 34-38) Defendants contend that "[i]t is beyond dispute, under the trial evidence, that Plaintiff and her attorneys sent emails and a draft complaint to Mr. Wey that falls not only within a layman's understanding of what 'extortion' and 'blackmail' are, but within the statutory definition as well." (Id. at 36)

**i. Applicable Law**

The Hobbs Act – 18 U.S.C. § 1951 – and 18 U.S.C. § 875(d) criminalize extortion. The Hobbs Act provides:

> [w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

"Threats of litigation, and even threats of meritless litigation or the actual pursuit of such litigation, have been held not to constitute acts of extortion [under the Hobbs Act]." G.I. Holdings, Inc. v. Baron & Budd, 179 F. Supp. 2d 233, 259 (S.D.N.Y. 2001); see also DirecTV, Inc. v. Lewis, No. 03 Civ. 6241-CJS-JWF, 2005 WL 1006030, at *5 (W.D.N.Y. Apr. 29, 2005) ("Threats of litigation, even economically ruinous litigation, even unmeritorious litigation, do not constitute extortion [under the Hobbs Act]." (citing G.I. Holdings, Inc., 179 F. Supp. 2d at 259)). "[A] lawsuit filed by lawful means is not 'wrongful,' as defined by the Hobbs Act, and courts would be wary of holding that 'the filing of a meritless lawsuit is . . . extortionate lest every unsuccessful lawsuit lead to an extortion claim and thus chill resort to the courts.'" Kerik v. Tacopina, 64 F. Supp. 3d 542 (S.D.N.Y. 2014) (quoting Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 577 (S.D.N.Y. 2014)).

Where a lawsuit is "not pursued by lawful methods alone," however, a lawsuit or threats to initiate a lawsuit may constitute extortion. See Chevron, 974 F. Supp. 2d at 577. In Chevron, Chevron sued a group of American and Ecuadorian lawyers – including Steven Donziger – who had brought an action against Chevron in Ecuador on behalf of thousands of Ecuadorian indigenous peoples. Id. at 383. "After years of pressuring Chevron to settle [the Ecuador lawsuit] by a variety of both legitimate and illegitimate means, Donziger and his clients obtained a multibillion dollar judgment . . . in the Ecuadorian courts. . . ." Id. at 383-84. Chevron then sued Donziger in this district, contending that the Ecuador judgment was procured by fraud. Id. at 384.

The court found that Donziger's actions were "wrongful" for purposes of Hobbs Act extortion:

> It was Donziger's purpose to magnify the pressure on Chevron by increasing both the perceived magnitude of its potential exposure and the perceived likelihood that the exposure in the end would culminate in huge liability. He repeatedly did so by manifestly wrongful means, which included corruption of the litigation and a pressure campaign premised on misrepresentations. Within the litigation, he coerced [the judge presiding over the Ecuador lawsuit] to allow the [plaintiffs in the Ecuador lawsuit] to drop their remaining judicial inspections and to appoint their hand-picked global expert, coordinated the ghostwriting of the [global expert report] to threaten Chevron for the first time with more than $16 billion of exposure; co-opted [the global expert] to put his name to it; supervised the ghostwriting for [the global expert's] signature on the response to the [parties'] comments on the [global expert's report], which raised the ante to more than $22 billion; and bribed [the judge] to allow the [plaintiffs'] team to ghostwrite the multibillion Judgment. His pressure campaign relied upon his repeated dissemination of estimates of Chevron's damages exposure . . . that he knew to be false.
>
> Each of these tactics increased the perceived threat of harm to Chevron, either by increasing the dollar exposure, by increasing the probability of a judgment that could be enforced outside Ecuador, or by both. They were inherently wrongful by any definition. Chevron had a preexisting right to be free from the threats invoked by the illegitimate means employed. . . . [The threats] destroyed the nexus between the original plausible claim and the fear of a catastrophic adverse result on that claim because the fear of such a result was a product not solely of the original plausible claim, but of the illegitimate means used to increase the exposure on that

> claim, the likelihood that Chevron would be found liable, and the likelihood that any such finding ultimately would prove enforceable. In other words, the illegitimate means that Donziger and his confederates used provided them with "leverage to force the payment of money" that arose uniquely from the illegitimate means. Moreover, the "actual disclosure" of those illegitimate means would have been, and even today would be, "counterproductive." Put still another way, one engaged in litigation either accepts the risk of an adverse result reached by fair and honest methods or settles, and that is fine. But a litigant who magnifies the risks to its adversary by corrupting the litigation in order to "get the price up" creates leverage purely attributable to the corruption, which is inherently wrongful, which bears no proper nexus to any plausible claim that may have been asserted in the first place, and from which the victim has a right to be free.

Chevron, 974 F. Supp. 2d at 579-80 (internal quotation marks and citations omitted).

Similarly, in La Suisse, Societe D'Assurances Sur La Vie v. Kraus, No. 06 CIV. 4404 CM GWG, 2014 WL 3610890, at *9 (S.D.N.Y. July 21, 2014), a RICO case founded on alleged acts of extortion, the court noted that "case law recognizes that litigation may constitute extortion where the 'victim of the extortionate activity had a preexisting right to be free from the threats invoked.'" La Suisse, 2014 WL 3610890, at *9 (quoting United States v. Tobin, 155 F.3d 636, 640 (3d Cir. 1998)). In La Suisse, defendants Kraus and Caruso "attempted to leverage their control and influence over [Swiss Life] policyholders by instituting policyholder litigations against Swiss Life, . . . and otherwise threatening Swiss Life in an attempt to extort Swiss Life into making payments directly to Kraus and [C]aruso." Id. at *10 (internal quotation marks and citations omitted). The court found that "Kraus and Caruso did not have a legitimate claim of right to the proceeds of [the lawsuit they filed against Swiss Life]" because they "did not commence [the lawsuit] for the benefit of the plaintiffs and the nominal policyholders; rather, they initiated and [were] financing it as a tool to extort additional money from Swiss Life." Id. (third alteration in original) (internal quotation marks and citation omitted).

18 U.S.C. § 875(d) also criminalizes extortion:

> Whoever, with intent to extort from any person, firm, association, or corporation, any money or thing of value, transmits in interstate or foreign commerce any

> communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 875(d). Section 875(d) does not define "extort" or "intent to extort."

In United States v. Jackson, 180 F.3d 55 (2d Cir. 1999), the Second Circuit discussed whether Section 875(d) – like the Hobbs Act – requires that threats be "wrongful" to constitute extortion. Jackson, 180 F.3d at 65-72. In Jackson, defendant Autumn Jackson was convicted of, inter alia, extortion under Section 875(d) for attempting to obtain up to $40 million from Bill Cosby "by threatening to cause tabloid newspapers to publish Jackson's claim to be Cosby's daughter out-of-wedlock." Jackson, 180 F.3d at 59. The trial court did not instruct the jury that the Government was required to prove that Jackson's alleged threats were "wrongful"; instead, the court instructed the jury that "the law does not permit someone to obtain money or a thing of value by threatening to injure another person's reputation," regardless of whether the person communicating the threat believed that he or she was actually owed money by the victim. Id. at 65-66.

The Second Circuit concluded that the trial court's instruction was erroneous:

> We conclude that not all threats to reputation are within the scope of § 875(d), that the objective of the party employing fear of economic loss or damage to reputation will have a bearing on the lawfulness of its use, and that it is material whether the defendant had a claim of right to the money demanded.

Id. at 70; see also id. at 71-72. The court found, however, that "the type of threat to reputation that has no nexus to a claim of right" is "inherently wrongful," id.:

> Where there is no plausible claim of right and the only leverage to force the payment of money resides in the threat, where actual disclosure would be counterproductive, and where compliance with the threatener's demands provides no assurance against additional demands based on renewed threats of disclosure, we regard a threat to reputation as inherently wrongful. We conclude that where a threat of harm to a person's reputation seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right,

> or where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful and its transmission in interstate commerce is prohibited by § 875(d).

Id. at 71.

In New York Penal Law § 155.05(2)(e), New York criminalizes "larceny by extortion":

> 2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways:
>
> . . .
>
> (e) By extortion.
>
> A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will:
>
> . . .
>
> (iv) Accuse some person of a crime or cause criminal charges to be instituted against him; or
>
> (v) Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule. . . .

N.Y. Penal Law § 155.05(2)(e).

New York law also provides that, "[i]n any prosecution for larceny by extortion committed by instilling in the victim a fear that he or another person would be charged with a crime, it is a[] . . . defense that the defendant reasonably believed the threatened charge to be true and that his sole purpose was to compel or induce the victim to take reasonable action to make good the wrong which was the subject of such threatened charge." N.Y. Penal Law § 155.15(2); see also People v. Zona, 14 N.Y.3d 488, 492-93 (2010) (noting that the statute defines this defense as an "affirmative defense," but that the New York Court of Appeals has "held that a good faith claim of right is properly a defense – not an affirmative defense – and thus, the people

have the burden of disproving such defense beyond a reasonable doubt" (internal quotation marks and citations omitted)).

Under New York law, a threat to make public embarrassing allegations does not constitute extortion where that "conduct [is] part of a larger endeavor to obtain recompense for a perceived wrong." Niagara Mohawk Power Corp. v. Testone, 272 A.D.2d 910, 911 (4th Dept. 2000). However, where a threat to make public embarrassing allegations is not part of a "larger endeavor to obtain recompense for a perceived wrong," liability under the "larceny by extortion" statute may lie.

In Dawkins v. Williams, 511 F. Supp. 2d 248 (N.D.N.Y. 2007), plaintiff brought a false arrest claim against a New York State Police investigator, alleging that he had been improperly arrested for larceny by extortion. Dawkins, 511 F. Supp. 2d at 260. Plaintiff was arrested after he reported to the State Police that his girlfriend had been raped by his attorney. Id. at 251. Plaintiff not only "threaten[ed] to continue to pursue . . . [the] rape complaint, and to file a complaint with an attorney grievance committee," but also "repeatedly threatened to contact various news outlets and report [the attorney's] alleged misconduct to them if [the attorney] did not pay Plaintiff money." Id. at 259 (footnote omitted).

The court found that plaintiff's conduct gave rise to probable cause to arrest him for violating New York's larceny by extortion statute, id.:

> [H]ere, Plaintiff's conduct in threatening to contact news outlets (as well as his apparent conduct of twice actually calling such news outlets) was not "part" of his "larger endeavor to obtain recompense for a perceived wrong," since it was not a step that was necessary to pursue some sort of legal remedy (for example, filing a complaint against Defendant with an attorney grievance committee of the Appellate Division of the New York State Supreme Court, or by filing a civil action against Defendant in New York State Supreme Court). Rather, the record evidence indicates that this conduct was a significant tool that Plaintiff used as a last resort, after his other threats had apparently failed, in order to try to extract an increased and exorbitant sum of money from Defendant.

Id. at 260 (emphasis in original). The court found that "probable cause existed to believe that Plaintiff was not acting in good faith when he threatened to go to the press with his claims, given the lack of any 'nexus' between the threatened disclosures to the press and any inherent material benefit to Plaintiff from going to the press." Id. at 259-60 (citing Jackson, 180 F.3d at 70-71) (emphasis in original).

**ii. Analysis**

Here, Plaintiff's counsel's April 29, 2014 letter and May 7, 2014 email and draft complaint do not constitute criminal extortion as defined under federal or New York law. The April 29, 2014 letter merely states that – if Wey's lawyer does not contact Plaintiff's counsel immediately – Plaintiff's counsel will be "forced to commence what is likely to be embarrassing litigation." (DX X) Similarly, the May 7, 2014 email informs Wey that he has "one more chance to avoid what surely will be expensive and embarrassing litigation for [him], [his] company and [his] family." (DX Y1) The letter and email do not threaten that Plaintiff or her counsel will "go to the press with [her] claims," see Dawkins, 511 F. Supp. 2d at 260; instead, these communications informed Wey that, if he did not contact Plaintiff's lawyers, Plaintiff intended to file a lawsuit against him – "a step that was necessary to pursue . . . [a] legal remedy." See id. at 260 (emphasis omitted). The fact that the allegations in the lawsuit might embarrass or affect the reputation of Wey, his friends, or his family does not convert Plaintiff's effort to enforce her legal rights into an extortion attempt. Unlike in Dawkins, the references to "embarrassing litigation" in the letter and email were "part of a larger endeavor to obtain recompense for a perceived wrong," not simply threats to ruin Wey's reputation. See Niagara, 272 A.D.2d at 911. Accordingly, Plaintiff's counsel's references to potentially "embarrassing litigation" clearly have a "nexus to a plausible claim of right." Jackson, 180 F.3d at 71.

The references to "embarrassing litigation" here are also not comparable to the conduct that the Chevron and LaSuisse courts found to be "wrongful" under the Hobbs Act. In Chevron, Donziger "corrupt[ed] . . . the litigation [process] and [conducted] a pressure campaign premised on misrepresentations," including bribing an Ecuadorian judge to allow Donziger's team to ghostwrite the multibillion-dollar judgment against Chevron. Chevron, 974 F. Supp. 2d at 580. Threatening to file a lawsuit that might be "embarrassing" is not analogous to wholesale corruption of a judicial proceeding through bribery and other misconduct. In LaSuisse, Kraus and Caruso instituted lawsuits against Swiss Life on behalf of insurance policyholders, but used those lawsuits to attempt to collect money for themselves – money to which they clearly had no right. LaSuisse, 2014 WL 3610890, at *9-10. Here, Plaintiff's counsel threatened to file a lawsuit on behalf of Plaintiff, which alleged that Defendants had violated Plaintiff's legal rights. The fact that the allegations in the Complaint might be embarrassing to Wey does not convert Plaintiff's lawsuit into extortion.

In the context of a motion for sanctions under Fed. R. Civ. P. 11, the Second Circuit has noted that "[a]n attorney is entitled to warn the opposing party of his intention to assert colorable claims, as well as to speculate about the likely effect of those claims being brought." Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 80 (2d Cir. 2000). And in Sussman v. Bank of Israel, 56 F.3d 450 (2d Cir. 1995), the court "overturned Rule 11 sanctions based on the attorney's having written a prelitigation letter warning of adverse publicity if the claims were to come to public attention," id.:

> Nor do we think it was appropriate for the district court to find that [the attorney's] prelitigation letters were evidence that the . . . complaint was filed for an improper purpose. It is hardly unusual for a would-be plaintiff to seek to resolve disputes without resorting to legal action; prelitigation letters airing grievances and threatening litigation if they are not resolved are commonplace, sometimes with

> salutary results, and do not suffice to show an improper purpose if nonfrivolous litigation is eventually commenced.

Id. (quoting Sussman, 56 F.3d at 459). Accordingly, with respect to the "threats" of embarrassing litigation in Plaintiff's counsel's letter and email, the general rule that "[t]hreats of litigation, even economically ruinous litigation, even unmeritorious litigation, do not constitute extortion" applies. DirecTV, 2005 WL 1006030, at *5.

Plaintiff's counsel's statement that his law firm was "investigating whether [Wey's] actions to date rise to the level of criminal misconduct that would require law enforcement intervention," (DX X), also does not constitute extortion. Although New York law provides that larceny by extortion may be committed by instilling in the victim a fear that he may be charged with a crime, see N.Y. Penal Law § 155.05(2)(e), the evidence at trial establishes that Plaintiff had a reasonable, good faith belief that Wey's actions rose to the level of criminal misconduct. After her termination from NYGG, Wey "started to harass and stalk [her] and [her] family and [her] friends" (Trial Tr. (Dkt. No. 240) at 1215), and during a phone call shortly after Plaintiff's termination, Wey told Plaintiff that he had video surveillance of her and Chauvet. (PX 105) Given Wey's harassment and stalking, Plaintiff "'reasonably believed the threatened charge to be true,'" and in these circumstances the law permits Plaintiff "'to compel or induce [Wey] to take reasonable action to make good the wrong which was the subject of the threatened charge.'" Dawkins, 511 F. Supp. 2d at 257 (quoting N.Y. Penal Law § 155.15(2)). Accordingly, it was reasonable for the jury to find that Plaintiff had satisfied her burden of proving the falsity of Defendants' statements accusing her of extortion.

Defendants argue, however, that "no reasonable jury could conclude that it was negligent for Defendants to have [published statements accusing Plaintiff of criminal extortion.]" (Def. Br. (Dkt. No. 256) at 38) Acknowledging that Wey testified that he interpreted the May 7,

2014 email and draft complaint as threatening that Bouveng and her counsel would "file a false charge of rape with . . . law enforcement if [Wey] did not pay them money" (Trial Tr. (Dkt. No. 234) at 724), neither Plaintiff's counsel's April 29, 2014 letter, nor the May 7, 2014 email and draft complaint, state or suggest that Plaintiff is contemplating filing a rape charge with law enforcement. (See DX X; Y1; Y3) Accordingly, the jury was entitled to reject Wey's argument that these communications constitute a threat to seek a rape charge against Wey.

As noted earlier, the April 29 letter makes no reference whatsoever to rape or forced sexual conduct. (See DX X) While this letter does suggest that Plaintiff may seek "law enforcement intervention," it is clear from context that Plaintiff is threatening to seek "law enforcement intervention" if Wey's "retaliatory action" – the harassment and stalking of Plaintiff, her family, and friends – continues. (Id.) This Court concludes that a reasonably jury could find that Defendants were at least negligent in publishing statements that accused Plaintiff of criminal extortion.

**b. Statements Accusing Plaintiff of Visa Fraud**

The Blot articles include many statements accusing Plaintiff of committing visa fraud. Plaintiff's J-1 visa expired thirty days after her termination from NYGG – i.e., on May 22, 2014 – by which time she was required to leave the United States. (See DX R at 2; Trial Tr. (Dkt. No. 294) at 1042-43) As to falsity, Defendants concede that a reasonable jury could have found that Plaintiff left the United States before her visa expired, but they argue that "[t]here is . . . no evidence that Defendant knew [that Plaintiff had left the United States in May 2014], or could have learned [that fact] upon some type of reasonable diligence." (Def. Br. (Dkt. No. 256) at 40)

Defendants ignore evidence demonstrating that Wey (1) knew the limitations of Bouveng's J-1 visa – having told her on April 22, 2014, that he would "revoke [her] visa today" (Trial Tr. (Dkt. No. 294) at 979-80); and (2) was aware as of May 22, 2014 – when Bouveng's visa expired – that Plaintiff had returned to Sweden. Indeed, in a May 22, 2014 Facebook message to Camilla Blomqvist, Plaintiff's best friend in Sweden, Wey stated: "Hanna is back to Vetlanda Sweden. Left yesterday." (PX 103 at 4; see also Trial Tr. (Dkt. No. 234) at 655) Wey also admitted at trial that he knew that "Ms. Bouveng wasn't kicked out of America," that she went home after losing her visa, and that she was not arrested at the airport upon her re-entry into the United States before trial. (Trial Tr. (Dkt. No. 234) at 693-94) Based on this evidence, a reasonable jury could find that Defendants were at least negligent in publishing statements accusing Plaintiff of visa fraud.

c. **Statements Accusing Plaintiff of Bank Fraud**

The Blot articles also accuse Plaintiff of committing bank fraud. See, e.g., PX 87 ("Hanna Bouveng defrauded JP Morgan Chase bank in New York by writing bad checks without any money in her bank account."). At trial, a document containing records from Plaintiff's Chase Bank account was received into evidence. (DX BO) This document shows that Plaintiff incurred a $34 overdraft fee in April 2014 because she attempted to cash a $69.68 check without having sufficient funds in her account. (See id. at 26)

Under 18 U.S.C. § 1344, it is a crime for anyone to "knowingly execute[], or attempt[] to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises[.]" 18 U.S.C. § 1344. "'[T]he "scheme to defraud" clause . . .

requires that the defendant engage in . . . a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss.'" United States v. Rodriguez, 140 F.3d 163, 167 (2d Cir. 1998) (alterations in original) (emphasis omitted) (quoting United States v. Stavroulakis, 952 F.2d 636, 694 (2d Cir. 1992)); see also United States v. Ragosta, 970 F.2d 1085, 1089 (2d Cir. 1992).

At trial, Plaintiff testified that she had not taken any steps to defraud Chase Bank. (Trial Tr. (Dkt. No. 294) at 1022) Moreover, a reasonable jury could conclude that Plaintiff's one-time overdraft – which involved a $69.68 check – did not constitute an effort to defraud Chase Bank, and could not reasonably be regarded as an effort to commit bank fraud – particularly by a sophisticated international businessman such as Wey. (See Trial Tr. (Dkt. No. 232) at 487-88)

In sum, the jury was entitled to conclude that Defendants were at least negligent in publishing statements accusing Plaintiff of having committed bank fraud.

* * * *

For the reasons stated above, Defendants are not entitled to judgment as a matter of law on Plaintiff's defamation claim with respect to statements referencing extortion, visa fraud, or bank fraud. To the extent that Defendants seek a new trial as to liability on Plaintiff's defamation claim, their motion is denied.

## II. REMITTITUR OF THE COMPENSATORY AND PUNITIVE DAMAGE AWARDS

### A. Standard of Review

"Under applicable New York state law, 'a monetary judgment is excessive "if it deviates materially from what would be reasonable compensation."'" Allam v. Meyers, 906 F.

Supp. 2d 274, 286 (S.D.N.Y. 2012) (citations omitted) (quoting Rangolan v. Cnty. of Nassau, 370 F.3d 239, 244 (2d Cir. 2004) (quoting N.Y. C.P.L.R. § 5501(c))). "Because New York trial courts apply § 5501(c), under Gasperini[ v. Ctr. for Humanities, Inc., 518 U.S. 415, 425 (1996)], so do federal district courts sitting in diversity." Okraynets v. Metro. Transp. Auth., 555 F. Supp. 2d 420, 435 (S.D.N.Y. 2008) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). "In determining whether an award 'deviates materially from what would be reasonable compensation,' N.Y. C.P.L.R. § 5501(c), [district courts] compare the jury's award to awards allowed in analogous cases involving similar types of injuries." Allam, 906 F. Supp. 2d at 286-87 (citing Gasperini, 518 U.S. at 425; Rangolan, 370 F.3d at 244; Okraynets, 555 F. Supp. 2d at 435). "While instructive, such earlier awards are not binding for [district courts'] review." Id. at 287 (citing Lewis v. City of New York, 689 F. Supp. 2d 417, 430 (S.D.N.Y. 2010); Okraynets, 555 F. Supp. 2d at 436).

"When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages. Alternatively, the court may grant remittitur. . . ." Iannone v. Frederic R. Harris, Inc., 941 F. Supp. 403, 411 (S.D.N.Y. 1996) (citations omitted).

"'Remittitur is the process by which a court compels a plaintiff to choose between a reduction of an excessive verdict and a new trial.'" Chisholm v. Memorial Sloan-Kettering Cancer Center, No. 09 Civ. 8211(VM), 2011 WL 5448251, at *4 (S.D.N.Y. Nov. 4, 2011) (quoting Thomas v. iStar Financial, Inc., 508 F. Supp. 2d 252, 257 (S.D.N.Y. 2007), aff'd, 629 F.3d 276 (2d Cir. 2010)). "Remittitur is appropriate to reduce verdicts only in cases 'in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award.'" Webungs Und Commerz Union Austalt v. Collectors' Guilt, Ltd., 930 F.2d 1021, 1027

(2d Cir. 1991) (quoting Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 50 (2d Cir. 1984)). "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages." Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990).

"'While it is properly within the province of the jury to calculate damages, there is "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law."'" Dotson v. City of Syracuse, No. 5:04-CV-1388(NAM)(GJD), 2011 WL 817499, at *13 (N.D.N.Y. Mar. 2, 2011) (quoting Khan v. Hip Centralized Lab. Servs., Inc., No. CV-03-2411(DGT), 2008 WL 4283348, at *6 (E.D.N.Y. Sept. 17, 2008) (citations omitted)). "'[A] jury has broad discretion in measuring damages, but it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket.'" Id. (quoting Khan, 2008 WL 4283348, at *6). "Importantly, in calculating the remittitur, the court must use the least intrusive – and most faithful to the jury's verdict – method of reduc[ing] the verdict only to the maximum that would be upheld by the trial court as not excessive." MacMillan, 873 F. Supp. 2d at 559-60 (internal quotation marks and citations omitted). To determine whether an award is so high as to "'shock the judicial conscience,'" the Court must "'consider[ ] . . . the amounts awarded in other, comparable cases.'" DiSorbo v. Hoy, 343 F.3d 172, 183 (2d Cir. 2003) (quoting Mathie v. Fries, 121 F.3d 808, 813 (2d Cir. 1997)). A court should determine whether the award is "within [a] reasonable range," not just "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." Ismail, 899 F.2d at 187.

**B. Compensatory Damage Awards**

Arguing that Plaintiff suffered no more than "garden-variety" emotional distress, Defendants assert that the jury's award of $500,000 in emotional distress damages on Plaintiff's

quid pro quo sexual harassment claims is excessive and should be remitted to no more than $30,000. (Def. Br. (Dkt. No. 256) at 56-64) Defendants also argue that the jury's $1.5 million compensatory damage award on Plaintiff's defamation claim is excessive. They contend that the emotional distress component of this award should be remitted to no more than $70,000, and that the reputational injury component of this award should be remitted to no more than $20,000. (Id. at 64-74)

### 1. NYSHRL and NYCHRL *Quid Pro Quo* Sexual Harassment Claims

"A plaintiff who prevails on a claim of sexual harassment under . . . the NYSHRL or the NYCHRL[] may recover compensatory damages[] for 'emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.'" Caravantes, 2012 WL 3631276, at *22 (quoting Bergerson v. N.Y. Office of Mental Health, Cent. New York Psychiatric Ctr., 652 F.3d 277, 286 (2d Cir. 2011); citing Mendez v. Starwood Hotels & Resorts Worldwide, Inc., 746 F. Supp. 2d 575, 600-01 (S.D.N.Y. 2010)). "The precise amount of compensatory damages in any given case 'depends on a unique set of facts and circumstances.'" Id. (quoting Olsen v. Cnty. of Nassau, 615 F. Supp. 2d 35, 45 (E.D.N.Y. 2009) (citation omitted)).

In this Circuit,

> [e]motional distress awards . . . can generally be grouped into three categories of claims: "garden-variety," "significant" and "egregious." In "garden variety" emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration. "Garden variety" emotional distress claims generally merit $30,000 to $125,000 awards.
>
> "Significant" emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment

> by a healthcare professional and/or medication, and testimony from other, corroborating witnesses.
>
> Finally, "egregious" emotional distress claims generally involve either "outrageous or shocking" discriminatory conduct or a significant impact on the physical health of the plaintiff. In "significant" or "egregious" cases, where there is typically evidence of debilitating and permanent alterations in lifestyle, larger damage awards may be warranted.

Id. (quoting Olsen, 615 F. Supp. 2d at 46-47 (internal quotation marks and citations omitted)).

"[A] court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony." Mendez, 746 F. Supp. 2d at 601 (citing Osorio v. Source Enterprises, Inc., No. 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007)). "However, when a court is convinced that the jury's award is entirely out of proportion to the plaintiff's injury, and was motivated by sympathy rather than by evidence of harm, remittitur is the appropriate remedy." Id.

Here, Plaintiff testified that – when she submitted to Wey's sexual advances for the first time – she "felt so used and weak and . . . was so ashamed that [she] let [it] happen." (Trial Tr. (Dkt. No. 236) at 934) After each subsequent sexual encounter, Bouveng "just felt more and more weak. That [she] didn't mean anything. That everything that [she] felt and thought, that it didn't matter. [She] felt useless" and "ashamed." (Id. at 935) Chemme Koluman testified that Plaintiff seemed "more stressed than usual" in February 2014, at about the time that Plaintiff decided to stop having sex with Wey. (Trial Tr. (Dkt. No. 230) at 360; Trial Tr. (Dkt. No. 236) at 935-36)

There is also evidence that Plaintiff suffered emotional distress as a result of her termination from NYGG, which – a reasonable jury could have found – was caused by her rejection of Wey's sexual advances. Plaintiff testified that Wey's conduct at that time left her "in shock." (Trial Tr. (Dkt. No. 294) at 980) Wey, Koluman, and Weiss testified that Plaintiff

seemed, "angry," "upset," and "stressed" as a result of her termination. (Trial Tr. (Dkt. No. 228) at 272-73; Trial Tr. (Dkt. No. 230) at 367; Trial Tr. (Dkt. No. 234) at 623-24) Wey's anger, screaming, use of profanity, and violent behavior on the day of Plaintiff's termination (see Trial Tr. (Dkt. No. 294) at 979-80, 982), and the surrounding circumstances, tend to support the evidence indicating that Plaintiff suffered emotional distress as a result of her termination.

Plaintiff also testified that the flurry of emails Wey sent to her family and friends – which accused her of consorting with a "naked, dirty, totally drunk" "homeless black man," "par[tying] like crazy," and leading a "double life" (see, e.g., PX 24, 38, 41) – were "embarrassing" and "scary." (Trial Tr. (Dkt. No. 294) at 985) Plaintiff felt that Wey was "[t]rying to humiliate [her] in front of [her] family," and "trying to make [her] look bad in front of everyone [she] know[s] in order to isolate [her]." (Id. at 989) Plaintiff also felt "stressed . . . out" because of "the impact and effect [Wey's emails] had on [her] father." (Id. at 986) Plaintiff testified that Wey's emails "affected [her] a lot and . . . got [her] really upset, stressed, scared that [Wey] would keep on contacting [her father]."[25] (Id. at 986)

Acknowledging that Wey's behavior – in the context of an employment relationship – was outrageous, the Court concludes that the emotional distress evidence establishes no more than "garden variety" emotional distress. Plaintiff described her emotional distress in largely "vague or conclusory terms, without relating either the severity or

---

[25] Defendants argue that the effect of Wey's emails cannot "be considered distress caused by the termination" (Def. Reply Br. (Dkt. No. 284) at 14), but Plaintiff's termination from NYGG was the but-for cause of these emails. Indeed, Wey testified that he sent the emails in order to inform Plaintiff's family about the reasons behind her termination, (Trial Tr. (Dkt. No. 232) at 596-97), and the emails do in fact discuss in detail Plaintiff's purported behavior leading up to her termination. Accordingly, for purposes of considering the emotional distress Plaintiff suffered as a result of her termination, Wey's emails discussing the reasons for her termination cannot be divorced from the termination itself.

consequences of the injury" in a meaningful way. Whatever emotional distress she suffered as a result of her termination appears to have been brief and transitory. There was no evidence of continued shock, nightmares, sleeplessness, weight loss, or humiliation, or of an inability to apply for a new position or to enjoy life in general. Plaintiff's claims of emotional distress were likewise "not supported by any medical corroboration." Olsen, 615 F. Supp. 2d at 46. To the contrary, Defendants' expert – the psychiatrist Dr. Ziv – testified that Plaintiff did not describe any psychiatric symptoms – even minor ones – as a result of Defendants' conduct, and Ziv concluded that Plaintiff did not have suffer from any continued depression, anxiety, phobias, or emotional distress as a result of Defendants' conduct. (Trial Tr. (Dkt. No. 228) at 212, 226) Plaintiff's failure to seek mental health treatment – other than on one occasion in March 2015, several months before trial (id. at 224) – is consistent with Ziv's finding that Plaintiff suffered no long-term emotional distress as a result of Defendant's conduct.

In the Second Circuit, "'[g]arden variety' emotional distress claims 'generally merit $30,000 to $125,000 awards.'" Olsen, 615 F. Supp. 2d at 46; see also Lore, 670 F.3d at 177 ("This Court has . . . affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of 'testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress.' . . . [W]e [have previously] rejected [a] defendant's contention that those damage awards, for 'garden variety emotional distress claims,' 'should have been reduced to between $5,000 and $30,000.'") (citations omitted); Patterson v. Balsamico, 440 F.3d 104, 120 (2d Cir. 2006) (upholding the jury's $100,000 compensatory damages award where "the plaintiff offered testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, [and] stomach pains"); Meacham v. Knolls Atomic

Power Laboratory, 381 F.3d 56 (2d Cir. 2004) (upholding award of $125,000 for "subjective distress"), vacated on other grounds sub nom. KAPL, Inc. v. Meacham, 544 U.S. 957 (2005); DeCurtis v. Upward Bound Int'l, Inc., No. 09 Civ. 5378(RJS), 2011 WL 4549412, at *4 (S.D.N.Y. Sept. 27, 2011) ("A review of the relevant case law in this jurisdiction reveals that plaintiffs with garden-variety claims generally receive between $30,000 and $125,000."); Dotson, 2011 WL 817499, at *15 ("Where emotional distress encompasses humiliation, shame, shock, moodiness and being upset but is devoid of any medical treatment or physical manifestation, it is considered to be 'garden variety.' 'Garden variety' emotional distress claims generally merit $30,000 to $125,000 awards.").

Here, an analysis of cases in this Circuit involving claims of serious sexual harassment in the workplace indicates that the jury's $500,000 compensatory award on Plaintiff's sexual harassment claims is excessive. In Caravantes v. 53rd Street Partners, LLC, No. 09 Civ. 7821(RPP), 2012 WL 3631276, (S.D.N.Y. Aug. 23, 2012), the plaintiff – a heterosexual man who worked as a coffee maker at a restaurant owned by the defendants – testified that defendant Velandia – a manager at the restaurant who is homosexual – forced plaintiff to engage in oral and anal sex in the restaurant's bathroom and elsewhere almost daily for more than two years. Caravantes, 2012 WL 3631276, at *1, *5-6. Plaintiff testified that, during the period that he and Velandia were having sex, he felt "dirty" and "bad" and "wouldn't want to speak to anyone." Id. at *23. He added: "I had no strength. . . . I was dead on the inside." Id. During this period, plaintiff suffered from nightmares, had trouble sleeping, did not associate with his friends, and did not have sexual relations with his wife. Id. Several years after the harassment, plaintiff was hospitalized for a week due to suicidal thoughts. Id. Plaintiff's

testimony was corroborated by his wife and a psychologist, who testified that plaintiff suffered from major depressive disorder. Id. at *23-24.

      After conducting a bench trial and finding liability, the court considered damages. Id. at *1. The court concluded that the case fell "into the 'egregious' category of emotional distress claims, given the extensive nature of Velandia's discriminatory conduct, and the significant impact on [plaintiff's] mental health that resulted from it." Id. at *24 (citing Olsen, 615 F. Supp. 2d at 47). The court also noted that Plaintiff's "compelling testimony" was supported by medical evidence. Id. The court concluded, however, that an award of $150,000 would adequately compensate plaintiff for his injuries, noting that although he "is entitled to substantial damages in this case . . . the evidence does indicate that [plaintiff's] condition is treatable, and that he is currently working in a restaurant." Id. (citations omitted). In reaching this conclusion, the court relied on Katt v. City of New York, 151 F. Supp. 2d 313, 370 (S.D.N.Y. 2001), aff'd in part sub nom. Krohn v. New York City Police Dep't, 60 F. App'x 357 (2d Cir. 2003) and aff'd sub nom. Krohn v. New York City Police Dep't, 372 F.3d 83 (2d Cir. 2004), and Watson v. E.S. Sutton, Inc., No. 02 Civ. 2739 (KMW), 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005), aff'd, 225 F. App'x 3 (2d Cir. 2006).

      In Katt, plaintiff was employed by the New York City Police Department. Katt, 151 F. Supp. 2d at 320. She testified that from "day one" at her precinct, she "experienced a 'rowdy atmosphere' with 'a lot of sexual innuendos, sexual comments, questions, [and] intrusive questions' regarding her personal life and personal sexual habits. Male employees at the precinct routinely touched her on the waist and referred to her as 'sweetheart' or 'honey.'" Id. at 320. Plaintiff also testified that her supervisor "touched [her] in an unwelcome, degrading and sexually suggestive manner" – including "touch[ing] the back of her neck with his tongue" – and

that he once "sprayed her with a water pistol on a summer day when she was dressed in a white t-shirt, and announced to the precinct that he hoped to wet plaintiff's nipples to 'have them show through.'" Id. at 321-22. Plaintiff testified that "these regular incidents of degrading and sexually provocative conduct, as well as unwelcome sexual advances, caused her to suffer severe headaches, stomach ailments, diarrhea, increased upper respiratory allergies and infections," and that she felt "continually run down . . . [and] had trouble sleeping." Id. at 323. She also testified that she "can't really have an intimate sexual relationship like [she] used to." Id. A psychologist corroborated plaintiff's claims of significant and continuing emotional distress, testifying that plaintiff was suffering from post-traumatic stress disorder, and that her "nonfunctional, barely functioning" state is "probably permanent." Id. at 324. The court upheld the jury's award of $400,000 in compensatory damages, finding that "there was ample testimony in this case that the Seventh Precinct's pervasive and sexually hostile work environment has caused the plaintiff substantial and permanent psychological damage." Id. at 371.

In Watson v. E.S. Sutton, Inc., No. 02 Civ. 2739 (KMW), 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005), a jury awarded plaintiff $500,000 in compensatory damages for emotional distress suffered as a result of defendants' unlawful retaliation under Title VII, the NYSHRL, and the NYCHRL. Watson, 2005 WL 2170659, at *14. The court concluded that this award was excessive, because plaintiff had

> not pointed . . . to any comparable cases – that is, cases with no permanent psychological damage or disability resulting from the harassment – with awards so high as the one the jury here gave her. The decisions she has cited approving multi-hundred-thousand dollar awards for emotional damages all involve post-traumatic stress disorder, and plaintiffs who were forced to be medicated and out of work for extended periods of time.

Id. at *15 (citing cases). The court also found, however, that the defendants' "contention that 'garden variety' emotional damage awards are in the range of $5,000 to $30,000 is . . . not

persuasive, because those numbers appear to be at the low end of the range of damages generally awarded under New York law." Id. The court concluded that, "[b]ecause the jury, and th[e] Court, found that [plaintiff] suffered considerable distress, the Court is inclined to remit the award to $120,000, a value within the appropriate range [for garden variety emotional distress] that nevertheless reflects the jury's view that [plaintiff's] distress was considerable." Id. at *16.

In sexual harassment cases in this Circuit where significant awards for emotional distress have been upheld – even absent proof of long-term psychological damage – the harassment had generally continued for years. In Quinn v. Nassau Cnty. Police Dep't, 53 F. Supp. 2d 347 (E.D.N.Y. 1999), for example, the jury awarded the plaintiff – a homosexual male employed at the Nassau County Police Department – $250,000 for emotional distress on a sexual harassment claim under 42 U.S.C. §§ 1983 and 1985, where the plaintiff testified that – for almost ten years – "he was ridiculed, humiliated, abused and singled-out because of his sexual orientation." Quinn, 53 F. Supp. 2d at 351. The defendants argued that the $250,000 award was excessive because (1) "the plaintiff did not begin seeking mental health counseling with a social worker until he had a consultation with an attorney about his case"; and (2) "there was no testimony showing that [plaintiff] will have permanent emotional scars because of the discrimination." Id. at 363. The court disagreed, finding that the $250,000 award "is in line with similar damages award in this Circuit," and noting that plaintiff's testimony, "which his social worker corroborated, as to the emotional distress he suffered from years of chronic, pervasive, humiliating and severe sexual orientation harassment adequately supports the award of compensatory damages in this case." Id.

Here, unlike the plaintiffs in Caravantes, Katt, and Quinn, Plaintiff offered no medical evidence whatsoever corroborating her testimony – which itself was quite limited –

concerning the emotional distress she suffered as a result of Wey's sexual harassment. Indeed, the only medical evidence the jury heard indicated that Wey's sexual harassment had caused Plaintiff no lasting damage. Because cases "approving multi-hundred-thousand dollar awards for emotional damages all involve post-traumatic stress disorder" or medical evidence of some other psychological harm, see Watson, 2005 WL 2170659, at *15, the jury's $500,000 award cannot stand. Moreover, sexual harassment cases that have sustained awards greater than $150,000 have generally involved pervasive harassment that took place over a number of years.

Defendants' argument that only a $30,000 award is appropriate is not persuasive, however. Defendants rely – for the most part – on race and sex discrimination and retaliation cases, and not cases in which an employer pressured his subordinate to have sex, and then had sex with the employee, over the course of several months. (See Def. Br. (Dkt. No. 256) at 57-63)

Only two of the cases cited by Defendants involve sexual harassment, and those cases are distinguishable. In Walia v. Vivek Purmasir & Associates, Inc., 160 F. Supp. 2d 380 (E.D.N.Y. 2000), plaintiff – a young woman – sued her former employer for, inter alia, defamation and sexual harassment under Title VII, the NYSHRL, and the NYCHRL.

Plaintiff had been hired to work as a part-time secretary at defendant Vivek Purmasir's company. Walia, 160 F. Supp. 2d at 383. On her first day of work, Purmasir squeezed her cheeks and told her that she was "very pretty and "very sexy." Id. On the second day, he "came from behind her while she was typing and held onto her shoulders," and later asked her to sit on his lap. Id. Later on, Purmasir tried to order a cocktail dress for plaintiff, and he asked her "out for dinner on several occasions." Id. On the third day, plaintiff was in the elevator with Purmasir when he "grabbed [her] from the back" and squeezed her breasts. Id. at 384. Plaintiff left the job that day. Id. at 384. The next day, Purmasir "threatened to publish

things about [plaintiff] that would bring shame to her if she filed a lawsuit," and "told her that he would write that she was a 'whore . . . and nobody will marry [her].'" Id. Plaintiff later learned that Purmasir had been telling "other people" that she was a "whore" and "a slut," and Purmasir called plaintiff at her home and told her that she was a slut and a whore. Id.

The defendants did not respond to the complaint, and a default was entered against them. Id. at 383. After an inquest, the court concluded that the plaintiff was entitled to $30,000 in compensatory damages for the physical and emotional distress she suffered as a result of defendants' sexual harassment. Id. at 392.

In determining an appropriate compensatory damage award, the court noted that "[e]vidence of the mental anguish and emotional distress suffered by plaintiff came primarily from the testimony of plaintiff herself," who testified that "she suffered humiliation and emotional distress as a result of Purmasir's actions, and her testimony establishes that she has been inhibited from continuing her schooling and from working certain jobs, and that she has been alienated from her family and from her community." Id. at 391-92. The court found that "the expert report of plaintiff's psychologist . . . corroborates this testimony." Id. The court concluded that, although the sexual harassment lasted only three days, "the effects of that harassment have been longstanding and disproportionate as a result of the reaction of plaintiff's family and community," because in plaintiff's culture, "the woman is blamed for the man's conduct." Id. at 392. The court also noted that plaintiff "suffered physical consequences including stomach aches that required hospitalization, sleeping disorders, and depression," and found that "the actual incidents of harassment . . . are particularly egregious." Id. The court concluded that "courts have typically awarded plaintiffs complaining of similar injuries in amounts ranging from $5,000.00 to $65,000.00 as compensatory damages for mental anguish

and emotional distress," and found that $30,000 would be an appropriate award under the

circumstances. Id. at 391-92.

The other case sexual harassment case cited by Defendants – Rodriguez v.

Express World Wide, LLC, No. 12 Civ. 4572 (RJD) (RML), 2014 WL 1347369 (E.D.N.Y. Jan.

16, 2014), report and recommendation adopted, No. 12 Civ. 4572 (RJD) (RML), 2014 WL

1350350 (E.D.N.Y. Mar. 31, 2014) – also involves a default judgment. In Rodriguez, the

plaintiff asserted claims for, inter alia, sexual harassment under Title VII and the NYCHRL

against her former employer. Rodriguez, 2014 WL 1347369, at *1. Plaintiff testified that on her

first day of work, defendant Mendoza made several inappropriate remarks to plaintiff during

training. Id. During a drive to an off-site warehouse, Mendoza continued to make inappropriate

comments to plaintiff, such as "you are so beautiful," and he stroked her hair and rubbed her

shoulder. Id. at *2. He also told plaintiff, among other things, that "he loved her eyes and that

he was 'excited to take business trips with her, where he can lay naked in bed with her.'" Id.

Mendoza also said that "'when he first saw her, he ejaculated on himself.'" Id. After plaintiff

returned from the trip to the warehouse, she left work and did not return. Id.

Plaintiff testified that, as a result of Mendoza's sexual advances, she felt

"uncomfortable and uneasy," "humiliated," and "physically repulsed and disgusted." Id. at *7.

Plaintiff also asserted that she had "suffered severe emotional distress and physical ailments,"

but she did not submit "any medical or mental health records in support of her claim for damages

and . . . provided no evidence of the duration of her emotional distress." Id. The court found

that, "[b]ased on plaintiff's submissions and testimony, the unquestionable severity and intensity

of the sexually harassing behavior, the brief duration of her employment, and the applicable case

law, . . . an award of $10,000 is reasonable to compensate plaintiff for her emotional distress claim." Id. (citing cases)

Walia and Rodriguez provide no guidance here. As an initial matter, the compensatory damage awards in both cases were determined by the court upon a default, and not by a jury. As discussed above, "in calculating [a] remittitur, the court must use the least intrusive – and most faithful to the jury's verdict – method of reduc[ing] the verdict only to the maximum that would be upheld by the trial court as not excessive." MacMillan, 873 F. Supp. 2d at 559-60 (internal quotation marks and citations omitted). This Court must respect the jury's "broad discretion in measuring damages." Dotson, 2011 WL 817499, at *13. Accordingly, cases in which a court has estimated damages after a default are less persuasive here than cases that involve remittiturs of jury awards. Moreover, the harassment at issue in Walia and Rodriquez is not comparable to the harassment Plaintiff suffered, either in severity or duration. Although the defendants' conduct in Walia and Rodriguez was reprehensible, neither case involved a demand for sex that culminated in sexual intercourse. And while Wey's sexual harassment continued for a number of months, the harassment in Walia and Rodriguez lasted several days or less.

Because (1) much of Plaintiff's testimony regarding her emotional distress is "vague or conclusory"; (2) there is almost no evidence of any sort that Plaintiff has suffered any long-term emotional distress; (3) Plaintiff offered no medical corroboration for her emotional distress, and Defendant offered medical testimony demonstrating that Plaintiff has suffered no long-term consequences from Wey's sexual harassment, this Court concludes that an award of $150,000 constitutes "the maximum that [can] be upheld . . . as not excessive" on her sexual harassment claims. See MacMillan, 873 F. Supp. 2d at 560 (internal quotation marks and citations omitted). This amount will compensate Plaintiff for the emotional distress, humiliation,

embarrassment, and stress she suffered for a number of months as a result of Wey's outrageous sexual harassment, but recognizes the absence of evidence suggesting any long-term effects or consequences.

Accordingly, Defendants' motion for a new trial concerning compensatory damages on Plaintiff quid pro quo sexual harassment claims will be granted unless Plaintiff agrees to a remittitur reducing the compensatory damage award from $500,000 to $150,000.

**2. Defamation Claim**

The jury awarded Plaintiff $1.5 million in compensatory damages on her defamation claim. Because Plaintiff did not seek damages for economic harm, she may only recover on her defamation claim for (1) emotional distress, and (2) damage to her reputation.

"The unique nature of [defamation] cases is well established. '"In actions for other torts there is generally . . . some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part."'" Yammine v. DeVita, 43 A.D.3d 520, 521 (3d Dept. 2007) (quoting Frechette v. Special Mags., 285 A.D. 174, 178 (3d Dept. 1954) (quoting Lynch v. New York Times Co., 171 A.D. 399, 401 (1st Dept. 1916))). "For that reason, the amount of such damages is peculiarly within the jury's province[,] requiring prudence and restraint by a trial court in the exercise of its discretion over these awards." Id. (internal citations and quotation marks omitted); see also Cantu v. Flanigan, 705 F. Supp. 2d 220, 227 (E.D.N.Y. 2010) ("Due to the uncertainties in calculating [non-economic] damage awards [in defamation cases], New York courts have consistently held that deference to the jury's findings is required in considering whether to reduce a jury's award." (citing Calhoun v. Cooper, 206 A.D.2d 497, 497 (2d Dept. 1994))). "Jurors are uniquely positioned to assess the evidence

presented at trial and assign a monetary value to the plaintiff's non-economic damages." Cantu, 705 F. Supp. 2d at 227. "Therefore, although this court cannot avoid its duty to conduct section 5501(c) review of the jury's verdict, the discretion to reduce such an award should be 'exercised sparingly' under New York law." Id. (quoting Calhoun, 206 A.D.2d at 497).

"In calculating non-economic damages in a defamation case, including humiliation, mental suffering and damage to plaintiff's reputation, a jury may properly consider a number of factors." Id. Here, the jury was instructed to consider "[P]laintiff's standing in the community, the nature of the statement made about [P]laintiff, the extent to which the statement was circulated, the tendency of the statement to injure a person such as [P]laintiff, and all of the other facts and circumstances in the case."[26] (Trial Tr. (Dkt. No. 244) at 1629; see also Cantu, 705 F. Supp. 2d at 227-28 (listing same factors)) "Additionally, the jury may consider all future harm to the plaintiff's reputation, as well as any humiliation or mental anguish that plaintiff would suffer in the future." Cantu, 705 F. Supp. 2d at 228 (citing Calhoun, 206 A.D.2d at 497 (reversing trial court's decision and reinstating jury's award for "future compensatory damages" in a defamation case)).

Here, Plaintiff's testimony at trial establishes that she suffered injury as a result of Defendants' defamatory statements. Plaintiff testified that she felt "humiliated" and "embarrassed" by the defamatory statements on The Blot website, including the claim that she was a "sex slave to a pimp." Plaintiff expressed concern that if she were to "apply for a job . . . [her] future employers would see [these statements.]" (Trial Tr. (Dkt. No. 294) at 1018-19) Plaintiff also testified that she found it "creepy and scary" that Wey would write such statements,

[26] Defendants have not challenged the Court's instructions.

and that it made her angry that Wey "just gets to continue to try to break [her] down or destroy [her] life." (Id. at 1019)

Plaintiff also testified that she did not feel comfortable returning to her small hometown of Vetlanda, because the Blot articles "portray[] [her] like [she is] some kind of prostitute," and "[i]t would be just too embarrassing to try to explain everything." (Id. at 1020) Plaintiff also testified that her relationship with her aunt, Helena Bouveng, – has been damaged as a result of the Blot statements. She and her aunt "don't talk as much as before, and [her aunt] [doesn't] want to be involved." (Id. at 1021) Plaintiff suffered emotional distress because of Wey's efforts in the Blot articles to make her aunt – a member of the Swedish parliament – "look bad," "all because of [Plaintiff]." (Id.)

As a result of the Blot articles, Plaintiff has

> lost a lot of friends and people don't want to be around me anymore. I really don't want to go out and see people either. I don't want to meet people. I don't want to post stuff or anything because I feel I will get abused and I feel bad. He is stalking me. So whatever I do, if I post it, I'm here at this café, he will know where I am. . . . I have applied for jobs, but I don't feel as confident as I did before. . . . [I]t's been a tough year.

(Id. at 1025-26)

Dr. Ziv confirmed that Plaintiff had suffered emotional distress as a result of the defamatory Blot articles, particularly from the allegations about prostitution and drug use. (Trial Tr. (Dkt. No. 228) at 252-53) Plaintiff also told Ziv that she was upset that the Blot headlines and images appeared first in the results of Google searches of her name. (Id. at 251, 253) Ziv testified, however, that although Plaintiff "was upset when [the articles] were first posted," she "is relieved that [they are] no longer on the internet." (Id. at 253, 255) And, as discussed above, Ziv testified that Plaintiff exhibited no continuing psychiatric symptoms as a result of Defendants' actions, and Plaintiff described no such symptoms to her. (Id. at 226-27)

The evidence of the emotional distress Plaintiff suffered as a result of Defendants' defamatory statements is similar in some respects to the evidence concerning the emotional distress she suffered as a result of Wey's sexual harassment. Some of the testimony Plaintiff offered – for example, that she was "humiliated" and "embarrassed" by the Blot articles – is vague and conclusory. And Plaintiff offered no medical evidence to corroborate her testimony about emotional distress. Plaintiff did, however, offer detailed testimony about the effect of the defamatory statements on her personal relationships, including the loss of friends and strained relationships with family members. The defamatory statements have discouraged Plaintiff from socializing and from returning to her small hometown, and have hurt her confidence in applying for jobs.

In arguing that the compensatory award for defamation is excessive here, Defendants rely on Rossignol v. Silvernail, 185 A.D.2d 497 (3d Dept. 1992); Weldy v. Piedmont Airlines, No. 88 Civ. 0628E(M), 1995 WL 350358 (W.D.N.Y. May 30, 1995); and the Walia case discussed above. (Def. Br. (Dkt. No. 256) at 66-68)

In Rossignol,

> [p]laintiff was the victim of a 2 1/2-year ordeal orchestrated by defendants during which time his professional and personal integrity were called into question. He was labeled a child abuser . . . and accused of having sexual intercourse with and performing deviate sexual acts upon a four-year-old child in addition to beating her and indiscriminately injecting her with needles.

Rossignol, 185 A.D.2d at 499. "These accusations . . . were communicated to State and local social services agencies and to plaintiff's employer, and prompted numerous investigations." Id. at 498.

The jury awarded plaintiff $800,000, but the trial court remitted the award to $85,000. Id. The remittitur was upheld on appeal.

The Third Department found that "the proof failed to establish the presence of substantial injury so as to justify the jury's original $800,000 award," because "plaintiff has been able to maintain continuous employment in his profession and is not suffering from any traumatic medically corroborated physical or psychological conditions attributable thereto." Id. at 499. The $85,000 reduced award was appropriate because "[t]he physical and psychological ramifications attendant to . . . addressing, defending and dealing with these baseless accusations are well established in the record, as is the fact that such charges are difficult to escape, especially in the small community where plaintiff lives and practices his profession." Id. at 499-500.

In Weldy v. Piedmont Airlines, No. 88 Civ. 0628E(M), 1995 WL 350358 (W.D.N.Y. May 30, 1995), plaintiff's employer told plaintiff – in the presence of others – that "he was being terminated because of 'aggravated assault.'" Weldy, 1995 WL 350358, at *2. The jury found the employer liable for defamation, and awarded plaintiff $150,000 in compensatory damages. Id. at *1. In granting a remittitur, the court noted that although plaintiff's testimony that he was "very, very scared and upset" – because he "didn't think anybody would hire [him] [given] the aggravated assault" – "could have been taken by the jury as showing the plaintiff's then humiliation and embarrassment, there was no evidence that such had any substantial and enduring effect so as to justify an award of $150,000 in compensatory damages." Id. at *3. The court found the compensatory award "shockingly excessive," and concluded "that the highest justifiable compensatory damages award is $30,000." Id. at *4.[27]

[27] As noted, Defendants also rely on Walia, the facts of which have been discussed above. Given the widespread nature of the defamatory statements here, their duration, and their relative permanence on the internet, Walia provides no useful guidance as to an appropriate compensatory award.

Here, this Court concludes that evidence of the emotional distress Plaintiff suffered as a result of the Defendants' defamatory statements cannot support a $1.5 million compensatory damage award. As in Rossignol, Plaintiff "is not suffering from any traumatic medically corroborated physical or psychological conditions attributable" to Defendants' defamatory statements. Rossignol, 185 A.D.2d at 499. And as in Weldy, there is no evidence here that the "embarrassment" and "humiliation" about which Plaintiff testified "had any substantial and enduring effect." Weldy, 1995 WL 350358, at *3.

As to loss of reputation, however, the circumstances in Rossignol and Weldy are drastically different from the circumstances here. Defendants engaged in a daily campaign of Internet-based defamation against Plaintiff that lasted for approximately ten months (see Ct. Ex. 2 (Stipulation)), during which time over 50,000 separate viewers visited The Blot Magazine's website each month. (Trial Tr. (Dkt. No. 228) at 193) Defendants also used search engine optimization techniques to ensure that Blot articles concerning Plaintiff would appear high on any search engine result list regarding Plaintiff, thus maximizing the damage to Plaintiff's reputation. In an effort to ensure that Blot articles would appear first in response to a search of Plaintiff's name, Defendants went so far as to arrange for phony and fabricated "comments" to be made on Blot articles about her. (Court Ex. 1 (Stipulation))

The Blot articles themselves are replete with egregiously defamatory statements about Plaintiff, referring to her as, inter alia, a "sex slave," "extortionist," "street walker," "fraudster," "fugitive," and "cocaine dealer's honey," and accusing her of "attempt[ing] to extort US$1 billion out of [Wey]," "defraud[ing] JP Morgan Chase bank," "blackmailing an American in a mafia-style shakedown," being "kicked out of America," and "vying for the attention of drug dealers and male patrons [at a nightclub] ready to pay for some 'special services' at a price."

(See PX 61 at 1,2; PX 63 at 2; PX 64 at 2; PX 85 at 1, 4, 24; PX 87 at 8, 17; PX 98 at 4, 12, 14, 15) The Blot articles also include many images of Plaintiff, her family, and her friends, together with defamatory statements or images. For example, one of the Blot articles features a photograph of Plaintiff and James Chauvet superimposed on a photograph of a white powdery substance on a tabletop, and bears the caption "BUSTED." (PX 87 at 19)

Defendants' defamatory statements are far more extensive – both in terms of dissemination and duration – than the defamation at issue in the cases cited by Defendants. For example, in Weldy, the defamation consisted of one statement made to a small group of people that plaintiff "was being terminated because of 'aggravated assault.'" See Weldy, 1995 WL 350358, at *2. The defamatory statements in Rossignol were of a serious nature, and received greater dissemination: they "were communicated to State and local social services agencies and to plaintiff's employer." Rossignol, 185 A.D.2d at 498.

Here, however, the defamatory statements in the Blot were not only outrageously egregious in nature, but also reached hundreds of thousands of people, and appeared on the first page of search results when Plaintiff's name was entered into Google.com over the course of a ten month period prior to trial.[28] See Court Ex. 2 (Stipulation); cf. Dattner v. Pokoik, 81 A.D.2d

[28] The jury may also have concluded, from the evidence presented at trial, that The Blot's defamatory statements about Plaintiff would not soon disappear from the internet. The jury was entitled to take into account "all future harm to the plaintiff's reputation, as well as any humiliation or mental anguish that plaintiff would suffer in the future." Cantu, 705 F. Supp. 2d at 228 (citing Calhoun, 206 A.D.2d at 497). Indeed, the jury was instructed to award Bouveng "the sum that you find from the preponderance of the evidence will fairly and justly compensate her for any damages you find she has sustained, and is reasonably certain to sustain in the future, as a direct result or as a reasonably foreseeable consequence of a defendant's conduct." (Trial Tr. (Dkt. No. 244) at 1628 (emphasis added)).

If the jury took future harm to reputation into account, based on the continued presence of Blot articles on the internet in some form, the jury's concern would have been well founded. A Google search of Plaintiff's name conducted a recently as March 28, 2016, continues to yield links to the Blot articles associating Plaintiff with criminal acts and sexual misconduct. See, e.g.,

572, 574 (2d Dept. 1981) (finding compensatory damage award excessive where the newspaper

in which a defamatory article appeared "has a relatively small circulation of 7,500 copies");

Allen v. CH Energy Grp., Inc., 58 A.D.3d 1102, 1104 (3d Dept. 2009) (reducing compensatory

damage award where "there is no evidence that the statement was widely disseminated" and "it

appears to have been heard by a very small number of people and perhaps only one person").[29]

           There is also an aspect of accessibility and permanence here that cannot be

ignored, and which reflects the enormous change in the media now used to disseminate

---

Benjamin Wey, Journalist Benjamin Wey Responds to Hanna Bouveng Blackmail, $850 Million Extortion, The Blot Magazine (Feb. 25, 2015), https://www.theblot.com/journalist-benjamin-wey-responds-hanna-bouveng-blackmail-extortion-7736305.

[29] The defamation at issue in the instant case is also far more extensive than the defamation at issue in Angel v. Levittown Union Free Sch. Dist., 171 A.D.2d 770, 772 (2d Dep't 1991), Nellis v. Miller, 101 A.D.2d 1002, 1003 (4th Dep't 1984), and Dalbec v. Gentleman's Companion, Inc., 828 F.2d 921, 928 (2d Cir. 1987), cited by Defendants. (Def. Br. (Dkt. No. 256) at 68)

Defendants reliance on Massre v. Bibiyan, No. 12 Civ. 6615(KPF), 2014 WL 2722849 (S.D.N.Y. June 16, 2014) is likewise misplaced. (Def. Br. (Dkt. No. 256) at 70) In that case, plaintiff sued for defamation based on defendant's posting of an entry on "the Ripoff Report, a consumer reporting website, . . . that claimed, among other things, that [plaintiff] was facing civil and criminal charges because of his involvement in a Ponzi scheme." Massre, 2014 WL 2722849, at *1. After a default was entered, plaintiff requested $100,000 in compensatory damages for the defamatory statements posted on the Ripoff website. Id. The magistrate judge recommended that plaintiff's claim for compensatory damages be denied, and the district court agreed. Id. at *5.

While Massre involves the calculation of a damage award by the court following a default, this case involves a jury's award after a full trial. As noted above, a jury's compensatory damage award in a defamation case is "peculiarly within the jury's province." Yammine, 43 A.D.3d at 521. In any event, Plaintiff has produced much more evidence about the nature of Defendants' conduct than did the plaintiff in Massre, providing a more substantial record for determining the harm to Plaintiff's reputation. For example, the editor of The Blot Magazine testified that over 50,000 separate viewers visited The Blot's website each month during the period that Defendants' defamatory statements about Plaintiff were on display (Trial Tr. (Dkt. No. 228) at 193), and the jury heard testimony about how Defendants utilized search engine optimization techniques to maximize the damage to Plaintiff's reputation. (Court Ex. 2 (Stipulation); Trial Tr. (Dkt. No. 228) at 153) Moreover, the statements at issue here are far more extensive than those in Massre, as they appeared in numerous articles and accused Plaintiff of committing numerous crimes and other misconduct. Accordingly, the Massre court's denial of compensatory damages does not foreclose a large award in this case.

defamatory statements. In the past, defamation plaintiffs might sue over a slanderous statement made in conversation, or over a one-day story in a newspaper, or about an account delivered over radio or television in a minute or two. The impact of defamatory statements was much more apt to be transitory, particularly for a private figure – such as Hanna Bouveng – who suffered defamation in connection with a private matter. We live in a different world today, where consideration of a job applicant might well begin with a Google search. And once defamatory statements find their way onto the internet, they do not disappear overnight, as this case demonstrates.

In calculating the damage to Plaintiff's reputation, the Court concludes that it was reasonable for the jury to consider, inter alia, the media used to transmit, disseminate, and store the defamatory statements; the accessibility of this media to anyone with an interest in Hanna Bouveng – including a prospective employer; the permanence of this material; and the likelihood of future harm to reputation, all of which were demonstrated by the evidence in this case. Moreover, the jury instructions concerning compensatory damages for defamation gave broad latitude to the jury to consider all of these matters. (Trial Tr. (Dkt. No. 244) at 1628-30)

Defendants argue, however, that regardless of the severity, dissemination, and duration of their defamatory statements regarding Plaintiff, "[c]ases in the defamation context simply fail to result in six-figure damages awards absent a significant injury to the plaintiff's business reputation." (Def. Br. (Dkt. No. 256) at 68) It is true that the largest compensatory damage awards approved by New York courts in defamation cases involve reputational injuries suffered by well-established business professionals.

In Osorio v. Source Enterprises, Inc., No. 05 Civ. 10029(JSR), 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007), for example, "plaintiff was the Editor-in-Chief at The Source

Magazine, which the evidence showed was one of only a handful of leading hip-hop magazines." Osorio, 2007 WL 683985, at *6. The plaintiff's defamation claim "rested on a statement [defendant Raymond] Scott[ – a former officer of defendant Source Enterprises, Inc. –] made in an interview with . . . a writer for the website AllHipHop.com." Id. During the interview, Scott told the writer that plaintiff – who had complained to her employer about gender discrimination – "'tried to extort us to be like listen . . . if you promise not to fire me or . . . [give me] some type of contract then I'll take the complaint away.'" Id. (citation omitted). Scott's statement was later published in an article on the AllHipHop.com website. See id. at *10. The jury – which considered only non-economic damages – awarded plaintiff $3.5 million in compensatory damages for damage to her reputation. Id. at *5, *10. The court upheld the award:

> [W]hile the award was undoubtedly substantial, there was adequate evidence of damage to plaintiff's reputation in the hip-hop industry following the publication of the article containing Scott's defamatory statement. . . . The jury could reasonably have credited plaintiff's testimony that Scott's defamatory statement had "branded [her] as a criminal in the industry" and thereby impaired her ability to work in that industry. . . . In these circumstances, the $3.5 million award does not "exceed[] the reasonable range" for recoveries.

Id. at *10 (citations omitted).

Similarly, in Cantu v. Flanigan, 705 F. Supp. 2d 220 (E.D.N.Y. 2010), the court considered a defamation claim brought by Cantu, "a businessman who lives in Mexico City, Mexico," who "works in the petroleum industry, and . . . [who] has worked hard to build a world-wide reputation within that industry as a man of integrity." Id. at 222. Flanigan – the defendant and a businessman who served as president of a Bahamian corporation – believed that Cantu could help him collect on a judgment that Flanigan had obtained against a Mexican petroleum workers union. Id. at 222-23. In order to persuade Cantu to assist him, Flanigan "engaged in a course of conduct designed to pressure [Cantu] into either paying [Flanigan] the

amount of the default judgment, or using his position and influence to help [Flanigan] collect from the union." Id. at 223. In furtherance of this scheme, Flanigan prepared a legal complaint against Cantu alleging that he "was the operations manager of a racketeering enterprise, and that he had laundered large sums of money." Id. The document also alleged that Cantu was involved in drug cartels, had illegally smuggled oil into the United States, and had conspired with Iraqi President Saddam Hussein to illegally circumvent sanctions against Iraq. Id. Flanigan then met with a reporter from a widely-circulated Mexican magazine, and submitted a copy of the draft complaint to the Eastern District of New York, where it became publicly accessible on an electronic database. Id. at 223-24. An article published in the Mexican magazine – which was circulated around the world – repeated Flanigan's allegations. Id. at 224. The article also prompted criminal investigations of Cantu by the Mexican and U.S. governments. Id. At trial, Cantu introduced evidence that "the damage to his reputation had resulted in an inability to secure [several] multi-million dollar contracts." Id.

The jury awarded Cantu $150 million in compensatory damages for harm to his reputation. Id. at 226. The court sustained the award, because (1) plaintiff "had a positive reputation throughout the petroleum industry and [] his reputation for honesty and fair business practice was recognized throughout the world by his peers," and "[t]he evidence [] indicated that [plaintiff's] reputation enabled him to secure large, multi-million dollar contracts"; (2) "the defendant's statements were . . . inflammatory"; (3) "the statements at issue [] were circulated throughout the world"; (4) the statements "addressed [plaintiff's] professional reputation within the petroleum industry . . . and were made such that they would appear to be coming from a credible source"; and (5) the defendant "engaged in a deliberate course of conduct that can only be described as attempted criminal extortion." Id. at 228-29. The court noted that it "ha[d]

found no instances where a jury has awarded, or a New York court has upheld, a verdict as large as $150,000,000 for non-economic damages in a defamation case." Id. at 229. The court nonetheless concluded, however, that the award did not deviate materially from reasonable compensation. Id. at 231.

In upholding the jury's compensatory damages award, the Cantu court noted that "New York courts have approved at least one multi-million-dollar damages award in a defamation case," citing Prozeralik v. Capital Cities Communications, Inc., 82 N.Y.2d 466 (1993). See Cantu, 705 F. Supp. 2d at 229. In Prozeralik,

> a television station and a radio station both falsely identified a prominent local businessman as the victim of an abduction and beating, and falsely stated that the F.B.I. was investigating the possibility that the businessman owed a debt to organized crime figures. [82 N.Y.2d at 470-71 ("Prozeralik II").] After a jury trial, plaintiff was awarded $1,487,525 to compensate for his direct financial losses, as well as $4,000,000 to compensate for non-economic injuries, including mental suffering and damage to plaintiff's reputation. [Prozeralik v. Capital Cities Communications, Inc., 188 A.D.2d 178, 185 (4th Dept. 1993) ("Prozeralik II").] On appeal, the appellate division held that this award did not "deviate[ ] materially from what would be reasonable compensation." Id. In doing so, the court explained that it found several factors to be important. Prozeralik I, 188 A.D.2d at 184-85. First, the appellate division found it significant that the plaintiff owned several businesses in the area, and that his businesses depended upon his reputation within the community. Id. Second, the appellate division found that a reputation for being involved in organized crime would tend to cause plaintiff's customers to withdraw their financial support from plaintiff's businesses. Id. Third, the appellate division noted that defendant did not challenge the additional award of $1,487,525 for direct financial loss. Id. Taken together, these considerations led the appellate division to uphold the award of $4,000,000 for non-economic injuries.
>
> After the case was remanded on other grounds, the appellate division once again upheld an even larger award of compensatory damages. [Prozeralik v. Capital Cities Communications, 222 A.D.2d 1020, 1020 (4th Dept. 1995) ("Prozeralik IV").] According to the appellate division, it was acceptable to award plaintiff $1,500,000 for direct financial loss, $6,000,000 for non-economic "injury to the plaintiff's reputation and standing in the community," and $3,500,000 for non-economic emotional harm. Prozeralik v. Capital Cities Commc'ns, Inc., No. 48424, 1995 WL 17810583 (Sup.Ct., Niagara County Mar. 24, 1995) ("Prozeralik III"); Prozeralik IV, 222 A.D.2d at 1020.

Cantu, 705 F. Supp. 2d at 229-30 (footnotes omitted).

Defendants here argue that "Plaintiff dramatically overreaches by pretending that her case compares to defamation cases with multi-million dollar awards. [These] cases . . . involved plaintiffs who established significant business reputations, and injury to their reputations, with ample trial evidence." (Def. Reply Br. (Dkt. No. 284) at 35) It is true that the courts in these cases sustained juries' large compensatory awards based on evidence that the plaintiffs – who had each attained a significant degree of professional status – suffered damage to their reputations as a result of defendants' defamatory statements.

Here, however, Plaintiff was at the outset of her professional career. She was well educated, and had held a responsible position for a Norwegian marketing firm. But she came to the United States in her mid-twenties with the goal of pursuing a career on Wall Street. (Trial Tr. (Dkt. No. 228) at 222-23, 245; Trial Tr. (Dkt. No. 236) at 852) She accepted a position at a Wall Street investment firm, NYGG, serving as the director of corporate communications, and was being groomed to take on the role of marketing director for a Swedish life insurance company. (Trial Tr. (Dkt. No. 232) at 489, 540; Trial Tr. (Dkt. No. 236) at 815-17, 916-18)

Acknowledging that Plaintiff was at the outset of what appeared to be a promising career – and had not established a professional reputation in any way comparable to the professional reputations of the plaintiffs in Osorio, Cantu, and Prozeralik – Plaintiff nonetheless suffered damage to her budding professional reputation as a result of Defendants' egregiously defamatory statements. In those defamatory statements, Defendants accused Plaintiff not only of sexual misconduct, prostitution, drug dealing, and alcoholism, but also of a host of crimes – including visa fraud and bank fraud – and financial misdeeds victimizing her Wall Street

employer. In particular, Defendants accused Bouveng of extorting, blackmailing, and defrauding her employer.

Defendants carefully and maliciously chose falsehoods and lies that would do maximum damage to Plaintiff's burgeoning professional career, and then employed a media that would disseminate those falsehoods and lies as broadly as possible, and in such a manner that they would likely be seen by anyone who was contemplating hiring Bouveng. It is not hyperbole or speculation to suggest that any substantial firm engaged in finance, marketing or public relations – the areas in which Plaintiff has worked and where her ambitions lie – would, after reading such allegations as the result of a Google search, hesitate to interview such a person, much less offer them a position. We live in a highly competitive, information-driven world, and most employers will not have the time or inclination to investigate whether such disturbing allegations are true. They will simply move on to the next candidate. Accordingly, it is idle to suggest that Bouveng's professional reputation has not been damaged by Defendants' defamatory statements. It has been grievously damaged.

To accept Defendants' arguments here would give a license to those with power and resources to disseminate defamatory falsehoods that destroy careers before they can become well established. It cannot be that a defendant can escape liability for causing such damage by choosing a victim who is at the outset of her career. Indeed, there is a compelling argument that plaintiffs at this stage of their careers are more vulnerable and more worthy of a remedy than more established individuals who have the resources and business networks necessary to more effectively combat the falsehoods and lies that have damaged their professional reputations.

This Court recognizes that "all [damage] awards must be supported by competent evidence concerning the injury." Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974). It also

recognizes, however, that "[n]ew factual scenarios may arise that warrant larger awards than those approved in prior cases." Cantu, 705 F. Supp. 2d at 226-27 (citing So v. Wing Tat Realty, Inc., 259 A.D.2d 373, 374 (1st Dept. 1999) (review of damage awards "cannot be based upon case precedent alone, because comparison of injuries in different cases is virtually impossible.")). The unique nature of the instant case warrants a significant compensatory damage award, despite the fact that Plaintiff was at the outset of her professional career at the time Defendants' defamatory statements were disseminated.

In the internet age in which we live, an individual's online presence is as important – perhaps more important early on – than her physical presence. Acting out of pure malice and spite, Defendants used the internet to ensure that no prospective employer would interview Bouveng, much less hire her, by intentionally disseminating scores of the most professionally damaging lies and falsehoods about her that they could conceive of. She is entitled to compensation for the damage Defendants have caused to her professional reputation, and they will not be heard to complain that she has not listed the interviews she never obtained, or the jobs she lost, as a result of their egregiously defamatory falsehoods. Having caused the harm, Defendants cannot escape the liability.

Defendants argue that "to the extent Plaintiff contends that the mode of publishing the statements at issue here – through The Blot, an internet magazine, using search engine optimization – is an aggravating factor . . . , such an argument should be viewed with skepticism." (Def. Br. (Dkt. No. 256) at 73) Defendants acknowledge that "internet publications have the potential to have great reach," but they argue that, because of "the sensationalist tone of The Blot articles at issue," recipients of the defamatory statements "'do not necessarily attribute the same level of credence to the statements [that] they would accord to statements made in other

contexts.'" (Id. at 73-74 (quoting Sandals Resorts Int'l, Ltd. v. Google, Inc., 86 A.D.3d 32, 43-44 (1st Dept. 2011) (internal quotation marks omitted))

Sandals Resorts Int'l, Ltd. v. Google, Inc., 86 A.D.3d 32 (1st Dept. 2011), the case on which Defendants rely, notes that the premise that "readers give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts," generally applies to "posted remarks in message boards and in chat rooms," or to online "blogs" and anonymous, widely distributed emails. Sandals, 86 A.D.3d at 44. The format of The Blot Magazine is that of a standard news website, however. As this Court has previously stated,

> [The Blot Magazine] offers articles in typical categories, such as politics, money, tech, news, health, entertainment, and sports. . . . The articles . . cite from and link to government documents, and they refer to information allegedly obtained from government authorities. For example, the articles report on James Chauvet's criminal record and include hyperlinks to "FBI criminal records." See [PX] 61 at 4. The articles also assert that a "[State Department] official confirmed that Hanna Bouveng's status would be a serious visa violation subject[ing] her to immediate arrest and deportation." [See PX 63 at 6.] . . . The point is that the articles purport to present facts about plaintiff Bouveng and her associates. The articles make factual assertions that are capable of being objectively characterized as true or false, and the assertions that are made are quite clear and direct.

(June 11, 2015 Conf. Tr. (Dkt. No. 216) at 6-7) This Court thus rejects Defendants' assertion that viewers of Blot articles would give them less credence because of the format in which they appear.

As this Court noted at the outset, compensatory damage awards in defamation cases are – under New York law – "peculiarly within the jury's province," and this Court must use "prudence and restraint . . . in the exercise of its discretion over these awards." Yammine, 43 A.D.3d at 521 (internal quotation marks and citations omitted). Here, the jury considered "[P]laintiff's standing in the community, the nature of the statement[s] made about [P]laintiff,

the extent to which the statement[s] w[ere] circulated, the tendency of the statement[s] to injure a person such as [P]laintiff, and all of the other facts and circumstances in the case," including the existence of present harm to reputation and the likelihood of future harm to reputation. (See Trial Tr. (Dkt. No. 244) at 1628-29)

A consideration of these factors here points in the direction of a substantial compensatory award. A jury that was properly instructed on the law concluded that $1.5 million would fairly compensate Plaintiff for the emotional distress and reputational harm she suffered, and was reasonably likely to suffer in the future, as a result of Defendants' outrageously defamatory statements, which were deliberately disseminated in a fashion to cause maximum damage to Plaintiff's reputation. Under the unique circumstances of this case, the Court will not disturb the jury's well considered judgment.

Accordingly, Defendants' motion for a new trial concerning compensatory damages on Plaintiff's defamation claim will be denied.

**C. Punitive Damage Awards**

Defendants argue that this Court must remit the jury's punitive damage awards on Plaintiff's defamation claim because they "can only be the result of passion or prejudice, [are] unconstitutionally high, and should be reduced to an amount reasonable for the non-violent claim of defamation and proportional to a proper compensatory award." (Def. Br. (Dkt. No. 256) at 13)

**1. Legal Standard**

"Regarding the magnitude of punitive damage awards, due process requires that they be '"reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition."'" Hill v. Airborne Freight Corp., 212 F. Supp. 2d 59, 75

(E.D.N.Y. 2002) aff'd, 93 F. App'x 260 (2d Cir. 2004) (quoting Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992) (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21 (1991))). In determining whether a punitive damage award is excessive, courts must consider the "guideposts" established by the Supreme Court in BMW of North Am., Inc. v. Gore, 517 U.S. 559 (1996), including "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996) (citing Gore, 517 U.S. at 575).

The Supreme Court has noted that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517 U.S. at 575. Courts determine the reprehensibility of a defendant's conduct by considering, inter alia, whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (citation omitted); see Norris v. New York City Coll. of Tech., No. 07-CV-853, 2009 WL 82556, at *7 (E.D.N.Y. Jan. 14, 2009) ("Factors bearing on the degree of reprehensibility include '(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct.'" (quoting Lee, 101 F.3d at 809 (citing Gore, 517 U.S. at 575-77))). "The existence of any one of these factors weighing in favor of a plaintiff may not be

sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." State Farm, 538 U.S. at 419.

With respect to the appropriate ratio of compensatory damages to punitive damages, the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." Id. at 424 (citations omitted). However, the Court has noted that "[o]ur jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. at 425.

Even when the "punitive award is not beyond the outer constitutional limit marked out . . . by the three Gore guideposts," a court must separately determine whether the award is "'so high as to shock the judicial conscience and constitute a denial of justice.'" Mathie, 121 F.3d at 816-17 (quoting Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978)); see also Payne v. Jones, 711 F.3d 85, 97 (2d Cir. 2012) ("A federal [district] court is not required to find that the jury's award was so excessive as to violate due process, as the Supreme Court was compelled to find in Gore, in order to justify setting the award aside. . . . It therefore follows that a degree of excessiveness less extreme than 'grossly excessive' will justify a finding that supports imposing a remittitur." (internal citations omitted)). Moreover, "a federal court in a case governed by state law[ – as here –] must apply the state law standard for appropriateness of remittitur." Payne, 711 F.3d at 97 n.8 (citing Gasperini, 518 U.S. at 429–30). Accordingly, this Court must apply N.Y. C.P.L.R. § 5501(c), which – as discussed above – "provides generally that damages awards are excessive or inadequate if they 'deviate[] materially from what would be reasonable compensation.'" Id. ("While it is not clear from the language of the New York

statute that it was intended to apply to punitive, as well as compensatory, damages, it is hard to imagine that the New York legislature expected its courts to exercise this supervisory responsibility only as to compensatory damages, and not as to punitive damages.").

In determining whether a punitive damages award is excessive, a court must "keep in mind the purpose of punitive damages: 'to punish the defendant and to deter him and others from similar conduct in the future.'" Lee, 101 F.3d at 809 (2d Cir. 1996) (citation omitted). The excessiveness inquiry for punitive damages, as with compensatory damages, "requires comparison with awards approved in similar cases." Mathie, 121 F.3d at 817.

**2. Analysis**

**a. Reprehensibility of Defendants' Actions**

With respect to the reprehensibility of their actions, Defendants "do not dispute that the jury was entitled to find Defendants' conduct in publishing articles in The Blot to be reprehensible," and they concede that the jury found that they acted with malice in publishing the defamatory statements in The Blot. (Def. Br. (Dkt. No. 256) at 75, 78) Defendants argue, however, that "[l]arge punitive damages verdicts typically involve physical injury to the plaintiff," and that "[Defendants'] conduct [here] did not involve violence or a threat of violence." Id. at 78. They also argue that "[t]he evidence . . . is vague and speculative at best as to whether the Defendants have been responsible for repeated instances of misconduct." Id. Finally, they argue that their "reprehensibility is mitigated substantially by Plaintiff's provocation" – i.e., her "threat[s] to refer Mr. Wey to law enforcement and to embarrass his family through false accusations of forced sexual conduct." Id.

This Court finds that Defendants' conduct in publishing the defamatory statements in The Blot was reprehensible to an extraordinary degree. Although Defendants'

conduct does not involve violence or the threat of violence, the malicious, calculated, and repeated nature of Defendants' conduct – involving countless egregiously defamatory postings over a ten-month period that ended only weeks before trial – requires a significant punitive damage award.

The evidence at trial established that Defendants acted with extreme malice in publishing their defamatory statements about Plaintiff. There was ample evidence that Wey used The Blot as a vehicle to write "attack articles" about "individuals [who] he considered his enemies." (Trial Tr. (Dkt. No. 228) at 146) Indeed, Wey told the editor of the The Blot that "the reason why he bought The Blot, bought a media company, [was] because this was his mission, to, in his words, get justice . . . for what [certain individuals] had done to him in his career." (Id. at 149-50) When Wey decided to make Plaintiff the subject of his "attack articles," he hired a private investigator to "look into her and also to look into Mr. Chauvet," and he collected hundreds of images from Plaintiff's and Chauvet's social media accounts to use in his "attack articles." (Id. at 183-84, 277)

In a May 24, 2014 Facebook message to Camilla Blomqvist, Plaintiff's best friend in Sweden, Wey explained how he intended to use The Blot to destroy Bouveng's reputation – and that of her family and friends – in the event that she filed a lawsuit against him:

> Camilla, you should know that Hanna wants to get some money out of us through the threat of a lawsuit. She has a lawyer in New York that just contacted us. . . . If she sues us, we will have to counter sue her – seeking millions of dollars in damages from her and her family for hurting our reputation. We will have to publish ALL of her relationships and photos with drug dealers, both in articles and in our counter lawsuit against her. All of her family and friends will be dragged in: her father, aunt (Helena), her brother, her family and friends in the U.S.. . . . If she sues us, we will NOT give her a penny, and we will spend millions of dollars going after her forever. . . . Don't force us. We will have to fight back. . . . If Hanna Bouveng would like to have a "fight," welcome.

(PX 103) (capitalization in original, underlining added)

The jury was entitled to conclude from the evidence at trial that Defendants acted knowingly and maliciously in publishing the defamatory statements concerning Plaintiff.

**b. The Ratio Between Compensatory and Punitive Damages**

The jury awarded Plaintiff $10 million in punitive damages on Plaintiff's defamation claim as against Wey; $1 million in punitive damages as against NYGG; and $5 million in punitive damages against FNL Media.[30] (Judgment (Dkt. No. 249)) Given that the compensatory damage award on Plaintiff's defamation claim is $1.5 million, the applicable ratios are: for Wey, more than 1:6; for FNL Media, more than 1:3; and for NYGG, less than 1:1.

"The Supreme Court has 'concluded that [a punitive damages] award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.'" Thomas v. iStar Financial, Inc., 652 F.3d 141, 149 (2d Cir. 2010) (discussing a 1:5.7 ratio) (quoting State Farm, 538 U.S. at 425). "Nonetheless, because there are no rigid benchmarks that a punitive award may not surpass, ratios greater than [four to one] may comport with due process where 'a particularly egregious act has resulted in only a small amount of

---

[30] Defendants have never argued that it was improper for the Court to instruct the jury that it could issue separate punitive damage awards as to each defendant, or that it was improper for the jury to impose separate punitive damage awards on each defendant. In fact, Defendants requested that the verdict sheet list the defendants separately for purposes of awarding punitive damages. (Trial Tr. (Dkt. No. 242) at 1518) Moreover, the Second Circuit has acknowledged that "New York favors individual assessment of punitive damages." McFadden v. Sanchez, 710 F.2d 907, 914 (2d Cir. 1983) (citing Raplee v. City of Corning, 6 A.D.2d 230, 233 (4th Dept. 1958)).

In cases in which defendants argue that a remittitur is necessary as to punitive damage awards against multiple defendants, courts routinely address each award separately. See, e.g., King v. Macri, 993 F.2d 294, 298-99 (2d Cir. 1993) (reducing punitive damages against one defendant from $175,000 to $100,000 and against another defendant from $75,000 to $50,000); Vasbinder, 976 F.2d at 122 (reducing punitive damages awards of $150,000 against each defendant to $20,000 as to one defendant and $30,000 as to the second defendant, in light of their different financial condition); Thomas, 508 F. Supp. 2d at 255, 262-64 (reducing punitive damages against one defendant from $1.6 million to $190,000, but leaving undisturbed the punitive damage award against another defendant).

economic damages.'" State Farm, 538 U.S. at 425 (quoting Gore, 517 U.S. at 582). "The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. In all cases, "courts must ensure that the measure of the punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Id. at 426.

Defendants argue that, "[f]ollowing State Farm, state and federal courts in New York routinely reduce awards that exceed the constitutionally permissible limit to a ratio of 4:1 or less for claims in a variety of contexts, including ones involving violence, physical injury, and far more severe emotional injury than present here." (Def. Br. (Dkt. No. 256) at 79-81 (citing cases))

Although the Supreme Court in Gore "reject[ed] [the use of] a categorical approach" in determining the proper ratio for compensatory and punitive damages, it provided the following guidance:

> . . . [L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

Gore, 517 U.S. at 582; see also State Farm, 538 U.S. at 426.

Here, the compensatory award on Plaintiff's defamation claim is high. With respect to the difficulty in determining the monetary value of Plaintiff's emotional distress and the damage to her reputation, this factor likewise does not warrant a higher ratio of punitive to compensatory damages. "[T]he Supreme Court has instructed district courts reviewing punitive damages awards to consider whether '[t]he compensatory damages for the injury suffered . . .

were based on a component which was duplicated in the punitive award[.]'" Osorio, 2007 WL 683985, at *3 (quoting State Farm, 538 U.S. at 426). "'In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both.'" Id. (quoting Restatement (Second) of Torts § 908, cmt. c, (1977)); see also State Farm, 538 U.S. at 426 ("The compensatory damages for the injury suffered here . . . likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element.").

Here, as discussed above, a substantial part of the jury's compensatory damage award was necessarily based on damage to Plaintiff's reputation. Moreover, the jury's $1.5 million compensatory award may well reflect some measure of "indignation aroused by the defendant[s]' act[s]." Accordingly, this factor does not counsel in favor of a higher ratio. To the contrary, under the circumstances here, this Court must take care to ensure that the punitive damages award is not duplicative of the compensatory damages already awarded. See State Farm, 538 U.S. at 426.

Defendants argue that, "[s]hould the Court elect not to reduce the compensatory damages verdict substantially, . . . the Second Circuit's recent holding in Turley[ v. ISG Lackawanna, Inc., 774 F.3d 140 (2d Cir. 2014)] would require the Court to. . . . reduc[e] [the] punitive damages [award] to a ratio that does not exceed 2-to-1." (Def. Br. (Dkt. No. 256) at 87, 89)

In Turley, a jury awarded $1.32 million in compensatory damages and $24 million in punitive damages on plaintiff's hostile work environment claims under 42 U.S.C. § 1981, Title VII, and the NYSHRL. Turley, 774 F.3d at 151-52. The district court found that the punitive damage award was excessive, and remitted the award to $5 million. Id. at 152. The Second Circuit found the reduced $5 million award to be excessive:

> As a general matter, the four-to-one ratio of punitive to compensatory damages awarded is "close to the line of constitutional impropriety." State Farm, 538 U.S. at 425. . . . And where, as here, the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. The district court's extensive damages judgment here therefore tests these constitutional limits. . . .
>
> Where the compensatory award is particularly high, as the one in this case assuredly was, a four-to-one ratio of punishment to compensation, in our view, serves neither predictability nor proportionality. As noted, this is particularly so where the underlying compensation is, as it is in this case, for intangible – and therefore immeasurable – emotional damages. Imposing extensive punitive damages on top of such an award stacks one attempt to monetize highly offensive behavior, which effort is necessarily to some extent visceral, upon another. . . . Our commitment to reducing arbitrariness in damages awards, reining in excessiveness, and ensuring some degree of proportionality thus weighs in favor of enforcing a tighter relationship between the harm suffered and the punishment imposed.

Id. at 165-66 (footnotes omitted).

The court concluded that "a roughly 2:1 ratio of punitive damages to what, by its nature, is necessarily a largely arbitrary compensatory award, constitutes the maximum allowable in these circumstances." Id. at 166. The court then considered "whether a reduced award yielding an approximate 2:1 ratio of punitive to compensatory damages would be so grossly excessive as to fall outside the boundaries of due process":

> As we have noted, the Supreme Court has cautioned that, when a compensatory award is particularly high, a 1:1 ratio between compensation and punishment may be the maximum award permitted by the Constitution. . . . We do not think that a 1:1 ratio is required in the case at bar, though, in light of the extreme nature of the

> defendants' conduct. Cf. Gore, 517 U.S. at 575 . . . (explaining that reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award"); Thomas[, 652 F.3d at 149-50] (affirming a remittitur requiring an approximately 1.5:1 ratio in light of "the moderate level of reprehensibility of [the defendant's] conduct"). We think that in the aggravated circumstances of this case, an approximate 2:1 ratio is both permissible under the Constitution and consistent with the established policies adopted and adhered to by this Court.

Id. at 167.

Turley's reasoning applies here. As discussed above, the compensatory damage award for defamation is both "imprecise because of the nature of the injury and high when compared with similar cases." Id. at 165. A "four-to-one ratio of punishment to compensation" thus "serves neither predictability nor proportionality." Id.

As to reprehensibility, as this Court has already explained, Defendants' conduct is at the extreme end of the spectrum. Moreover, it is clear that a large punitive damage award is necessary to deter Defendants from engaging in this type of conduct in the future. See Lee, 101 F.3d at 813 ("We recognize that one purpose of punitive damages is deterrence. . . .").

Although Defendants argue that a large punitive damage award against them would cause "financial ruin" (Def. Br. (Dkt. No. 256) at 86), the jury was entitled to credit, and this Court is entitled to consider, the evidence presented at trial concerning Defendants' assets. That evidence included (1) a statement from NYGG's general counsel and board chairman to the U.S. Department of State that NYGG's annual revenue exceeds $25 million (PX 3); (2) Wey's statement to Chemme Koluman that he is the "CEO of a . . . billion[-]dollar[]" firm, and that he makes $30 million a year, (PX 27 at 12, 17), and (3) Wey's statement in his Facebook message to Camilla Blomqvist that "we will spend millions of dollars going after [Plaintiff] forever" if she sues Wey and his companies. (PX 103 at 3)

Under all the circumstances, this Court concludes that a punitive damage award yielding a ration of no more than 1:1 as to each defendant is appropriate. Such an award accounts for the fact that the compensatory award on Plaintiff's defamation claim is large, is based on intangible harm, and may reflect factors that are more properly considered in imposing punitive damages. Such awards are also large enough to deter Defendants' egregious and offensive conduct.

While the Court has considered all of the cases cited by Defendants in determining the propriety and extent of remittitur, (see Def. Br. (Dkt. No. 256) at 82-84), none of these cases is comparable in terms of the extent, scope, nature, and dissemination of the defamatory statements.[31] Defendants' use of the internet to lodge repeated and extensive attacks against Plaintiff, as well as their malicious intent in doing so, requires a significant punitive damage award. "While the [C]ourt recognizes that punitive damages awarded in other defamation actions have . . . been lower than those awarded here, those awards involved circumstances in which the dissemination of the defamatory statements were, for the most part, limited in their reach. Here, in contrast, the defamatory statements [were] published on internet web sites which [were] accessible to millions of people, all over the world, on a daily basis."

---

[31] The Court has also considered Defendants' argument that the "punitive damages verdict [was] driven by passion or prejudice resulting from Plaintiff's injection of racial and sexual orientation issues into the case." (Def. Br. (Dkt. No. 256) at 84-85) It was Wey who injected racial and sexual orientation issues into this case, however. For example, the defamatory statements concerning Plaintiff are replete with references to the fact that her boyfriend, James Chauvet, is black. Evidence of these references was thus not a product of Plaintiff's counsel's trial strategy, but rather the result of Wey's decision to emphasize Chauvet's race in his statements defaming Plaintiff. Similarly, it was Wey's decision to discuss the sexual orientation of one of Plaintiff's lawyers in a Blot article defaming Plaintiff. In any event, Defendants did not object at trial to evidence of Wey's statements concerning Chauvet's race or the sexual orientation of Plaintiff's lawyer, and the impact of these references – at a trial with evidence and allegations as incendiary as those discussed above – was de minimis.

Rombom v. Weberman, No. 1378/00, 2002 WL 1461890, at *1-2, 11 (Kings Cnty. Sup. Ct. 2002) (upholding jury's $500,000 punitive damage award on a defamation claim where defendant posted statements on several internet websites stating that plaintiff "was a dangerous psychopath," had "bombed several Soviet installations," and "kidnapped people"), aff'd, 309 A.D.2d 844, 844 (2d Dept. 2003).

In sum, the $1 million punitive damage award against NYGG on Plaintiff's defamation claim will remain undisturbed. If Plaintiff does not accept (1) a remittitur to $1.5 million of the punitive damage award against Wey on Plaintiff's defamation claim; and (2) a remittitur to $1.5 million of the punitive damage award against FNL Media on Plaintiff's defamation claim, this Court will vacate the punitive damage awards against these defendants and conduct a new trial limited to the question of damages. See Kauffman v. Maxim Healthcare Serv., Inc., 509 F. Supp. 2d 210, 221 (E.D.N.Y. 2007) (citing Vasbinder, 976 F.2d at 122).

## CONCLUSION

Defendants' motion for judgment as a matter of law is denied. Defendants' motion for a new trial as to liability is denied. Defendant's motion for a new trial as to damages is granted unless Plaintiff agrees in writing by April 10, 2016, to a remittitur reducing the (1) compensatory damage award on the NYSHRL and NYCHRL quid pro quo sexual harassment claims to $150,000; (2) punitive damage award on the defamation claim against Wey to $1.5 million; and (3) punitive damage award on the defamation claim against FNL Media to $1.5 million. The Clerk of the Court is directed to terminate the motion (Dkt. No. 255).

Dated: New York, New York
       March 31, 2016

SO ORDERED.

Paul G. Gardephe
United States District Judge