```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   HANNA BOUVENG,

 4                   Plaintiff,

 5            v.                           14 CV 5474 (PGG)

 6   NYG CAPITAL LLG, ET AL.,

 7                   Defendants.

 8   ------------------------------x
                                          New York, N.Y.
 9                                        June 23, 2015
                                          9:40 a.m.
10
     Before:
11
                        HON. PAUL G. GARDEPHE
12
                                          District Judge
13
                          APPEARANCES
14
     MORELLI ALTERS RATNER
15        Attorneys for Plaintiff
     BY:  DAVID S. RATNER
16        MARTHA MCBRAYER

17   DENTONS US LLP
          Attorneys for Defendants
18   BY:  GLENN CHARLES COLTON
          GARY MEYERHOFF
19

20

21

22

23

24

25
```

1            (Trial resumed; jury not present)

2            THE COURT:  Please bring in the jury.

3            Ms. Bouveng, you can retake the stand.

4            MR. RATNER:  Your Honor, the parties agreed that we

5    will take a defense witness out of turn this morning.  It's

6    going to be a very brief witness.

7            THE COURT:  Are we starting with that?

8            MR. RATNER:  Yes.

9            THE COURT:  Who is it?

10           MR. RATNER:  Dan Larson.

11           (Jury present)

12           THE COURT:  Ladies and gentlemen, we are going to take

13   break into Ms. Bouveng's testimony briefly so that we can

14   accommodate a witness called by defendants.

15           Mr. Colton, Mr. Meyerhoff, please call your witness.

16           MR. COLTON:  Thank you, your Honor.  The defense calls

17   Daniel Larson.

18    DANIEL ANTHONY LARSON,

19        called as a witness by the Plaintiff,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. COLTON:

23   Q.  Good morning, Mr. Larson.

24   A.  Good morning.

25   Q.  Mr. Larson, what do you do for a living?

 1   A.  I am a trial lawyer from Tampa, Florida.  I do what Mr.

 2   Ratner does.

 3   Q.  How long have you been a lawyer?

 4   A.  I've been a lawyer for 28 years, started out on the defense

 5   side, and then I became a claimant's attorney.

 6   Q.  Where did you go to law school?

 7   A.  I went to the University of South Carolina in Columbia.

 8   Q.  Where did you get your undergraduate degree?

 9   A.  Florida State University.

10   Q.  When did you get your law degree?

11   A.  I graduated law school in 1988.

12   Q.  And you've been a practicing lawyer ever since?

13   A.  Yes, sir.

14   Q.  Do you know Mr. Benjamin Wey?

15   A.  Yes, I do.

16   Q.  When did you first meet Mr. Wey?

17   A.  I met Mr. Wey about two years ago, summer of 2013 in New

18   York City.

19   Q.  Was that a social occasion?

20   A.  I was in town for my old childhood best friend's 50th

21   birthday, and apparently he had a business relationship with

22   somebody who also had a business relationship with Mr. Wey, and

23   Mr. Wey graciously agreed to throw like a cocktail reception

24   for my buddy who was turning 50.

25   Q.  And that was, you said, approximately two years ago.

 1   Summer of 2013?

 2   A.   Summer of 2013, correct.   And there were husbands and

 3   wives.   All of us were there.

 4   Q.   After the first time you met Mr. Wey in the summer of 2013,

 5   did you stay in touch with him?

 6   A.   Yes.

 7   Q.   Did there come a time when you arranged to meet up with him

 8   again?

 9   A.   Yes.   Do you want me to tell you?

10   Q.   How did that come about?

11   A.   Thank you, sir.   After I met Mr. Wey in the summer of 2013,

12   I was very impressed with the gentleman and his story, how he

13   came here with very little and he became a successful man.   And

14   my son, D.A., was graduating from Florida State University and

15   actually he was doing an externship at the end of the year.   He

16   had really finished his studies, was finishing his studies and

17   was doing an externship.   I said to him in an e-mail, is there

18   any way that I could get D.A. to meet you some time so he can

19   hear about the hard work and if you work hard you can

20   accomplish great things.

21   Q.   Did there come a time when you and your son, D.A., met with

22   Mr. Wey?

23   A.   Yes.   We corresponded back and forth.   There may have been

24   a phone call or two, but there were several e-mails and I said,

25   hey, if I bring D.A. to the city could you meet us for a cup of

1    coffee or lunch or breakfast or whatever so D.A. can meet you.

2    He said sure.  He made the arrangements.  He told me the dates

3    that he was out of the country.  He said if you could fit it in

4    here, come on down and we will meet D.A.

5    Q.  Have you met the plaintiff, Hanna Bouveng?

6    A.  Yes.  Two occasions.

7    Q.  Did you correspond with Ms. Bouveng at all in connection

8    with this planned visit for you and D.A. to New York?

9    A.  Yes.  I understood that Hanna was working as an intern for

10   Mr. Wey, and she sent me some e-mails to basically set the time

11   for when I was going to bring D.A. into town to meet Mr. Wey.

12   Q.  I'd like to now show you what's been marked for

13   identification as Defendant's BS.

14   A.  It starts from the back and goes forward?

15   Q.  As e-mail printouts typically do, yes.

16   A.  This appears to be the e-mail string between myself,

17   Mr. Wey, and Hanna Bouveng.

18   Q.  Is it an accurate copy of the e-mail string between

19   yourself, Mr. Wey, and Hanna Bouveng?

20   A.  Yes, sir.

21          MR. COLTON:  Defendants offer BS, your Honor.

22          MR. RATNER:  No objection.

23          THE COURT:  BS is received.

24          (Defendants' Exhibit BS received in evidence)

25          MR. COLTON:  If we can please publish, your Honor.

1          THE COURT:  Yes.

2   Q.   The first page of BS on your screen, Mr. Larson, is an

3   e-mail between Ms. Bouveng and yourself?

4   A.   Yes, sir.

5   Q.   And it references a meeting on November 8 in New York City.

6   Is that November 8, 2013?

7   A.   Yes, sir.

8   Q.   Did that meeting in New York City actually happen?

9   A.   Yes, sir.

10  Q.   The e-mail refers to a meeting at the Ritz Carlton hotel

11  lobby at 5:30 p.m.  Did you meet with Ms. Bouveng and anyone

12  else around that time on November 8, 2013?

13  A.   I think we actually met in the Ritz Carlton bar.

14  Q.   You and who?

15  A.   Myself; my son, D.A; Hanna was there; and maybe somebody

16  else.  I remember Mr. Wey came in, said, my family is leaving

17  for the weekend.  I need to go kiss my wife and kids good-bye.

18  I'll be back in about 20 minutes.  We had a drink with Hanna

19  and maybe another gentleman.  I'm not a hundred percent sure.

20  Q.   After having a drink in the Ritz Carlton, did you go

21  anywhere?

22  A.   Yes.

23  Q.   Where?

24  A.   We had the drink, Mr. Wey eventually came back.  We went

25  across the street to a restaurant, literally right across the

1    street from the hotel.

2    Q.  Who was at the dinner besides yourself?

3    A.  My son, D.A.; Hanna; Mr. Wey; a gentleman from a local

4    company; and I believe maybe Adam -- I forget his last name.

5    Q.  Can you describe the general ambience or feel of the

6    dinner?

7    A.  Yeah.  It was great.  We had a blast.  We laughed -- it was

8    a long dinner.  We laughed through the entire dinner.  We were

9    talking about what we all do for a living.  I was telling

10   lawyer stories.  Ben was telling some business stories.  Hanna

11   was talking about her family.  I heard about the insurance

12   company from Sweden.  I think the goal was Hanna was going to

13   work as some marketing person somehow and her dad was going to

14   be employed and she had family members that were important in

15   Sweden.  But it was a very fun dinner and we laughed and had a

16   blast, at least we did.

17   Q.  Were you able to observe Mr. Wey and Ms. Bouveng at this

18   dinner?

19   A.  Yes, sir.

20   Q.  Did you notice any hostility between the two of them?

21            MR. RATNER:  Objection.

22            THE COURT:  Overruled.

23   A.  Absolutely none.  Like I said, it was a happy occasion.  We

24   were all laughing and having a blast.

25   Q.  After this dinner on November 8, where did you go?

1   A.   It was a long dinner and it wasn't long because it was

2   taking long to get our food.  We were laughing and talking a

3   lot.  And so at the end of the dinner I asked Mr. Wey if he

4   wouldn't mind showing my son, D.A., his apartment.  And he has

5   got beautiful views.  He was like, sure, come on, come across

6   the street.  So we went across the street to his apartment.

7   Q.   Who else besides yourself, Mr. Wey and your son, D.A., went

8   across the street to Mr. Wey's apartment on November 8, 2013?

9   A.   It was myself; my son, D.A.; Mr. Wey; Hanna Bouveng; and

10  Adam.

11  Q.   What happened when you got to the apartment?

12  A.   You get to the front door, everybody takes off their shoes,

13  and we walked inside.  And once we went inside I believe Adam

14  opened up a bottle of champagne and we each had a champagne

15  drink.  And I asked Ben if he would show D.A. around his

16  apartment.

17  Q.   At any point in time during the November 8 time in

18  Mr. Wey's apartment, did you notice any hostility between

19  Mr. Wey and has Bouveng?

20  A.   Absolutely none.

21  Q.   I'd like to now show you what's been marked for

22  identification as Defendants' Exhibit CI.  Do you recognize

23  Defendant's CI?

24  A.   Yes, sir.

25  Q.   What is it?

1    A.  It's a photograph of my son, D.A., and Hanna.

2    Q.  When was the photograph, Defendant's CI for identification,

3    taken?

4    A.  It was taken that night, kind of after we did the whole

5    tour of the house and everything.

6    Q.  That night being November 8, 2013?

7    A.  Yes, sir.

8             MR. COLTON:  Defendants offer CI, your Honor.

9             MR. RATNER:  No objection.

10            THE COURT:  CI is received.

11            (Defendants' Exhibit CI received in evidence)

12            MR. COLTON:  Permission to publish, your Honor.

13            THE COURT:  Yes.

14   A.  You'll notice nobody has shoes on.

15   Q.  In Defendant's CI, Mr. Larson, is that D.A. on the left?

16   A.  Yes, sir.

17   Q.  Who is that on the right?

18   A.  Hanna.

19   Q.  After the tour of the apartment that you are describing,

20   did Mr. Wey say anything to Ms. Bouveng and your son, D.A.?

21   A.  Actually, during the tour he said some things.  We were

22   walking around, we saw the kids' rooms.  They had nice views.

23   We were going around.  We finally get to his bedroom.  The bed

24   was a mess and I said, this is where it all happens, I made a

25   joke to him, and he laughed.  And there were closets and purses

1    and stuff like that.  And he said -- he was talking to both

2    D.A. and Hanna because D.A. was about to graduate from college

3    and she was the intern.  And he said, listen, you see all this,

4    you see these fancy purses, you see all this, D.A., you see

5    this view, if you work hard, if you outwork everybody in what

6    you do, then you can be successful and have what you want in

7    this world.  But you have to work.  Nobody gets anything for

8    free in America.  That was his story and he was talking about

9    D.A. and Hanna at the time.

10   Q.  Towards the end of the evening, did Mr. Wey make any

11   suggestions to D.A. or to Hanna?

12   A.  Towards the end of the evening he suggested that the young

13   people go out and see the city.  He said, Hanna, why don't you

14   show D.A. around New York City.  And I believe they exchanged

15   numbers, but they never hooked up.

16   Q.  At any point in time during the course of the evening,

17   whether it be the dinner or the tour or any time before it

18   ended, did you notice any hostility or ill will between

19   Ms. Bouveng and Mr. Wey?

20            MR. COLTON:  Nothing further, your Honor.

21            THE COURT:  Anything, Mr. Ratner?

22            MR. RATNER:  Yes, a couple of questions.

23   CROSS-EXAMINATION

24   BY MR. RATNER:

25   Q.  When you met Mr. Wey in the summer of 2013 at that social

1  event, was Ms. Bouveng at that social event?

2  A.  Yes, sir.  That was the other time that I saw her.

3  Q.  Was Mrs. Wey at that social event?

4  A.  I believe Mrs. Wey and the children were traveling abroad.

5  Q.  So the answer to that question is no?

6  A.  Correct, sir.  Yes, sir.

7  Q.  And on the second occasion when you met Mr. Wey for the

8  dinner, Mrs. Wey wasn't there either, true?

9  A.  No.  As I testified, he went to kiss them good-bye because

10 they were on their way out of town.  So she did not attend the

11 dinner, sir.

12 Q.  You never met Mrs. Wey, true?

13 A.  Not true.

14 Q.  When did you meet her?

15 A.  I met her on another travel to New York when I was here one

16 time.  She is a very nice lady.

17 Q.  And the e-mail communications you had to and from

18 Ms. Bouveng was signed by Ms. Bouveng as director of corporate

19 communications, true?

20 A.  Yes.  I remember that.  Because I knew she was interning.

21 And when I saw it it surprised me.

22 Q.  But that's how she signed her official New York Global

23 Group e-mails, correct?

24 A.  Yes, sir.

25 Q.  At the social event in the Hamptons, were adult beverages

1    served?

2              MR. COLTON:  Object to the form.

3              THE COURT:  Sustained.

4    Q.  Were alcoholic beverages served?

5              THE COURT:  Sustained.

6              MR. RATNER:  I have nothing further.

7              THE COURT:  Anything else?

8              MR. COLTON:  No, your Honor.

9              THE COURT:  Mr. Larson, you can step down.

10             THE WITNESS:  Thank you, your Honor.

11             (Witness excused)

12             THE COURT:  Are we returning to Ms. Bouveng?  Is that

13   the next witness?

14             MR. RATNER:  Ms. Bouveng.

15             THE COURT:  Ms. Bouveng, please take the stand.

16             Ms. Bouveng, you remain under oath.

17             Mr. Ratner, please proceed.

18    HANNA BOUVENG, resumed.

19   DIRECT EXAMINATION (cont'd)

20   BY MR. RATNER:

21   Q.  Good morning.

22   A.  Good morning.

23   Q.  I'd like to go back and talk about in a little more detail

24   some of the things we talked about yesterday.  Okay?

25   A.  Okay.

 1   Q.   When you first started at New York Global Group, how did

 2   Mr. Wey act towards you in the office?

 3   A.   It depended.

 4   Q.   What did it depend on?

 5   A.   If I would accompany him to dinners or social events after

 6   work.  If I did that, then he would be happy and treat me well.

 7   And if I would say that I was going to go to dinner with

 8   friends, then he would get upset and get pouty and did not talk

 9   to me and treat me differently.

10   Q.   Did the way he treated you in the office change over time

11   or did it remain the same?

12   A.   He got more aggressive regarding that I wanted to spend

13   time with friends outside of work.  He would bring me to the

14   office and have these long monologues.  As soon as I had a

15   dinner with a friend, he would bring me to the office the next

16   day.

17   Q.   And after the Boston trip, how did Mr. Wey treat you in the

18   office?

19   A.   He was pretty cold and didn't talk to me, and that was the

20   first days.  He would put a lot of work pressure on me and then

21   he would just switch and asked if we were about to go to

22   dinner, so we did.  And then he was all happy and everything

23   was great.

24   Q.   You told us yesterday that after Mr. Wey took off your

25   jacket in the hotel room you asked him if he had a condom.  Do

1    you remember that?

2    A.   Yes.

3    Q.   Why did you do that?

4    A.   It was just something that I came up with to try to prevent

5    what was going to happen.

6    Q.   And you told us that you pretended to be asleep.  Tell us

7    how you slept that night or not slept that night.

8    A.   I didn't sleep very well that night and I tried to lay as

9    still as possible because I wanted to make it seem as if I was

10   sleeping.

11   Q.   Did you get up early in the morning?

12   A.   Yes.

13   Q.   What did you do?

14   A.   I went out for a run or walking and running.

15   Q.   And we talked a little about the trip to Dubai yesterday.

16   Do you remember that?

17   A.   Yes.

18   Q.   After the Dubai trip and once you were back at New York

19   Global Group, how did Mr. Wey treat you?

20   A.   He was treating me in the same manner as after the Boston

21   trip.  He was very pouty and chilly and would put a lot of work

22   pressure on me.

23   Q.   How did that make you feel?

24   A.   Really bad.

25   Q.   And from time to time did Mr. Wey compliment you in the

1    office?

2    A.  Yes.

3    Q.  Tell us about that, please.

4    A.  He would often compliment me on my looks and how I dressed,

5    and he would make comments about my body.

6    Q.  Like what?

7    A.  For example, if I said that I was going to go to the gym

8    after work he would say, oh, you don't need that and you have a

9    fit and thin body anyway.

10   Q.  Anything else?

11   A.  Just a lot of compliments on how I looked.

12   Q.  These compliments, did he give them to you while you were

13   in private with him or when you were with other people?  Tell

14   us.

15   A.  Both.

16   Q.  How did it make you feel?

17   A.  Embarrassed.

18   Q.  Why is that?

19   A.  Because he was complimenting me a lot more than other

20   people.  And when he made a compliment about my body, about the

21   Crunch, that I didn't have to go to Crunch, Mr. Baxter was

22   present, and I thought that was very embarrassing.

23   Q.  Did he ever touch you in the office?

24   A.  Yes.

25   Q.  Tell us how, when.

1  A.  He would very often put his arm around me or come close to

2  me, stand very close to me and kiss me on the cheek when he

3  greeted me.

4  Q.  Did he greet you the same or differently from other people?

5  A.  I never saw him greet other people in that way.

6  Q.  And in terms of touching you in the office, was that the

7  same or different from other people?

8  A.  I never saw him touch other people.

9  Q.  How frequently, say, from October through January would you

10  go out to dinner with Mr. Wey?

11  A.  Weekly.

12  Q.  And were these always with other people or were they

13  sometimes just you and Mr. Wey?

14  A.  In the beginning it was with other people, business

15  contacts, and then it started becoming more just him and I.

16  Q.  When he has asked you to go out to dinner at the beginning,

17  would you always say yes?

18  A.  Yes.

19  Q.  Were there times when you didn't say yes?

20  A.  Yes.

21  Q.  And what would happen when you did not say yes?

22  A.  He would treat me differently at work, and he would be very

23  pouty and he made me feel very guilty for not accompanying him.

24  Q.  How frequently would you accompany Mr. Wey to social

25  events?

 1              THE COURT:  During what period of time?

 2   Q.  From October through January.

 3   A.  Weekly or every other week.

 4   Q.  Now, we talked about yesterday the first time Mr. Wey had

 5   sex with you in the apartment.  Do you remember that?

 6   A.  Yes.

 7   Q.  There was a time after that, right?

 8   A.  Yes.

 9   Q.  How did that come about?

10   A.  We had dinner.

11   Q.  How was dinner arranged?

12   A.  He asked if we would have that.

13   Q.  What did you say?

14   A.  I said yes.  Because before that he called me one time and

15   said that he needed to talk to me and ask me if he could come

16   to the apartment.  And I said that I would be more comfortable

17   if we met somewhere else.  So we met at Stone Street.  At Stone

18   Street he had this long monologue, around 45 minutes, that I

19   didn't appreciate the chance I got on Wall Street and that he

20   thinks that I feel entitled to things and that I need to work

21   for it, things like that.

22   Q.  How did that 45-minute monologue make you feel?

23   A.  Really bad and guilty.

24   Q.  And so after that he asked you out to dinner?

25   A.  Yes.

 1   Q.  And what happened?

 2   A.  We had dinner and he ordered wine.  And then after dinner

 3   he came with me back to the apartment again.

 4   Q.  Did you want to have sex with Mr. Wey on that occasion?

 5   A.  No.

 6   Q.  Did you ever want to have sex with Mr. Wey?

 7   A.  No.

 8   Q.  Did you find Mr. Wey physically attractive?

 9   A.  No.

10   Q.  And what happened when you were back in the apartment?

11   A.  The same thing happened again, he tried to kiss me, and I

12   pulled away and he still kept on doing that, and everything

13   happened again.

14   Q.  Did you kiss him?

15   A.  No.

16   Q.  Did you hug him?

17   A.  No.

18   Q.  Did you reciprocate in any way?

19   A.  No.

20   Q.  How long did it last?

21   A.  A few minutes.

22   Q.  How did you feel afterwards?

23   A.  Blank.

24   Q.  And did Mr. Wey remain in the apartment afterwards?

25   A.  No.  I got out of bed really quickly and said that I was

1    really tired, and he put his clothes on and left.

2    Q.  What did you do after he left?

3    A.  I took a shower or a bath and then I put my sweats on and

4    sit in front of the TV.

5    Q.  Would it be fair to say that this was repeated a couple of

6    more times?

7    A.  Yes.

8    Q.  Now, you told us yesterday that you never actually

9    discussed with him any of these occasions, true?

10   A.  True.

11   Q.  But you made a decision that it wasn't going to happen

12   again?

13   A.  Yes.

14   Q.  And how did you go about making sure that it never happened

15   again?

16   A.  I started to spend a lot more time with Mr. Chauvet and

17   Ms. Koluman, and I asked them to be in the apartment or I tried

18   to be more around them so I wasn't going to be alone.

19   Q.  Did you notice any change in Mr. Wey's behavior towards you

20   after you made sure it never happened again?

21   A.  Yes.

22   Q.  Tell us about that.

23   A.  He would be more aggressive and put a lot more work

24   pressure on me and expected things that seemed very difficult

25   to accomplish in that period of time that he required.

1   Q.  We heard when Mr. Wey testified something about training

2   with Mr. Baxter.  Do you remember that?

3   A.  Yes.

4   Q.  Tell us about that.  What was that all about?

5   A.  Well, Mr. Wey was going to travel to China, and he wanted

6   to meet me before then.  So he came up to the apartment and he

7   wanted to have sex again, and I said no.  And then he would be

8   very aggressive and pouty and try to make me feel guilty.  And

9   then he said that he was going to think about repercussions or

10  consequences that he felt -- he switched from that to work very

11  quickly and said that he had to think about my role in the

12  company.  Then he left to China and he send an e-mail to

13  Mr. Baxter and myself that I needed training.

14  Q.  Did that training take place?

15  A.  Yes.

16  Q.  Tell us about the training.

17  A.  It was a classroom setting training with Mr. Baxter in the

18  offices.

19  Q.  How many days did the training take?

20  A.  Four.

21  Q.  What did it consist of?

22  A.  General knowledge about Wall Street.

23  Q.  How do you think you did during the training?

24  A.  I think it helped a lot because Mr. Baxter has a lot of

25  experience and he is very knowledgeable, and I thought it was

1   great to sit one on one with him and hear him talk about Wall

2   Street and experiences and how he views the Wall Street world.

3   Q.  Before that training with Mr. Baxter, had you taken any

4   classes in college or in Berkeley about the subjects that

5   Mr. Baxter was talking to you about?

6   A.  No.

7   Q.  And before that training had your work entailed any of the

8   subjects that Mr. Baxter was training you about?

9   A.  No.

10  Q.  Now, you told us that you were basically estranged from

11  your mother.  Do you remember that?

12  A.  Yes.

13  Q.  Where was your mother born?

14  A.  In the United States.

15  Q.  So she is an American citizen?

16  A.  Yes.

17  Q.  There was some talk about an H-1B visa the other day.

18  Remember that?

19  A.  Yes.

20  Q.  Did you want to get an H-1B visa?

21  A.  Not with New York Global Group.

22  Q.  Why is that?

23  A.  Because I did not want to work for Mr. Wey.

24  Q.  Did you tell Mr. Wey that?

25  A.  Not straight out.

 1   Q.  I'm sorry?

 2   A.  Not straight out.

 3   Q.  What did you do, if anything, to make sure you didn't get

 4   the H-1B visa?

 5   A.  I would not send the application in on time.

 6   Q.  Now, were you trying to do something else in order to stay

 7   in the United States?

 8   A.  Yes.

 9   Q.  What was that?

10   A.  I was looking at the possibilities for me to apply for

11   American citizenship and a passport.

12   Q.  Why did you think you would be able to be an American

13   citizen?

14   A.  Because my mom is an American citizen.

15   Q.  Did you ever do that?

16   A.  No.

17   Q.  Why not?

18   A.  My papers disappeared or got stolen from my apartment.

19   Q.  When did you realize that?

20   A.  When Mr. Wey kicked me out I brought that folder that I had

21   everything, all those paper in.  And when I got back to

22   Ms. Koluman's house I looked through the folder and none of the

23   documents were there.

24   Q.  Were you doing anything else after February 2014 in order

25   to get away from New York Global Group?

1   A.  Yes.

2   Q.  What were you doing?

3   A.  I started to look at different jobs, New York jobs,

4   possibilities for me to work somewhere else.

5   Q.  And were you, after February 2014, communicating with your

6   father?

7   A.  Yes.

8   Q.  And were you communicating with him about your work at New

9   York Global Group?

10  A.  Yes.

11  Q.  In March, you took a trip to Sweden and Denmark by yourself

12  on behalf of New York Global Group, right?

13  A.  Yes.

14  Q.  And what was the purpose of that trip?

15  A.  It was to meet lawyers and accounting firms and marketing

16  companies so that we would work with them in relation with

17  Nordica Life, the life insurance company.

18  Q.  And in connection with that trip did you have any materials

19  prepared?

20  A.  Yes.

21  Q.  What were those materials?

22  A.  It was a presentation of New York Global Group and of

23  Mr. Baxter and Mr. Wey, and it was -- I did not bring any

24  papers, but I was prepared to talk about Nordica Life and

25  present the idea that we had for the company.

 1   Q.   Did you have a presentation of some kind to show them?

 2   A.   Yes.

 3   Q.   Who prepared the presentation?

 4   A.   Me and Mr. Wey.

 5   Q.   I'd like to show you Exhibit 20 for identification.  Do you

 6   recognize Exhibit 20?

 7   A.   Yes.

 8   Q.   And on the bottom of Exhibit 20, is that an e-mail dated

 9   March 27, 2014 from you to Mr. Wey?

10   A.   Yes.

11   Q.   And on the top of it, is that Mr. Wey's response?

12   A.   Yes.

13   Q.   And is this a report to Mr. Wey concerning meetings you had

14   at Setterwalls and DL Nordica?

15   A.   Yes.

16             MR. RATNER:  Offer it into evidence.

17             MR. COLTON:  Your Honor, can we approach, please?

18             THE COURT:  Yes.

19             (Continued on next page)

20

21

22

23

24

25

1              (At the side bar)

2         THE COURT:  What's the objection?

3         MR. COLTON:  We had made a motion in limine with

4    respect to prior proceedings, the Oklahoma securities issue.

5    This e-mail references problems in Oklahoma and her

6    explanations of it.  That has to come out based on the Court's

7    previous rulings, in our view.

8         THE COURT:  I don't know why you think that anyone on

9    the jury would think this had anything to do with an Oklahoma

10   securities problem.  The sentence reads:  They even asked about

11   Oklahoma.  He went to school in Oklahoma, didn't he?

12        MR. COLTON:  If there is going to be no question, no

13   information, no accidental testimony that Mr. Ratner says he

14   didn't understand she would say, I have no objection to the

15   document.  But I am fearful of having something that can't be

16   unrung.  And if Mr. Ratner is representing that he has prepped

17   his client, she won't go into that issue, I will accept that

18   representation.  If he hasn't prepped his client on what the

19   Court has ruled inadmissible, then I think we are taking a

20   danger.

21        THE COURT:  Are there going to be questions about the

22   document?

23        MR. RATNER:  There are not going to be any questions

24   about Oklahoma.  There is not going to be any questions about

25   Oklahoma.  Therefore, there won't be any answers about

1   Oklahoma.

2                THE COURT:  What are the questions going to be?

3                MR. RATNER:  Did you send him a follow-up e-mail?

4                THE COURT:  You are not going to ask any questions

5   about the document.

6                MR. COLTON:  Thank you, your Honor.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1           (In open court)

 2           THE COURT:  Any objections to Plaintiff's Exhibit 20?

 3           MR. COLTON:  No, your Honor.

 4           THE COURT:  Plaintiff's Exhibit 20 is received.

 5           (Plaintiff's Exhibit 20 received in evidence)

 6           MR. RATNER:  May we publish it to the jury?

 7           THE COURT:  You may.

 8    Q.  Your e-mail to Mr. Wey is on the bottom of the page.  You

 9    see that?

10    A.  Yes.

11    Q.  And you said:  I will e-mail you more thoroughly later from

12    my computer, right?

13    A.  Yes.

14    Q.  Did you e-mail him more thoroughly from your computer?

15    A.  Yes.

16           MR. RATNER:  At this time, your Honor I'd like to show

17    the witness Plaintiff's Exhibit 44 that's in evidence.

18           THE COURT:  Go right ahead, Mr. Ratner.

19           MR. RATNER:  Not 44, your Honor.  My mistake.  45.

20           THE COURT:  Mr. Ratner, please proceed.

21    Q.  If you look at second page, second page of 45, is that the

22    e-mail you sent to Mr. Wey as a follow-up e-mail about the

23    Setterwalls and DLA Nordica meeting?

24    A.  Yes.

25    Q.  And can you read that e-mail to the jury, please.

1   A.   Dear Ben, hope you are doing great.  The meetings I had

2   yesterday went well.

3        No. 1.  Setterwalls.  I met with Emine Lundquist and

4   Magdalena Huber.  They asked a lot of questions regarding NYGG

5   and also regarding your status in Oklahoma.  Regarding our

6   project they needed to go back to our previous e-mail

7   communication and see where we were.

8        They had following questions.  What company will the

9   shareholders use in the purchase?  Exactly what activities does

10  the Bermuda company do?  They would like a chart of the fee

11  flow.  They were also wondering where the profit would go,

12  Sweden, Luxembourg or Bermuda.

13       I also asked them to look into consequences and so

14  forth regarding having staff in the different companies versus

15  consultants, also regarding office addresses.

16       No. 2.  DLA Nordica.  What a great team.  I got a very

17  warm welcome from four of their lawyers:  Marianne Ramel, Peter

18  Ihrfelt, Magnus Hagevi, Mats Borgstrom.  We had a great

19  discussion.  We went through all kinds of different aspects

20  regarding structure and how that would affect IRS and

21  Finansinspektionen.  I believe that these people would be very

22  devoted to this project.  They prepared very well.  Now they

23  are waiting for a letter of engagement in order to proceed.

24  After that, they will give us answers to all of our questions.

25       Regarding an aged Swedish company, they are also in

1    the process of looking, and I will give them the name of our

2    targeted company as soon as we have an agreement.

3    Q.  Next page.

4    A.  No. 3.  Happy Forsman & Bodenfors.  This is very

5    interesting.  They are experts in branding and have been

6    working in the biggest pension funds in Sweden.  They gave me a

7    lot of good thoughts and insights.  They thought, for example,

8    a logo would not be a problem to change; rather, the opposite.

9    I have all the data points, so let's discuss them when I see

10   you, much easier.

11        This weekend I will meet with my grandmother and my

12   aunts, I will tell them about all of our efforts regarding both

13   NL and the China consulting part.

14        Have a great Friday and a great weekend.  I am reading

15   Sweden's Wall Street Journal every day and I learn a lot of

16   great data points.

17        This is a documentary regarding how big international

18   corporations do their tax planning in Europe.  It is very

19   interesting.  You should see it and learn more about the tax

20   regulations in Europe.  Then it's a link to a documentary.

21   Sincerely, Hanna Bouveng.

22        (Continued on next page)

23

24

25

1   Q.  Thank you.  You can put that down.

2           The meetings at these three places, about how long was

3   each meeting?

4   A.  Two of them were around -- one -- the first one was around

5   45 minutes, an hour.  The second was around an hour-and-a-half

6   and two.  And the third one was around an hour-and-a-half.

7   Q.  Were any of these three firms ever engaged by New York

8   Global Group?

9   A.  Not that I know.

10  Q.  In your mind were these meetings just meet and greet, hi,

11  how are you, or was it something else?

12          MR. COLTON:  Objection.

13          THE COURT:  Sustained.

14  Q.  Tell us what your understanding of what the purpose of

15  these meetings was.

16  A.  It was to discuss structures and strategies for our

17  upcoming acquisition.

18  Q.  And when you got back to New York did you have further

19  discussions with Mr. Wey about those meetings?

20  A.  Yes.

21  Q.  Now, let's go to April 21, 2014.  Day before you were

22  fired?

23  A.  Yes.

24  Q.  Did you have a meeting with Mr. Wey on that occasion?

25  A.  Yes.

1   Q.  How did that come about?

2   A.  He called me and said that he wanted a meeting with me.

3   Q.  Where were you when he called you?

4   A.  I don't remember exactly.

5   Q.  At that time were you over at Cambridge Alliance Capital?

6   A.  Yes.

7   Q.  How did it come about that you went -- that you were at

8   Cambridge Alliance Capital instead of New York Global Group?

9   A.  He said that I should get some proper training.  And he

10  also said that, who knows, maybe you'll like it better over

11  there.

12  Q.  Did you get any training at Cambridge Alliance Capital?

13  A.  I got a Series 7 book to read.  And then they wanted me to

14  do cold calling.

15  Q.  What's cold calling?

16  A.  You call up a random person and ask if they would like to

17  invest in stocks or bonds.

18  Q.  Did you do the cold calling?

19  A.  Yes.

20  Q.  And were you able to interest people in buying stocks and

21  bonds?

22  A.  No.  I was really only allowed to get their contact info

23  and then have one of the brokers to call them up.  Because I

24  don't have a license.  So I cannot sell stocks and bonds.

25  Q.  Besides making the cold calls, did you do anything else

1    over at Cambridge Alliance Capital?

2    A.   I started to read the Series 7 book.

3    Q.   Did you find that interesting?

4    A.   No.

5    Q.   So, Mr. Wey called you to a meeting on April 21.  Where did

6    the meeting take place?

7    A.   In the office of 40 Wall Street, New York Global Group

8    offices.

9    Q.   What did he say to you during this meeting?

10   A.   It was a long meeting.  And he was talking a lot.  And he

11   was talking about that he always wanted to see me.  He always

12   wanted to spend time with me.  He wanted to have sex with me.

13   He wanted to hug me.  He wanted to kiss me.  And he said that

14   he's driven by passion.  And if there is no passion then

15   there's nothing there for him.

16        He was talking a lot about -- that I should stick

17   close to him.  And he was talking about -- this is something he

18   said before as well, but he was saying that I don't have any

19   friends.  They don't like me.  Or even if they do, they're not

20   going to be able to be there for me anyway because they don't

21   have resources.  And he has resources because he's the top dog

22   on Wall Street.

23        And he was kind of saying that if I didn't start to

24   spend more time with him he would have to start to look for

25   someone else.  In the beginning of the conversation he said

1  that he was going to -- that I had until December 1 to change

2  my mind.  And then at the end of the conversation he said

3  August 1.

4  Q.  And did he put this to you in any particular way?  What

5  were his exact words?

6  A.  He said that if I don't show him tangible love he's kicking

7  me out by August 1.

8  Q.  What did you say to him?

9  A.  I -- I just -- well throughout the entire conversation I

10  didn't say much because he was doing a lot of talking.  And

11  then in the end of the conversation he just said you should

12  think about it.  And then we just said bye.  So I didn't say

13  more than that.

14  Q.  Next day.  April 22.  Day you're fired, right?

15  A.  Yes.

16  Q.  Tell us what happened.

17  A.  I was at the offices of Cambridge Alliance Capital.  And

18  then one of the partners told me that I should go downstairs

19  because Mr. Wey is waiting for me.  So I went downstairs.  And

20  then as soon as I came out he asked me if -- if I had fun

21  yesterday.  And I said that it was fun because it was a

22  friend's birthday.

23          And then he said let's go and talk over here.  So we

24  went by the water.  We sat down.  And he said that he was just

25  in my apartment.  And I said well then you must have met my

1   friend James.  And then he screamed -- he screamed you fucking

2   bitch.  I'm gonna revoke your visa today.  I want you out of

3   the apartment today.  You're no longer hired by New York Global

4   Group.

5           And I was kind of in shock.  So I just told him that I

6   think you're exaggerating a little bit.  Then he just stood up.

7   And said let's go.  So he walked in front of me and he called

8   the office at Cambridge Alliance Capital and he asked them to

9   bring my bag and my coat downstairs.  So their assistant came

10  downstairs.  She gave me the bag.

11          Then we were walking towards the apartment.  He was

12  walking in front of me.  And I said to him again that I think

13  you exaggerate a little bit.

14          We came there.  We went up the elevator.  And we went

15  into the apartment.  Then he started to become very aggressive

16  and said that I should pack my things.  And I told him that he

17  can come back in a couple of hours so I have time to pack.  And

18  he said no, I want you out now and I'm going to be there until

19  you are out.

20          So he sat down by the kitchen table and I just got all

21  my suitcases and started to throw things in them.

22          That day I was supposed to have lunch was Ms. Koluman.

23  And she called me and asked where I was.  And I told her well

24  there's a slight change of plans.  You have to come to the

25  apartment and help me pack.  And then we just hang up.

 1              And she came to the apartment.  And Mr. Wey was just

 2     sitting there.  And I greeted her and said that she should

 3     probably help me pack.

 4              So we started to just pull clothes from the hangers

 5     and the drawers.  And then he asked her to come and talk to

 6     her.

 7              So they were sitting and talking.  And he said to her

 8     that he felt betrayed and that he trusted me.  And they were

 9     sitting there for a while, while I was packing.  And then all

10     of a sudden he asked her how many languages she speak.  And she

11     said well that she speaks three languages.  And he said well

12     aren't you done with school soon, maybe you're looking for an

13     internship or a job.  And she didn't say much.  And then he

14     said why don't you send your resume to me.

15     Q.  Did you and Mr. Wey have a conversation as you were packing

16     your stuff?

17     A.  After I was -- I packed everything I could fit into the

18     suitcases I had, because I didn't get a chance to pack

19     everything, we sat down in the kitchen -- at the kitchen table

20     and he said that I should not tell this to anyone and that I

21     shouldn't talk badly about him and that he wouldn't talk badly

22     about me.  And he wanted Ms. Koluman to hear that so she would

23     be a witness to that deal.  And we shook hands on that.

24              Then I had all my things out in the hallway.  We went

25     downstairs.  We left the key to the building manager and he

1  said that they should never let me in again.

2         Then we took the elevator up to the apartment again.

3  And on the way up he asked me if I was okay.  And he asked me

4  where I was going to go or if I needed money.  And then I just

5  told him that I don't need anything from you.

6         Then I had all my -- my bags in the hallway.  And we

7  went to the door.  And he was going to go in the apartment.  So

8  he was standing inside of the apartment.  And before he slammed

9  the door in any face he screamed that you can go and tell that

10  black guy James to go and fuck himself.

11  Q.  Can you describe Mr. Wey's demeanor when you met him after

12  you came down from Cambridge Alliance Capital?

13  A.  You could tell that he was very angry.

14  Q.  How could you tell?

15  A.  I've been working with him for the past half year and you

16  could tell when he's very upset or very angry.

17  Q.  Did you have a deal with Mr. Wey that you needed his

18  permission any time you had an overnight guest in the

19  apartment?

20  A.  No.

21  Q.  Did you ever tell him that there were going to be people

22  staying in the apartment?

23  A.  Maybe I mentioned it a few times.  But it was not to get

24  his permission.

25  Q.  Did you have a male friend of yours staying in the

 1  apartment for a period of time?

 2  A.   Yes.

 3  Q.   Who is that?

 4  A.   It's a friend of mine.  His name is Carl Carlson.  I've

 5  known him since we were twelve years old.  And he's a very good

 6  friend of mine.

 7  Q.   Any romantic relationship with him?

 8  A.   No.

 9  Q.   Did you have any relatives of yours staying in the

10  apartment?

11  A.   Yes.

12  Q.   Who?

13  A.   Well she is my half sibling.

14  Q.   Did you ask Mr. Wey's permission for Carl Carlson to stay

15  in the apartment?

16  A.   No, I did not ask for his permission.

17  Q.   Did you ask his permission for your half siblings to stay

18  in the apartment?

19  A.   No.

20  Q.   Did you tell him that they were staying in the apartment?

21  A.   Yeah, I think I did.

22  Q.   Why did you tell him?

23  A.   He was -- he asked me how I was going to celebrate

24  Christmas.  And I said I was not really going to celebrate

25  Christmas but my sister was going to come.

1      And then my friend Carl, he's one of my best friends.

2  And I really proud of him for everything that he's doing.  So,

3  you know, I talk about him a lot.  So -- because he was living

4  in Buenos Aires at the time and he was going to stop by

5  New York to come back.  So I guess that's just how it came

6  about.

7  Q.  While working at New York Global Group -- withdrawn.

8      Now, you were -- April 22, you were just fired; you

9  were just thrown out of your apartment.  How did you feel?

10 A.  I felt free.

11 Q.  Why is that?

12 A.  Because I thought that everything was going to be over and

13 that it didn't -- that I wouldn't have to deal with this man in

14 my life ever again.

15 Q.  And after April 22 did you telephone Mr. Wey?

16 A.  No.

17 Q.  After April 22 did you write any e-mails to Mr. Wey?

18 A.  No.

19 Q.  After April 22 did you send him any texts?

20 A.  No.

21 Q.  After April 22 did you attempt to communicate with him in

22 any way?

23 A.  No.

24 Q.  After April 22 did he communicate with people you knew?

25 A.  Yes.

1  Q.  And after April 22 did he communicate with your father?

2  A.  Yes.

3  Q.  How do you know that?

4  A.  Because he told me and I also got the e-mails that he sent.

5  Q.  And a couple of those e-mails have been introduced into

6  evidence already.  How did you feel that Mr. Wey was sending

7  these e-mails to your father?

8  A.  It was embarrassing.  And then I thought it was scary

9  because I couldn't understand why Mr. Wey would send my father

10 e-mails.  And I could not understand the content of the e-mails

11 that he is sending to my father.

12 Q.  Now, I'd like to show you what's been marked as Plaintiff's

13 Exhibit 30.

14      Do you recognize this?

15 A.  Yes.

16 Q.  Is this an e-mail dated April 26 from Mr. Wey to you and

17 your father?

18 A.  Yes.

19      MR. RATNER:  Offer it into evidence, your Honor.

20      MR. COLTON:  No objection, your Honor.

21      THE COURT:  Plaintiff's Exhibit 30 is received.

22      (Plaintiff's Exhibit 30 received in evidence)

23 Q.  Did you respond to this e-mail?

24 A.  No.

25 Q.  Did you ever discuss with your father how he felt getting

 1  these e-mails?

 2  A.  Yes.

 3  Q.  And how did those discussions with your father make you

 4  feel?

 5  A.  It stressed me out because -- the impact and the effect it

 6  had on my father, who was in Vetlanda, in Sweden.  It affected

 7  me a lot and it got me really upset, stressed, scared that he

 8  would keep on contacting him.

 9          MR. COLTON:  Excuse me, your Honor.  Can we have a

10  brief moment?

11          THE COURT:  All right.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (At the sidebar)
 2            MR. COLTON:  I'm not sure exactly where all of this is
 3    going.  I know it starts to get into the issue of whose
 4    potential hurt or upset is at issue.
 5            THE COURT:  Are you asking anything more on this?
 6            MR. RATNER:  No.
 7            THE COURT:  This is it?
 8            MR. RATNER:  Yes.
 9            MR. COLTON:  Then we'll save the -- well if this is
10    all he's doing then we'll save the issue of the instruction for
11    when Mr. Sundqvist testifies about any potential harm on him.
12            THE COURT:  All right.
13            MR. COLTON:  Thank you, your Honor.
14            (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25
```

1              (In open court)

2    BY MR. RATNER:

3    Q.  In the few days following April 22, how did you feel

4    knowing that Mr. Wey was communicating with your father like

5    this?

6    A.  I felt some sort of panic.  It made me upset and scared and

7    I just wanted him to leave us alone.

8    Q.  Did it affect you in any way emotionally?

9    A.  Yes.

10   Q.  Tell us about that.

11   A.  You would get really -- I was really freaked out and you

12   get a sense of that someone is -- just can't let go and is

13   coming after you; and now it's not only you anymore, now it's

14   everyone around you.  And it made me really sad and upset that,

15   you know, it would not only affect me anymore but that he would

16   drag everyone I know into this.

17   Q.  I'd like to show you Exhibit 44 that's already in evidence.

18            This is an e-mail to you, Ms. Koluman, and your

19   father, correct?

20   A.  Yes.

21   Q.  "Are you looking at yourself in the mirror?"

22            Let's go down to the fourth paragraph.  Do you see

23   that?  It starts, "He got you drunk."  Right?

24   A.  Yes.

25   Q.  "He got you drunk, gave you free access to nightclubs,

 1   complimented you with empty words.  But he is not yours.  He

 2   belongs to hundreds of other young girls.  That's his business

 3   and how he makes his money.  Many of his girls are a lot better

 4   looking than you are.  When is your day going to end badly?

 5   What tangible stuff do you have to offer James Chauvet other

 6   than alcohol and sex?  Not much.  Both are getting old, aren't

 7   they?"

 8            How do you feel that this letter, this e-mail was sent

 9   to your dad?

10   A.  Embarrassing.  Trying to humiliate me in front of my

11   family.  I felt that he's trying to make me look bad in front

12   of everyone I know in order to isolate me.  And it -- it freaks

13   you out when a person of his rank -- he is the CEO on Wall

14   Street -- CEO of a Wall Street company in private equity.  And

15   he would write to my father about my boyfriend and about sex

16   and about alcohol.  And it's just bizarre.

17   Q.  I'd like to show you what's been marked as Exhibit 46 for

18   identification.  Do you recognize this e-mail?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's an e-mail from Mr. Wey to me.

22   Q.  May 4, 2014, true?

23   A.  Yes.

24            MR. RATNER:  Offer it into evidence.

25            MR. COLTON:  No objection, your Honor.

1          THE COURT:  Plaintiff's Exhibit 46 is received.

2          (Plaintiff's Exhibit 46 received in evidence)

3   Q.  Now, this e-mail came to you after you got a lawyer?

4   A.  Yes.

5   Q.  This e-mail came to you after he had a phone conversation

6   with you in the end of April, right?

7          MR. COLTON:  Object to the leading.

8          THE COURT:  Sustained.  Sustained.

9   Q.  Did you respond to this e-mail?

10  A.  No.

11         MR. RATNER:  Last page, please.

12  Q.  Mr. Wey says, "I wanted the best for your life.  Let me

13  know what I can do to help you.  We can start over.  Totally

14  professionally, as you wish.  No strings attached.  I want to

15  help you.  At a minimum I want to buy your plane ticket back to

16  Sweden as a gift."

17         What do you think -- what did you take him to mean,

18  "No strings attached"?

19  A.  That I will have to show him tangible love.

20  Q.  At some point after the telephone conversation that was

21  recorded did Mr. Wey leave a voice mail on your phone?

22  A.  Yes.

23  Q.  And did you save that voice mail?

24  A.  Yes.

25  Q.  Have you listened to the recording of that voice mail?

1           MR. COLTON:  I think we need to approach on this one,

2    your Honor.

3           THE COURT:  Well that's a yes-or-no question.  Have

4    you listened to the voice mail on your phone, yes or no?

5           THE WITNESS:  Yes.

6           MR. RATNER:  And have you reviewed a transcript of the

7    recording of the voice mail while you were listening to it?

8           THE WITNESS:  Yes.

9           THE COURT:  Do you want to approach?

10          MR. COLTON:  I do.  Thank you, your Honor.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2              MR. COLTON:  As Mr. Ratner well knows, there is no

3        recording.  No recording has been produced.  So there will be

4        no recording to be played.

5              MR. RATNER:  That's not true.

6              MR. COLTON:  Well we have never been given a recording

7        for this phonecall.  We've been given a transcript and

8        obviously you cannot get a transcript, which is only an aid,

9        into evidence.  That's basic.  So if he wants to ask her what

10       she remembers, wants to refresh her recollection, those things

11       are fine.  But this transcript can't possibly go into evidence

12       without a recording.

13             MR. RATNER:  I agree with that but I'm pretty sure we

14       exchanged.

15             THE COURT:  Hold on.

16             MR. COLTON:  That's why we objected in the pretrial

17       order.  We don't have the recording.

18             (Pause)

19             MR. RATNER:  I believe we exchanged it, Exhibit 39.

20             I'll move on to another topic now and at a break we'll

21       go over that.

22             THE COURT:  All right.

23             MR. COLTON:  Thank you, your Honor.

24             (Continued on next page)

25

1                    (In open court)

2     BY MR. RATNER:

3     Q.  Ms. Bouveng, what do you remember about that voice mail?

4     A.  I remember that he insisted on seeing me.

5                    That he insisted on seeing me.

6     Q.  Now, do you know a gentleman by the name of Levi McCathern?

7     A.  Yes.

8     Q.  Who is Levi McCathern?

9     A.  It's a friend and acquaintance of mine.

10    Q.  How did you meet Mr. McCathern?

11    A.  Through a common friend.

12    Q.  What is Mr. McCathern's profession?

13    A.  He's a lawyer.

14    Q.  And in connection with your work at New York Global Group

15    did you have any communications with Mr. McCathern?

16    A.  Yes.

17    Q.  Tell us about that.

18    A.  I introduced Mr. McCathern to Mr. Wey because Mr. McCathern

19    is a lawyer for NFL league.  So I thought that it would be

20    interesting since FIKA, the coffee shop chain, they produce

21    chocolate.  So I thought it would be interesting if they could

22    meet and see if we could create some kind of merchandise with

23    chocolate that in relation to football or the NFL league.

24    Q.  Did you learn that Mr. Wey communicated with Mr. McCathern

25    after you were fired?

 1          THE COURT:  Sustained.

 2   BY MR. RATNER:

 3   Q.  I'd like to show you what's been marked as Plaintiff's

 4   Exhibit 53 for identification.

 5          Now, look at the second page of 53.  Do you recognize

 6   the e-mail address of the sender of this e-mail?

 7   A.  Yes.

 8   Q.  Whose e-mail address is that?

 9   A.  Mr. Wey's.

10   Q.  Do you recognize the e-mail address of the recipient of

11   this e-mail?

12   A.  Yes.

13   Q.  Whose e-mail address is that?

14   A.  Mr. McCathern.

15   Q.  And -- while at New York Global Group did you receive and

16   send numerous e-mails to and from Mr. Wey?

17   A.  Yes.

18   Q.  And had you also communicated by e-mail to and from

19   Mr. McCathern?

20   A.  On occasion.

21   Q.  On occasion?

22   A.  Yes, I believe so.

23          MR. RATNER:  Your Honor, I offer this into evidence.

24          MR. COLTON:  Voir dire, your Honor?

25          THE COURT:  Sure.

1    VOIR DIRE EXAMINATION

2    BY MR. COLTON:

3    Q.   Good morning, Ms. Bouveng.

4    A.   Good morning.

5    Q.   Looking at Plaintiff's Exhibit 53 for identification.   The

6    vast majority is an e-mail -- purports to be an e-mail that you

7    just testified to, from Mr. Wey to Mr. McCathern?

8    A.   Sorry.

9    Q.   Let me try that again.   If you look at the second page of

10   the exhibit?

11   A.   Yes.

12   Q.   It's your testimony that that's an e-mail from Mr. Wey to

13   Mr. McCathern, right?

14   A.   Yes.

15   Q.   You didn't actually receive this e-mail from Mr. Wey,

16   correct?

17   A.   No.

18   Q.   And you have no way to know whether Mr. McCathern edited

19   the e-mail that Mr. Wey sent before forwarding it to you,

20   right?

21   A.   No.

22   Q.   You have no idea whether it was a longer or shorter?

23   A.   No.

24   Q.   You have no idea whether information was added or

25   subtracted from this e-mail, right?

1   A.   No.

2   Q.   So you have no idea whether this is exactly or even close

3   to the e-mail that Mr. Wey purportedly sent to Mr. McCathern,

4   correct?

5   A.   Not other than that Mr. McCathern told me that this was the

6   accurate e-mail.

7            MR. COLTON:  Move to strike the hearsay, your Honor.

8            THE COURT:  That's overruled.  It's responsive to your

9   question.

10            MR. COLTON:  Well we object on foundation,

11   authenticity grounds to Exhibit 53.

12            THE COURT:  I'll see the lawyers at the bench.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2            THE COURT:  Who produced the document?

3            MR. COLTON:  Plaintiff.

4            MR. RATNER:  The plaintiff.

5            It was never produced by defendant, your Honor.

6            THE COURT:  What's your explanation for why it wasn't

7    produced by defendant?

8            MR. COLTON:  I don't have an explanation because I

9    wasn't counsel before.  But we reached an in-depth stipulation

10   agreeing to the -- I'm sorry.  Your deputy wants your

11   attention, your Honor.

12           THE DEPUTY CLERK:  Judge the jurors are asking for a

13   break.

14           (In open court)

15           THE COURT:  Ladies and gentlemen, we'll take a

16   ten-minute recess.

17           (Jury excused)

18           (At the sidebar)

19           THE COURT:  What's the stipulation?

20           MR. COLTON:  We have reached a detailed stipulation to

21   resolve plaintiff's discovery motions.  We agreed to the

22   authenticity and admissibility for a series of exhibits.  I can

23   get the stipulation for your Honor.

24           (In open court)

25           THE COURT:  Please be seated.

1             (At the sidebar)

2             MR. COLTON:  This is not one of those exhibits.  Many,

3    many have come into evidence pursuant to that stipulation.

4    This is simply not one of those exhibits.

5             MR. RATNER:  Your Honor, this is the e-mail that has

6    been produced by defendants in this particular case.  It's an

7    e-mail that was forwarded to Ms. Bouveng by Mr. McCathern.  She

8    identified to and from.  I think it has certainly inherent

9    reliability since she recognized both the e-mail address of the

10   sender and the recipient and I see no reason to exclude it.

11            (In open court)

12            THE COURT:  Please be quiet.

13            (At the sidebar)

14            THE COURT:  I'm not really sure what the basis would

15   be for a challenging the authenticity of the document.  The

16   e-mail is very, very similar to countless e-mails that have

17   been introduced in the case that were authored by Mr. Wey.  The

18   e-mail is in exactly the same form with exactly the same

19   information regarding Mr. Wey, his title, where he works, his

20   address, the websites of New York Global Group, his e-mail

21   address is the same.  The e-mail in question, which is

22   addressed to Mr. McCathern -- that's M-C-C-A-T-H-E-R-N -- the

23   subject matter -- well, first of all, it begins by talking

24   about the possibility of FIKA's chocolates being -- having a

25   relationship with the NFL.  So the witness has testified about

1   this.  And Mr. Wey directs Mr. McCathern's attention to that

2   discussion about the NFL getting into a cobranding relationship

3   with FIKA with respect to a chocolate line.

4        The e-mail goes on to say that NYGG has terminated

5   Hanna Bouveng on April 22 for cause; that she engaged in

6   dishonest acts, violations of professional conduct, that she

7   engaged in extensive alcohol abuse, possible use of illegal

8   substances, that she was sleepy and suffered from alcohol

9   hangovers at work, partied at night almost daily until early

10  morning hours; that she has associated with a criminal club

11  promoter, specifically her boyfriend, James Chauvet, a

12  six-foot-tall black man from the streets of Brooklyn and Haiti,

13  allegedly someone with an extensive criminal court background

14  and arrest record.  The FBI record that we've heard so much

15  about is attached as an exhibit to the e-mail, along with a mug

16  shot.

17       The e-mail goes on to say that Ms. Bouveng leads a

18  double life in New York, that she was at New York Global Group

19  during the day and partied crazy at night.  He talks about

20  extensive video footage relating to Ms. Bouveng's allegedly

21  irresponsible behavior.

22       The e-mail goes on to say that Mr. Chauvet has sought

23  medical attention for sexually transmitted diseases.  And

24  attached also to the e-mail are photos from Mr. Chauvet's

25  Facebook page.

 1              The e-mail goes on to say he is the sponsor for her

 2    visa, NYGG had no choice but to terminate Ms. Bouveng, and that

 3    she will have to leave the U.S. by May 22.

 4              So this e-mail has extremely strong indicia of

 5    reliability.  It repeats almost in haec verba countless other

 6    statements that Mr. Wey has made to others, many of which are

 7    in evidence already.

 8              There's a forward e-mail from Mr. McCathern to

 9    Ms. Bouveng attaching this e-mail and obviously nothing in the

10    e-mail is offered for its truth.  So, there is no hearsay

11    problem.

12              On authenticity grounds, I find that there is no basis

13    to challenge the authenticity of the e-mail from Wey to

14    McCathern.

15              MR. COLTON:  It is also we believe, your Honor,

16    incomplete because it lists attachments that plaintiff has

17    conveniently omitted from the e-mail.

18              MR. RATNER:  Third page, your Honor.  There are the

19    links to the attachments.

20              MR. COLTON:  No.  It says at least, as the court read

21    it, that the photos taken and posted by James Chauvet are

22    splashed on the internet.  So I have no way to know whether

23    there was an attachment or not, or just the links, because we

24    don't have the witness, and we don't have any witness who can

25    say what the complete e-mail was.

1    THE COURT:  Well I mean I suppose that Ms. Bouveng

2    could be asked whether the photos were attached.  But the

3    e-mail itself indicates that the photos were attached.

4    Again, the backdrop for this is this is a document

5    that was obviously in defendants' possession.  There is no

6    explanation why it wasn't produced in discovery.  And to now

7    say that it should not be admitted because of inadequate

8    authentication when it was a document that was in defendants'

9    possession, I'm overruling the objection.

10    MR. COLTON:  I understand the Court's ruling.  Not

11    rearguing.

12    As far as the presumption of documents in defendants'

13    possession, I'd urge the court, for future rulings, not to

14    consider what was or wasn't produced because a stipulation

15    resolving those issues, with substantial concessions by the

16    defendants, were given to resolve those issues and obviate that

17    issue.

18    THE COURT:  Well but you told me that the stipulation

19    doesn't address this particular e-mail.

20    MR. COLTON:  Right.  But it addresses many, many

21    e-mails where we decided, in exchange for concessions by both

22    sides not to fight evidentiary issues.  That was -- this

23    e-mail -- if Mr. Ratner said we wanted this e-mail on the list,

24    we would have considered that.  It just didn't come up.

25    I don't need to argue that issue now.  I'm just asking

1    the Court to keep that in mind if it comes up again, which it

2    may not.

3            The only other issue I have with respect to this

4    e-mail and the court is, of course, right that there are

5    similarities to other e-mails, but I don't believe there is

6    another e-mail or document that I can recall that says

7    Mr. Chauvet sought medical attention for sexually transmitted

8    diseases.  That's an addition to the case that's different.

9    And we don't have a witness that says they got --

10           THE COURT:  I have seen articles on TheBlot that make

11   exactly that allegation; that -- am I correct, Mr. Ratner?

12           MR. RATNER:  Yes.

13           THE COURT:  So I think you're wrong about that,

14   Mr. Colton.  There is a suggestion in materials that I've read

15   in connection with the trial alleging that Mr. Chauvet has some

16   kind of sexual disease.

17           MR. COLTON:  I don't dispute that that may be

18   somewhere.  My question, and I'm happy to look at the issue, is

19   whether it's in any of the materials that are actually going to

20   the jury as opposed to the far more massive set of materials

21   the Court has gone through.

22           MR. RATNER:  Actually the -- just for a for instance,

23   the Facebook message to Oscar Bouveng talks about AIDS and

24   Hanna possibly contracting AIDS from Mr. Chauvet.  So it's

25   there.

1              THE COURT:  Do you recall that Mr. Colton?  That

2    sounds familiar.

3              MR. COLTON:  I do.

4              THE COURT:  All right.  Anything else before we take a

5    break?

6              MR. MEYERHOFF:  Nothing is.

7              MR. COLTON:  No, your Honor.  Thank you.

8              (Recess)

9              (Continued on next page)

F6NMBOU3                    Bouveng - direct

 1            THE COURT:  Ms. Bouveng, you can retake the stand.

 2            MR. RATNER:  Your Honor, before the jury comes in, I

 3   asked Mr. Colton if he had received the recording of Exhibit

 4   39, and apparently they have.

 5            MR. COLTON:  What happened, your Honor, is that about

 6   a week and a half to two weeks after the pretrial order was

 7   exchanged and the exhibits evaluated, we apparently were sent

 8   by Dropbox this recording.  I did not know that.  There are

 9   systems, I guess.  But we accept their representation that it

10   was sent prior to trial.  And I'm happy to correct the record,

11   but also make it clear why there was a mistake here, not just

12   that we didn't bother to look at the pretrial order and the

13   exhibits.

14            THE COURT:  Do you have any concerns about the

15   accuracy of the transcript?

16            MR. COLTON:  I have not had the opportunity, but,

17   frankly, if the witness is going to testify that she sat down

18   and did that, it's going to get in, and we will cross however

19   we cross.

20            THE COURT:  Please bring in the jury.

21            Ms. Bouveng, can you take the stand.

22            (Jury present)

23            THE COURT:  Please proceed, Mr. Ratner.

24   Q.  Ms. Bouveng, I want to go back to something we talked about

25   a little earlier and that was a voice mail that Mr. Wey left

 1   for you.

 2   A.   Yes.

 3   Q.   Did you listen to the recording of that voice mail and read

 4   along with the transcript of the voice mail?

 5   A.   Yes.

 6   Q.   And did you also listen to the recording and read along

 7   with the transcript as it was being displayed on the computer

 8   screen simultaneously with the recording?

 9   A.   Yes.

10   Q.   And were the titles that were on the computer screen an

11   accurate transcription of the recording?

12   A.   Yes.

13            MR. RATNER:   I offer the recording into evidence, your

14   Honor.

15            THE COURT:   What's the exhibit number, Mr. Ratner?

16            MR. RATNER:   39.   Sorry.

17            THE COURT:   Any objection, Mr. Colton?

18            MR. COLTON:   No, your Honor.   Just so we are clear,

19   the exhibit is 39 and then the eventual transcript is something

20   else?

21            MR. RATNER:   The transcript would be, I guess, 39A for

22   identification, your Honor.   But for the purposes today, the

23   transcript will be displayed electronically, not in paper form.

24            THE COURT:   You don't object to that, do you, Mr.

25   Colton?

1          MR. COLTON:  We don't object to that.  Just so the

2     record is clear, obviously what's being admitted into evidence

3     is the recording.  And the transcript, even though it's on the

4     screen, is just an aid.

5          THE COURT:  Yes.  Plaintiff's Exhibit 39 is received.

6          (Plaintiff's Exhibit 39 received in evidence)

7          THE COURT:  Ladies and gentlemen, as I've told you

8     before, what is in evidence is the actual tape itself, the

9     conversation and more specifically what you hear on the tape

10    and not what is on the transcript.  Whether the transcript is

11    in paper form, is shown on the computer screen, that's not the

12    evidence.  That's just an aid to you in listening to the tape.

13         Go ahead, Mr. Ratner.

14         (Audio recording played)

15    Q.  Ms. Bouveng, did you ever call him back?

16    A.  No.

17    Q.  Now, I'd like to show you what's been marked as Exhibit 67

18    in evidence.  Do you recognize Exhibit 67?

19    A.  Yes.

20    Q.  Did you at some point come into possession of the

21    photograph that's shown on the screen?

22    A.  Yes.

23    Q.  How did you get it?

24    A.  My younger brother send it to me.

25    Q.  And when did he send it to you?

1   A.  Either that night that Mr. Wey and his friends --

2           MR. COLTON:  Objection.  Move to strike, your Honor.

3   The witness is testifying to what somebody obviously must have

4   told her.

5           THE COURT:  This is in evidence, right?

6           MR. RATNER:  Yes.

7   Q.  When did you receive the photograph that's shown right

8   here, Exhibit 67?

9   A.  After Mr. Wey and his friends were in Vetlanda.

10          MR. COLTON:  Objection, your Honor.  Move to strike.

11          THE COURT:  Sustained.

12  Q.  Did you receive it before Mr. Wey appeared at Cafe Linne in

13  Stockholm?

14          MR. COLTON:  Same objection.  This witness, he has to

15  lay groundwork that she was there and had firsthand knowledge.

16          THE COURT:  Sustained.

17  Q.  You didn't take this photograph, true?

18  A.  True.

19  Q.  How did you receive the photograph?

20  A.  From my younger brother in a text message.

21  Q.  He texted you the photograph?

22  A.  Yes.

23  Q.  And how do you know it came from your younger brother?

24  A.  Because I know his number.

25  Q.  And how do you know this photograph was attached to the

1   text message?

2   A.   It was in the text message.

3   Q.   You opened the text message and saw the photograph?

4   A.   Yes.

5   Q.   And where were you when you received the text message

6   containing this photograph?

7   A.   I was staying at my sister's place in Stockholm.

8   Q.   And place that in time before or after Mr. Wey appeared at

9   Cafe Linne in Stockholm.

10          MR. COLTON:  Same problem, your Honor.  This witness

11  wasn't at Cafe – strike that.  I'll withdraw the objection and

12  see if the answer is hearsay or not.

13  A.   It was before.

14  Q.   And next page.  Did you receive this photograph?

15  A.   Yes.

16  Q.   How did you receive it?

17  A.   As a text message.

18  Q.   From whom?

19  A.   My younger brother.

20  Q.   And how do you know it was from your younger brother?

21  A.   I know his number.

22  Q.   When you received the text message from your younger

23  brother, did you look at the photograph?

24  A.   Yes.

25  Q.   And place this in time before or after Mr. Wey appeared at

F6NMBOU3                        Bouveng

 1   Cafe Linne in Stockholm.

 2   A.   Before.

 3   Q.   Did you recognize, when you received the photograph, where

 4   the photograph was taken?

 5   A.   Yes.

 6   Q.   How did you recognize that?

 7   A.   I recognized that it was from our bar in Vetlanda.

 8   Q.   Are you aware that at some point a website by the name of

 9   HannaBouveng.com appeared on the Internet?

10   A.   Yes.

11   Q.   How did you become aware of it?

12   A.   It appears on Google.  So when I Googled it appeared.

13   Q.   What did you Google?

14   A.   My name.

15   Q.   And when you Googled your name and HannaBouveng.com

16   appeared, did you look at what the contents of the website was?

17   A.   Yes.

18   Q.   I would like to show you what's been marked as Plaintiff's

19   Exhibit 57 for identification.

20             MR. RATNER:  I need to show the hard copy to the

21   witness, your Honor.  I'm sorry.

22   Q.   Do you recognize Exhibit 57 of screen shots of what

23   appeared on the website HannaBouveng.com?

24   A.   Yes.

25   Q.   And do those pages of Exhibit 57 fairly and accurately show

F6NMBOU3                    Bouveng - direct

1    what was on HannaBouveng.com when you looked at it?

2    A.  Yes.

3              MR. RATNER:  Offer it into evidence, your Honor.

4              MR. COLTON:  As much as I hate to ask for it, can we

5    have a moment of the Court's time at side bar?

6              THE COURT:  Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. COLTON:  Your Honor, I understand typically the

3   Court doesn't want to have two lawyers addressing an issue, but

4   this issue is the one that Mr. Meyerhoff was in the lead on.  I

5   would ask the Court's indulgence to allow him to address it.

6          THE COURT:  All right.

7          MR. MEYERHOFF:  Your Honor, as you well know, we spent

8   a lot of time working on the defamatory statements.  Mr. Ratner

9   had the opportunity to present those which he wanted to take to

10  the jury.  We went over many, many statements.  And while this

11  exhibit isn't from The Blot, that was clearly his opportunity

12  to have the Court consider, if he wanted to present this

13  evidence, whether those statements were defamation per se or

14  not and went through the same process that we went through at

15  length with respect to the rest of the record.

16          As you can see from looking through the documents,

17  your Honor, there are some pictures and statements and captions

18  that we have not vetted.  We did not know that Mr. Ratner would

19  attempt to put this into evidence.  Had we known that, we might

20  have, 10 days ago or whatever it was, addressed it with the

21  Court.  We think his attempt to do this through the back door

22  when it didn't come through the front door is improper, and we

23  would object to it.

24          MR. RATNER:  Your Honor, Mr. Wey testified that at

25  times he directed and controlled the contents of it.

1          THE COURT:  Try to respond to what he said.

2          MR. RATNER:  This didn't come up in our discussions

3   about defamation or The Blot.  This was on our exhibit list.

4   It was never brought to our attention that it was a problem.

5          THE COURT:  I don't know how it couldn't have been

6   obvious to that it would present a problem because this

7   exhibit, Plaintiff's Exhibit 57, contains the same types of

8   statements we spent hours, hours discussing, talking about,

9   ruling on, whether they constituted defamation per se or not.

10  I am shocked that you are telling me that you couldn't have

11  foreseen that this would present a problem.  How can you say

12  that?

13         MR. RATNER:  Very easily.  But I will withdraw the

14  offer and do it a different way.

15         MR. COLTON:  Perhaps while we are here, we can address

16  what the different way is so I don't have to ask twice.

17         MR. RATNER:  I am going to ask how she felt after

18  reviewing the content of HannaBouveng.com.

19         THE COURT:  I don't know how that's going to be

20  illuminating to the jury if we don't have the foggiest clue on

21  what's on HannaBouveng.com.

22         MR. RATNER:  I can ask her if there were some

23  photographs on there from The Blot and some words on there from

24  The Blot without going into the words.  I can ask her if there

25  were pornographic pictures on there, which there were.  I could

1   ask her to describe the pornographic pictures, which she can.

2          THE COURT:  There is a pornographic image, yes.  It's

3   redacted, but I gather it's the same one I already ruled on.

4          MR. RATNER:  Similar, worse, actually.

5          THE COURT:  This needed groundwork, Mr. Ratner, and

6   you chose not to.

7          MR. RATNER:  I'll move on.

8          (Continued on next page)

1              (In open court)

2   Q.  Let's go back to Exhibit 53, the e-mail from Mr. Wey to

3   Mr. McCathern.

4              MR. RATNER:  Offer that into evidence, your Honor.

5              THE COURT:  Any objection, other than what was

6   discussed at the bench?

7              MR. COLTON:  No, your Honor.

8              THE COURT:  Plaintiff's Exhibit 53 is received.

9              (Plaintiff's Exhibit 53 received in evidence)

10             MR. RATNER:  May we publish it to the jury.

11             THE COURT:  You may.

12             MR. RATNER:  Second page, please.

13  Q.  This is an e-mail to Mr. McCathern, right?

14  A.  Yes.

15  Q.  Did New York Global Group, while you were working there,

16  ever work out any deal with the NFL through Mr. McCathern?

17  A.  No.

18  Q.  Let's go to the second photograph.  Extensive alcohol

19  abuse, possible use of illegal substance, sleepy and alcohol

20  hangover at work, partying at work almost daily until early

21  morning hours, associations with a criminal nightclub promoter,

22  her boyfriend, James Chauvet, six foot tall black man from the

23  streets of Brooklyn and Haiti, and someone with extensive

24  criminal court proceedings and an arrest record, FBI record

25  attached, as recent as on March 20, 2013, by the NYPD for

1    illegal drug possessions.  Unknown to us, they have been living

2    together at our corporate apartment unauthorized.  You can see

3    his photo, mugshot taken in jail.

4         How did you feel, knowing that Mr. Wey sent this to

5    Mr. McCathern?

6    A.   So extremely humiliated.  This was embarrassing that he

7    would send it to an acquaintance of mine that I would

8    potentially do business with, and he is sending that to him.

9    Q.   Next paragraph.  Hanna lived a double life in New York, an

10   executive assistant to us on Wall Street in the daytime and a

11   partying craze at night on weekdays and weekends.  There is

12   extensive video footage relating to her irresponsible behavior.

13   According to our investigations, her boyfriend, Chauvet, sought

14   medical attention for sexually transmitted diseases.  Hanna

15   does not have sufficient medical insurance coverage in the U.S.

16        How did you feel about that, Hanna?

17   A.   Well, first, I was creeped out and scared because I didn't

18   know what video footage that he was talking about, and it just

19   made me scared and paranoid.  I knew from before that he had

20   hired detectives that followed other women.  It creeped me out

21   and it was scary.  And then he's talking about transmitted

22   diseases, which I have no idea what he's talking about.  And he

23   is trying to say that I have a disease to an acquaintance of

24   mine, to a person that I might want to do business with, that

25   maybe was going to work with.  That's so embarrassing and

 1    humiliating.

 2    Q.   Now, when you went back to Sweden in the summer of 2014,

 3    did you go back to your hometown of Vetlanda?

 4    A.   No.

 5    Q.   Why not?

 6    A.   I was scared to go there.

 7    Q.   Why?

 8    A.   Because I knew that Mr. Wey knew where I come from, and he

 9    knew where I was, and I was scared that he was going to come

10    there or that he was going to have someone following me there.

11    Q.   Where did you go?

12    A.   I went to Stockholm.

13    Q.   Did you get a job in Stockholm?

14    A.   Yes.

15    Q.   Where?

16    A.   At Ms. Koluman's family's cafe.

17    Q.   Did you have to be interviewed for that job?

18    A.   No.

19    Q.   And what type of work did you do at the cafe?

20    A.   Worked as a waitress, made coffee, cleaned dishes.

21    Q.   Do you still work in the cafe?

22    A.   Yes.

23    Q.   Did there come a time when Mr. Wey appeared at the cafe?

24    A.   Yes.

25    Q.   Tell us about that.

1    A.  I was standing behind the counter and I had my back towards

2    the entrance and the customers because I was making coffee.

3    Then I just turned around and there he was, and he just said,

4    wow, and I turned around and my entire stomach just froze.  I

5    panicked.  So I just ran back to the kitchen and told one --

6    the brothers, both of them were there, that Mr. Wey was in the

7    cafe, and then they just ran out.

8    Q.  Did you see if Mr. Wey was with anyone in the cafe?

9    A.  With three or four other people.

10   Q.  What did you do in response to seeing him in the cafe?

11   A.  Well, the day before I went to the Swedish police, since I

12   knew that he was in my hometown, and I told them everything

13   that's happened, and she was going to talk to her colleagues.

14              MR. COLTON:  Objection.

15              THE COURT:  Sustained.

16   Q.  Just tell us what you did.

17   A.  I made a report at the police station and I told them

18   everything about the case.  The next day, after Mr. Wey showed

19   up at the cafe and I was in the kitchen, I called the police

20   again.  And then two of the civilian police officers came to

21   the cafe and we sat down and talked for 45 minutes.  We talked

22   about how I was going to protect myself, we talked about the

23   fact that I had to take different ways to work, so I

24   wouldn't --

25              MR. COLTON:  Objection.

 1          THE COURT:  Sustained.

 2   Q.  Just tell us what you did.  Don't tell us what the police

 3   did.

 4   A.  Well, I went with the police back to my house.  So I did

 5   not work -- I didn't work that afternoon.  So they gave me a

 6   ride back to my house and they gave me an alarm phone.

 7   Q.  You've heard about The Blot magazine, did you not?

 8   A.  Yes.

 9   Q.  Did there come a time when you learned that The Blot was

10   writing articles about you?

11   A.  Yes.

12   Q.  How did you find that out?

13   A.  I got them sent to me on Facebook, and I also Googled.

14   Q.  I'd like to show you what's been marked as Exhibit 61 in

15   evidence.  If you look at Exhibit 61 in evidence, at the bottom

16   it says:  The pimp and the sex slave meet criminal James

17   Chauvet and party girl, Hanna Bouveng.  And there are links to

18   JamesChauvet.com and HannaBouveng.com.  You see that?

19   A.  Yes.

20   Q.  How did it make you feel to be called a sex slave to a

21   pimp?

22   A.  Well, not good.  It made me feel humiliated and it made me

23   feel -- like I didn't know what I was going to react, how I was

24   going to react to this because I couldn't understand it.  And

25   it made me free embarrassed.  If I would apply for a job or, if

 1   anything, my future employers would see this and what would

 2   they think about me and people believe this.

 3   Q.  Ms. Bouveng, is Mr. Chauvet a pimp?

 4   A.  No.

 5   Q.  And were you his sex slave?

 6   A.  No.

 7   Q.  Third line down, a party girl, Hanna Bouveng, linked to

 8   your HannaBouveng.com, stood out from the crowd vying for the

 9   attention of drug dealers and male patrons, ready to pay for

10   some "special services" at a price.

11            How did you feel about that?

12   A.  Well, same as before, embarrassed and just kind of creepy

13   and scary that anyone -- that he -- that Mr. Wey would write

14   this.  And it also made me angry, that everything that's

15   happened, he is the one -- he just gets to continue to try to

16   break me down or destroy my life.

17   Q.  Two pages further on, please.  In the middle of the

18   paragraph in bold letters, so long as the money is paid, the

19   alcoholic Swedish girls, like Hanna Bouveng, may just jump on

20   the donkeys.

21            Are you an alcoholic, Ms. Bouveng?

22   A.  No.

23   Q.  Next page, towards the bottom of the page.  Hanna Bouveng,

24   prostitution and massage parlors.

25            Did you ever work in a massage parlor, Ms. Bouveng?

1   A.  No.

2   Q.  Then it mentions that you are from the small town of

3   Vetlanda.  How did you feel that your home town was being

4   published in this online magazine?

5   A.  Embarrassed, and I felt that Mr. Wey was really trying to

6   come after me.  He is trying to write about Vetlanda.  In

7   Vetlanda everyone knows everyone and everyone talks.  It

8   wouldn't be pleasant for me to go there because even though how

9   absurd this article is, it might portray me -- it portrays me

10  like I'm some kind of prostitute and it made me feel I can't go

11  there.  It doesn't make any sense that my former boss, he fired

12  me and he keeps on writing this about me.  It doesn't make any

13  sense, what's going on here.  It would be just too embarrassing

14  to try to explain everything.

15  Q.  It says Bouveng's father is Nils Sundqvist, a heavyset man

16  with a popping beer belly.  How did it make you feel that your

17  dad was mentioned in this?

18  A.  Extremely unfair, because he has nothing to do with this at

19  all.  And he is a very, very kind person and he always want the

20  best for people.  And to have -- to see his name, I just don't

21  think it's fair.

22  Q.  Her aunt is Helena Bouveng and then there are some links, a

23  junior member of the Swedish parliament to the Vetlanda region.

24  Readers may wonder to what extent the affiliation with cocaine

25  dealers may affect Helena Bouveng already tough reelection

1   campaign.

2         How did it make you feel that your aunt was now being

3   mentioned in The Blot article?

4   A.  Not good.  I mean, of course, this is not something that

5   for a parliament member to be a part of and I just felt that

6   he's mixing -- he is trying to make her look bad and it's all

7   because of me.  He is trying to write about her, that she is

8   some kind of cocaine dealer because of me.  She didn't have

9   anything to do with me.  I don't have anything to do with

10  cocaine dealing.  Again, this is scary that one would go

11  through this measures to do this.

12  Q.  Has your relationship with your aunt changed at all since

13  the publication of The Blot articles?

14  A.  Yes.

15  Q.  Tell us about that.

16  A.  Well, we don't talk as much as before, and she didn't want

17  to be involved.  And she always calls me on my birthday.  But

18  she didn't do that this year, or last year.  Sorry.

19  Q.  Exhibit 87, please.  I'd like to show you what's been

20  marked as Exhibit 87 in evidence.  NYPD arrest record,

21  nightclub promoter, James Chauvet, extortionist, Hanna Bouveng

22  swim in criminal hot water.

23         Are you an extortionist, Ms. Bouveng?

24  A.  No.

25  Q.  Next page, please.  There is a picture.  You recognize who

1   is in the picture?

2   A.  Yes.

3   Q.  Who is that?

4   A.  It's me and Mr. Chauvet.

5   Q.  It says:  Hanna Bouveng, waitress, Cafe Linne, Stockholm,

6   Sweden.

7          How did it make you feel that The Blot was now

8   publishing where you worked in?

9   A.  Not good.  And it felt like an intent to destroy whatever I

10  would do.  I can't even serve coffee and he has to mention that

11  name and try to drag it in all of his lies and everything.

12  Q.  If you look further down, Hanna Bouveng kicked out of

13  America.

14          Were you kicked out of America?

15  A.  No.

16  Q.  Bank fraud.  Are you a bank fraud?

17  A.  No.

18  Q.  Party girl, alcoholic.  Are you an alcoholic?

19  A.  No.

20  Q.  Do you have any affiliation with cocaine dealers?

21  A.  No.

22  Q.  Then it mentions Danny Koluman and Andre Koluman, owners of

23  the popular Cafe Linne in Stockholm.  They are not only your

24  bosses, but they are also friends, right?

25  A.  Yes.

1  Q.  How did that make you feel that they are now dragged into

2  this?

3  A.  I felt really bad for them that they had to be dragged into

4  this.  And I felt that -- it's almost like giving up.  Like I

5  said, I can't even be at a cafe.  It opened up a year before

6  that, so it's really new.  And they have been fighting really

7  hard in their family to build all this up.  Just because I work

8  there, it has to get destroyed.

9          MR. RATNER:  Next page.

10  Q.  There is a photograph there.  You see that?

11  A.  Yes.

12  Q.  What's that a photograph of?

13  A.  It's from the cafe and it's Daniel and Andrea Koluman and

14  the girl that I don't know.

15  Q.  It's not Chemme, though, is it?

16  A.  No.

17  Q.  It now has the address of the cafe where you are working,

18  right?

19  A.  Yes.

20  Q.  How do you feel about the address of where you are working

21  being published on the Internet?

22  A.  I felt that he -- I started to become paranoid.  He is

23  writing out all these -- he is writing out the address, where I

24  work.  It made me feel that I'm being watched, that he has

25  someone watching or extremely uncomfortable.

1   Q.  Go two pages forward, please.  If you look down at the

2   bottom below the black box.

3   A.  Yes.

4   Q.  It says:  Oscar Bouveng.

5   A.  Yes.

6   Q.  Who is he?

7   A.  My younger brother.

8   Q.  Go to the next page, please.  It says Frederick Sundqvist.

9   Who is he?

10  A.  My older brother.

11  Q.  Nina Chelidze was here in court yesterday.  Had you been

12  friends with her at some point?

13  A.  Yes.

14  Q.  Has your relationship with her changed in any way?

15  A.  Yes.

16  Q.  How?

17  A.  We don't talk anymore.

18  Q.  You know a woman by the name of Sophie Darsot?

19  A.  Yes.

20  Q.  Who is she?

21  A.  She used to be a friend of mine.

22  Q.  Are you aware that Mr. Wey tried to contact her?

23  A.  Yes.

24  Q.  Are you still friends with her?

25  A.  No.

1   Q.  Amanda Bostrom?

2   A.  Yes.

3   Q.  Who is she?

4   A.  She used to be my roommate in the East Village.

5   Q.  Do you know if Mr. Wey tried to contact her?

6   A.  Yes.

7   Q.  Are you still friends with her?

8   A.  No.

9   Q.  Pamela Blomquist, who is she?

10  A.  She used to be a friend of mine.

11  Q.  We know Mr. Wey contacted her because that message is in

12  evidence.  Are you still friends with her?

13  A.  No.

14  Q.  Frederick Sundqvist was mentioned in the article.  Has your

15  relationship with him changed at all?

16  A.  No.

17  Q.  And did you go home to Vetlanda for this past Christmas?

18  A.  No.

19  Q.  Why not?

20  A.  I don't want to be there because I think it is embarrassing

21  and humiliating and I don't feel safe being there because

22  Mr. Wey was there.  And I prefer to just be somewhere where no

23  one really knows where I am.

24  Q.  How do you feel your life has changed as a result of

25  Mr. Wey's communications with your friends and family and the

1    articles that are published on The Blot?

2    A.   I lost a lot of friends and people don't want to be around

3    me anymore.  I really don't want to go out and see people

4    either.  I don't want to meet people.  I don't want to post

5    stuff or anything because I feel I will get abused and I feel

6    bad.  He is stalking me.  So whatever I do, if I post it, I'm

7    here at this cafe, he will know where I am.  And I think

8    it's -- I have applied for jobs, but I don't feel as confident

9    as I did before.  And I have -- it's been a tough year.

10              MR. RATNER:  I have nothing further, your Honor.

11              THE COURT:  Cross-examination.

12              MR. COLTON:  Yes, your Honor.  It will take a few

13   minutes to organize.

14              THE COURT:  We will take a brief recess, ladies and

15   gentlemen.  Don't discuss the case.  Keep an open mind.  We

16   will be back to you very shortly.

17              (Jury not present)

18              THE COURT:  We will resume in 15 minutes.

19              (Recess)

20              (Continued on next page)

21

22

23

24

25

1                    (Trial resumed; jury not present).

2          THE COURT:  Ms. Bouveng, you can retake the stand.

3          HANNA BOUVENG, resumed.

4          (Jury present)

5          THE COURT:  Mr. Colton, please proceed.

6          MR. COLTON:  Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MR. COLTON:

9    Q.  Good afternoon, Ms. Bouveng.

10   A.  Good afternoon.

11   Q.  When you write e-mails to people you intend them to be

12   honest, right?

13   A.  Yes.

14   Q.  And you intend them to be accurate?

15   A.  Yes.

16   Q.  And you understand that sometimes when you write e-mails to

17   people they may rely on them, right?

18   A.  Yes.

19   Q.  Now right at the very beginning of your testimony yesterday

20   Mr. Ratner asked you whether you ever asked your grandmother to

21   be an investor in Nordica Life.  Do you remember that?

22   A.  Yes.

23   Q.  And you said no, correct?

24   A.  Yes.

25   Q.  And you said that your grandmother was not going to be an

F6N9BOU4                          BOUYEA

 1    investor in Nordica Life, right?

 2    A.  Yes.

 3            MR. COLTON:  Take a look at Exhibit 45 in evidence,

 4    please.  Last page, please.  Blow that up.

 5    BY MR. COLTON:

 6    Q.  This is an e-mail that you had written to Mr. Wey in March

 7    of 2014, correct?

 8    A.  Yes.

 9    Q.  An e-mail that you wrote when you were still employed at

10    New York Global Group?

11    A.  Yes.

12    Q.  And you wrote to Mr. Wey, "This weekend I will meet with my

13    grandmother and my aunts.  I will tell them about all our

14    efforts regarding both NL and the China consulting part."

15            NL is Nordica Life, right?

16    A.  Yes.

17    Q.  And you told Mr. Wey that you would talk to your

18    grandmother about Nordica Life, right?

19    A.  Yes.

20    Q.  You met with your lawyers to prepare for testifying today,

21    right?

22    A.  Yes.

23    Q.  How many hours did you spend preparing for this testimony?

24    A.  I don't know how many hours exactly.

25    Q.  More than ten?

 1   A.  I don't know.  I don't think so.

 2   Q.  And you met with them last night, right?

 3   A.  Yes.

 4   Q.  And you went over questions you were going to be asked,

 5   right?

 6   A.  Yes.

 7   Q.  And you had some conversations after your direct

 8   examination just here in the courtroom to prepare for your

 9   cross-examination, right?

10           MR. RATNER:  Objection.

11           THE COURT:  Overruled.

12           THE WITNESS:  No.

13   Q.  Let's go back to the beginning before you came to New York.

14   I think you said that you graduated from college in Sweden,

15   right?

16   A.  Yes.

17   Q.  And then you moved to Norway, right?

18   A.  Yes.

19   Q.  And you went by yourself without your family, right?

20   A.  Yes.

21   Q.  And then from Norway you moved without your family to Hong

22   Kong, right?

23   A.  No.  I moved from Sweden to Hong Kong.

24   Q.  You moved to Hong Kong without your family?

25   A.  Yes.

 1  Q.  And then eventually you moved to New York without any

 2  family, right?

 3  A.  Yes.

 4  Q.  Eventually it came to be that you met with Mr. Wey and

 5  Mr. Baxter in July of 2013 at New York Global Group's offices,

 6  right?

 7  A.  Yes.

 8  Q.  And at that first meeting that occurred at New York Global

 9  Group office you discussed taking a job there, right?

10  A.  Yes.

11  Q.  And you started to fill out the paperwork to be able to get

12  that job, correct?

13  A.  Yes.

14  Q.  And one of the things you filled out was some details about

15  yourself, right, in order to be able to obtain a visa?

16  A.  I don't remember exactly what it was we filled.

17  Q.  But you were participating in actually filling out the

18  forms, right?

19  A.  Yes.

20  Q.  And originally the form stated that you would make $1,800 a

21  month, correct?

22  A.  Yes.

23  Q.  But from the very beginning of your time with New York

24  Global Group they didn't pay you 1800 a month.  They started

25  you much higher at 2500 a month, right?

1  A.  I got paid 2,000 every month.  And I don't know what the

2  top --

3  Q.  Can you come a little closer to the mic.

4  A.  Sorry.  I got paid -- I got a check with a thousand dollars

5  every other week.  So that is what I know that I got.

6  Q.  I'd like to show you what's been marked as Plaintiff's

7  Exhibit 130.

8          Do you recognize Plaintiff's Exhibit 130?

9  A.  Yes.

10 Q.  This is your earnings record at New York Global Group?

11 A.  Yes.

12          MR. COLTON:  Your Honor, we offer Plaintiff's 130.

13          MR. RATNER:  No objection.

14          THE COURT:  Plaintiff's Exhibit 130 is received.

15          (Plaintiff's Exhibit 130 received in evidence)

16          MR. COLTON:  Publish, please?

17          THE COURT:  Yes.

18          MR. COLTON:  Can we go to the next page, please.  And

19 if you could blow that up, please.

20 BY MR. COLTON:

21 Q.  Ms. Bouveng, on -- you were paid twice a month at New York

22 Global Group, right?

23 A.  Yes.

24 Q.  And the first time you were paid was October 15 of 2013,

25 right?

```
 1   A.  Yes.

 2   Q.  And you were paid $1,250 on October 15, right, gross pay?

 3   A.  Yes.

 4   Q.  So double 1250 is $2,500 gross pay per month, correct?

 5   A.  Yes.

 6   Q.  So even before you started working you received a raise of

 7   $700 per month gross, right?

 8   A.  A raise?

 9   Q.  The original number was 1800.  They paid you 2500 per

10   month.  That was an increase of $700 a month?

11   A.  Yes.

12   Q.  Now, before you joined New York Global Group you had no --

13            MR. COLTON:  You can take that down.  I'm sorry.

14   BY MR. COLTON:

15   Q.  Before you joined New York Global Group you had no Wall

16   Street experience, correct?

17   A.  Correct.

18   Q.  No finance degree?

19   A.  No.

20   Q.  And at the last school you attended you didn't take any

21   finance courses, correct?

22   A.  Correct.

23   Q.  I'd like to show you what's been marked as Exhibit CM.

24            This is your transcript from Hong Kong Baptist

25   University, the last university you attended before moving to
```

1    the states, correct?

2    A.   Yes.

3              MR. COLTON:   Your Honor, we offer Exhibit CM.

4              MR. RATNER:   No objection.

5              THE COURT:   Defendants' Exhibit CM is received.

6              (Defendants' Exhibit CM received in evidence)

7    Q.   Ms. Bouveng, there were no finance courses that you took at

8    Hong Kong Baptist University, correct?

9    A.   Correct.

10   Q.   And no finance courses you took when you came to the states

11   at Berkeley College, correct?

12   A.   Correct.

13   Q.   Now despite having no finance background and having

14   recently taken no finance courses, you thought you were

15   entitled to a raise within one month of starting at New York

16   Global Group, right?

17             MR. RATNER:   Objection.

18             THE COURT:   Sustained.  Sustained as to form.

19   Q.   You believed that you were entitled to a raise in your

20   first month or two at New York Global Group, correct?

21   A.   Not a raise.

22             MR. COLTON:   Your Honor, I'd refer the Court to

23   Ms. Bouveng's deposition, page 199, line 22.

24             THE COURT:   Do I have the deposition?

25             MR. COLTON:   I think they were all provided.  We'll

 1   hand another copy to make it easier.

 2            THE COURT:  What was the page, Mr. Colton?

 3            MR. COLTON:  199, line 22 -- 22 to 24 for the Court's

 4   convenience.

 5            THE COURT:  Any objection, Mr. Ratner?

 6            MR. RATNER:  Yes.

 7            It doesn't contradict her testimony, your Honor.

 8            THE COURT:  I think Mr. Ratner is right, Mr. Colton.

 9            MR. COLTON:  I'll ask the question again.

10   Q.  Ms. Bouveng did you think you were entitled to a raise in

11   your first month or two at New York Global Group?

12   A.  Not at --

13            THE COURT:  No.  That doesn't help.

14            You have to make the question more specific.

15            MR. COLTON:  Certainly, your Honor.

16   BY MR. COLTON:

17   Q.  You started working at New York Global Group in

18   October 2013, right?

19   A.  Yes.

20   Q.  And you thought by November or December you were entitled

21   to a raise, correct?

22   A.  Yes.

23   Q.  Now earlier you had testified about a conversation in which

24   Mr. Wey allegedly told you he wanted a girlfriend.  Do you

25   remember that testimony?

 1    A.   Yes.

 2    Q.   And your response was to make sure you drew lines for him,

 3    right?

 4    A.   Can you ask me that again, please.

 5    Q.   Sure.  Please feel free to tell me any time you don't

 6    understand.  I want to make sure you do.

 7    A.   Thank you.

 8    Q.   You were being extra careful to keep it only a professional

 9    relationship, right?

10    A.   When he asked me that?

11    Q.   No.  After Mr. Wey allegedly said he wanted a girlfriend,

12    your response was to make sure you kept everything extremely

13    professional, right?

14    A.   Yes.

15    Q.   I'd like to show now what's been marked as Exhibit BF in

16    evidence.

17              MR. COLTON:  If you could pull that up.

18    BY MR. COLTON:

19    Q.   Exhibit BF is an e-mail that you wrote to Mr. Wey in August

20    of 2013, correct?

21    A.   Yes.

22    Q.   This is planning out the trip that -- where you and he were

23    going to meet in Sweden and spend a week or so's time together?

24    A.   Yes.

25    Q.   And if you look at the last page of your note on 248, the

1    bottom -- I'm sorry.  248 is the number in the right corner.

2    Do you see where you say, "Let me know your thoughts" and write

3    "Kram"?

4    A.  Yes.

5    Q.  So you signed that Kram meaning hugs, correct?

6    A.  Not hugs, but hug.

7    Q.  So you didn't sign it "best regards" or anything like that?

8    A.  No.

9    Q.  You'd agree with me that's a more personal greeting, right?

10   A.  Yes.

11   Q.  Now let's take a look at the beginning of this document.

12   It's fair to say that when you planned what you and Mr. Wey

13   would do together in August, early September of 2013 there were

14   substantial social events that you planned as well, correct?

15   A.  Yes.

16   Q.  So, for example, on August 31 you planned to take a tour of

17   the island, correct?

18   A.  Yes.

19   Q.  And on -- next page -- on September 7 you planned to take

20   him to parties in Oslo, correct?

21   A.  Yes.

22   Q.  And then on September 8 you planned to take him

23   sightseeing, correct?

24   A.  Yes.

25   Q.  And you testified earlier yesterday that you didn't want to

1  be a companion, correct?

2          MR. RATNER:  Objection.  She said girlfriend.

3          THE COURT:  Sustained.

4  BY MR. COLTON:

5  Q.  When you accepted the job at New York Global Group you

6  accepted it without getting all of the details of the

7  responsibilities, correct?

8  A.  There were some descriptions but not specific details.

9  Q.  So even though Mr. Wey allegedly asked you to be his

10 girlfriend you took a job with him without knowing what all of

11 your responsibilities would be?

12 A.  I knew some of the responsibilities.

13 Q.  I'm having trouble hearing you.  I'm sorry.

14 A.  I knew some of the responsibilities.

15 Q.  It's fair to say, Ms. Bouveng, that the introduction to

16 Nordica Life came from you and your contacts, right?

17 A.  Yes.

18 Q.  Now in this trip to Sweden in August, September of 2013 you

19 took Mr. Wey to your hometown of Vetlanda, correct?

20 A.  Yes.

21 Q.  And you visited your family's lake house?

22 A.  No.

23 Q.  Did you show him your family's lake and compound?

24 A.  We drove by where my family lives.

25 Q.  And you took Mr. Wey to Stockholm, correct?

 1   A.   Yes.

 2   Q.   And when you were touring around Sweden in August and

 3   September of 2013 you talked to Mr. Wey about Sapa, the

 4   aluminum company your grandfather founded, correct?

 5   A.   Yes.

 6   Q.   Now, there was a lot of discussion about your title, do you

 7   remember that, from Mr. Ratner's questioning?

 8   A.   My work title?

 9   Q.   Yes.

10   A.   Yes.

11   Q.   And you had the title on some e-mails of director of

12   corporate communications, right?

13   A.   Yes.

14   Q.   But you also to this day still hold yourself out as that as

15   well as a trainee, correct?

16   A.   On the visa papers -- on the visa papers it says trainee

17   but I worked as the director of corporate communications.

18   Q.   In fact, on your own LinkedIn in page you describe yourself

19   from New York Global Group as both director of corporate

20   communications and as trainee, correct?

21   A.   I don't know.  I haven't seen it for a long time.

22            MR. COLTON:  I'd like to show you what's been marked

23   as SZ for identification.

24   Q.   Ms. Bouveng, Defendants' SZ for identification is a page

25   from your LinkedIn profile, correct?

1  A.  Correct.

2  Q.  A profile you created, correct?

3  A.  Yes.

4  Q.  And it says -- well, before I do that.

5          MR. COLTON:  Your Honor, defendants offer SZ.

6          MR. RATNER:  No objection.

7          THE COURT:  Defendants' Exhibit SZ is received.

8          (Defendants' Exhibit SZ received in evidence)

9          MR. COLTON:  If we could publish, please?

10          THE COURT:  Yes.

11          MR. COLTON:  If we could blow that up slightly.

12  Q.  So I'm correct, Ms. Bouveng, that when you describe your

13  past experience it says:  Director of corporate communication,

14  (trainee) at New York Global Group, correct?

15  A.  Yes.

16  Q.  Now, when you started at New York Global Group part of your

17  duties included booking trips, correct?

18  A.  Yes.

19  Q.  And in some ways you served as an assistant to Mr. Wey,

20  correct?

21  A.  Yes.

22  Q.  And let's say in the first three months of your job at

23  New York Global Group, October to January, early January, a big

24  part of your responsibility was to make introductions, correct?

25  A.  Yes.

1   Q.  You've heard of ASSE A-S-S-E, right?

2   A.  Yes.

3   Q.  And that was the sponsor firm that sponsored your J-1 visa

4   to allow you to work in the United States, right?

5   A.  Yes.

6   Q.  I'd like to show you now what's been marked as Exhibit R.

7            Exhibit R is the trainee intern program rules and

8   regulations from Aspire A-S-P-I-R-E, correct?

9   A.  Yes.

10  Q.  And on the second page there is a signature above the

11  phrase signature of trainee.  Do you see that?

12  A.  Yes.

13  Q.  That's your signature?

14  A.  Yes.

15  Q.  And before you started working at New York Global Group

16  through this visa sponsor firm you read these rules and

17  regulations, correct?

18  A.  Yes.

19            MR. COLTON:  Defendants offer Exhibit R, your Honor.

20            MR. RATNER:  No objection.

21            THE COURT:  Defendants' Exhibit R is received.

22            (Defendants' Exhibit R received in evidence)

23            MR. COLTON:  Permission to publish?

24            THE COURT:  Yes.

25            MR. COLTON:  If we could start with the second page,

1    please.  Blow up the area where the signature is.

2    BY MR. COLTON:

3    Q.  There is a block letter name, Hanna Bouveng; and a

4    signature.  That's the signature that we just talked about,

5    right?

6    A.  Yes.

7    Q.  And you signed this on July 22, 2013?

8    A.  Yes.

9    Q.  You understood that this document, Exhibit R in evidence,

10   laid out the rules and regulations that would govern your work

11   as a trainee at New York Global Group?

12   A.  Yes.

13          MR. COLTON:  If we could look at Rule No. 23, for

14   example.

15   BY MR. COLTON:

16   Q.  You understood that you could not seek, carry out -- I'm

17   sorry.  I'll strike that.

18          You understood No. 23 that you could not seek or carry

19   out any other training, internship, or employment while

20   participating in the program, correct?

21   A.  Yes.

22   Q.  But, in fact, during the time that you worked at New York

23   Global Group you sent your modeling portfolio to modeling

24   companies, correct?

25   A.  Yes.

1   Q.  And by sending your portfolio to modeling companies you

2   were seeking modeling jobs, right?

3   A.  Yes.

4   Q.  And you did that even though you understood you were not

5   allowed to work outside of New York Global Group, according to

6   Exhibit R, right?

7   A.  Yes.

8   Q.  Now your J-1 visa that allowed you to work in the United

9   States was set to automatically expire in February of 2015,

10  right?

11  A.  Yes.

12  Q.  You understood that under the rules that you signed,

13  Exhibit R, if you were no longer in the program that you would

14  have to leave the country within 30 days, right?

15  A.  Yes.

16  Q.  You your employment with New York Global Group ended on

17  April 22, 2014?

18  A.  Yes.

19  Q.  And your final evaluation was April 30, 2014?

20  A.  I don't remember the date for the evaluation.

21  Q.  But you're sure of the April 22 date?

22  A.  Yeah.

23  Q.  And you were still in the United States in New York in

24  July -- July 23, 2014, to be precise, right?

25  A.  Yes.

1   Q.  So you stayed in New York even though you had signed an

2   agreement saying you would leave the United States within 30

3   days, right?

4   A.  I left within 30 days from an expired.

5   Q.  Your testimony is you left the United States on May 22 or

6   before?

7   A.  What is the question?

8   Q.  You were in New York on July 23, 2014, correct?

9   A.  Yes.

10   Q.  Given that you filed suit on July 21, 2014, it was made

11   public that you were in New York, right?

12   A.  Yes.

13   Q.  You never told Mr. Wey of any travel you may or may not

14   have done in between April 22 and July 23 of 2014, right?

15   A.  No.  I did not speak to him.

16   Q.  And you didn't explain that to anyone at New York Global

17   Group, right?

18   A.  No.

19   Q.  And you didn't explain that to anyone at TheBlot or FNL

20   Media, right?

21   A.  I don't know if -- when Mr. Weiss was fired.

22   Q.  But if you did tell him it would have been in your personal

23   friend capacity not in his capacity as a Blot employee, right?

24   A.  Right.

25   Q.  So when it was printed, an allegation was printed about

 1   "visa fraud" you hadn't told anybody you had left and come

 2   back, correct?

 3              MR. RATNER:  Objection.

 4              THE COURT:  Sustained.

 5   Q.  As of July 23, 2014 you had not informed anyone at any of

 6   the defendant companies that you had left the country and come

 7   back?

 8              MR. RATNER:  Objection.

 9              THE COURT:  Sustained.

10              MR. COLTON:  Perhaps I'm making an assumption.

11   Q.  Did you leave the country between April 22, the United

12   States, between April 22, 2014 and July 23, 2014?

13   A.  Yes.

14   Q.  And did you ever tell anyone at New York Global Group that

15   you actually left the country in that time period?

16              MR. RATNER:  Objection.

17              THE COURT:  Overruled.

18              THE WITNESS:  No.  I did not tell anyone.

19   Q.  I'd like to turn your attention now, Ms. Bouveng, to the

20   trip to Boston that was discussed earlier.

21              This was a subject of the complaint you filed in

22   federal court, right?

23   A.  Yes.

24   Q.  And you knew that it was important to be accurate in that

25   complaint, right?

1   A.  Yes.

2   Q.  And you knew that the court may rely on your complaint,

3   right?

4   A.  Yes.

5   Q.  And here in court you testified that you stayed two nights

6   in Boston, right?

7   A.  Yes.

8   Q.  And your seconded amended complaint doesn't say anything

9   about two nights in Boston, does it?

10  A.  No.

11  Q.  And you filed a first amended complaint also with the

12  court, right?

13  A.  Yes.

14  Q.  And that first amended complaint doesn't say anything about

15  two nights in Boston, right?

16  A.  No.

17  Q.  The way I'm asking it is poorly -- I'm correct that the

18  complaint doesn't say two nights in Boston, right?

19  A.  Yes.

20  Q.  And the original complaint filed July 21, 2014, that

21  document that you filed with the court does not say anything

22  about your spending two nights in Boston, correct?

23  A.  No.

24  Q.  But now in this court you say you did spend two nights in

25  Boston, right?

1    A.  Yes.

2    Q.  And that testimony only changed after you saw a hotel bill

3    that said two nights in Boston, correct?

4              MR. RATNER:  Objection.

5              THE COURT:  Sustained.

6    BY MR. COLTON:

7    Q.  Did you see a hotel bill from the Boston Harbor Hotel that

8    listed two nights?

9    A.  Not until very --

10   Q.  I'll withdraw and make it more specific.

11             Before taking the stand here yesterday did you see a

12   hotel bill from the Boston Harbor Hotel that listed two nights,

13   November 1 to 3, 2013?

14             MR. RATNER:  Objection to the form of that question

15   since it doesn't really link it in time, your Honor.

16             THE COURT:  Well, reference the in time is before

17   taking the stand.

18             MR. RATNER:  I don't understand whether it means right

19   before taking the stand or at any time before taking the stand.

20   That's problem.

21             THE COURT:  At any time before taking the stand?

22             MR. COLTON:  I'll rephrase.

23   BY MR. COLTON:

24   Q.  After filing the second amended complaint in October of

25   2014 and taking the stand on June 22, 2015, you saw a copy of a

 1  hotel bill that said two nights in Boston in early November,

 2  correct?

 3  A.  Yes.

 4  Q.  And the first time you ever testified or made a statement

 5  about how many -- about spending two nights in Boston was after

 6  seeing that hotel bill, correct?

 7  A.  Could you please repeat.

 8  Q.  Hopefully better than that.

 9       THE COURT:  "Made a statement" is very broad.  So make

10  sure that that's what you want.

11       MR. COLTON:  Fair enough, your Honor.

12  BY MR. COLTON:

13  Q.  The first time you filed a formal document in court or gave

14  formal testimony in court that said you spent two nights in

15  Boston in early November 2013 was after you saw the hotel bill

16  that said two nights, correct?

17  A.  Do you mean after today or when do you mean?

18  Q.  I will try it again and I apologize for any confusion.

19       Do you recall when the first time you saw the hotel

20  bill that asserts two nights in Boston at the Boston Harbor

21  Hotel at the beginning of November 2013?

22  A.  No.  I don't remember.

23  Q.  Is it fair to say that the first time you saw that hotel

24  bill listing two nights was after you filed the second amended

25  complaint in October of 2014?

1  A.  Yes.

2  Q.  Is it also fair to say that the first time you saw that --

3  strike that.

4      Is it also fair to say that you saw that Boston Harbor

5  Hotel bill listing two nights before you took the stand

6  yesterday?

7  A.  I don't look at it like in front of me so I don't know.

8  Q.  Is it fair to say that before you took the stand yesterday

9  you learned that the Boston Harbor Hotel bill listed two nights

10  for early November 2013?

11  A.  Learned -- I know that I've been spending a lot of time

12  thinking about it and I was confused.  So if I learned --

13  Q.  Your testimony is that despite filing three complaints that

14  say one night and testifying at deposition saying one night in

15  Boston, you were confused and now you say two nights because of

16  the confusion?

17      THE COURT:  Sustained.

18      MR. COLTON:  I'll move on, your Honor.

19  BY MR. COLTON:

20  Q.  When you were in Boston on early November of 2013 you had a

21  credit card, right?

22  A.  Yes.

23  Q.  The credit card worked, right?

24  A.  Yes.

25  Q.  So if you chose to go down to the front desk and ask for a

F6N9BOI4                          Bonventre - Cross

 1   hotel room you had a credit card that you could have used

 2   right?

 3   A.  Pardon me.

 4   Q.  You're in Boston.  You're in the Boston Harbor Hotel.  And

 5   if you chose to, you could have walked down to the front desk,

 6   given them your credit card and asked for a hotel room, right?

 7   A.  I don't remember if I had enough funds on that credit card.

 8   Q.  Ask it another way.  Did you try to do that?

 9   A.  No.

10   Q.  I want to make sure I understand the testimony of what you

11   say happened in Boston.  Is it your testimony that you stayed

12   in the same room with Mr. Wey for two nights?

13   A.  Yes.

14   Q.  Is it your testimony that you stayed in the bed the first

15   night and then the couch the second night?

16   A.  Yes.

17   Q.  Why didn't you stay on the couch both nights?

18   A.  I was in shock.  I didn't know what to do.  So I just

19   wanted to pretend I was asleep right away.

20   Q.  And none of the complaints you filed say anything about

21   staying on a couch, right?

22   A.  No.

23   Q.  And you said nothing about staying on a couch in your

24   deposition, right?

25   A.  No.

1    Q.  You left Boston on November 3, 2013?

2    A.  Yes.

3    Q.  And then on November 8, 2013 you had dinner with, among

4    others, Dan Larson and D.A. Larson, right?

5    A.  I don't remember the date.

6    Q.  Were you in court earlier when Mr. Larson testified that

7    dinner was on November 8?

8    A.  Yes.

9    Q.  Does that refresh your recollection as to when that dinner

10   with Dan Larson and D.A. Larson was?

11   A.  Not exactly dates, no.  But I do remember the dinner.

12   Q.  It's fair to say it was shortly after your trip to Babson?

13   A.  I don't remember when it was.

14   Q.  Let's take a look at Exhibit BS which I believe is in

15   evidence.

16            Exhibit BS that we're looking at on the screen is an

17   e-mail from you to Mr. Larson that you sent on Wednesday,

18   November 6, correct?

19   A.  Yes.

20   Q.  And the subject line is RE Meeting on November 8 in NYC is

21   confirmed, right?

22   A.  Yeah, that's right.

23   Q.  Do you have any reason to believe that you didn't meet

24   Mr. Larson and his son at The Ritz-Carlton on November 8?

25   A.  No.

 1              MR. COLTON:  Take that down.

 2              If we could pull up CI in evidence.

 3  Q.  This is a picture of you and D.A. Larson on November 8,

 4  2013, right?

 5  A.  Yes.

 6  Q.  You met at 5:30 like that e-mail said?

 7  A.  I think so.

 8  Q.  You went straight from work?

 9  A.  Yes.

10  Q.  So that's the outfit you wore to work?

11  A.  Yes.

12              MR. COLTON:  Take that down.

13  BY MR. COLTON:

14  Q.  We discussed the apartment at 25 Broad Street.  You

15  remember that, right?

16  A.  Yes.

17  Q.  And you filled out the forms for that apartment on

18  November 15, 2013, correct?

19  A.  Yes.

20  Q.  And it asked you for an emergency contact, right?

21  A.  Yes.

22  Q.  And you didn't list your friend Chemme Koluman, right?

23  A.  No.

24  Q.  And you didn't list your soon-to-be-former-roommate Amanda

25  Bostrom, right?

1   A.  No.

2   Q.  You didn't list your father?

3   A.  No.

4   Q.  You didn't list any of your girlfriends?

5   A.  No.

6   Q.  You listed Benjamin Wey as your emergency contact, right?

7   A.  Yes.

8   Q.  And you titled him friend, correct?

9   A.  Yes.

10  Q.  Not boss?  Right?

11  A.  No.

12  Q.  Not employer?

13  A.  No.

14  Q.  And November 15 was less than two weeks after you traveled

15  to Babson College, right?

16  A.  Yes.

17  Q.  Now your rent when you shared the apartment with Amanda

18  Bostrom was $2,500 a month, right?

19  A.  Yes.

20  Q.  Was that your portion or split?

21  A.  That was the total.

22  Q.  So approximately 1250 each?

23  A.  Yeah.  I paid a little less than that because I had a

24  smaller room.

25  Q.  So, round numbers, the new apartment was about $2,000 a

 1  month more?

 2  A.  Yeah.

 3  Q.  And Mr. Wey gave you $2,000 a month toward the rent on the

 4  Broad Street apartment, right?

 5  A.  Yes.

 6  Q.  So with that 2,000 a month you were basically back in the

 7  same place as you were before, correct?

 8  A.  In the same place?

 9  Q.  You were paying approximately the same amount of rent out

10  of your own pocket with Amanda Bostrom as you were at 25 Broad

11  Street, correct?

12  A.  I had less when I moved into the apartment.

13  Q.  You had less what?

14  A.  Money.

15  Q.  The actual monthly amount of money you had to pay out of

16  your pocket or out of your account was pretty close to the

17  amount that you were paying with Amanda Bostrom, right?

18  A.  No.

19  Q.  Let me do the math a little bit better.  The rent at 25

20  Broad Street was 3365?

21  A.  Yes.

22  Q.  And Mr. Wey was giving you $2,000?

23  A.  Yes.  It was different.  He didn't give me an exact number

24  every month.

25  Q.  But a round number, 2,000?

1   A.  Mm-hmm.

2   Q.  So we can agree that 3365 minus 2,000 is about 1365, right?

3   A.  Can you say that again.  Sorry.

4   Q.  Sure.  We can agree that 3,365 minus 2,000 is 1,365?

5   A.  Yes.

6   Q.  And your rent was just a little bit less than 1250 with

7   Amanda Bostrom, right?

8   A.  Yes.

9   Q.  So maybe a hundred, 150-dollar difference in your expenses

10  monthly?

11  A.  Like I said it was different amounts that he gave me and I

12  had less -- I did not have control over the amount of money

13  that I netted when I moved into the apartment but it was less

14  than I had when I lived in the apartment with Amanda and that

15  was 800.

16  Q.  It's fair to say you wouldn't have needed a raise of $5,000

17  per month to make up for the difference in what you were paying

18  in rent between Amanda Bostrom's apartment and the 25 Broad

19  Street apartment?

20  A.  No.

21  Q.  You wouldn't?

22  A.  I wouldn't need -- what is the --

23  Q.  You wouldn't need a 5,000-dollar raise to pay for an

24  increase in expenses of two or three hundred dollars a month?

25  A.  No.

 1   Q.  Let's turn the attention to the trip to Dubai.  You

 2   traveled first to China in December 2013, right?

 3   A.  Yes.

 4   Q.  You went with Mr. Wey?

 5   A.  Yes.

 6   Q.  And Mr. Baxter?

 7   A.  Yes.

 8   Q.  And that was your only New York Global Group trip to China,

 9   correct?

10   A.  Yes.

11   Q.  And you went from China to Dubai, right?

12   A.  Yes.

13   Q.  When you arrived in Dubai at no point did you say you

14   wanted your own hotel room, correct?

15   A.  When, when we arrived?

16   Q.  In your testimony you asserted that you stayed in the same

17   room as Mr. Wey, correct?

18   A.  Yes.

19   Q.  At any point did you say:  I want my own hotel room?

20   A.  No.

21   Q.  Now, at this point it's mid December, 2013, right?

22   A.  Yes.

23   Q.  And you had already moved into the apartment on Broad

24   Street, right?

25   A.  Yes.

1   Q.  So you were already living on your own?

2   A.  Yes.

3   Q.  When you filed your original complaint July 21, 2014 you

4   asserted you stayed two nights in Dubai, right?

5   A.  Yes.

6   Q.  You asserted you were there on the nights of the 16th of

7   December and 17th of December?

8   A.  Yes.

9   Q.  And then when you filed your first amended complaint you

10  asserted that you spent those same two nights in Dubai,

11  correct?

12  A.  Yes.

13  Q.  And then when you filed your second amended complaint with

14  the court you again asserted you spent two nights, December 16

15  and December 17, in Dubai, correct?

16  A.  Yes.

17          MR. COLTON:  If we could call up Exhibit CG in

18  evidence, please.

19  BY MR. COLTON:

20  Q.  The first time that you either made a formal submission to

21  a court or testified that you only spent one night in Dubai was

22  after receiving a copy of this exhibit, Mr. Wey's --

23          THE COURT:  Sustained.  It's compound.  You've got to

24  lay a foundation.

25          MR. COLTON:  Thank you, your Honor.

1   BY MR. COLTON:

2   Q.  The first time you testified or made a formal submission to

3   a court asserting that you stayed only one night in Dubai

4   December 2013 was here at this trial?

5   A.  Yes.

6   Q.  And you either received a copy of or heard about the

7   contents of this exhibit before you testified in court?

8           MR. RATNER:  Objection.

9           THE COURT:  Sustained.

10  Q.  You received a copy of Exhibit CG before you testified in

11  court, correct?

12  A.  I haven't seen the document before.

13  Q.  You learned that a document had been produced that

14  demonstrated that Mr. Wey left Dubai on the 17th before you

15  testified in court, correct?

16  A.  Yes.

17          MR. RATNER:  Objection.

18          THE COURT:  Overruled.

19          MR. COLTON:  We can take that down.  Thank you.

20  BY MR. COLTON:

21  Q.  Now, at some point in time during your employment with

22  New York Global Group you bought yourself a Rolex watch,

23  correct?

24  A.  I bought half of it.

25  Q.  You took $5,000 from your bank account and bought a Rolex

 1  watch, correct?

 2  A.  I bought half of it.

 3  Q.  I just want to ask the question again.  You took $5,000 out

 4  of your bank account and put it toward the purchase of a Rolex

 5  watch?

 6  A.  Yes.

 7  Q.  And you claim that that's a bonus that you received because

 8  of the December China trip, correct?

 9  A.  Yes.

10  Q.  But you didn't purchase that Rolex until late March of

11  2014, correct?

12  A.  Correct.

13  Q.  And that's when you got the bonus, correct?

14  A.  Correct.

15  Q.  And the $5,000 for the Rolex watch that came out of your

16  bank account, that would have been a substantial percentage of

17  your monthly take-home pay, right?

18  A.  Yes.

19  Q.  In fact, it would have been more than your monthly

20  take-home pay, right?

21  A.  Yes.

22  Q.  But you didn't save that money, you spent it on a Rolex

23  watch?

24  A.  I bought half of it.

25          MR. COLTON:  I'd like to pull up what is in evidence

1  as Plaintiff's 35, please.

2  Q.  This is a picture of you, Ms. Koluman, and Mr. Chauvet?

3  A.  Yes.

4  Q.  And that's you wearing the Rolex watch?

5  A.  Yes.  I think it's that one.

6  Q.  I'd like to now show you what's been market as Exhibit BO.

7       These are the records from your Chase Bank account

8  that you used while you were employed at New York Global Group?

9  A.  I believe so.

10      MR. COLTON:  Your Honor at the first page is a 902(11)

11  declaration.  And with that support we offer BO into evidence.

12      MR. RATNER:  No objection.

13      THE COURT:  Defendants' Exhibit BO is received.

14      (Defendants' Exhibit  BO received in evidence)

15      MR. COLTON:  If you could pull up page 21.

16  BY MR. COLTON:

17  Q.  The part on the screen is -- reflects the purchase you made

18  on March 24 -- or March 22, not clear -- of the Rolex -- your

19  portion of the Rolex watch, correct?

20  A.  Yes.

21  Q.  During your time at New York Global Group you also were a

22  member of the Crunch gym?

23  A.  Yes.

24  Q.  And at times you paid for personal training sessions?

25  A.  Um -- yes, I did.

1                    MR. COLTON:  BP, please.

2      BY MR. COLTON:

3      Q.  I'd like to show you what's been marked as Exhibit BP.

4                    MR. COLTON:  Your Honor, given the 902(11) declaration

5      that's at the top defendants offer BP into evidence.

6                    MR. RATNER:  No objection.

7                    THE COURT:  BP is received.

8                    (Defendants' Exhibit  BP received in evidence)

9                    MR. COLTON:  We could go to page 11.

10                    THE COURT:  What's the question, Mr. Colton?

11                    MR. COLTON:  We're only on page ten.  I'm sorry.  I

12      apologize.

13      BY MR. COLTON:

14      Q.  Ms. Bouveng, this is a history of the personal training

15      sessions that you attended while at New York Global Group?

16      A.  Sorry.  That I attended?

17      Q.  That you purchased and attended while at New York Global

18      Group?

19      A.  Yes.

20                    MR. RATNER:  Actually no.

21      Q.  I'll correct the record slightly.  Other than the last

22      entry which is from May of 2014?

23      A.  Yes.

24                    MR. COLTON:  Thank you.

25                    You can take that down.

 1   BY MR. COLTON:

 2   Q.  Before you started at New York Global Group you were a

 3   student at Berkeley College, right?

 4   A.  Yes.

 5   Q.  And the only employment you had were unpaid internships,

 6   right?

 7   A.  Yes.

 8   Q.  And in part you were supporting yourself with grants or

 9   money from the Swedish government, right?

10   A.  And the money that I -- and money that I saved from working

11   in Norway.

12   Q.  Had you wanted to, you could have gone back to school and

13   the Swedish government would have helped you, right?

14   A.  I'm not sure because you only get a certain amount of years

15   that you can apply for funds.  So I don't know exactly where my

16   status is right now.

17   Q.  You were only at Berkeley for a year?

18   A.  Two quarters.

19   Q.  Two quarters.  So half a year?

20   A.  Yes.

21   Q.  There's been a lot of discussion about dinners that you

22   went with Mr. Wey, right?

23   A.  Yes.

24   Q.  When you went to dinner with Mr. Wey you understood he was

25   the boss, right?

 1   A.   Yes.

 2   Q.   You wouldn't be rude or inconsiderate at dinner, would you?

 3   A.   No.

 4   Q.   And you wouldn't like, for example, pick up a newspaper and

 5   just start reading?

 6   A.   No.

 7   Q.   And you wouldn't pick up your phone and start surfing the

 8   internet or e-mailing friends or family while you were at

 9   dinner with your boss?

10   A.   If I did that or --

11   Q.   You wouldn't do that, would you?

12   A.   I don't -- I don't remember I did.

13   Q.   No.  I'm not saying you did or didn't.  I'm asking as a

14   matter of habit you wouldn't be rude to your boss and start

15   playing with your phone at dinner.

16   A.   Yes.

17            MR. RATNER:  Objection.

18            THE COURT:  Sustained.  The answer will be stricken.

19   It's a compound question.

20   BY MR. COLTON:

21   Q.   As a matter of habit did you text while you were at dinner

22   with your boss?

23   A.   I could sometimes.

24   Q.   Typically you wouldn't be using or reading your phone when

25   you're at dinner with your boss, right?

1   A.   Right.

2   Q.   Turn your attention to January of 2014.   Okay.   In your

3   complaints you allege that Mr. Wey forced you to have sex,

4   right?

5   A.   Yes.

6   Q.   You're not alleging any physical force, right?

7   A.   Not physical, no.

8   Q.   And you're not alleging that he pinned you down or anything

9   like that, right?

10  A.   No.

11  Q.   And in those times where you allege that you did have sex

12  with Mr. Wey you agree that you didn't say no?

13  A.   He knew that I said no and what I felt.

14  Q.   I'm going to ask the question again just about what you

15  said.   Okay.   On those occasions where you allege you had sex

16  with Mr. Wey you did not say no?   Correct?

17  A.   I did one of the times that I was tired.

18  Q.   You said you were tired but you didn't say no, correct?

19  A.   In which one of the times?

20  Q.   In each of the alleged times.   At none of those times did

21  you say no?

22  A.   I did say no one of the times.

23          MR. COLTON:   Your Honor, I would like to go to the

24  deposition.   I refer the Court and counsel to page 109, line

25  lines 17 to 20.

1              MR. RATNER:  One moment.

2              (Pause)

3              MR. RATNER:  I'm going to object, your Honor.

4              THE COURT:  What's the grounds for your objection?

5              MR. COLTON:  I don't think it contradicts what she

6    said in court.

7              THE COURT:  I'll see the lawyers at the bench.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (At the side bar)

 2          THE COURT:  Mr. Colton is trying on elicit from the

 3    witness that when she had sex with Mr. Wey she did not say no,

 4    and the witness has said that she said no once.  And the

 5    deposition excerpt that Mr. Colton has proposed to read is

 6    obviously Ms. Bouveng's deposition and she is asked whether she

 7    said no.  The question was, line 21, page 109:  It was three or

 8    four times when you firmly did not say no.

 9    "A.  Where I did not say no.

10    "Q.  You said yes?

11    "A.  I did not say yes.

12    "Q.  What did you say?

13    "A.  Nothing."

14          Mr. Ratner, how is that not inconsistent with her

15    testimony here today?

16          MR. RATNER:  Well, she says he made a lot of advances.

17          THE COURT:  Where are you reading from?

18          MR. RATNER:  I'm reading from line 18.  He made a lot

19    of advances and proposition and it was three or four times

20    where I firmly did not say no.

21          She didn't say no firmly.  It doesn't contradict the

22    fact that she said no.  And if you look at the top, from the

23    bottom --

24          THE COURT:  If you are arguing that more of the

25    deposition needs to be read, that's a different point.  But the

1    testimony that has been isolated by Mr. Colton in the larger

2    context contradicts what the witness has said.  The witness has

3    said she had sex with Mr. Wey four times and it says here that

4    there were three or four occasions when she had sex with

5    Mr. Wey when she did not say no.

6         MR. RATNER:  I understand your Honor's ruling.  I will

7    on redirect read the rest of the deposition to clarify.

8         THE COURT:  If you think in fairness that more of the

9    deposition needs to be read now --

10        MR. RATNER:  I do.

11        THE COURT:  Tell me what, in fairness, needs to be

12   read now to put the statement in context.

13        MR. RATNER:  I think he should read from 108, line 18

14   through 109, to the top of 110.  I think that puts it all in

15   context.

16        THE COURT:  I think we probably need more than that

17   because it begins with the question:  What did he say when you

18   said that?  It starts in the middle of nowhere.  We can't start

19   with line 18 on page 108.  It's incomprehensible.

20        MR. RATNER:  Then I think we have to go all the way

21   back to 106 in the middle of the page where it says:

22   "Q.  Did you hold yourself responsible for what happened?" That

23   goes through 107, 108, 109, to the top of 110 and that puts the

24   whole answer in the proper context.

25        MR. COLTON:  Your Honor, I just disagree with that.

1    That just tells a different story that he would like to tell

2    and what's critical about not saying no is, there is an

3    allegation made five or six times in this case that she was

4    forced to have sex.  And if she didn't say no, that's relevant.

5           THE COURT:  I disagree with you.  Page 106 is very

6    clear that she is saying that she failed to stand up for

7    herself and to say no and to walk away.  And then that whole

8    question is pursued.  And the way it ultimately comes out is,

9    she criticizes herself for not being as firm as she should have

10   been.

11          So it's more complicated, Mr. Colton, than you are

12   suggesting.  It's actually very complicated.  And I do not

13   think it would be fair to read the four or five lines that

14   you've requested to be read without putting it in the larger

15   context.  I think it's an important point.  And if you intend

16   to bring in his prior testimony, it needs to be fairly

17   presented.  It's not just simply a matter of her saying there

18   were three or four times where I did not say no.  The answer is

19   more complicated than that.

20          MR. COLTON:  I understand the Court's ruling and,

21   given that, I am not going to read it.

22          (Continued on next page)

23

24

25

 1              (In open court)

 2              MR. COLTON:  May I proceed, your Honor?

 3              THE COURT:  Yes.

 4   Q.  Is it fair to say, Ms. Bouveng, that on any of these

 5   alleged occasions where you have the sex allegedly with

 6   Mr. Wey, you cannot recall any of the dates where that

 7   happened?

 8   A.  No.

 9   Q.  Perhaps I asked the question badly.  Can you recall any of

10   the dates where that allegedly happened?

11   A.  Not the specific dates.

12   Q.  You didn't call the police when you were in New York, did

13   you?

14   A.  No.

15   Q.  You didn't seek medical attention, did you?

16   A.  No.

17   Q.  Now, at work you had a pretty good relationship with

18   Mr. Baxter, right?

19   A.  Yes.

20   Q.  He was sort of elder statesman of the company?

21   A.  He was the -- sorry.

22   Q.  The oldest person at the company.

23   A.  Yes.

24   Q.  The most experienced?

25   A.  Yes.

1   Q.  And you didn't speak to Mr. Baxter about anything that

2   allegedly happened?

3   A.  No.

4   Q.  And you didn't make a report to the Spire Host company?

5   A.  No.

6   Q.  You understood that it was your responsibility to make a

7   report if anything was wrong at your host company, correct?

8          I'll withdraw the question.

9          MR. COLTON:  Can we pull up Exhibit R, please.  If we

10  could zoom in on No. 9, please.

11  Q.  This is the portion of the contract you signed with your

12  host company, right?

13  A.  Yes.

14  Q.  And it says:  It is my responsibility to advise ASSE Spire

15  of any significant problems regarding my health, safety,

16  welfare, adjustment to training, culture, language, etc.,

17  right?

18  A.  Yes.

19  Q.  And it's fair to say you made no report any time between

20  October of 2013 and April 22 of 2014 to ASSE Spire?

21  A.  Yes.

22  Q.  You knew how to get in touch with them?

23  A.  Yes.

24  Q.  Now, in January, or around January of 2014, you got a job

25  for your friend Nina Chelidze at FNL Media, correct?

1   A.  I didn't get her that job.

2   Q.  You introduced her to the company, correct?

3   A.  Yes.  But that was back in October.

4   Q.  Back in what?

5   A.  I believe it was back in October 2013 that she was

6   introduced to Mr. Wey.

7   Q.  You didn't tell her not to take the job at FNL Media, did

8   you?

9   A.  No.

10  Q.  You actually thought you were helping your friend by

11  helping her get an internship, right?

12  A.  I don't remember what I was thinking.

13  Q.  But you agree you were the connection between Ms. Chelidze

14  and your global group or FNL Media?

15  A.  Yes.  Well, she knew Mr. Wey as well, but I was the one who

16  introduced them.

17  Q.  There was a discussion about your hours at New York Global

18  Group.  Do you remember that?

19  A.  Yes.

20  Q.  Is it true that your typical hours were 9 to 5?

21  A.  Yes.  When I ended, that could be different, when I quit

22  the day.

23  Q.  When you filed your first complaint, your allegation was

24  the first time you allegedly had sex with Mr. Wey was late

25  December 2013, right?

1    A.  Yes.

2    Q.  And you knew it was important to be accurate when you filed

3    the complaint in court, right?

4    A.  Yes.

5    Q.  And then you filed a second complaint which made the same

6    allegation about late December 2013, right?

7    A.  Approximately.

8    Q.  And then a third complaint that made the same allegation,

9    that the first time you allegedly had sex with Mr. Wey was late

10   December 2013, right?

11   A.  Approximately around December, late December.

12   Q.  And then you testified at a prior proceeding in this matter

13   in which you testified that it was allegedly late December,

14   correct?

15   A.  If I'm not mistaken, I believe I said late December,

16   beginning of January, but it was after he got back from his

17   vacation.

18          MR. COLTON:  Your Honor, I propose to read from the

19   December 16 proceeding, page 278, line 8 to 14.

20          THE COURT:  Let me just see it.

21          MR. COLTON:  We are getting the Court another copy.

22          THE COURT:  Any objection, Mr. Ratner?

23          MR. RATNER:  Again, there is further testimony on page

24   343 which I believe clarifies and adds to the previous

25   testimony, lines 11 through 22.

1          THE COURT:  What is your position, Mr. Colton?

2          MR. COLTON:  My position is, there is no need to go

3   into something 60 pages later.  If it helps the Court do it, I

4   will do it in a different way.

5          THE COURT:  I am not requiring that 343 be read at

6   this point because I don't think it's substantially different

7   than what Mr. Colton proposes to read.

8          Go ahead, Mr. Colton.

9   Q.  Ms. Bouveng, when you testified at the prior proceeding in

10  December you were under oath, correct?

11  A.  Pardon?

12  Q.  You were under oath, correct?

13  A.  When.

14  Q.  When you testified at prior proceeding?

15  A.  Yes.

16  Q.  You knew you had to tell the truth, right?

17  A.  Yes.

18  Q.  And you were asked certain questions and you gave certain

19  answers, right?

20  A.  Yes.

21  Q.  And you were asked the following questions and gave the

22  following answers:

23  "Q.  When did it begin?

24  "A.  What begin?

25  "Q.  The sexual relationship Mr. Ratner was asking you about.

1    "A.  That began in December.

2    "Q.  December of what year?

3    "A.  2013."

4            Those are the questions that you were asked and the

5    answers that you gave, correct?

6    A.  Yes.

7    Q.  Is it fair to say that your first complaint filed in July

8    of 2014 was closer in time to December 2013 or January 2014

9    than it is today?

10   A.  Yes.

11   Q.  When you filed your second complaint it was closer in time

12   to the end of '13, beginning of '14 than it is today?

13   A.  Yes.

14   Q.  And the same is true for your third complaint, correct?

15   A.  Yes.

16   Q.  And to your testimony back in December, correct?

17   A.  Yes.

18   Q.  And the reason you changed the testimony from alleging an

19   encounter with Mr. Wey in late December to beginning of January

20   was because the Weys, you knew, were on vacation in Costa Rica?

21           MR. RATNER:  Objection.

22           THE COURT:  Overruled.

23   A.  No.

24   Q.  In fact, the first time you ever alleged that January was

25   the alleged starting point was in testimony and your deposition

1   in late March or early April of this year, right?

2   A.  Yes.

3   Q.  And there was nothing in particular that, according to you,

4   changed your recollection, right?

5   A.  Since I was going to a deposition, I spent a lot of time

6   thinking about it, because these are not dates that I want to

7   remember.

8   Q.  Prior to filing three separate complaints in court, you

9   didn't spend a lot of time thinking about it?

10          MR. RATNER:  Objection.

11          THE COURT:  Overruled.

12  A.  I didn't, because I was a lot more confused then because

13  there is a lot more feelings involved.

14  Q.  When you testified in this courtroom in December you had

15  not spent a lot of time thinking about it?

16  A.  Pardon?

17  Q.  When you testified about the alleged events back in

18  December of 2014 in this courtroom, is it your testimony now

19  that back then you didn't spend a lot of time thinking about

20  it?

21  A.  I did not spend a lot of time thinking about exact dates.

22  Q.  Talking about late December and early January, your half

23  sister came to New York in late December or early January,

24  right?

25  A.  Yes.

1   Q.  Her name is Ida, I believe?

2   A.  Yes.

3   Q.  And Ida was in New York between approximately December 23

4   and January 3, correct?

5   A.  Yes.

6   Q.  And she stayed in your apartment, correct?

7   A.  Yes.

8           MR. COLTON:  If we could have Exhibit N, please.

9   Q.  Defendants' Exhibit N for identification is a picture of

10  you and your sister in New York in late December or early

11  January, late December 2013, early January 2014, correct?

12  A.  This is around Christmas Eve, around the 24th, 25th.

13  Q.  And it was during that same trip where she was in New York

14  from around Christmas through January 3 of '14?

15  A.  Yes.

16          MR. COLTON:  Defense offers Exhibit N, your Honor.

17          MR. RATNER:  No objection.

18          THE COURT:  Defense Exhibit N is received.

19          (Defendants' Exhibit N received in evidence)

20          MR. COLTON:  Permission to publish, your Honor.

21          THE COURT:  Yes.

22  Q.  Which one is you and which one is your sister?

23  A.  I'm the one to the left and she is the one to the right.

24  Q.  And this is around Christmas Eve of 2013?

25  A.  Yes.

F6NMBOU5                         Bonventre - cross

1   Q.  Correct me if I'm wrong, but I believe you testified that

2   on each of the alleged occasions where you alleged you had sex

3   with Mr. Wey that you had dinner and drinks each time

4   beforehand?

5   A.  Yes.

6   Q.  And the only place you are alleging that the two of you had

7   any sexual relations was in your apartment on 25 Broad Street?

8   A.  Yes.

9   Q.  When you filed your original complaint on January 21, 2014,

10  you alleged that you stopped any sexual relations at 9 a.m. on

11  the morning of February 2, right?

12  A.  I told him that --

13  Q.  I'm asking what you alleged in the complaint, if you

14  recall.

15  A.  Could you please ask the question again.

16  Q.  Sure.  Let me do it this way.

17          MR. COLTON:  If we could have RA.

18  Q.  I am going to show you what's been marked for

19  identification as Defendants' RA.  Defendant's RA is the

20  complaint that you filed in this court on July 21, 2014, right?

21  A.  Yes.

22  Q.  And you intended to be accurate in this complaint, right?

23  A.  Yes.

24  Q.  And you understood that the Court may rely on the

25  assertions you make in this complaint, right?

1   A.  Yes.

2   Q.  And in paragraph 69, is it fair to say that you allege that

3   on February 2, 2014, at approximately 9 a.m., you told

4   defendant, in no uncertain terms, that you would not have a

5   sexual relationship with him?

6   A.  Yes.

7   Q.  And when you filed your first amended complaint, you made

8   the very same allegation about the events of February 2 at 9

9   a.m., correct?

10  A.  Yes.

11  Q.  And when you filed your second amended complaint in October

12  of 2014, you, again, made the same allegation that on February

13  2, at 9 a.m., you told Mr. Wey, no more sexual relations,

14  right?

15  A.  Yes.

16  Q.  And yesterday, when you testified about your decision to

17  allegedly stop any sexual relations with Mr. Wey, you testified

18  that you did not convey this decision to him, correct?

19  A.  Yes.

20          MR. COLTON:  Your Honor, I'm wondering if I could ask

21  the Court's indulgence for a two-minute nature break.

22          THE COURT:  We will take a very brief recess, ladies

23  and gentlemen, very brief.  We will resume in five minutes.

24          (Recess)

25          THE COURT:  Please continue, Mr. Colton.

 1              MR. COLTON:  Thank you, your Honor.

 2   Q.  Ms. Bouveng, it's fair to say -- I just want to make sure I

 3   have this right -- that you cannot remember a specific date of

 4   any of the three to four alleged sexual interactions with

 5   Mr. Wey, right?

 6   A.  Yes.

 7   Q.  You'll agree with me, though, I assume, that since your

 8   sister was staying with you through the 3rd of January, it had

 9   to be after the 3rd of January?

10   A.  Yes.

11   Q.  On each of these alleged occasions you went to dinner and

12   drinks.  You said that, right?

13   A.  Yes.

14   Q.  Did you go directly from work?

15   A.  Yes.

16   Q.  It's fair to say that after each of these alleged instances

17   you wanted nothing to do with Mr. Wey, right?

18   A.  Yes.  I didn't want any sexual relationship or any

19   relationship --

20   Q.  Let me ask it a different way.  I apologize.  It was not

21   clear.  After these alleged incidents happened you didn't want

22   to talk to him?

23   A.  When?

24   Q.  After the alleged sexual liaisons happened.

25   A.  He was the one not talking to me.

1   Q.  Let me break it down, and I apologize if I'm not being

2   clear.  You testified that at some point in these instances you

3   left the apartment, right?

4   A.  I left the apartment?

5   Q.  He did.

6   A.  Yes.

7   Q.  After he left the apartment you didn't call him to say,

8   let's get together, right?  You wanted nothing to do with him?

9   A.  Yes.

10  Q.  So you didn't text him or reach out for him because you

11  wanted to stay away from him?

12  A.  Yes.

13  Q.  At the end of January you took a trip to Sweden, correct?

14  A.  Yes.

15  Q.  I would like to show you now what's been marked as

16  Defendants' Exhibit AL.  Do you recognize Defendants' Exhibit

17  AL, Ms. Bouveng?

18  A.  Yes.

19  Q.  This is the itinerary for your trip, as well as Mr. Wey's,

20  to Europe in late January 2014?

21  A.  Yes.

22          MR. COLTON:  Defendants offer AL, your Honor.

23          MR. RATNER:  No objection.

24          MR. COLTON:  Permission to publish, your Honor.

25          THE COURT:  Yes.  Defendants' Exhibit AL is received

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    and you may publish it.

 2              (Defendant's Exhibit AL received in evidence)

 3              MR. COLTON:  Specifically if we could look at the next

 4    page, please.  If you could blow that middle portion up,

 5    please.

 6    Q.  You left New York on January 25 on an 8 p.m. flight out of

 7    JFK, correct?

 8    A.  Yes.

 9    Q.  And you have to be at the airport at least two hours or

10    more before an international flight, right?

11    A.  Yes.

12    Q.  It's fair to say that you did not have dinner in New York

13    City on the 25th, correct?

14    A.  Yes.

15    Q.  And you didn't return to New York until February 1,

16    correct?

17    A.  Yes.

18    Q.  You got back approximately 6:00 on the 1st of February?

19    A.  Yes.

20    Q.  And then you had to clear customs?

21    A.  I don't remember exactly.

22    Q.  Typically there are some lines with customs and immigration

23    when you come back into the country, right?

24    A.  Yes.  Sometimes more and sometimes less.

25    Q.  And you and Mr. Wey didn't go to dinner that night

 1   immediately from the airport, right?

 2   A.  No.

 3   Q.  The night before you left for Sweden, that was January 24,

 4   correct?

 5   A.  Yes.

 6   Q.  And you were at an event with your friend Chemme at Tao,

 7   correct?

 8   A.  Yes.

 9   Q.  Now, typically when you went out to dinner with Mr. Wey he

10   paid, right?

11   A.  Yes.

12            MR. COLTON:  If you could put up again, Exhibit BO, at

13   page 13.  For the record, I'm sorry, your Honor, BO in

14   evidence.

15   Q.  If you look at the second to last entry there, Ms. Bouveng,

16   you made a $200 purchase at Tao at that event on January 24 of

17   2014?

18   A.  Yes.

19   Q.  You are not at dinner with Mr. Wey that night?

20   A.  No.

21   Q.  Let's talk about the trip to Sweden at the end of January

22   2014.

23   A.  Yes.

24   Q.  That was a business trip, right?

25   A.  Yes.

1   Q.   It was a trip related to the potential acquisition of the

2   Nordica Life Insurance Company?

3   A.   Yes.

4   Q.   And you had meetings both with potential managers and with

5   the Nordica people, correct?

6   A.   I wouldn't say potential managers, but more people that

7   could be helpful or could be involved.

8   Q.   What meetings related to trying to make the acquisition

9   come to pass?

10  A.   Yes.

11  Q.   As of January 25 or 26 of 2014, your Aunt Helena was not

12  working on the Nordica deal, right?

13  A.   No.

14  Q.   And you took Mr. Wey to see your Aunt Helena, right?

15  A.   Yes.

16  Q.   And this is shortly after the alleged sexual encounters you

17  are talking about, correct?

18  A.   Yes.

19  Q.   And you took Mr. Wey on a private tour of the parliament

20  with your Aunt Helena, who is in parliament?

21  A.   Yes.   My aunt and her assistant took us on the tour.

22  Q.   And her assistant is a woman by the named of Madeleine

23  Eriksson?

24  A.   Yes.

25  Q.   You also took Mr. Wey during the course of this late

 1    January 2014 trip to the home of Chemme Koluman's parents,

 2    right?

 3    A.  I did not take him there.

 4    Q.  You went with him there?

 5    A.  Yes.

 6    Q.  And you arranged that, right?

 7    A.  I don't remember exactly how it was arranged.

 8    Q.  Do Chemme Koluman's parents speak English?

 9    A.  No.

10    Q.  It's fair to say that Mr. Wey did not make the arrangements

11    directly with the Koluman's parents, right?

12    A.  But I didn't speak to her parents.  It was Daniel speaks

13    English and he is the one of the family, so he was the point of

14    contact.

15    Q.  It's fair to say that the dinner at the Koluman home was

16    not a business dinner, right?  Strike that.  It's fair to say

17    it was not a Nordica Life business dinner?

18    A.  We discussed Nordica Life at that dinner as well, and

19    Mr. Wey proposed to them that it could be interesting for them

20    to look at the possibilities to become clients of Nordica Life.

21    So we did discuss Nordica Life at that dinner.

22    Q.  And at no point in time did you try to cancel that dinner

23    at the Koluman home, right?

24    A.  No.

25    Q.  You didn't try to get out of it?

 1    A.  No.

 2    Q.  Your aunt, who is in parliament, is a pretty important

 3    person, right?

 4    A.  Yes.

 5    Q.  Busy?

 6    A.  It depends.

 7    Q.  You didn't try to get out of having a meeting between your

 8    aunt and Mr. Wey in late January 2014, did you?

 9    A.  No.

10    Q.  It would have been believable to say that this member of

11    parliament is very busy, right?

12    A.  It depends.

13    Q.  You also met with your father in late January 2014, when

14    Mr. Wey and you traveled to Sweden?

15    A.  Yes.

16    Q.  And the three of you actually traveled from Stockholm to

17    Luxembourg together, correct?

18    A.  Yes.

19    Q.  When you were in Stockholm in late January 2014, you took

20    Mr. Wey to Cafe Linne, correct?

21    A.  If I took him?

22    Q.  You, Mr. Wey, and your father went to Cafe Linne in late

23    January 2014, correct?

24    A.  Yes.

25              MR. COLTON:  If we could pull up Exhibit J in

1  evidence, please.

2  Q.  This is a picture of Mr. Wey, you, and your father in late

3  January 2014, right?

4  A.  Yes.

5  Q.  And this is at Cafe Linne, right?

6  A.  Yes.

7           THE COURT:  What's this exhibit?

8           MR. COLTON:  I'm sorry.  Exhibit J, your Honor.

9           THE COURT:  Go ahead.

10  Q.  And this picture was taken, at a minimum, less than a week

11  or two after one of these alleged sexual encounters?

12  A.  Yes.

13  Q.  And that's you sitting between Mr. Wey and your father,

14  right?

15  A.  Yes.

16  Q.  Your father is not sitting between you and Mr. Wey?

17  A.  No.

18  Q.  When you went to Sweden in January of 2014, you don't

19  allege that you and Mr. Wey stayed at the same hotel, right?

20  A.  No.

21  Q.  You stayed in your family apartment in Stockholm?

22  A.  Yes.

23  Q.  And were you afraid that Mr. Wey would be angry that you

24  were staying in your family apartment?

25  A.  I explained to him that I was going to stay there because

 1   my sister lives very close.

 2   Q.   And you felt comfortable doing that?

 3   A.   Yes.

 4   Q.   You would agree with me that the latest version of your

 5   complaint, the second amended complaint, is detailed, right?

 6   A.   Yes.

 7   Q.   It has 227 paragraphs of allegations?

 8   A.   Yes.

 9   Q.   And 65 pages?

10   A.   Yes.

11   Q.   And argued me with me that nowhere in those 227 paragraphs

12   or 65 pages is the late January trip that you and Mr. Wey took

13   to Sweden mentioned, right?

14   A.   No.

15   Q.   I'm correct?

16   A.   You are correct.

17   Q.   Remember we were talking earlier about your testimony

18   yesterday that you had made a decision to stop any physical

19   relationship with Mr. Wey, but you didn't communicate it.  Do

20   you remember that testimony?

21   A.   Yes.

22   Q.   Back in late March or early April, when you testified at

23   deposition, you directed an alleged meeting in a conference

24   room where you asserted that you would put your foot down and

25   said no more relations, right?

1      MR. RATNER:  Objection.

2      THE COURT:  Grounds.

3      MR. RATNER:  If he's referring to a deposition, then

4  it should be page, line, not a characterization of the

5  testimony.

6      THE COURT:  He is asking her if she recalls the

7  testimony, so I'm overruling your objection.  You may answer

8  the question.

9  A.  Could you please repeat the question.

10 Q.  Of course.  When you testified at deposition, you testified

11 under oath, right?

12 A.  Yes.

13 Q.  You knew you had to tell the truth, right?

14 A.  Yes.

15 Q.  And you testified to an alleged meeting in a conference

16 room at New York Global Group in mid-February, where you

17 allegedly communicated to Mr. Wey your position that you would

18 no longer have any sexual relations with him, right?

19 A.  Yes.

20 Q.  And you would agree with me that that's a different

21 position than the complaints which list a February 2 date in

22 your apartment, correct?

23 A.  There are different dates, yes.

24 Q.  And you would agree with me that that's a different version

25 than the version you gave yesterday in which you said you never

1   communicated that decision to Mr. Wey, right?

2   A.  I never communicated that decision in April, when we had

3   that meeting.  We had several meetings and several discussions.

4   And there was a meeting/discussion in February as well.

5            MR. COLTON:  Your Honor, I refer to yesterday's

6   transcript.

7            THE COURT:  What page?

8            MR. COLTON:  Starting page 935, line 23 through 936,

9   line 5.

10           THE COURT:  Any objection, Mr. Ratner?

11           MR. RATNER:  I didn't bring my copy of the transcript,

12  so -- thank you.  What line?

13           MR. COLTON:  935-23 through 936-5.

14           MR. RATNER:  No objection.

15  Q.  Yesterday you were under oath when you testified, right?

16  A.  Yes.

17  Q.  And you were asked the following questions by Mr. Ratner

18  and you gave the following answers:

19  "Q.  Did there come a time when you made a decision not to let

20  this happen again?

21  "A.  Yes.

22  "Q.  About when was that?

23  "A.  Middle or end of February.

24  "Q.  And did you convey this decision to Mr. Wey?  In other

25  words, did you tell him?

1    "A.  No."

2           You were asked those questions and gave those answers,

3    right?

4    A.  Yes.

5    Q.  Shortly after you returned to New York from the trip to

6    Europe at the end of January to February 1, 2014, Mr. Wey flew

7    to China, correct?

8    A.  Yes.

9    Q.  I would like to show you what's been marked as Exhibit BG.

10          MR. COLTON:  I believe BG is already in evidence, your

11   Honor.

12          THE COURT:  Yes.

13          MR. COLTON:  If we could pull up page 268, please.

14   Q.  At the bottom of the page, it's an e-mail from you on

15   February 15 to Mr. Wey, correct?

16   A.  Yes.

17   Q.  When you wrote this e-mail on February 15, you knew he was

18   traveling to China, correct?

19   A.  If I knew --

20          (Continued on next page)

21

22

23

24

25

1  Q.  When you wrote the e-mail on February 15, 2014 you knew he

2  was traveling to China?  And if you need to look at the e-mail

3  above that to refresh your recollection, of course go ahead and

4  do so.

5  A.  If I knew then he was going to travel?

6  Q.  I'll ask it a different way and I apologize for not being

7  clear.

8       Mr. Wey was traveling to Beijing on February 15 and

9  16, 2014, yes?

10  A.  Yes.

11  Q.  And on the 16th he told you he arrived in Beijing, right?

12  A.  Yes.

13  Q.  And in this e-mail exchange on the 15th and 16th it was

14  an e-mail exchange that you started, even though he was

15  traveling half a world away, correct?

16  A.  Yes.

17  Q.  Now you testified about the training that Mr. Baxter gave

18  you in mid-February.  Do you remember that?

19  A.  Yes.

20  Q.  Is it your position that being forced to go through

21  training with Mr. Baxter was some kind of punishment in

22  retaliation?

23  A.  I think it depends on the circumstances.

24  Q.  I'm sorry.  The door was opening and closing.  I didn't

25  hear you.

1   A.   I think it depends on the circumstances.

2   Q.   You did go through training with Mr. Baxter, correct?

3   A.   Yes.

4   Q.   And my question -- and strike that.

5        You spent four days learning about finance from

6   Mr. Baxter?

7   A.   Yes.

8   Q.   And I'm asking whether being asked to or ordered to sit

9   through four days of training, whether you -- strike that.

10       Do you believe that being asked to go through four

11  days of training was somehow a punishment for you?

12  A.   Depends on the circumstances.

13  Q.   What do you believe as you sit here today?

14  A.   I believe as the training if you just take the training

15  that is a great experience.

16       But the way he came at it and the way he put

17  expectations on me were unreachable.  So I think it depends.

18       MR. COLTON:  Now, if we go to the front page of

19  Exhibit BG in evidence, please.  Blow up the body.

20  Q.   This is an e-mail you wrote to Mr. Wey on February 18,

21  2014, right?

22  A.   Yes.

23  Q.   And you wrote to him that you were fully devoted to make

24  these training efforts in order to become an effective and

25  sophisticated financial product marketing executive, correct?

 1   A.  Yes.

 2   Q.  You understood it was important for you to learn about

 3   financial products, right?

 4   A.  Well depending on what I was going to do.  But, yes, it is

 5   important.

 6            MR. COLTON:  Take that down.

 7   Q.  On February 5, 2014 the term sheet, the formal term sheet

 8   for the acquisition of Nordica Life Insurance was signed,

 9   correct?

10   A.  Yes.

11   Q.  And that had a closing date of March 31, 2014, right?

12   A.  I'm not sure about the dates but --

13   Q.  If we could call up Exhibit BC.

14            MR. COLTON:  I'd like to call up BC in evidence, your

15   Honor.

16            THE COURT:  Go ahead.

17            MR. COLTON:  Specifically page 96.  Blow up the middle

18   where it says targeted closing date.

19   Q.  Does that refresh your recollection that the term sheet

20   provided a targeted closing date of March 21, 2014?

21   A.  Yes.

22   Q.  And that meant -- I'm sorry March 31, 2014.

23            That meant that as of that date the new owners would

24   be running or responsible for running Nordica Life Insurance,

25   right?

 1   A.  We had a different discussion with the owner.  That he

 2   actually was still going to continue as the CEO for I don't

 3   know how -- how long time we discussed but that he was going to

 4   work alongside with the new team and the owners.  So it would

 5   be a transition so we would not just take over abruptly.

 6   Q.  It would be fair to say that the New York Global Group

 7   associated management would have greater responsibility for

 8   actually operating the company after the deal closed targeted

 9   for March 31, 2014, right?

10   A.  I wouldn't know how they split the responsibilities since

11   it depends on how you work together.

12   Q.  Let me come at it a little bit of a different way.

13           There was talk of you potentially taking the position

14   of marketing director at Nordica Life Insurance, right?

15   A.  Some kind of marketing role, yes.

16   Q.  And that would have been a different role than what you

17   were doing before the term sheet was even signed, right?

18   A.  I don't know exactly what that role.

19   Q.  Let me try it another way.  You were working with Mr. Wey

20   and others in attempting to negotiate and come to deal terms in

21   order to be able to acquire Nordica Life, right?

22   A.  Yes.

23   Q.  But after the deal closed, if it closed, you would no --

24   you and New York Global Group would no longer be in the

25   position of attempting to be a purchaser but actually playing a

 1   role in managing and running the company?

 2   A.   Yes.

 3   Q.   And in a marketing position for a financial product, a

 4   financial services company, you'd agree with me it's important

 5   to understand the products that the company is offering, right?

 6   A.   Yes.

 7   Q.   I mean, to use a simple example, if you want to sell cars

 8   you have to understand the basic features of a car, right?

 9   A.   Yes.

10   Q.   So it was important if you were going to take some

11   marketing role that you understood the financial products that

12   Nordica Life Insurance was offering to its investors, right?

13   A.   Yes.

14   Q.   And that's what Mr. Baxter was working with you to

15   understand, correct?

16   A.   Yes.

17   Q.   Before undergoing the training with Mr. Baxter you did not

18   have any type of deep knowledge of these financial products,

19   right?

20   A.   No.

21   Q.   In fact, it's fair to say that in February 2014 when you

22   were doing the training with Mr. Baxter you didn't really

23   understand what it would mean to be a marketing executive at

24   Nordica Life Insurance, right?

25   A.   They didn't define it, if it was market -- what kind of

1   marketing it was.

2   Q.  It's fair to say that when you underwent the training with

3   Mr. Baxter you were coming from a very, very beginner level,

4   right?

5   A.  Yes.

6   Q.  And you didn't at that point know the difference between a

7   stock and a bond, correct?

8   A.  I wanted him to explain it more thoroughly so I could have

9   his American Wall Street language written down.

10  Q.  But you'd agree with me that the concept of a stock, or

11  equity, and a bond, or debt, are fairly basic to financial

12  products in general?

13  A.  Yes.

14  Q.  Now we saw earlier that you promised to be devoted to the

15  training with Mr. Baxter, correct?

16  A.  Yes.

17  Q.  But, in fact, Mr. Baxter assigned you to read a book that

18  you didn't bother to read, correct?

19  A.  He didn't assign me to read a book.  He suggested and

20  recommended I should read a book.

21  Q.  And you chose not to?

22  A.  I started to read the book.

23  Q.  You never finished it?

24  A.  No.

25  Q.  And it was called Selling The Invisible, correct?

1   A.  Yes.

2   Q.  Which is about selling services that you can't touch or

3   feel, correct?

4   A.  Yes.

5   Q.  Selling services would be important for selling services at

6   a financial services company, correct?

7   A.  Yes.  I've been working with sales before.

8           MR. COLTON:  Your Honor, I see it's 2:30 so I -- make

9   sure I get the Court's direction.

10          THE COURT:  All right, ladies and gentlemen, we'll

11  break for the evening.  As always, don't discuss the case with

12  anyone.  Don't read, listen to or look at anything about the

13  case.  Ask you to still keep an open mind because we have more

14  evidence.

15          Have a pleasant evening.  We'll resume at 9:30

16  tomorrow morning.

17          (Jury excused)

18          (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  You can step down, Ms. Bouveng.

3          (Witness excused)

4          THE COURT:  How much longer do you have, Mr. Colton?

5          MR. COLTON:  I guess about an hour, your Honor.  I'm

6    hoping to do it shorter and I will work on the outline to cut

7    things down.

8          THE COURT:  What are your expectations with respect to

9    redirect, Mr. Ratner?

10         MR. RATNER:  Very short, your Honor.

11         THE COURT:  What are your expectations, Mr. Ratner, as

12   to your remaining witnesses?

13         MR. RATNER:  I have Mr. Sundqvist, Mr. Chauvet,

14   Mr. Byrnes tomorrow.  And possibly Mr. Baxter.

15         THE COURT:  Well, I'd just like to say to the lawyers

16   that you have to start getting realistic about how we're going

17   to get this trial done within the time period that we told the

18   jury it would be finished in.  And the estimate which you told

19   me to give to the jury was seven to nine days, and we completed

20   our seventh day.  So, I'm concerned to hear that we still have

21   a number of witnesses coming up.  And, to state the obvious,

22   the longer the proof drags on, the greater the risk that we're

23   going to lose the jury and we'll have to do this all over

24   again.  So I hope you're being reasonable and realistic about

25   what can be accomplished within the remaining time because it

 1    certainly would be a shame to have gone this effort only to

 2    wind up with a mistrial.

 3              MR. RATNER:  Your Honor, I'm going to attempt to limit

 4    my direct examination to each of the remaining witnesses to a

 5    half-hour or less.  And the only exception may be with

 6    Mr. Sundqvist who is going to speak through an interpreter and

 7    that may lengthen it.

 8              THE COURT:  Mr. Colton, what's the defense case going

 9    to look like?  I assume you'll do your examination of

10    Mr. Baxter when he's on the stand through Mr. Ratner.  What

11    else do you expect?

12              MR. COLTON:  Your Honor is correct about Mr. Baxter.

13    We'll do it once to be more efficient.  We have had some

14    conversations with Mr. Ratner about taking some of the shorter

15    witnesses and simply stipulating to what they would say to --

16    that would obviously be a big timesaver, and we're working on

17    that.  I would suspect that we have no witnesses that would be

18    more than 30 minutes on direct.  Looking at Mr. Meyerhoff for

19    confirmation.

20              MR. MEYERHOFF:  That's correct.

21              MR. COLTON:  Which he confirms.

22              I have told Mr. Ratner yesterday to try to get close

23    to the 48-hour rule that we would expect Mrs. Wey as well as

24    Madelynn Salas and Daniel Spacher -- I'm not sure I'm saying

25    that right -- but all of those would not be lengthy witnesses.

1    I think they're only a half-hour or less.  And we'd have to

2    play the tape of Madeleine Eriksson.  But our portion that we

3    want to play is probably no more than 15 to 20 minutes.  And if

4    we could stipulate to other witnesses of either side to what

5    they would say because it's not controversial be more than

6    happy to do that to move this along.

7            THE COURT:  What is the Madeleine Eriksson tape?

8            MR. RATNER:  It's her deposition.

9            MR. MEYERHOFF:  It's the deposition you ruled on a

10   couple questions of your Honor.  She's the woman from Sweden.

11           THE COURT:  I remember who she is but I -- I wasn't

12   aware that we were going to play 25 minutes of her deposition.

13   This is a lady who, as I understand it, gave a tour of the

14   Parliament.  So I'm surprised she'd have 25 minutes of

15   meaningful relevant testimony to give.  She doesn't know these

16   people.  Saw them once.  Never saw them again.  So what -- I

17   mean 25 minutes of her deposition?

18           MR. COLTON:  Your Honor, I had said fifteen to twenty

19   but we can certainly look to even do less than that.

20           THE COURT:  I just don't -- given that this was the

21   one and only occasion she met these people and given that it

22   was a tour of Parliament, it's hard for me to see how that's

23   going to be useful.

24           Again, you've got to ask yourselves:  Is it worth it,

25   given where we are in the trial, seven days into the trial, is

1   it worth it?  And you've got to weigh that against the risks

2   that we're -- once we get to two weeks the trial is not over,

3   you may well start losing people.

4        MR. COLTON:  We understand the admonition.  We'll go

5   back and attempt to cut that and again work to eliminate the

6   necessity of witnesses or change live witnesses into

7   stipulations which I think saves a dramatic amount of time.

8        THE COURT:  I'm going to be getting papers from you at

9   5 on the defamation issue?

10        MR. RATNER:  Yes.

11        MR. MEYERHOFF:  Yes, your Honor.

12        THE COURT:  Any other legal issues we should talk

13   about before we break for the evening?

14        MR. COLTON:  The only question I have, your Honor, is

15   to the extent we will need either now or in the morning before

16   Mr. Sundqvist takes the stand as to a final decision on what,

17   if any, in limine instruction will be given the jury about what

18   they are being asked to potentially award for or not.

19        THE COURT:  Well, so far we've had two witnesses that

20   supposedly presented this issue.  Neither one actually

21   presented the issue.  So is it going to be an issue with

22   Mr. Sundqvist?

23        MR. RATNER:  I think the plaintiff has already

24   testified about how she felt about her father receiving these

25   communications from Mr. Wey.  So I think anything else might

 1    just be cumulative to that.  So the answer is no.

 2              THE COURT:  All right.

 3              MR. COLTON:  Issue solved.  We can deal with any

 4    charging conference issues at that time.

 5              THE COURT:  I'm sorry?

 6              MR. COLTON:  The issue is solved for the night.  We

 7    can deal with charging conference issues at that time.

 8              THE COURT:  All right.  So we'll resume at 9:30.  As

 9    always, if something emerges overnight let me know and we'll

10    meet at 9.

11              MR. RATNER:  Your Honor, is there an expectation about

12    when we'll have a charge conference?

13              THE COURT:  Hard to answer that when I don't know when

14    the proof is going to end.  I could tell you right after the

15    proof.

16              MR. RATNER:  Okay.

17              THE COURT:  That's about all I can tell you.

18              MR. RATNER:  Fair enough.  Okay.

19              (Adjourned to June 24, 2015 at 9:30 a.m.)

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                         Page

DANIEL ANTHONY LARSON

Direct By Mr. Colton . . . . . . . . . . . . . 948
Cross By Mr. Ratner  . . . . . . . . . . . . . 956
HANNA BOUVENG

Direct By Mr. Ratner . . . . . . . . . . . . . 958
Cross By Mr. Colton  . . . . . . . . . . . . .1027
PLAINTIFF EXHIBITS

Exhibit No.                                         Received

  20    . . . . . . . . . . . . . . . . . . . . 973

  30    . . . . . . . . . . . . . . . . . . . . 985

  39    . . . . . . . . . . . . . . . . . . . .1006

  46    . . . . . . . . . . . . . . . . . . . . 990

  53    . . . . . . . . . . . . . . . . . . . .1014

  130   . . . . . . . . . . . . . . . . . . . .1031

DEFENDANT EXHIBITS

Exhibit No.                                         Received

   BO   . . . . . . . . . . . . . . . . . . . .1059

   BP   . . . . . . . . . . . . . . . . . . . .1060

  AL    . . . . . . . . . . . . . . . . . . . .1080

  BS    . . . . . . . . . . . . . . . . . . . . 951

  CI    . . . . . . . . . . . . . . . . . . . . 955

  CM    . . . . . . . . . . . . . . . . . . . .1033

  N     . . . . . . . . . . . . . . . . . . . .1075

  R     . . . . . . . . . . . . . . . . . . . .1040

  SZ    . . . . . . . . . . . . . . . . . . . .1039